UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse  40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): _26-15_

Motion for: _Amended Motion_

Caption [use short title]

Set forth below precise, complete statement of relief sought:

_See enclosed_

Romano
v.
United States

MOVING PARTY: _Joseph Romano_   OPPOSING PARTY: _United States Ausa Stern + Muros-Bishoff_

[✓] Plaintiff   [ ] Defendant

[ ] Appellant/Petitioner   [ ] Appellee/Respondent

MOVING ATTORNEY: _Joseph Romano_   OPPOSING ATTORNEY: _Ausa Stern + Muros-Bishoff_

[name of attorney, with firm, address, phone number and e-mail]

_PO Box 8500_
_USP Max_
_Florence Co. 81226_

_271 Cadman Plaza East_
_Brooklyn, N.Y. 11201_

Court- Judge/ Agency appealed from: _____

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
[ ] Yes   [ ] No (explain): _____

Opposing counsel's position on motion:
[ ] Unopposed   [ ] Opposed   [✓] Don't Know
Does opposing counsel intend to file a response:
[ ] Yes   [ ] No   [✓] Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND INJUCTIONS PENDING APPEAL:

Has this request for relief been made below?   [ ] Yes   [ ] No
Has this relief been previously sought in this court?   [ ] Yes   [ ] No

Requested return date and explanation of emergency: _____

Is the oral argument on motion requested?   [ ] Yes   [✓] No (requests for oral argument will not necessarily be granted)

Has the appeal argument date been set?   [ ] Yes   [✓] No If yes, enter date: _____

Signature of Moving Attorney:

Date: _May 22, 2026_   Service: [ ] Electronic   [ ] Other [Attach proof of service]   _US Mail_

Form T-1080 (rev. 10-23)

Joseph Romano, Reg. No. 72247-053
USP Florence ADMAX, P.O. Box 8500, Florence, CO 81226

May 22, 2026

Clerk of Court
United States Court of Appeals for the Second Circuit
40 Foley Square, New York, New York 10007

**Re: Romano v. United States, No. 26-15**

Dear Clerk of Court:

I respectfully write as the Applicant in the above-captioned matter to transmit the signed amended motion for authorization to file a successive 28 U.S.C. § 2255 application, with all supporting exhibits, for filing and docketing in this proceeding.

On April 30, 2026, Circuit Judge Alison J. Nathan issued an order (DktEntry 33.1) granting my motion for a thirty-day extension of time and setting a deadline of May 30, 2026 for the amended motion. Because the Court denied the motions for spouse authorization and power of attorney, I understand that I must personally file the amended motion. I am doing so by depositing it through ADX Florence's institutional legal mail system on the date reflected in this letter and in the enclosed Declaration of Inmate Filing (FRAP Form 7). Under Fed. R. App. P. 25(a)(2)(A)(iii), the deposit date is the filing date.

I am subject to Special Administrative Measures at USP Florence ADMAX that restrict my outgoing nonlegal correspondence to three pages per calendar week, impose processing delays of up to sixty business days, and require FBI monitoring of every communication. I cannot independently assemble, print, or transmit an approximately 400-page evidentiary package within a thirty-day deadline. To enable my compliance with DktEntry 33.1, my wife Karen Romano assembled, printed, and mailed to me two complete pre-printed sets of the amended motion and all exhibits. Upon receipt, I reviewed the amended motion, confirmed that it is my filing prepared at my direction for my review and personal filing, signed both sets, and am depositing them into the institutional legal mail system on the date reflected in this letter. The amended motion is my filing. All positions and representations in it are mine.

Enclosed for filing are: the signed amended motion with all supporting exhibits (Exhibits A through X); the Declaration of Joseph Romano pursuant to 28 U.S.C. § 1746 (Exhibit T); the Declaration of Karen Romano pursuant to 28 U.S.C. § 1746 (Exhibit U); the DOJ-361 Certification of Identity; this cover letter; the Certificate of Service; and the Declaration of Inmate Filing (FRAP Form 7). A copy of the complete filing is being served on Respondent's counsel simultaneously through the institutional mail, as reflected in the enclosed Certificate of Service.

I also respectfully note that 28 U.S.C. § 2244(b)(3)(D) directs that the court of appeals "shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion." Because this is a gatekeeping authorization proceeding, no government response is required before the Court acts. I respectfully request that the Court docket this submission as the operative amended motion under DktEntry 33.1.

The Applicant respectfully advises the Court of a recent record development bearing on the concurrent-sentence issue discussed at pages 28–29 of the Amended Motion. On March 19, 2026, the Government filed its opposition to compassionate release in United States v. Romano, No. 2:09-cr-00170-EK (E.D.N.Y.), Doc. 798. At PageID 5518, the Government confirmed that the Applicant's 180-month fraud sentence has fully run and that he is incarcerated solely pursuant to the life sentences imposed in No. 1:12-cr-00691-DC (E.D.N.Y.), the conviction this application challenges. The Government's concurrent-sentence argument in Doc. 787, PageID 5094, depended on the conviction in No. 1:12-cr-00691-DC remaining intact. Doc. 798 confirms that relief from that conviction would directly affect the Applicant's present custody.

Respectfully submitted,

Joseph Romano, Applicant, Pro Se

**Certificate of Service:**
I certify under penalty of perjury that on _May 22_, 2026, I deposited a copy of this letter and all enclosures in the institutional mail at USP Florence ADMAX, addressed to Dylan Alexander Stern, AUSA, and Amanda Muros-Bishoff, AUSA, United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201.

Joseph Romano, Reg. No. 72247-053

**Federal Rules of Appellate Procedure Form 7. Declaration of Inmate Filing**

United States Court of Appeals for the Second Circuit
Court

Romano
    *Applicant,*
v.
United States of America,
    *Respondent.*

Case No. 26-15

I am an inmate confined in an institution. Today, May 22, 2026, I am depositing the Amended Motion for Authorization to File a Successive 28 U.S.C. § 2255 Application, with all supporting exhibits (Exhibits A through X), the Declaration of Joseph Romano (Exhibit T), the Declaration of Karen Romano (Exhibit U), the DOJ-361 Certification of Identity, and the Certificate of Service, in this case in the institution's internal mail system. First-class postage is being prepaid either by me or by the institution on my behalf.

I declare under penalty of perjury that the foregoing is true and correct (see 28 U.S.C. § 1746; 18 U.S.C. § 1621).

Sign your name here _____

Signed on May 22, 2026

*[Note to inmate filers: If your institution has a system designed for legal mail, you must use that system in order to receive the timing benefit of Fed. R. App. P. 4(c)(1) or Fed. R. App. P. 25(a)(2)(A)(iii).]*

# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

JOSEPH ROMANO,
*Applicant,*

v. Docket No. 26-15

UNITED STATES OF AMERICA,
*Respondent.*

## AMENDED MOTION FOR AUTHORIZATION TO FILE A SUCCESSIVE MOTION UNDER 28 U.S.C. § 2255(h)(1)

*(Submitted pursuant to the Court's Order dated February 26, 2026, DktEntry 15.1)*

## I. INTRODUCTION: THE § 2255(h)(1) PRIMA FACIE SHOWING

This amended motion is submitted pursuant to this Court's February 26, 2026 Order, DktEntry 15.1. It supersedes the Applicant's prior authorization submission and presents each claim, each item of newly discovered evidence, the diligence showing, and the prima facie prejudice showing separately, with exact record citations, as required by that Order.

This motion is about one evidentiary bridge. The trial court's Rule 29 decision identifies a single witness—Gerald Machacek—as the source of the only cited pre-contact predisposition evidence. Doc. 168 at 2, 6, PageID #: 1672, 1676, No. 1:12-cr-00691-DC (E.D.N.Y.), filed March 28, 2014. No other pre-contact evidence is cited. A later judicial finding, which did not exist at the time of trial, materially undermines that bridge. No court has evaluated the predisposition record in Doc. 168 in light of Doc. 579's judicial findings and the complete evidentiary package now before this Court. The question this motion presents is whether the newly discovered

1

evidence materially undermines the only cited pre-contact bridge and, if so, what remains of the predisposition showing.

Joseph Romano is the Applicant. He is currently held in solitary confinement at ADX Florence, the federal government's most restrictive facility, under Special Administrative Measures that have been in effect since June 2015 and renewed annually on the basis of the conviction this motion challenges. Exhibit R; Exhibit X. He is serving a life sentence imposed on April 14, 2014 by United States District Judge John F. Keenan, a visiting judge from the Southern District of New York, in United States v. Romano, No. 1:12-cr-00691-DC (E.D.N.Y.). That conviction rests on two counts of conspiracy to murder an employee of the United States, with life sentences imposed on each count running concurrently. The trial was prosecuted by AUSA Marshall L. Miller and AUSA Una A. Dean and lasted two weeks. This motion does not depend on proving the Applicant had no predisposition. It shows that the only cited pre-contact predisposition bridge was Machacek, and the later record materially undermines confidence in using Machacek as the pre-contact predisposition bridge.

Gerald Machacek's own attorney would later tell the sentencing court that his "record clearly indicate a man who was a career offender" whose criminal history was "a progression of crime that has, unfortunately, now escalated into federal court." Exhibit M, Certified Machacek Sentencing Tr. at 8:22–24, 9:10–11, No. 2:11-cr-00639-JFB (E.D.N.Y.) (June 30, 2014). He was a member of what the Government termed the "Timothy Glass Robbery Crew," an armed robbery ring that used firearms and operated across Queens, the Bronx, Nassau, and Suffolk counties. Exhibit M at 9:14–19; Doc. 99, No. 2:11-cr-00639-JFB (E.D.N.Y.), at 10, PageID #: 267. On January 4, 2012, he was arrested on federal charges of armed robbery conspiracy, money laundering conspiracy, and use of a firearm during a crime of violence, and detained without bail at the Nassau County Correctional Center. Doc.

57, No. 2:11-cr-00639-JFB (E.D.N.Y.), entered 01/10/2012; Doc. 59 (permanent order of detention). He faced a possible maximum sentence of life imprisonment on the firearms count and up to twenty years on the Hobbs Act robbery count. Trial Tr. 1388:1–13 (Jan. 16, 2014). He began cooperating with the Government within weeks of his arrest. His first proffer session occurred in January 2012. Trial Tr. 1386:7–12; Exhibit M at 9:15–17. By March 2012, the Government had drafted a cooperation agreement for him. Trial Tr. 1387:9–10. He did not sign it because of a dispute over a brandishing charge. Trial Tr. 1387:11–17. The formal cooperation agreement was not signed until October 19, 2012, after the wire operation that produced the evidence on which the conviction depends. Trial Tr. 1384:22–1385:1. In a January 13, 2014 defense letter, counsel stated that a March 2012 draft cooperation agreement was "the first time the Government has put the defense on notice that a cooperation agreement had been drafted for Machacek prior to the time when other discovery indicates Machacek first mentioned Romano (i.e., prior to August 2012)." No. 1:12-cr-00691-DC (E.D.N.Y.), Doc. 151, filed Jan. 13, 2014, at 1 (internal pagination). Defense counsel further stated that the earliest reference to Romano in Machacek's 3500 material was an August 8, 2012 proffer, and that the defense had received "absolutely no notes or reports" for the apparent February 9, 2012 proffer session or any other February or March 2012 session. Id. at 2 (internal pagination). At his sentencing, his own attorney described him as "maybe you can consider him the Babe Ruth of cooperators." Exhibit M at 13:3–9.

Joseph Romano was at the Nassau County Correctional Center on a bail violation arising from his advisory work for a friend's coin business. He is a United States Navy veteran with honorable service. Doc. 178, pp. 15–16, PageID #: 1791–1792; Exhibit W (DD-214); Doc. 178, p. 46, PageID #: 1822 (Romano: "I have never put my hands on another human being"). He is the father of three children who were eleven, ten, and seven years old when he was taken into federal custody on March

3

25, 2010. They have maintained a continuous relationship with him throughout nearly sixteen years of confinement, twelve of them under Special Administrative Measures. Exhibit U, 6; Exhibit R, pp. 10, 12–13. Romano had been charged with one count of conspiracy to commit mail fraud in United States v. Romano, No. 2:09-cr-00170-EK (E.D.N.Y.)—a non-violent, white-collar prosecution. No allegation of violence appeared anywhere in the case. His retained attorney, Charles Carnesi, had been hired to defend Romano at trial. To help meet Carnesi's fees, Romano advised his friend Dejvid Mirkovic on his coin and telemarketing business, and Mirkovic in turn helped pay Romano's legal fees directly to Carnesi. The Government would later turn Mirkovic into a cooperating witness in that same prosecution, United States v. Romano, No. 2:09-cr-00170-EK (E.D.N.Y.). Romano's advisory work for Mirkovic's company violated his bail conditions. Joseph Romano was taken into federal custody on March 25, 2010 and remained in custody thereafter; the formal bail-revocation and remand order was entered on May 26, 2010. Doc. 178, pp. 33–34, PageID #: 1809–1810. What Carnesi did not disclose to the court was the scope of those payments: $263,800 in total, including $228,800 in cash that Mirkovic withdrew and that Carnesi directed be delivered through Karen Romano. Carnesi demanded his fees be paid in cash and refused to provide any invoices. Affidavit of Dejvid Mirkovic, dated March 1, 2011, reproduced at Doc. 296, pp. 94–95, PageID #: 3420–3421, No. 1:12-cr-00691-DC (E.D.N.Y.).

On Carnesi's advice, Romano pleaded guilty on September 28, 2010, but sentencing was not imposed until October 19, 2012. That was a two-year delay driven by sequential counsel withdrawals arising from the conflict that had placed him there. United States v. Romano, No. 2:09-cr-00170-EK (E.D.N.Y.), Doc. 227 (Sept. 28, 2010 plea); Doc. 522 (Oct. 19, 2012 judgment). He had already been in federal custody for twenty-eight months before Machacek arrived. He litigated his fraud case pro se. Judge Bianco ordered additional library access so he could work

4

on his own case. Doc. 421, No. 2:09-cr-00170-EK (E.D.N.Y.), entered 03/06/2012. Six weeks before the July 26 meeting, the access was still being denied: Romano wrote to Judge Bianco to clarify the Government's update on his library access (Doc. 474, entered 06/18/2012), and Karen Romano separately wrote to chambers that day to report that Joe had not been allowed any library time since his last status hearing (Doc. 476, entered 06/18/2012). By July 2012, Romano remained in Nassau custody, was litigating law-library access under Judge Bianco's March 5, 2012 order, and first met Machacek there.

The conflict that placed Romano at Nassau County Correctional Center is not a closed question. It is currently before United States District Judge Eric R. Komitee, who on September 3, 2025, more than nine years after Romano filed his pro se challenge to the Carnesi conflict from ADX Florence (Doc. 659, No. 2:09-cr-00170-EK (E.D.N.Y.), filed 02/17/2016), ordered the Government to address whether that conflict infected the representation Romano received when he pleaded guilty. Doc. 784, PageID #: 4841, No. 2:09-cr-00170-EK (E.D.N.Y.). Doc. 659 was filed the same year Judge Bianco issued Doc. 579. Doc. 659 was filed before Judge Komitee in the fraud case; Doc. 579 was filed before Judge Bianco in the Velazquez case. Both were filed on separate dockets, in separate proceedings, before separate judges. Both documents have been in the public record since 2016. The Government responded to neither until compelled. The Government did not defend the representation. It argued that the court should not look at it at all—that "the Court should dismiss the Petition under the concurrent-sentence doctrine because the Petition will not reduce Romano's time in custody." Doc. 787, No. 2:09-cr-00170-EK (E.D.N.Y.), PageID #: 5094. The conviction on which the Government relies for that argument is the conviction in No. 1:12-cr-00691-DC (E.D.N.Y.), the conviction built on Machacek. The Government's concurrent-sentence argument in Doc. 787 depends on the conviction in No. 1:12-cr-00691-DC (E.D.N.Y.) remaining intact.

5

That conviction rests on the predisposition showing in which Machacek's pre-contact account is the only cited bridge. That proceeding remains pending, and that conviction began in the same place the conflict put him.

On July 26, 2012, Machacek—already operating under a draft cooperation framework—met Romano at the Nassau County Correctional Center law library. Trial Tr. at 1433 (Jan. 16, 2014). It was the first time they had ever spoken. Machacek confirmed this under oath: "I met Joe that day." Trial Tr. at 1423. Twelve days later, on August 7, 2012, Machacek wrote to his attorney identifying Romano as a target, while acknowledging he did not even know Romano's last name. Each page of the letter bears a fax header identifying the United States Attorney's Office for the Eastern District of New York as the transmitting source: "AUG-07-2012 09:36AM From: ID:USAO EDNY." Gov't Ex. 3500-GM-14 (Exhibit I). On August 8, 2012, the next day, he met with the United States Attorney's Office and was directed to wear a wire. Trial Tr. 1375. Two days after that, on August 10, 2012, Machacek wore a government wire to a second meeting with Romano. The case that produced this conviction was built through the one man Doc. 168 identifies as the only cited pre-contact bridge. Judge Keenan identified that July 26 meeting as the only pre-contact predisposition event in his Rule 29 analysis. Doc. 168 at 2, PageID #: 1672. Without that meeting, and without Machacek, the record cited in Doc. 168 supplies no pre-contact meeting, no wire operation, no introduction to the undercover, and no cited pre-contact basis for the predisposition element. Doc. 168 at 2–3, PageID #: 1672–1673.

On June 24, 2016, two and a half years after Romano's conviction, seven months after the Second Circuit affirmed on direct appeal, and thirty-nine days after the Supreme Court denied certiorari, United States District Judge Joseph F. Bianco issued Doc. 579 in United States v. Velazquez, et al., No. 2:11-cr-00639-JFB (E.D.N.Y.). Judge Bianco is the same judge who presided over Joseph Romano's

6

fraud case in No. 2:09-cr-00170-EK (E.D.N.Y.) and who is named as one of the intended victims in No. 1:12-cr-00691-DC (E.D.N.Y.). That is the structural reason why the Eastern District bench was recused and a visiting judge was brought in from the Southern District. Doc. 12, No. 1:12-cr-00691-DC (E.D.N.Y.), filed November 8, 2012. In Doc. 579, after adversarial evidentiary hearings spanning multiple days, Judge Bianco found that Machacek—"a cooperating witness for the government"—"failed to identify the defendant as someone he knew at all in three separate photo arrays." Doc. 579 at 4, PageID #: 3206. That finding did not exist at the time of Romano's trial, his sentencing, or his direct appeal. While Judge Bianco was conducting the evidentiary hearings that would produce Doc. 579's findings in the spring of 2016, Joseph Romano was at ADX Florence, writing by hand, under Special Administrative Measures, without counsel, the pro se motion he had filed on February 17, 2016 challenging Carnesi's conflict of interest in United States v. Romano, No. 2:09-cr-00170-EK (E.D.N.Y.), Doc. 659. He had no access to the Velazquez docket. His Jencks set, including the physical exhibit that connects Doc. 579 to his case, had been confiscated by court order on September 25, 2014. The Government has since acknowledged the connection. In its supplemental brief filed October 20, 2025 by AUSA Matthew Sullivan in the fraud case, No. 2:09-cr-00170-EK (E.D.N.Y.), the Government argued in footnote 4 that the Velazquez decision "was published over nine years ago" and "discussed Machacek's role as a government cooperator in a separate case that did not involve Romano." Doc. 787, PageID #: 5104.

Gerald Machacek died on March 20, 2021. Exhibit V. His pre-contact account of the July 26, 2012 meeting cannot be reconciled or explained by his live testimony at any future proceeding.

The controlling facts are as follows. **Fact 1. March 2012—The Cooperation Agreement.** By March 2012, Machacek was operating under a draft cooperation

7

agreement. He confirmed under oath that "as of March 2012" he had "been given a proposed cooperation agreement by the Government," and that when he "first met Joseph Romano in July of 2012," he had "already been offered certain terms for a cooperation agreement." Trial Tr. 1444:6–12 (Jan. 16, 2014).

**Fact 2. July 26, 2012—The Only Pre-Contact Event.** Four months after the draft agreement, Machacek met Romano at the Nassau County Correctional Center. Trial Tr. at 1433. It was the first time they had ever spoken. Trial Tr. at 1423. Judge Keenan identified that meeting as the predisposition event in his Rule 29 analysis. It is the only pre-contact event cited. Doc. 168 at 2, PageID #: 1672; at 6, PageID #: 1676.

**Fact 3. August 7, 2012—The Machacek Letter.** Three days before the wire, Machacek wrote to his attorney about Romano as a target, asking counsel to contact AUSA Burton T. Ryan, Jr.—the prosecutor who handled Machacek's cooperation in No. 2:11-cr-00639-JFB (E.D.N.Y.)—while acknowledging he did not know Romano's last name. Each page bears a fax footer: "AUG-07-2012 09:36AM From: ID:USAO EDNY." The Government cataloged and authenticated the letter as Jencks Act material: "12 CR 691 (JFK) / 3500-GM-14 / EXHIBIT / GOVERNMENT." Gov't Ex. 3500-GM-14 (Exhibit I).

**Fact 4. June 24, 2016—Doc. 579.** After Romano's trial, sentencing, direct appeal affirmance, and certiorari denial, Judge Bianco found that Machacek "failed to identify the defendant as someone he knew at all in three separate photo arrays." Doc. 579 at 4, PageID #: 3206. The photo-array failures were established at a hearing on April 7, 2014—after Romano's verdict. Doc. 579 at 35–36, PageID #: 3237–3238. Judge Bianco concluded the case rested on "underwhelming evidence" and granted a new trial. Doc. 579 at 34–35, PageID #: 3236–3237; at 40, PageID #: 3242. See Exhibits C—F.

**Fact 5. September 25, 2014—The Confiscation Order.** The protective order defined "Trial Discovery" as "[t]he material produced by the government to defense counsel pursuant to 18 U.S.C. § 3500 and United States v. Giglio." Exhibit N, Doc. 120, PageID #: 716. On September 15, 2014, AUSA Una A. Dean requested confiscation of "all documents covered by the terms of the protective order." Doc. 180 at 1, PageID #: 1848. The preserved family copy of Gov't Ex. 3500-GM-14 bears a September 12, 2014 postmark. Exhibit I-1. The confiscation order was entered September 25, 2014. Doc. 185 at 5, PageID #: 1879.

**Fact 6. The Reward—Machacek Sentenced by Judge Keenan.** Machacek received 42 months, which was 58 months below the bottom of the guidelines range of 100 to 125 months. Exhibit M at 4:9–11; 17:21–24. That sentencing was presided over by Judge Keenan, the same judge who denied the Rule 29 motion relying on Machacek's account. Doc. 336; Doc. 340, No. 2:11-cr-00639-JFB (E.D.N.Y.).

Doc. 168 identifies no pre-contact evidentiary source other than Machacek. Doc. 579 establishes that the cooperator on whom that account depends could not identify, in three separate photo arrays, a person he claimed to know. The jury was instructed that predisposition must be proved before any inducement. Exhibit J, Trial Tr. 1630:22–1633:25 (Jan. 23, 2014). The complete evidentiary package now before this Court has never been assembled or presented to any court. The prima facie showing under 28 U.S.C. § 2255(h)(1) is satisfied.

Sections II(a) through II(e) address, in order, the claim, each item of newly discovered evidence, why each item could not have been previously discovered and how it was discovered, why the newly discovered evidence would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the Applicant guilty of the offense, and the statutory basis for authorization.

9

## II. THE CLAIM

Claim 1 (28 U.S.C. § 2255(h)(1)): Newly discovered evidence materially undermines the only cited pre-contact bridge in the Rule 29 analysis in Doc. 168. The Applicant asserts one claim for authorization under § 2255(h)(1), supported by four evidence items listed below.

### (a) *Statement of the Claim*

Newly discovered judicial findings in Doc. 579, together with the newly discovered evidentiary significance of Government Exhibit 3500-GM-14, materially undermine the only cited pre-contact bridge in the Rule 29 analysis in Doc. 168— Gerald Machacek's testimony. Doc. 168 at 2, PageID #: 1672; at 6, PageID #: 1676; at 12, PageID #: 1682. Because Machacek supplied the only evidence described in the trial court's Rule 29 analysis of the Applicant's alleged intent before Government involvement began, and because Machacek's own pre-wire letter supports the inference that the cooperator's pre-wire account of the pre-contact meeting is inconsistent with neutral reporting, the newly discovered evidence materially undermines the evidentiary foundation for the predisposition element that the Government was required to prove beyond a reasonable doubt to defeat the Applicant's entrapment defense.

### (b) *Description of Each Piece of New Evidence*

**Evidence Item 1 (Machacek's Photo-Array Failures):** Judge Bianco found that Machacek—"a cooperating witness for the government"—"failed to identify the defendant as someone he knew at all in three separate photo arrays." Doc. 579 at 4, PageID #: 3206. The photo-array failures were established at an April 7, 2014

10

hearing, and the judicial finding was issued June 24, 2016. Doc. 579 at 35–36, PageID #: 3237–3238. Published at 197 F. Supp. 3d 481 (E.D.N.Y. 2016).

The nature of this evidence is qualitatively different from the evidence typically presented in applications under § 2255(h)(1). It is not an affidavit. It is not a witness recantation. It is not an investigative report or a jailhouse statement. It is a published judicial finding entered after full adversarial proceedings, including multiple days of evidentiary hearings, in camera review (Doc. 535, PageID #: 2867), post-hearing court questioning, a government response, and a bench ruling (Doc. 578, PageID #: 3202), before an Article III judge. Unlike an unsworn recantation, Doc. 579 is a later judicial finding entered after adversarial evidentiary proceedings that materially bears on the reliability of the same witness the Rule 29 decision cited as the pre-contact bridge. Neither the district court nor this Court need decide whether Machacek lied; a federal judge has already found that he could not identify people he claimed to know. The evidence is documentary, fixed, and unrebutted.

**Evidence Item 2 (Cooperating Witness Unreliability—Collapse of Claimed Familiarity):** Doc. 579 documents not a general credibility deficiency but the total collapse of claimed familiarity across six specific categories of joint criminal activity. Cooperating witness Timothy Glass told investigators Machacek had: (1) introduced Glass to the defendant; (2) been in the defendant's presence "many times" and "vouched for" him; (3) participated with the defendant in the charged New Jersey warehouse burglary; (4) driven with the defendant to commit the doctor's office robbery; (5) robbed the Glen Oaks Bar with Glass and the defendant; and (6) burglarized a construction company with Glass and the defendant. Doc. 579 at 35–36, PageID #: 3237–3238. Machacek still failed to identify the defendant at all in three separate photo arrays. Id. Detective Holmes—the Government's own lead case agent—testified that in over thirty years he had never seen a witness identify two people in the same photo array; Glass did exactly that.

Doc. 579 at 35–36, PageID #: 3237–3238; at 4, PageID #: 3206. Glass himself admitted that when he first cooperated with investigators in 2009, he "was pretty much making things up" and "totally lying." Doc. 579 at 35, PageID #: 3237. The witness who vouched for Machacek's claimed familiarity admitted fabricating that account.

Machacek also lied about himself under oath. At his plea allocution before Judge Bianco, he swore he was outside the doctor's office during the robbery: "I wasn't in there." "I was outside." "I was just a passenger in the car." Doc. 99 at Tr. 28:12–29:14, PageID #: 285–286; at Tr. 33:6–14, PageID #: 290. His own cooperating associate later testified he was inside. Doc. 579 at PageID #: 3218. A witness whose sworn plea allocution is contradicted by his own cooperating associate's later testimony is the only firsthand source Doc. 168 identifies for the July 26, 2012 pre-contact meeting.

**Evidence Item 3 (Cooperation Incentive—Corroborative Context Only):** The cooperation agreement contemplated a 5K1.1 motion permitting sentencing below any mandatory minimum. Doc. 99 at Tr. 25:17–26:2, PageID #: 282–283. Machacek confirmed under oath that "as of March 2012" he had "been given a proposed cooperation agreement by the Government," and that when he "first met Joseph Romano in July of 2012," he had "already been offered certain terms for a cooperation agreement." Trial Tr. 1444:6–12 (Jan. 16, 2014).

**Evidence Item 4 (The Machacek Letter—Newly Discovered Evidentiary Significance):** Government Exhibit 3500-GM-14 is a handwritten letter from Machacek to his attorney, transmitted by fax on August 7, 2012, through the USAO-EDNY (fax footer: "AUG-07-2012 09:36AM From: ID:USAO EDNY"). Exhibit I. Written three days before the August 10 wire recording, Machacek communicated with counsel concerning a target whose last name he did not yet know, asking

12

counsel to contact "MR RYAN & MR HOLMS [sic]"—AUSA Ryan being the prosecutor who handled Machacek's cooperation in the same docket.

The letter is not independently newly discovered. Its evidentiary significance is. That significance could not be demonstrated through independent judicial findings until Doc. 579 supplied those findings on June 24, 2016. Before Doc. 579, the letter was ambiguous witness communication. After Doc. 579 established that the same cooperator could not identify people he claimed to know from years of shared criminal activity, the letter, viewed in light of those judicial findings, supports the inference that Machacek's account of the pre-contact meeting is inconsistent with neutral reporting. The combination of the 2012 letter and the 2016 judicial findings constitutes the newly discovered evidence under § 2255(h)(1). The Government's control over this letter at every stage is relevant to why the evidentiary package could not have been assembled sooner.

*Pretrial:* The Government possessed the letter before trial, designated it as Jencks Act material (18 U.S.C. § 3500), and affixed its own evidence sticker in the top right corner of the first page. Gov't Ex. 3500-GM-14 (Exhibit I). Machacek § 3500 material had been produced under the protective order. Doc. 133, PageID #: 834 (Government representing it had already provided "disclosures that would be required if Machacek were to be called as a government witness, including disclosures under Giglio … and … Section 3500"); Doc. 180 at 1, PageID #: 1848 (Government describing confiscated material as "sensitive Trial Discovery produced to the defendant prior to trial"). The letter on its face shows a cooperator who did not know his target's last name, writing to his attorney about that target three days before the wire operation began, in a letter the Government's own fax machine transmitted.

*At trial:* The Government successfully moved to preclude the defense from cross-examining Machacek on his credibility as a declarant, though the court noted

13

the defense remained free to call Machacek as its own witness. Doc. 142, PageID #: 862, 865. The Government argued Machacek's statements on the August 10 recording were not offered for their truth but merely as context. Doc. 133, PageID #: 834. The letter remained within the protected § 3500/Giglio trial-discovery regime. The declarant-impeachment ruling meant the letter's significance to Machacek's reliability could not be developed before the jury through cross-examination of Government witnesses.

***Post-conviction:*** The Government moved to confiscate the Applicant's complete Jencks set, including this letter, by court order. Doc. 185 at 5, PageID #: 1879. The Government that possessed, authenticated, and then moved to confiscate this exhibit is not well positioned to argue that the Applicant should have used it to build this application sooner.

The SAM imposed June 1, 2015 (Exhibit R) explicitly recites the factual narrative of the charged plot against Judge Bianco and AUSA Gatz as the grounds for imposing solitary confinement at ADX Florence: three pages of correspondence per week, mail delays of up to sixty business days, and FBI monitoring of every family telephone call. Exhibit R, pp. 2–3, 10, 12–13. The letter Machacek wrote, kept within the protected trial-discovery regime and subject to the in limine ruling that precluded declarant impeachment, runs through the conviction that justifies every one of those restrictions.

### (c) *Why This Evidence Could Not Have Been Previously Discovered and How It Was Discovered*

The diligence showing rests on five facts, each documented in the record. The dated sequence makes the obstacles concrete:

March 25, 2010: Joseph Romano is taken into federal custody on a bail violation arising from his advisory work for his friend Mirkovic's coin company; the formal remand order is entered May 26, 2010. Doc. 178, pp. 33–34, PageID #: 1809–1810. He will remain at Nassau until his sentencing on October 19, 2012, more than two and a half years.

January 4, 2012: Gerald Machacek is arrested and detained at Nassau County Correctional Center. His first proffer session with the United States Attorney's Office occurs that same month. Trial Tr. 1441 (Jan. 16, 2014). From the moment Machacek arrives at Nassau, he is a cooperating witness in active dialogue with the Government, operating out of the same courthouse, before the same judge, through the same prosecutor's office that handled the Applicant's fraud case.

January 23, 2014: Guilty verdict in No. 1:12-cr-00691-DC (E.D.N.Y.). Doc. 168 at 1, PageID #: 1671.

September 11–25, 2014: The Government learned that the Applicant had transmitted trial discovery from the MDC to his wife Karen Romano. Doc. 180 at 1, PageID #: 1848. The preserved family copy of Gov't Ex. 3500-GM-14 bears an envelope postmark of September 12, 2014. Exhibit I-1. Karen Romano received that envelope. Approximately two to three days later, two individuals who identified themselves as FBI agents came to her home and asked whether she had received anything from the Applicant. Exhibit U, 4. On September 25, 2014, the court entered the confiscation order. Doc. 185 at 5, PageID #: 1879.

June 1, 2015: Special Administrative Measures imposed. Exhibit R, pp. 1–16. Since that date, the Applicant has been held in solitary confinement. He has had no contact visits, no unmonitored communication, no access to electronic legal research tools, and no ability to review court filings electronically. Three pages of correspondence per week. Mail delays up to sixty business days. FBI monitoring of every family telephone call. The measures have been renewed annually, each

renewal predicated on the conviction this motion challenges. SAMs Renewal dated September 10, 2025 (Exhibit X).

November 17, 2015: Second Circuit affirms on direct appeal. Doc. 579 does not yet exist. No judicial finding materially undermining Machacek's pre-contact account exists anywhere in the record.

June 24, 2016: Judge Bianco issues Doc. 579, the first independent judicial finding that materially undermined the observational foundation of the only cited pre-contact bridge. Doc. 579, PageID #: 3203–3242.

October 7, 2016: The Applicant files his first § 2255 motion. Doc. 210. This filing comes one hundred and five days after Doc. 579 issued. The complete evidentiary package now before this Court had not yet been assembled and could not be presented at that time.

July 13, 2022: Judge Komitee unseals related records in No. 2:09-cr-00170-EK (E.D.N.Y.), further reducing access barriers. Exhibit S.

January 2025—March 2026: Karen Romano conducts systematic cross-docket PACER review identifying the Doc. 579 / Doc. 168 connection; certified Machacek sentencing transcript requested February 14, 2026 and received March 2, 2026; evidentiary package assembled under SAMs communication restrictions. Exhibit U, ¶¶ 7–8, 11.

Each obstacle was either imposed by the Government (confiscation, protective order, SAMs predicated on this conviction) or embedded in the structure of the record (sealed docket, recused bench, cross-docket correlation barrier). The evidentiary package now before this Court could not have been assembled in usable form earlier.

First, the Machacek Letter existed before trial but was not legally meaningful as evidence bearing on pre-contact predisposition until Doc. 579 supplied the independent judicial basis through which its transformed significance could be

demonstrated, not merely argued. Doc. 579 issued June 24, 2016. The trial ended January 23, 2014. The direct appeal was affirmed November 17, 2015. Certiorari was denied May 16, 2016. See Exhibits C—F.

Second, by the time Doc. 579 issued, the Government had already confiscated the Applicant's complete Jencks set—including the physical exhibit that connects Doc. 579 to this case. On September 25, 2014, Judge Keenan entered a confiscation order directing the MDC to confiscate all Trial Discovery and return it to the USAO-EDNY. Doc. 185 at 5, PageID #: 1879. The Government's proposed order identifies Karen Romano by name as the recipient of Trial Discovery transmitted on or about September 11, 2014. Doc. 180-1, PageID #: 1850. Approximately two to three days after Karen Romano received the September 12, 2014 envelope (Exhibit I-1), two individuals who identified themselves as FBI agents came to her home and asked whether she had received anything from the Applicant. Exhibit U, 4.

Third, Special Administrative Measures imposed June 1, 2015 restricted the Applicant to three pieces of paper per calendar week to a single recipient, with mail review delays of up to sixty business days, and FBI monitoring of every family telephone call. Exhibit R, pp. 10, 12–13. The district court itself acknowledged that "the special administrative measures Romano is under makes it difficult to send information 'in an expedient manner.'" Exhibit S, Docket Text Order, No. 2:09-cr-00170-EK, entered 07/13/2022.

Fourth, cross-docket records relating to the Applicant's fraud case remained sealed and inaccessible until Judge Komitee ordered their unsealing on July 13, 2022. Doc. 333, No. 2:09-cr-00170-EK (E.D.N.Y.), unsealed 07/13/2022. The sealed transcript of that proceeding (Doc. 776, filed 07/20/2022, PageID #: 4725–4777 (Exhibit Q-1)), confirms that Romano raised the Carnesi conflict under oath before Magistrate Judge Tomlinson on June 23, 2011, three years before the murder

17

trial. The cross-docket correlation required to identify the Doc. 579 / Doc. 168 connection depended on records that were not available until that date.

Fifth, the Government cannot exploit delay it helped create. The Government possessed the letter, marked it as Jencks material, successfully moved to preclude impeachment of Machacek at trial (Doc. 142, PageID #: 862), then moved to confiscate the entire Jencks set after conviction (Doc. 185, PageID #: 1879). The confiscation physically disarmed the Applicant of the exhibit that would have made Doc. 579 actionable in this proceeding.

Assembling a legally sufficient packet required sequential acquisition of four components: (1) an authenticated copy of Gov't Ex. 3500-GM-14 with chain-of-custody provenance (Exhibit I / I-1), as set out in Exhibits T and T-1; (2) a certified Machacek sentencing transcript (Exhibit M), requested February 14, 2026 and received March 2, 2026; (3) correlation of records across two dockets through ECF filings impeded by sealed records not unsealed until July 13, 2022; and (4) legal coordination under SAMs communication restrictions limiting correspondence to three pages per week with delays up to sixty business days. Exhibit R, pp. 12–13; Exhibit U, ¶¶ 7–8.

The Applicant's filing history confirms diligence, not delay. He filed a first § 2255 motion on October 7, 2016 (Doc. 210), filed Doc. 296 on September 23, 2025, and wrote to Circuit Judge Chin on January 6, 2026. He has never stopped pursuing relief. Circuit Judge Chin, sitting by designation, transferred this matter to this Court in the interests of justice pursuant to 28 U.S.C. § 1631. Doc. 298, filed 01/05/2026, PageID #: 3479.

**(d)** *Why No Reasonable Factfinder Would Have Found the Applicant Guilty of the Offense*

The newly discovered evidence described above would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the Applicant guilty of the offense.

Doc. 168 identifies a single source for pre-contact predisposition: Machacek's account of the July 26, 2012 meeting. Doc. 168 at 2, PageID #: 1672. The August 7, 2012 letter shows that same cooperator, twelve days after first contact and three days before the wire, communicating with counsel about Romano as a target while acknowledging he did not know Romano's last name. Gov't Ex. 3500-GM-14 (Exhibit I). Doc. 579 establishes that this cooperator could not identify individuals he claimed to know from years of shared criminal activity in three separate photo arrays. Doc. 579 at 4, PageID #: 3206. The only cited pre-contact bridge is both unsupported by independent corroboration and materially undermined by later judicial findings. No alternative pre-contact evidentiary basis appears anywhere in Doc. 168.

The Government will likely cite the Second Circuit's direct appeal affirmance, which characterized "the evidence that Romano was … predisposed to commit the crime" as "overwhelming." Exhibit C at 6; Doc. 231 at 9, PageID #: 2340 (quoting Summary Order). That characterization does not resolve the present question. The direct appeal issued November 17, 2015. Doc. 579 issued June 24, 2016, seven months later. The Second Circuit reviewed the trial record without Doc. 579 in existence. The § 2255(h)(1) standard is structurally different from direct appeal sufficiency review. It does not ask whether the prior record was sufficient. It asks whether the newly discovered evidence, viewed in light of the evidence as a whole, the whole record now, with Doc. 579 in it, would be sufficient to establish by clear

19

and convincing evidence that no reasonable factfinder would have found the Applicant guilty of the offense.

The Government will further argue that Doc. 579 amounts to nothing more than impeachment evidence—that it merely shows Machacek told a lie in a different case. That framing misidentifies what Doc. 579 establishes. The Velazquez findings do not show that Machacek told a lie. They show that he was judicially found to be functionally incapable of accurately identifying people he claimed to know from shared criminal activity—not in one instance but in three separate photo arrays, across six specific categories of joint criminal activity. Doc. 579 at 35–36, PageID #: 3237–3238. That is not a credibility ruling. It is a judicial finding that the witness could not perform the foundational act on which the pre-contact bridge depends: identifying people he claimed to know. Once a court has found that Machacek could not reliably identify his own associates, his claimed account of a jailhouse conversation with a man he had just met, an unwitnessed, unrecorded conversation that no other evidence corroborates, rests on no foundation a reasonable factfinder could accept.

If Doc. 168 identifies Machacek as the only cited pre-contact bridge, and Doc. 579 later materially undermines Machacek in that bridge role, what is left?

**Step 1.** The jury was instructed that predisposition must be established before any government inducement. Exhibit J, Trial Tr. 1630:22–1633:25 (Jan. 23, 2014).

**Step 2.** The trial court's own Rule 29 analysis identifies a single source for the pre-contact period: Machacek's testimony regarding the July 2012 meeting. Doc. 168 at 2, PageID #: 1672; at 6, PageID #: 1676. Doc. 168 identifies no other cited pre-contact evidentiary bridge.

**Step 3.** Doc. 579 establishes that Machacek "failed to identify the defendant as someone he knew at all in three separate photo arrays." Doc. 579 at 4, PageID #: 3206. This is not a credibility ruling. It is a judicial finding that Machacek could not

20

identify people he claimed to know from years of shared criminal activity—the specific function on which the pre-contact bridge depends. A man who cannot identify his own criminal associates in three photo arrays is not a reliable narrator of an unrecorded encounter with a man he met once in a jail.

Doc. 579 was not an offhand observation from a collateral proceeding. It was the written culmination of adversarial evidentiary hearings spanning multiple days (March 31 and April 20–22, 2016), in camera review of unredacted submissions (Doc. 535, PageID #: 2867), post-hearing court questioning, a government response, and a bench ruling granting a new trial (Doc. 578, PageID #: 3202). The Government was present through AUSA Ryan—the prosecutor who handled Machacek's cooperation and who was named in the August 7, 2012 letter. Doc. 579 at 40, PageID #: 3242. On the strength of these findings, Judge Bianco concluded that the prosecution's case rested on "underwhelming evidence" and granted a new trial under Fed. R. Crim. P. 33. Doc. 579 at 34–35, PageID #: 3236–3237; at 40, PageID #: 3242. This was a developed judicial finding entered after full adversarial proceedings before an Article III judge—not a stray impeachment snippet.

**Step 4.** Nothing else in Doc. 168 fills the pre-contact slot. The only other witness in the predisposition analysis is Investigator Cox. Cox's testimony relates to the October 9, 2012 arrest and post-arrest interview, three months after government involvement began. Doc. 168 at 7, PageID #: 1677. Cox does not appear in the court's pre-contact narrative. He is not cited for the July 2012 meeting. Cox is October 9. The July meeting is pre-contact. Cox cannot replace Machacek as the pre-contact bridge.

Doc. 168 confirms this in one additional respect. The Government introduced Romano's post-arrest written statement, which the court identifies as admitting a conspiracy to murder the Judge and AUSA. Doc. 168 at 7, PageID #: 1677 (citing ECF No. 38-3). Cox "testified that Defendant agreed to and initialed each paragraph

21

of his statement, which does not mention Gerald Machacek." Id. The written statement the Government relied upon to prove the conspiracy does not contain Machacek's name. But the pre-contact meeting the Government relied on to establish the plot existed before Machacek's arrival is Machacek's account alone. Without Machacek, the record cited in Doc. 168 supplies no pre-contact meeting, no wire operation, no introduction to the undercover, and no cited pre-contact basis for the predisposition element. Doc. 168 at 2–3, PageID #: 1672–1673. He was not a bystander who reported a preexisting plot. He was the Government's instrument through whom every subsequent step of the operation was built. The trial court's in limine ruling acknowledged Machacek as the Government's "principal informant" while granting the Government's motion to preclude impeachment of his credibility: "that Machacek is the Government's 'principal informant' does not change the analysis." Doc. 142, PageID #: 864.

**Step 5.** Post-contact evidence cannot do the job. Under Jacobson v. United States, 503 U.S. 540, 549–50 (1992), the Government must demonstrate predisposition before, and independent of, its inducement. The remaining evidence Doc. 168 identifies falls into four categories, and each fails to reach the pre-contact period. Every category of evidence cited in Doc. 168 either originates with, is communicated through, or is interpreted via Machacek:

***August 10, 2012 wire recording:*** This was post-government-involvement by definition. The recording occurred after Machacek met with the USAO and agreed to wear a wire. Doc. 168 at 2, PageID #: 1672. Furthermore, the trial court relied on statements from that recording, regarding a "knife to the throat" and the Applicant's brother-in-law, characterizing them as "ostensibly Defendant's recollections of his earlier actions and ideations." Doc. 168 at 10–11, PageID #: 1680–1681. The court's word was "ostensibly," meaning apparent on its face, not proven. Those statements were made to Machacek while he was actively wearing a Government wire, three

days after the USAO transmitted the August 7 letter from its own fax machine. Once Doc. 579 establishes that Machacek's observational reliability cannot be trusted, those recorded statements, made to a cooperator whose observational reliability has been materially undermined, cannot carry the independent weight the trial court assigned them.

*Investigator Cox:* On redirect, the Government elicited from Cox that Romano had told investigators he "never acted upon offers from other inmates to kill people with the exception of Jerry Machacek." Trial Tr. 1378 (Jan. 16, 2014). The Government's own redirect confirmed the sole exception was the cooperator whose observational reliability Doc. 579 later materially undermined. Romano told Cox the plot was a "harebrained scheme" that he "only recently contemplated putting into action," and that "the only person he spoke to putting the plan of action" forward was Jerry, meaning Machacek. Trial Tr. 1369:1–13. Cox confirmed both statements on cross-examination. Id. Romano's own account of the plot's initiation ran through Machacek, reinforcing rather than displacing the centrality of the Machacek bridge. The Government cannot substitute the pre-contact bridge by pointing to Cox's testimony regarding a separate assault matter unrelated to the charged conspiracy and not the pre-contact bridge identified in Doc. 168. Under Jacobson, predisposition requires proof of readiness to commit the specific federal crime charged.

*"Ready compliance":* Doc. 168 found Romano's prompt response to Machacek's offer evidenced predisposition. Doc. 168 at 9–10, PageID #: 1679–1680. But the response was a response to Machacek. Machacek was the Government's instrument of inducement. A "ready response" to a cooperator whose reliability has been judicially undermined is not evidence of predisposition independent of that inducement. It is evidence of the inducement itself.

*Post-arrest statements:* Post-contact conduct and statements cannot supply the missing proof of predisposition before government involvement. Under

Jacobson, predisposition must exist before and independent of government inducement.

**Step 6.** No reasonable factfinder could convict. When each category fails to reach the pre-contact period, materially undermining Machacek's account eliminates the only cited path to proving predisposition before government involvement. Because the Government bears the burden to disprove entrapment beyond a reasonable doubt, materially undermining that bridge means no reasonable factfinder would have found the Applicant guilty of the offense.

The chain of logical necessity is as follows. Doc. 168 identifies Machacek's account of the July 26, 2012 meeting as the only cited pre-contact predisposition evidence. Doc. 168 at 2, PageID #: 1672. Under Jacobson v. United States, 503 U.S. 540, 549–50 (1992), predisposition must be proved before and independent of government inducement. Doc. 579 materially undermines the observational foundation of the only witness Doc. 168 identifies for that pre-contact period. Doc. 579 at 4, PageID #: 3206. No alternative pre-contact evidentiary basis appears anywhere in Doc. 168. Because the Government bears the burden of disproving entrapment beyond a reasonable doubt, and because the only cited pre-contact bridge has been materially undermined by a later judicial finding while no substitute bridge exists in the trial court's own analysis, the newly discovered evidence—if proven and viewed in light of the evidence as a whole—would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the Applicant guilty of the offense. 28 U.S.C. § 2255(h)(1).

The trial court drew the conditional explicitly: "If the jury credited the testimony of Machacek and Investigator Cox, as the Court assumes under Rule 29, then they properly concluded that Defendant had a 'preexisting' idea to kill the Judge and AUSA." Doc. 168 at 12, PageID #: 1682. The newly discovered evidence materially undermines the predicate. The conclusion cannot stand.

24

The jury was instructed that informer testimony "must be examined with greater scrutiny than the testimony of an ordinary witness." Trial Tr. at 1633 (Jan. 23, 2014) (Exhibit J). That instruction had no operative force at trial because Doc. 579 did not yet exist. The findings it contains are the record that would have given the court's own scrutiny instruction its meaning. The jury was told to look harder at Machacek. Doc. 579 is what they would have needed to see.

The Government will urge this Court to look past Judge Keenan's Rule 29 decision and search the full trial record for any independent evidence of pre-contact predisposition. That invitation should be declined, but it also cannot be avoided, and the record answers it directly. Judge Keenan sat through the entire trial. He was not summarizing selected evidence when he identified the pre-contact predisposition foundation. He was resolving a Rule 29 motion. His decision cites the trial transcript at pages 1345, 1427, and 1430–31 for the proposition that "Defendant had already planned to kill the Judge and AUSA before meeting Machacek." Doc. 168 at 12, PageID #: 1682. Pages 1427 and 1430–31 are Machacek's testimony. Page 1345 is Investigator Cox's direct examination regarding Romano's October 9, 2012 post-arrest statement—post-contact by three months—in which Romano's own description of the plot's origin ran through Machacek: "a Jerry from Nassau County Correctional Center" who "said he had somebody on the outside that could help commit acts of violence" and who "had arranged for him to meet the undercover." Trial Tr. 1345 (Jan. 16, 2014). Every citation in that passage is either Machacek's own testimony or a post-arrest account that itself routes through Machacek. If any other evidence in the trial record established Romano's predisposition before first government contact, the Government is required to identify the specific trial transcript page on which it appears. No such page exists.

Five record facts reinforce this showing:

First, Doc. 168 itself is the Applicant's map, not his invention. The trial judge who presided over the entire proceeding identified the pre-contact bridge. If any other evidence established Romano's predisposition before first government contact, the Government is required to identify the specific trial transcript page. The trial judge identified none.

Second, Doc. 142 let the Government use Machacek while limiting how the defense could attack him. The Government secured a ruling precluding impeachment of Machacek's credibility as a declarant before trial, though the court noted the defense could call Machacek as its own witness. Doc. 142, PageID #: 862, 865. The jury never evaluated Machacek's reliability with Doc. 579's findings, because the in limine ruling precluded that evaluation. Doc. 579 is the judicial record that would have powered it.

Third, Doc. 185 took the key material away after conviction. The confiscation order physically removed the Jencks set, including the Machacek Letter, from the Applicant. Doc. 185 at 5, PageID #: 1879.

Fourth, Doc. 787 uses the conviction in No. 1:12-cr-00691-DC (E.D.N.Y.) to avoid reaching the conflict merits in No. 2:09-cr-00170-EK (E.D.N.Y.). The Government's concurrent-sentence argument depends on the conviction in No. 1:12-cr-00691-DC remaining intact. That conviction rests on the predisposition showing in which Machacek's pre-contact account is the only cited bridge. Doc. 579 materially undermines that account. The Government's concurrent-sentence argument thus depends on the same conviction that Doc. 579 materially undermines.

Fifth, this Court is being asked to look at Doc. 168 and Doc. 579 together for the first time. That is not an accident of briefing. It is a structural consequence of how federal jurisdiction operated in this case. Judge Keenan, a visiting judge from the Southern District, was brought in to preside over No. 1:12-cr-00691-DC (E.D.N.Y.) after Chief Judge Carol Bagley Amon recused the entire Eastern District

bench under 28 U.S.C. § 455(a) because the conspiracy targets were an EDNY judge and an EDNY prosecutor. Doc. 12, filed 11/08/2012. Judge Keenan alone wrote Doc. 168, identifying Machacek as the only cited pre-contact bridge. Judge Bianco—the named victim who remained on both Machacek's case (No. 2:11-cr-00639-JFB) and the Velazquez docket—issued Doc. 579 two years after the Second Circuit affirmed Romano's conviction. These two judges operated on parallel tracks that the structure of federal jurisdiction in this case guaranteed would never converge. The prosecutors crossed the same lines the judges could not. AUSA Ryan handled Machacek's cooperation in the Velazquez case, was named in Machacek's August 7, 2012 letter identifying Romano as a target, and was present in the courtroom when Judge Bianco issued Doc. 579. AUSA Lara Gatz prosecuted the fraud case in which the Carnesi conflict arose and is named as one of the intended victims in the murder case that conflict produced. The judges were structurally separated. The prosecutors were not. The Applicant, held in solitary confinement under restrictions predicated on the conviction itself, had no access to the docket on which Doc. 579 was filed and no ability to conduct the cross-docket review that this motion required. The court that assessed predisposition never saw the later reliability findings. The court that made the reliability findings had no occasion to revisit predisposition. No prior court has evaluated the predisposition record in Doc. 168 in light of Doc. 579's judicial findings and the complete evidentiary package now before this Court—because no prior court had both documents before it. This Court is the first.

The Machacek Letter reinforces this showing. Gov't Ex. 3500-GM-14 (Exhibit I)—dated August 7, 2012—shows the same cooperator whose observational foundation has been materially undermined by Doc. 579 communicating with counsel concerning Romano as a potential target three days before the wire recording, while acknowledging he did not know Romano's last

27

name. That combination supports an inference inconsistent with neutral reporting. The jury's own deliberation record is consistent: during deliberations, the jury requested to replay the August 10 wire recording—not any testimony from the pre-contact period. Trial Tr. 1646:4–10; 1648:4–1649:13 (Exhibit K).

At this authorization stage, the Applicant need only make a prima facie showing. That showing is made here.

### (e) *Statutory Basis*

This application proceeds exclusively under 28 U.S.C. § 2255(h)(1), which authorizes a successive motion containing "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense."

The newly discovered evidence is the objective factual finding that Machacek failed to identify a target in three separate photo arrays (Doc. 579 at 4, PageID #: 3206), not the IAC legal framework on which the court in No. 2:11-cr-00639-JFB (E.D.N.Y.) granted relief. The evidence consists of judicial findings contained in ECF-filed court orders and certified transcripts, not affidavits or investigative reports. The evidence is documentary and does not depend on a recanting witness or future live testimony. The newly discovered evidence is already fixed in the record in documentary form.

No claim is asserted under § 2255(h)(2). The original application form indicated reliance on Glossip v. Oklahoma; Applicant clarified that Glossip is not relied upon. See Doc. 299, filed 01/15/2026, PageID #: 3480.

The Government has already supplied the cross-case bridge itself. In Doc. 787, filed October 20, 2025 by AUSA Matthew Sullivan in the fraud prosecution,

No. 2:09-cr-00170-EK (E.D.N.Y.), PageID #: 5094, the Government argued that Judge Komitee should decline to reach the merits of Applicant's § 2255 petition because Applicant is serving concurrent life sentences in No. 1:12-cr-00691-DC (E.D.N.Y.). In the same document, footnote 4, PageID #: 5104, the Government previewed its opposition to this application, arguing that Doc. 579 "was published over nine years ago" and "discussed Machacek's role as a government cooperator in a separate case that did not involve Romano." Both arguments—one about the fraud case conflict, the other about the murder case predisposition—appear in a single filing in the fraud case. The Government bridged the two cases. The dependency runs in both directions. The Government's concurrent-sentence argument depends on the conviction remaining intact. That conviction rests on the predisposition showing in which Machacek's pre-contact account is the only cited bridge. Doc. 579 materially undermines that account. The Government's "nine years ago" argument does not address the statutory question. The question under § 2255(h)(1) is not when Doc. 579 was publicly filed. It is when the complete evidentiary package could be discovered, assembled, authenticated, and presented in usable form. A published judicial opinion about a different defendant becomes actionable newly discovered evidence in this proceeding only when connected to the physical exhibit that links it to Romano's case—Government Exhibit 3500-GM-14, the August 7, 2012 letter bearing the USAO EDNY fax footer. That physical exhibit was confiscated from the Applicant by court order on September 25, 2014. Doc. 185 at 5, PageID #: 1879. The Government that moved to confiscate the Applicant's complete Jencks set in September 2014 is not well positioned to argue that he should have used that confiscated material to build this application sooner. The confiscation physically disarmed the Applicant from making the connection the Government claims he should have made earlier. Furthermore, the cross-docket correlation required to identify the Doc. 579 / Doc. 168 connection depended on records in the fraud case

29

that remained sealed until Judge Komitee's July 13, 2022 unsealing order. That showing is made in Section II(c).

The prior denial of Romano's first § 2255 motion does not foreclose this application. That motion was denied by Judge Keenan on August 20, 2018. Doc. 231, No. 1:12-cr-00691-DC (E.D.N.Y.), filed 08/20/2018. Judge Keenan is the same judge who presided at Romano's trial, wrote Doc. 168 identifying Machacek as the only cited pre-contact predisposition bridge, sentenced Romano to life on April 14, 2014, later presided over Machacek's sentencing on June 30, 2014, imposed 42 months, and stated on the record at that sentencing: "I believe he testified truthfully." Exhibit M at 16:23–24. Doc. 579 was issued June 24, 2016, two years before Judge Keenan denied the first § 2255 motion. But the complete evidentiary package now before this Court was not assembled or presented to him in that proceeding. He never evaluated Doc. 168 together with Doc. 579 in an adversarial proceeding with the authenticated Machacek Letter, the certified sentencing transcript, and the documented access-barrier chronology before him. That evaluation is now before this Court for the first time.

In Haouari v. United States, 510 F.3d 350, 353–54 (2d Cir. 2007), this Court denied authorization where the proffered "newly discovered evidence" was an unsworn, conclusory letter from a co-conspirator who recanted his trial testimony; the Court held that such unsworn recantations do not constitute "evidence" within the meaning of the statute. In Bell v. United States, 296 F.3d 127, 128–29 (2d Cir. 2002) (per curiam), this Court denied authorization without prejudice where the application lacked sufficient factual detail to determine whether the newly discovered misconduct was material to the conviction. This application presents what those applications did not. The newly discovered evidence here is not an unsworn recantation. It is a published judicial finding—Doc. 579, 197 F. Supp. 3d 481 (E.D.N.Y. 2016)—entered after adversarial evidentiary hearings spanning

multiple days, with the Government present through AUSA Burton T. Ryan, Jr., the same prosecutor who handled Machacek's cooperation and who is named in the August 7, 2012 letter. Doc. 579 at 40, PageID #: 3242. Unlike an unsworn recantation, it is a later judicial finding entered after adversarial evidentiary proceedings that materially bears on the reliability of the same witness the Rule 29 decision cited as the pre-contact bridge. And unlike the application in Bell, this application does not leave materiality to speculation: the trial court's own Rule 29 analysis identifies the undermined witness as the sole cited source of pre-contact predisposition evidence. Doc. 168 at 2, PageID #: 1672; at 6, PageID #: 1676; at 12, PageID #: 1682.

The Applicant's filing history confirms diligence, not delay. He filed a first § 2255 motion on October 7, 2016 (Doc. 210), later filed a second motion (Doc. 296, filed 09/23/2025), and wrote to Circuit Judge Chin on January 6, 2026. What the prior filings also confirm is that none of them presented this claim in this form, because none of them had access to the complete evidentiary package now before this Court. The gap between 2016 and 2025 is not silence. It is documented, continuous effort under documented, continuous constraints. Circuit Judge Chin, sitting by designation, reviewed the prior submission and transferred this matter to this Court in the interests of justice pursuant to 28 U.S.C. § 1631, finding that transfer rather than dismissal was warranted. Doc. 298, No. 1:12-cr-00691-DC (E.D.N.Y.), filed 01/05/2026, PageID #: 3479. Under Liriano v. United States, 95 F.3d 119, 123 (2d Cir. 1996), transfer in the interests of justice is the appropriate disposition when a successive motion warrants the appellate court's consideration.

This Court has held that a prima facie showing under § 2255 "is not a particularly high standard." Bell, 296 F.3d at 128. "An application need only show sufficient likelihood of satisfying the strict standards of § 2255 to 'warrant a fuller exploration by the district court.'" Id. (quoting Bennett v. United States, 119 F.3d

468, 469 (7th Cir. 1997)). This application exceeds that threshold. It presents a published judicial finding that materially undermines the only cited pre-contact predisposition bridge in the trial court's Rule 29 analysis, documented government-created access barriers that explain why the evidentiary package could not have been assembled sooner, and a trial record in which the court's own sufficiency analysis identifies no alternative pre-contact source. The question before this Court is not whether the Applicant will ultimately prevail on the merits. It is whether this application, supported by ECF-stamped judicial findings, certified transcripts, and authenticated exhibits—warrants fuller exploration by the district court. It does.

Applicant does not ask this Court to decide the ultimate merits. He asks only for authorization to present in district court a claim that rests on newly discovered evidence which, viewed with the evidence as a whole, shows by clear and convincing evidence that no reasonable factfinder would have found him guilty. This was not a preexisting murder case found by the Government. It was a cooperator-driven case built by the one man Doc. 168 used to supply the only cited pre-contact bridge. If that bridge is materially undermined, what is left? The record answers that question. No cited pre-contact bridge is left. The Applicant is serving two concurrent life sentences in solitary confinement at the federal government's most restrictive facility, under annually renewed Special Administrative Measures predicated on this conviction. The evidentiary foundation supporting that sentence reduces, under Doc. 168's own analysis, to the pre-contact account of a single cooperator who a federal judge later found could not identify his own associates in three separate photo arrays.

32

## III. TABLE OF EXHIBITS (TIERED)

### TIER 1—Core Authorization Evidence (Attached / Pinpoint-Located)

**Exhibit A—Doc. 168—Rule 29 Decision**
No. 1:12-cr-00691-DC (E.D.N.Y.), filed 03/28/2014; PageID #: 1671–1683.

**Exhibit B—Doc. 579—Velazquez New Trial Order**
No. 2:11-cr-00639-JFB (E.D.N.Y.), filed 06/24/2016; PageID #: 3203–3242.

**Exhibit V—Death Certificate of Gerald F. Machacek III**
Certificate No. 156-21-016612; NYSCEF Doc. No. 74, Aug. 4, 2021.

**Exhibit C—Doc. 94—Summary Order and Judgment**
United States v. Romano, No. 14-1588-cr (2d Cir.), filed 11/17/2015; ECF No. 1643614, Page 1 of 6.

**Exhibit D—Doc. 100—Order Denying Rehearing and Rehearing En Banc**
United States v. Romano, No. 14-1588-cr (2d Cir.), filed 01/11/2016; ECF No. 1681241, Page 1 of 1.

**Exhibit E—Doc. 101—Judgment Mandate**
United States v. Romano, No. 14-1588-cr (2d Cir.), issued 01/21/2016; ECF No. 1688177, Page 1 of 6.

**Exhibit F—Doc. 103—Supreme Court Notice of Certiorari Denial**
United States v. Romano, No. 14-1588-cr (2d Cir.), filed 05/18/2016; ECF No. 1774308, Page 1 of 1.

**Exhibit G—Doc. 31, Pages 4–5—Defense Withdrawal Motion**
United States v. Romano, No. 14-1588-cr (2d Cir.), filed 08/25/2014; ECF No. 1304201, Pages 4–5 of 11.

**Exhibit H-1—Doc. 133—Government Motion to Preclude Impeachment**
No. 1:12-cr-00691-DC (E.D.N.Y.), filed 01/03/2014; PageID #: 833–836.

**Exhibit H—Doc. 142—In Limine Ruling**
No. 1:12-cr-00691-DC (E.D.N.Y.), filed 01/08/2014; PageID #: 861–866.

**Exhibit I—Machacek Letter (Gov't Ex. 3500-GM-14), Aug. 7, 2012**
No. 1:12-cr-00691-DC (Jencks material); 5 pp.

**Exhibit I-1—Envelope (postmarked Sept. 12, 2014)**
1 p.

**Exhibit J—Jury Charge Excerpt—Entrapment Instruction**
No. 1:12-cr-00691-DC—Trial Tr. 1630:22–1633:25.

**Exhibit K—Trial Transcript Excerpt—Jury-Note Chronology**
No. 1:12-cr-00691-DC—Trial Tr. 1646:4–10; 1648:4–1649:13.

## <u>TIER 2—Corroborative Context / Impediment / Diligence (Supplemental)</u>

**Exhibit L—Doc. 99—Machacek Plea Transcript**
No. 2:11-cr-00639-JFB (E.D.N.Y.), filed 11/27/2012; PageID #: 282–283.

**Exhibit M—Machacek Sentencing Transcript (Certified)**
No. 2:11-cr-00639-JFB (E.D.N.Y.), June 30, 2014; pp. 1–22.

**Exhibit N—Doc. 120—Stipulation & Protective Order**
No. 1:12-cr-00691-DC (E.D.N.Y.), filed 12/18/2013; PageID #: 716.

**Exhibit O—Doc. 180 & Doc. 180-1—Government Confiscation Request and Proposed Order**
No. 1:12-cr-00691-DC (E.D.N.Y.), filed 09/15/2014; PageID #: 1848–1851.

**Exhibit P—Doc. 185—Confiscation Order**
No. 1:12-cr-00691-DC (E.D.N.Y.), filed 09/25/2014; PageID #: 1875–1879.

**Exhibit Q—Doc. 333—Sealed Minute Entry**
No. 2:09-cr-00170-EK (E.D.N.Y.), filed 06/23/2011; PageID #: 4635–4636.

**Exhibit Q-1—Doc. 776—Sealed Transcript (Unsealed 07/13/2022)**
No. 2:09-cr-00170-EK (E.D.N.Y.), filed 07/20/2022; PageID #: 4725–4777; 53 pp.

**Exhibit R—SAMs Documentation**
USP Florence ADMAX, effective June 1, 2015; pp. 1–16.

**Exhibit S—Docket Text Order—Judge Komitee (07/13/2022)**
No. 2:09-cr-00170-EK (E.D.N.Y.); docket report entry.

**Exhibit T—Declaration of Joseph Romano (28 U.S.C. § 1746)**
No. 26-15 (2d Cir.). Establishes chain of custody for Exhibit I / I-1; documents SAMs conditions and access barriers; and confirms DktEntry 33.1 compliance and filing authorization.

**Exhibit U—Declaration of Karen Romano (28 U.S.C. § 1746)**
No. 26-15 (2d Cir.).

**Exhibit W—DD-214 (Certificate of Release or Discharge from Active Duty)—Joseph Romano**
United States Navy. See Doc. 178, p. 16, PageID #: 1792.

**Exhibit X—SAMs Renewal—Notification of Modification of Special Administrative Measures**
U.S. Department of Justice, Federal Bureau of Prisons, dated September 10, 2025; 2 pp.

34

## IV. CONCLUSION

For the foregoing reasons, Applicant respectfully requests that this Court certify under 28 U.S.C. § 2244(b)(3)(C) that this successive motion makes a prima facie showing satisfying § 2255(h)(1), and authorize its filing in the United States District Court for the Eastern District of New York.

Respectfully submitted,

May 22, 2026

Joseph Romano, Reg. No. 72247-053
USP Florence ADMAX
P.O. Box 8500
Florence, CO 81226

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

JOSEPH ROMANO,
 *Applicant,*

v.

UNITED STATES OF AMERICA,
 *Respondent.*

Docket No. 26-15

---

## EXHIBIT LIST
*(Filed with Amended Motion for Authorization Under 28 U.S.C. § 2255(h)(1))*

## TIER 1 — CORE AUTHORIZATION EVIDENCE

*(Attached / Pinpoint-Located)*

**Exhibit A** Doc. 168 — Rule 29 Decision (Opinion & Order Denying Motion for Judgment of Acquittal). No. 1:12-cr-00691-DC (E.D.N.Y.), filed 03/28/2014; PageID #: 1671–1683. 13 pp.

**Exhibit B** Doc. 579 — Memorandum and Order Granting New Trial (Velazquez). No. 2:11-cr-00639-JFB (E.D.N.Y.), filed 06/24/2016; PageID #: 3203–3242. Published at 197 F. Supp. 3d 481 (E.D.N.Y. 2016). 40 pp.

**Exhibit V** Death Certificate of Gerald F. Machacek III. Certificate No. 156-21-016612; NYSCEF Doc. No. 74, Aug. 4, 2021. 1 p.

**Exhibit C** Doc. 94 — Summary Order and Judgment (Direct Appeal Affirmance). United States v. Romano, No. 14-1588-cr (2d Cir.), filed 11/17/2015; ECF No. 1643614, Page 1 of 6. 6 pp.

**Exhibit D** Doc. 100 — Order Denying Rehearing and Rehearing En Banc. United States v. Romano, No. 14-1588-cr (2d Cir.), filed 01/11/2016; ECF No. 1681241, Page 1 of 1. 1 p.

**Exhibit E** Doc. 101 — Judgment Mandate. United States v. Romano, No. 14-1588-cr (2d Cir.), issued 01/21/2016; ECF No. 1688177, Page 1 of 6. 6 pp.

**Exhibit F** Doc. 103 — Supreme Court Notice of Certiorari Denial. United States v. Romano, No. 14-1588-cr (2d Cir.), filed 05/18/2016; ECF No. 1774308, Page 1 of 1. 1 p.

**Exhibit G** Doc. 31, Pages 4–5 — Defense Withdrawal Motion (Excerpt). United States v. Romano, No. 14-1588-cr (2d Cir.), filed 08/25/2014; ECF No. 1304201, Pages 4–5 of 11. 2 pp.

**Exhibit H-1** Doc. 133 — Government Motion to Preclude Impeachment of Machacek. No. 1:12-cr-00691-DC (E.D.N.Y.), filed 01/03/2014; PageID #: 833–836. 4 pp.

**Exhibit H** Doc. 142 — In Limine Ruling (Preclusion of Machacek Impeachment). No. 1:12-cr-00691-DC (E.D.N.Y.), filed 01/08/2014; PageID #: 861–866. 6 pp.

**Exhibit I** Machacek Letter (Gov't Ex. 3500-GM-14), Aug. 7, 2012. No. 1:12-cr-00691-DC (Jencks material); fax footer: "AUG-07-2012 09:36AM From: ID:USAO EDNY." 5 pp.

**Exhibit I-1** Envelope (Postmarked Sept. 12, 2014). Chain-of-custody provenance for Exhibit I. See Exhibit T. 1 p.

**Exhibit J** Jury Charge Excerpt — Entrapment Instruction. No. 1:12-cr-00691-DC — Trial Tr. 1630:22–1633:25 (Jan. 23, 2014). 4 pp.

**Exhibit K** Trial Transcript Excerpt — Jury-Note Chronology (Request to Replay Wire Recording). No. 1:12-cr-00691-DC — Trial Tr. 1646:4–10; 1648:4–1649:13 (Jan. 23, 2014). 3 pp.

## TIER 2 — CORROBORATIVE CONTEXT / IMPEDIMENT / DILIGENCE
*(Supplemental)*

**Exhibit L** Doc. 99 — Machacek Plea Transcript. No. 2:11-cr-00639-JFB (E.D.N.Y.), filed 11/27/2012; PageID #: 257–296. 40 pp.

**Exhibit M** Machacek Sentencing Transcript (Certified). No. 2:11-cr-00639-JFB (E.D.N.Y.), June 30, 2014. Court Reporter: Anthony D. Frisolone. Requested 02/14/2026; received 03/02/2026. 22 pp.

**Exhibit N** Doc. 120 — Stipulation & Protective Order. No. 1:12-cr-00691-DC (E.D.N.Y.), filed 12/18/2013; PageID #: 716–719. 4 pp.

**Exhibit O** Doc. 180 & Doc. 180-1 — Government Confiscation Request and Proposed Order. No. 1:12-cr-00691-DC (E.D.N.Y.), filed 09/15/2014; PageID #: 1848–1851. 4 pp.

**Exhibit P** Doc. 185 — Confiscation Order. No. 1:12-cr-00691-DC (E.D.N.Y.), filed 09/25/2014; PageID #: 1875–1879. 5 pp.

**Exhibit Q** Doc. 333 — Sealed Minute Entry (Curcio Hearing, 06/23/2011). No. 2:09-cr-00170-EK (E.D.N.Y.), filed 06/23/2011; PageID #: 4635–4636. Unsealed 07/13/2022. 2 pp.

**Exhibit Q-1** Doc. 776 — Sealed Transcript (Unsealed 07/13/2022). No. 2:09-cr-00170-EK (E.D.N.Y.), filed 07/20/2022; PageID #: 4725–4777. 53 pp.

**Exhibit R** Special Administrative Measures (SAMs) Documentation. USP Florence ADMAX, effective June 1, 2015. 16 pp.

**Exhibit S** Docket Text Order — Judge Komitee (Unsealing Order, 07/13/2022). No. 2:09-cr-00170-EK (E.D.N.Y.); docket report entry. 1 p.

**Exhibit T** Declaration of Joseph Romano (28 U.S.C. § 1746). No. 26-15 (2d Cir.). Establishes chain of custody for Exhibit I / I-1; documents SAMs conditions and access barriers; and confirms DktEntry 33.1 compliance and filing authorization. 3 pp.

**Exhibit U** Declaration of Karen Romano (28 U.S.C. § 1746). No. 26-15 (2d Cir.). Documents diligence, SAMs barriers, DktEntry 33.1 compliance steps, and chain of custody for Exhibit I / I-1. Executed May 1, 2026. 3 pp.

**Exhibit W** DD-214 (Certificate of Release or Discharge from Active Duty). United States Navy. Corroborates four years of honorable service. See Doc. 178, p. 16, PageID #: 1792. 1 p.

**Exhibit X** SAMs Renewal — Notification of Modification of Special Administrative Measures. U.S. Department of Justice, Federal Bureau of Prisons, dated September 10, 2025. 2 pp.

# EXHIBIT A

## Doc. 168 — Rule 29 Decision

No. 1:12-cr-00691-DC (E.D.N.Y.), filed 03/28/2014
PageID #: 1671–1683

Romano v. United States, No. 26-15 (2d Cir.)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
UNITED STATES OF AMERICA          :
                                  :
        -against-                 :        No. 12 Cr. 691 (JFK)
                                  :        **OPINION & ORDER**
JOSEPH ROMANO,                    :
                                  :
              Defendant.          :
----------------------------------X

APPEARANCES

FOR UNITED STATES OF AMERICA
Eric H. Holder, Jr.
  Attorney General of the United States
William J. Hochul, Jr.
  United States Attorney, Western District of New York
By:  Marshall L. Miller
     Una A. Dean

FOR DEFENDANT JOSEPH ROMANO
George R. Goltzer
Michael K. Bachrach

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Defendant Joseph Romano's motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  For the reasons that follow, the motion is denied.

## I.   Background

On January 23, 2014, a jury convicted Defendant of conspiring to kill a United States District Judge (the "Judge") and an Assistant United States Attorney (the "AUSA") in violation of Title 18, United States Code, Sections 1114 and

1117.   The Court presumes familiarity with this case, and recounts the facts and trial testimony only as necessary to decide the instant motion.

At trial, the Government offered evidence that Defendant made statements about killing the Judge and the AUSA to Gerald Machacek when they first met at the Nassau County Correctional Center ("NCCC") in July 2012.  To support his entrapment defense, Defendant called Machacek as a hostile witness. Machacek testified that at their first meeting, Defendant stated that he wanted the Judge killed because of the Judge's role in his earlier coin fraud prosecution. (Trial Tr. at 1427.) Machacek stated that he believed Defendant was serious and not merely "venting":  "There's a difference . . . .  When you get into the details of planning and details of people's lives.  He was speaking about intimate things about them.  He was a serious guy, serious.  This was well thought out." (Id. at 1431.)

Machacek wrote about the encounter to his attorney, and later met with the U.S. Attorney's Office. (Id. at 1432.)  At the Government's request, Machacek wore a wire to a second meeting with Defendant on August 10, 2012.  A video of this meeting was played for the jury at trial, and was replayed at the jury's request during jury deliberations.  During this conversation, Defendant stated that he swore to kill the Judge after his sentencing. (Gov. Ex. A at 34.)  He also discussed his

2

plans for the AUSA. (Id. at 24-25, 34-35, 40.)  It was during this conversation that Machacek offered to introduce Defendant to an "investigator" who could perform acts of violence. (Id. at 33-34, 37-41, 44-51.)  Defendant agreed to meet Machacek's man, and asked him to set up the meeting the following week. (Id. at 51.)

The "investigator" was actually Robert Strecker, an undercover detective with the Suffolk County Police Department. At Defendant's first meeting with Strecker, he "hired" Strecker to assault a Nicholas Pittas, who Defendant believed had stolen two of his cars. (Gov. Ex. C at 5-9.)  Defendant also told Strecker that he had "plenty of work" if the Pittas assault went well. (Id. at 18.)  A staged assault of Pittas was later photographed and shown to Defendant's alleged co-conspirator, Dejvid Mirkovic.  After this, Defendant directed Mirkovic to arrange with Strecker murders of the Judge and AUSA. (Gov. Ex. F.)

## II.   Discussion

### A.   Rule 29 Legal Standard

Rule 29 of the Federal Rules of Criminal Procedure states that a district court "on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Such a motion may be made after the jury has returned a guilty

3

verdict, see Fed. R. Crim. P. 29(c)(2), but the defendant "carries a heavy burden; he must show that when viewing the evidence in its totality, in a light most favorable to the government, and drawing all inferences in favor of the prosecution, no rational trier of fact could have found him guilty," United States v. Cromitie, No. 09 Cr. 558, 2011 WL 1842219, at *1 (S.D.N.Y. May 10, 2011), aff'd, 727 F.3d 194 (2d Cir. 2013). Under this standard, the court must credit every inference that the jury might have drawn in favor of the government, "recognizing that the government's evidence need not exclude every other possible hypothesis." United States v. Persico, 645 F.3d 85, 104 (2d Cir. 2011) (citations omitted). And "while the defendant's conviction cannot rest on speculation or conjecture, it may be based solely on reasonable inferences drawn from circumstantial evidence." United States v. Duncan, No. 02 Cr. 122, 2003 WL 21305469, at *2 (D. Conn. June 4, 2003) (Droney, J.) (citing United States v. Pinckney, 85 F.3d 4, 7 (2d Cir. 1996)). Ultimately, the court must uphold the conviction if "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" United States v. Payne, 591 F.3d 46, 60 (2d Cir. 2010) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

4

### B.    Analysis

Defendant argues that no reasonable jury could have rejected his entrapment defense.  This defense "'has two related elements:  government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in criminal conduct.'" Cromitie, 727 F.3d at 204 (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)).  The Court discusses each element in turn.

#### 1.    The Jury Was Entitled to Conclude that Defendant Failed to Meet His Burden of Proving Inducement

The first element of the entrapment defense is government inducement of the crime. See, e.g., United States v. Bala, 236 F.3d 87, 94 (2d Cir. 2000).  Inducement occurs where the government "sees fit to set the accused in motion," and includes "soliciting, proposing, initiating, broaching or suggesting the commission of the offence charged." United States v. Sherman, 200 F.2d 880, 883 (2d Cir. 1953) (Hand, J.).  The burden is on the defendant to establish government inducement by a preponderance of the evidence. See United States v. Brand, 467 F.3d 179, 189 (2d Cir. 2006) (citing United States v. Williams, 23 F.3d 629, 635 (2d Cir. 1994).  The Second Circuit has characterized this burden as "relatively slight," but not "hollow." Id. at 190.

In the instant case, the defense appears to take its burden to show inducement for granted. See Def. Br. at 2 (conclusory statement that "Romano was induced into the conspiracies by the Government's cooperating informant, Gerald Machacek"). The Second Circuit has cautioned, however, that a defendant does not meet his burden by "simply point[ing] to the government's use of an undercover agent or confidential informant." Brand, 467 F.3d at 190. Here, the evidence was more than sufficient for the jury to conclude that Defendant had failed to establish inducement by a preponderance of the evidence. As described earlier, the jury heard from Machacek that Defendant had talked about his plans for revenge at their first meeting in July 2012, before any Government involvement. Machacek testified that he believed Defendant was serious about these plans, and was not boasting or venting. (Trial Tr. at 1431.) The jury was entitled to credit this testimony, and it was not irrational for them to do so. See Duncan, 2003 WL 21305469, at *4 (the jury was "free to accept" cooperator's testimony that defendant initiated the criminal act prior to the cooperator "becoming an 'agent' of the government"); see also United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008) (noting that "the government's evidence need not exclude every other possible hypothesis").

Additionally, the jury twice watched the recording of the second meeting between Defendant and Machacek, which occurred on

6

August 10, 2012.  During that meeting, Defendant made several statements about his plans for the Judge and the AUSA. (Gov. Ex. A at 24-25, 34-35, 40.)  After reviewing this recording, the jury could have reasonably concluded that it was Defendant, and no one else, who "initiated the crime" of conspiracy. United States v. Mayo, 705 F.2d 62, 67 (2d Cir. 1983); see Payne, 591 F.3d at 60 (the court "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses").

Finally, the jury heard testimony from James Randolph Cox, an investigator with the U.S. Attorney's Office.  Cox participated in Defendant's arrest on the instant charges, which occurred on October 9, 2012, and in the interview of Defendant that day.  Cox testified that Defendant had stated that the conspiracy to kill the Judge and AUSA "was his idea". (Trial Tr. at 1345-46.)  He also testified regarding Defendant's written statement, which was admitted into evidence and published to the jury.  That statement reads, in part:  "I and at least one other, including but not limited to Dejvid Mirkovic, conspired to murder Federal District Court Judge Joseph Bianco and Assistant United States Attorney Lara Gatz." (ECF No. 38-3.) Cox testified that Defendant agreed to and initialed each paragraph of his statement, which does not mention Gerald Machacek. (Trial Tr. at 1350-51.)  The jury was entitled to

7

credit this testimony as well. See Eppolito, 543 F.3d at 45-46 ("The ultimate question is not whether we believe the evidence adduced at trial established the pertinent fact, but whether any rational trier of fact could so find." (alterations and emphases omitted)).

In sum, Defendant has failed to show that no rational jury could have rejected the first element of his entrapment defense, inducement.  Crediting "every inference that the jury might have drawn in favor of the government," Eppolito, 543 F.3d at 45, as the Court must under Rule 29, the Court concludes that ample evidence existed from which the jury could have reasonably determined that Defendant initiated the charged conspiracy, see Sherman, 200 F.2d at 883.  Defendant's motion is denied.

### 2.    The Jury Was Entitled to Conclude that Defendant Was Predisposed to Commit the Charged Conspiracies

If a defendant meets his preponderance burden of presenting credible evidence of inducement by a government agent, the burden shifts to the government to prove, beyond a reasonable doubt, that the defendant was predisposed to commit the charged offense. Brand, 467 F.3d at 189; Duncan, 2003 WL 21305469, at *3.  The predisposition inquiry "'focuses upon whether the defendant was an unwary innocent or, instead, an unwary criminal who readily availed himself of the opportunity to perpetrate the crime.'" Cromitie, 727 F.3d at 204 (quoting Mathews, 485 U.S. at

8

63).   To prove disposition, the government may show evidence of "(1) an existing course of criminal conduct [by the accused] similar to the crime for which he is charged, (2) an already formed design on the part of the accused to commit the crime for which he is charged, or (3) a willingness to commit the crime for which he is charged as evidenced by the accused's ready response to the inducement." Brand, 467 F.3d at 191; see United States v. Al-Moayad, 545 F.3d 139, 154 (2d Cir. 2008). Ultimately, predisposition "does not require specific prior contemplation of criminal conduct by the defendant." Cromitie, 2011 WL 1842219, at *3.   He need only be "of a frame of mind such that once his attention is called to the criminal opportunity, his decision to commit the crime is the product of his own preference and not the product of government persuasion." United States v. Williams, 705 F.2d 603, 618 (2d Cir. 1983).

As noted earlier, the jury would have been well within bounds to reject the entrapment defense on the first element, inducement.   But even if the jury proceeded to the second step, it could have found disposition on several grounds in the record.   Most obviously, when Machacek and Strecker indicated that they could be of assistance in a plot to kill the Judge and AUSA, Defendant's response was indisputably "ready" and "prompt." See Cromitie, 727 F.3d at 206 ("'Ready compliance' is

9

usually indicated by the promptness of a defendant's agreement to commit an offense."). This is not a case where government agents repeatedly cajoled or pressured the defendant into participating in a criminal act. See Jacobson v. United States, 503 U.S. 540, 550 (1992) (reversing conviction where Government spent over two years exploring defendant's willingness to break the law, but reaffirming that had the defendant "promptly availed himself of this criminal opportunity, it is unlikely that his entrapment defense would have warranted a jury instruction"). Here, the jury was entitled to conclude that Defendant's enthusiasm evinced predisposition. See Cromitie, 727 F.3d at 205 n.5 ("[W]e rely on the jury, as the conscience of the community, to convict those it believes, based on all the evidence, would (or at least are likely to) commit the crime if solicited by someone other than a government agent and acquit those it believes would not (or at least are not likely to) commit the crime if so solicited."); Brand, 467 F.3d at 191-95.

Alternatively, the jury could properly have decided that Defendant was predisposed to commit the charged crimes because of his prior conduct. Defendant correctly points out that "predisposition to harm is not predisposition to kill," at least not necessarily. (Def. Br. at 1; see id. at 3-4.) However, the jury heard evidence that Defendant convinced his co-defendant in the coin fraud case not to cooperate with the Government by

10

holding a knife to the co-defendant's throat and threatening to cut his head "clean off." (Gov. Ex. A at 43; Trial Tr. at 689-97.)  On the same recording, Defendant also stated:  "I was going to kill him [Defendant's brother-in-law] too.  I told my mother I was going to kill him and she was like "No, no — he didn't, he didn't cooperate then." (Gov. Ex. A at 44.)  These statements, although made to the Government's informant, were ostensibly Defendant's recollections of his earlier actions and ideations. See Cromitie, 727 F.3d at 208-09 & n.12 ("Of course, what a defendant says after contacted by agents is generally admissible to prove predisposition because, although some post-contact conduct might be the product of inducement, it will be a rare situation where a defendant can plausibly claim that the inducement caused him to say something that evidenced predisposition."). See generally Jacobson, 503 U.S. at 550 (conduct of a defendant after contact by Government agents may be offered to prove predisposition if the conduct was "independent and not the product of the attention that the Government had directed at" the defendant).  Although various inferences can be drawn from these statements, the jury would have been within the bounds of reason to conclude that Defendant was serious, and that his statements about harming and killing certain people involved in his coin fraud case demonstrated his predisposition to conspire to kill other people involved in that

11

case — namely, the Judge and AUSA. See Eppolito, 543 F.3d at 45 ("As it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence, when there are such competing inferences, we must defer to the jury's choice." (citations and internal quotation marks omitted)).

Finally, the Government asserts that the remaining avenue of proving predisposition — "an already formed design on the part of the accused to commit the crime" — was satisfied at trial through testimony that Defendant had already planned to kill the Judge and AUSA before meeting Machacek. (Trial Tr. at 1345, 1427, 1430-31.)   The Second Circuit has recently considered precisely what constitutes "design" for the purpose of proving predisposition. See Cromitie, 727 F.3d at 206-08. The majority of that panel concluded that a defendant has the requisite design if he is

> "prepared" in the sense of being ready to commit the offense once the opportunity is presented.   If the accused has a "preexisting purpose" to commit offenses such as, or similar to, the charged offenses, then he has the requisite preparedness.   That is enough to have the requisite "design."

Id. at 207.   Under this standard, the Court agrees with the Government that the jury was entitled to determine that the evidence established Defendant's design.   If the jury credited the testimony of Machacek and Investigator Cox, as the Court assumes under Rule 29, then they properly concluded that

12

Defendant had a "preexisting" idea to kill the Judge and AUSA, and was "ready and willing" to do so. See, e.g., Al-Moayad, 545 F.3d at 154 ("A defendant is predisposed to commit a crime if he is ready and willing without persuasion to commit the crime charged and awaiting any propitious opportunity to do so." (citations and internal quotation marks omitted)).

In any of the above ways, or indeed in some other, the jury may rationally have decided that the Government met its burden of proving Defendant's predisposition to commit the charged conspiracies beyond a reasonable doubt. The Court may not disturb that judgment. Accordingly, Defendant's failure as to this element of the entrapment defense provides an alternative basis for denying the motion.

### III. Conclusion

For the reasons stated above, Defendant's Rule 29 motion is denied. Sentencing will proceed on April 2, 2014 at 10:30 A.M. as scheduled.

**SO ORDERED.**

Dated:     New York, New York
           March 27 , 2014                 s/John F. Keenan

                                           John F. Keenan
                                           United States District Judge

13

# EXHIBIT B

**Doc. 579 — Velazquez New Trial Order**

No. 2:11-cr-00639-JFB (E.D.N.Y.), filed 06/24/2016
PageID #: 3203–3242

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

Nº 11-CR-639 (JFB)

UNITED STATES OF AMERICA,

VERSUS

ADAM VELAZQUEZ,

Defendant.

**FILED**
U.S. IN CLERK'S OFFICE
DISTRICT COURT E.D.N.Y.
★ JUN 24 2016 ★
LONG ISLAND OFFICE

## MEMORANDUM AND ORDER
June 24, 2016

JOSEPH F. BIANCO, District Judge:

On May 1, 2014, a jury convicted defendant Adam Velazquez ("Velazquez" or "defendant") of five crimes related to defendant's participation in a conspiracy to rob drug traffickers and business owners in New York City and Long Island.[1] Velazquez now moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Velazquez asserts, among other things, that he should be granted a new trial based on the ineffective assistance of his trial counsel. Velazquez asserts that his trial counsel made numerous errors, including failing to investigate alibi evidence in the form of cell phone, work, and school records, and failing to introduce evidence that Velazquez did not in fact have a black, four-door sedan in 2009, as the government alleged. For the reasons set forth below, after careful consideration of the parties' written submissions, the trial record, and the evidentiary hearing, the Court grants the motion for a new trial based upon ineffective assistance of trial counsel.

As a threshold matter, having presided over the trial, it was apparent to the Court that defense counsel was prepared during the course of the trial, conducted thorough cross-examinations of the government's witnesses, and gave effective opening and closing statements to the jury. There is no doubt that he took his responsibility as defense counsel in this case very seriously, that he is an experienced and talented

---

[1] The jury returned a verdict of guilty with respect to the following counts charged in the superseding indictment: (1) Hobbs Act Robbery Conspiracy, 18 U.S.C. § 1951(a) (Count One); (2) Hobbs Act Robbery at 152nd Street in Queens, New York, 18 U.S.C. § 1951(a) (Count Three); (3) Brandishing of a Firearm During a Crime of Violence, 18 U.S.C. § 924(c)(1)(A)(ii) (Count Four); (4) Conspiracy to Distribute Controlled Substances, 21 U.S.C. §§ 841(a)(1), 846 (Count Seven); and (5) Conspiracy to Launder Money, 18 U.S.C. § 1956(h) (Count Eight). The jury acquitted defendant on the remaining three counts charged in the superseding indictment, which were (1) Interstate Transportation of Stolen Property, 18 U.S.C. § 2314 (Count Two); (2) Hobbs Act Robbery at 99th Street in Queens, New York (Count Five); and (3) Using or Carrying a Firearm During a Crime of Violence (Count Six).

defense lawyer, and that he used that experience to substantially undermine the government's case. The effectiveness of certain aspects of defense counsel's strategy and performance in the courtroom was confirmed by the jury's decision to acquit the defendant on several counts of the superseding indictment. In short, defense counsel's effort was apparent, his courtroom performance was effective in many respects, and his professionalism was at the highest level. Thus, the Court emphatically rejects any suggestion by the defendant that his trial counsel was completely lacking in effort or preparation. However, as discussed in detail below, defense counsel's performance was deficient in several major respects, including failing to develop evidence that would have been highly favorable to the defendant's case, erroneously entering into a stipulation regarding identifications of his client by two witnesses who did not testify at trial, and engaging in a line of questioning with a cooperating witness that unnecessarily bolstered the credibility of the witness and damaged the defendant's case. These failures, in the Court's view, satisfy the *Strickland* standard for ineffective assistance of counsel.

First, defense counsel failed to obtain and introduce defendant's cellular telephone records (including locational information), and additional evidence that would support and explain those records. In particular, defense counsel told his client that he would obtain those telephone records, but then unilaterally decided not to do so because trial counsel believed that such records would be useless given that the records would not confirm that it was the defendant (as opposed to someone else) using the telephone at any particular time and the government was alleging that the robbery crew used "burner" phones. That reasoning was fundamentally flawed in the context of this case, and cannot be attributed to trial

strategy, especially where there was no downside to obtaining and reviewing the records. Even though telephone records do not conclusively establish on their face who was using the phone at a given time, the records can often be used by the government or a defendant, in conjunction with other evidence or information, to strongly support the conclusion that it was the defendant (rather than some other third party) who was using the telephone at the relevant times. In fact, when new defense counsel obtained those records after the trial, the cellphone records and other records (such as college attendance and work records), in fact, provided substantial evidence, among other things, that: (1) defendant was in *Manhattan* at the time he was alleged to have participated in the 99th Street robbery in Queens and the St. Johns Place robbery in Brooklyn, both on November 23, 2009; and (2) defendant was in Woodhaven, Queens, around the time the 152nd Street robbery was alleged to have taken place in Whitestone, Queens.

Second, defense counsel failed to show his client the government's proposed trial exhibits prior to the trial, which prevented counsel from learning of favorable evidence to the defense that would have completely undermined one of the government's only pieces of evidence offered to corroborate the government's cooperating witnesses. Specifically, among the trial exhibits was Government Exhibit 7, which was a certified DMV document demonstrating that the defendant owned a black four-door sedan. The government argued that this exhibit was strong corroboration of the testimony of a cooperating witness that the defendant and his partner were in a black four-door sedan at the 99th Street robbery on November 23, 2009. The defendant was not shown this record prior to its introduction, and there was evidence that could have conclusively undermined that exhibit. In particular, the

2

DMV record related to 2008 (through the robbery was in November 2009) and, following the trial, based upon information provided by the defendant, new defense counsel was able to obtain uncontroverted proof (in the form of DMV and insurance records) demonstrating that the plates for that black sedan were surrendered and destroyed in June 2008 (over one year prior to the 99th Street robbery) because the defendant had wrecked the car in June 2008. In fact, there was even a reference on Exhibit 7 itself, indicating that the plate had been surrendered in 2008, which apparently neither the government nor defense counsel noticed. In short, it is clear that, if the defendant had been shown that document prior to trial and had time to discuss it with his attorney, counsel would have been able to obtain this evidence that would have definitively undermined the government's theory that Exhibit 7 established that defendant owned that black sedan at the time of the 99th Street robbery.

Finally, defense counsel entered into a stipulation with the government (Government Exhibit 10) regarding photo arrays that were shown to numerous witnesses during the investigation of the case. A portion of the stipulation was helpful to the defense because it indicated that six co-conspirators in the robbery crew and a robbery victim were each shown photo arrays containing the defendant and failed to identify the defendant. The stipulation, however, also indicated that five individuals positively identified the defendant in the photo arrays. Although three of those witnesses testified at the trial for the government, two of those witnesses never testified at all. Thus, the highly damaging inference from the stipulation was that two non-testifying co-conspirators from the robbery crew had also identified the defendant in connection with the robbery crew (even though their identifications were

unrelated to any charged crimes) or, at the very least, had identified the defendant in connection with some other criminal activity. In short, although the Court has carefully considered the explanations offered by trial counsel regarding these issues, the Court cannot attribute any of these decisions to trial strategy, but rather concludes, in each instance, that it was an error by trial counsel.[2] Moreover, the Court believes that, in the aggregate, these errors by trial counsel satisfy the first prong of the *Strickland* standard.

With respect to the prejudice prong of *Strickland*, this Court recognizes that a defense lawyer's failure to obtain phone or car records, even if such records would have been helpful to the defense, does not necessarily mean that such failures affected the outcome of the case. However, having presided over this particular trial, this Court concludes that it is reasonably likely that, had the jury heard this additional evidence (and had the other errors regarding the stipulation and Lovly cross-examination not occurred), the jury would not have convicted the defendant of any of the counts in this weak case. The only substantive robbery for which the jury returned a guilty verdict was the 152nd Street robbery of a drug dealer and

---

[2] Defendant also points to the fact that defense counsel spent an extensive amount of time on the cross-examination of cooperating witness Martin Lovly attempting to establish that, on January 29, 2013, Lovly sat next to the defendant in the courtroom at a pretrial conference and asked the defendant, "Who the hell are you?". Trial counsel made this issue an important part of his cross-examination by virtue of both the extent and the tone of his questioning on this particular point. However, the government later produced irrefutable evidence from the United States Marshal's Service and docket sheet that Lovly and the defendant never appeared in court on the same day, and trial counsel was forced to concede these facts in a stipulation, which clearly showed counsel had made a mistake in his cross-examination, and that he had confused Lovly with another co-defendant.

3

(from the verdict sheet and the evidence) it is highly likely that the other counts of conviction (robbery conspiracy, brandishing a firearm, conspiracy to distribute marijuana, and conspiracy to launder money) all arose from the jury's conclusion that the defendant participated in that robbery of a marijuana dealer, as well as the subsequent splitting of the proceeds from that robbery. The government's proof for that robbery was based primarily on the testimony of two cooperating witnesses – Martin Lovly ("Lovly") and Timothy Glass ("Glass")           –whose           out-of-court identifications were unusual (to say the least), and whose largely uncorroborated testimony contained numerous, and often troubling, inconsistencies with other proof in the case.

For example, Glass (the leader of this robbery crew who committed over 100 robberies) admitted that he did not know the defendant well and picked out another individual in a photo array as having done robberies with him and, after the circling of that other individual, an arrow was drawn on the array to the defendant to indicate Glass also knew the defendant. In other words, Glass picked out two co-conspirators in the same array. Moreover, Glass testified that he was introduced to the defendant by co-conspirator Gerry Machacek ("Machacek"), whom Glass understood knew the defendant extensively from other criminal activities. However, Machacek, who also was a cooperating witness for the government, failed to identify the defendant as someone he knew *at all* in three separate photo arrays. In addition, Glass's girlfriend (Teri Bedell), who is also a cooperating witness for the government and is alleged to have participated in the 152nd Street robbery (and the Advanced Dermatology robbery) with the defendant, also did not recognize the defendant in a photo array. Finally, Glass had stated, among other things, that the person known to him as "Rob" or "Alex," and who the government argued was the defendant (based upon the identification in the array), had the following personal characteristics: (1) he had a scar on his hand from a dog bite; (2) he was "in his early 20s" at the time of the robberies; and (3) he spoke Spanish.      However, (1) it is uncontroverted that the defendant has no scar on his hand; (2) it is uncontroverted that the defendant was over 30 years old at the time of the alleged robberies; and (3) there is no evidence (independent of Glass) that the defendant speaks Spanish. It is clear that, even without the additional evidence that trial counsel did not obtain that would have been helpful to the defense (such as the cell phone records and car information), the jury already had significant issues with Glass's credibility because they found the defendant not guilty on two substantive counts – the New Jersey warehouse burglary (Count Two) and the Advanced Dermatology robbery (Counts Five and Six) – even though Glass testified extensively as to the defendant's alleged involvement in those crimes.

The other main cooperator on the 152nd Street robbery, Martin Lovly, also had substantial impeachment issues. Lovely had been involved in dozens of robberies and, when initially shown a photo of the defendant in an array, only identified him as someone he knew from a neighborhood barbershop rather than from a robbery. However, a week later, he positively identified the defendant as having participated in the 152nd Street robbery, even though (1) the robbery had occurred five years earlier, and Lovely had been involved in dozens of robberies; (2) Lovely said he met the defendant only an hour before the crime; and (3) Lovely was on heroin at the time of the robbery. Lovely also incorrectly told investigators that the defendant was a "dark skinned Dominican."

4

Thus, given these substantial weaknesses in the government's case, the Court concludes that it is highly likely that the introduction of the additional evidence in favor of the defense – such as the telephone records, school records, work records, and the evidence regarding the black sedan – would have impacted the government's case in such a way as to alter the outcome as to each of the counts of conviction. That real and substantial risk of a material impact on the trial's outcome was further magnified by the error with respect to the stipulation regarding positive identifications by two non-testifying government witnesses. Although the Court gave a curative instruction advising the jury not to consider those identifications by non-testifying witnesses, the Court is troubled by the real possibility that hearing about those identifications could have led the jury to wrongly believe that two non-testifying robbery crew members had also implicated the defendant in robberies, even though that was not true.[3]

The Court has carefully considered the government's arguments in opposition and finds them unpersuasive. First, the government argues that the additional telephone evidence is hardly conclusive proof that the defendant did not participate in the charged robberies. As an initial

matter, the Court finds the telephone records and accompanying additional evidence to be compelling proof that the defendant did not participate in the 99th Street and St. Johns Place robberies on November 23, 2009 because he was in Manhattan. Moreover, as it relates to the 152nd Street robbery, although the exact date and time of that robbery are uncertain, there is testimony in the record from Glass and the robbery victim (and accompanying evidence) to support the defense argument that the robbery took place on January 13, 2009, and there are telephone records that would support defendant's position that he was not in Woodhaven at the approximate time the robbery was alleged to have taken place in Woodhaven on that day. Although this evidence is not conclusive proof that the defendant did not participate in the 152nd Street robbery, the test is not "conclusiveness" – rather, the test is whether there is a reasonable probability that, absent the errors, the outcome with the jury would have been different. Second, the government correctly notes that much of the additional evidence relates to robberies other than the 152nd Street robbery, including counts of which defendant was acquitted and, thus, argues such evidence is irrelevant to the counts of conviction. However, the Court must consider the "prejudicial spillover" effect that these errors had on the jury's decision with respect to the 152nd Street robbery. Under the circumstances of this case, the Court finds that the "prejudicial spillover" effect is extremely high. In its summation, the government often spoke of the robbery crew and the charged robberies together, and emphasized the cross-corroboration between the robberies in an effort to bolster its cooperating witnesses on each individual robbery. The Court concludes that there is not only a reasonable probability, but a high probability that, if the jury had heard this additional evidence

---

[3] The error during the cross-examination of Martin Lovly regarding an alleged statement he made to the defendant during a court appearance also further damaged the defendant's case. The government made a point during their summation to highlight this mistake and suggest that it bolstered the credibility of Lovly. Thus, although that error alone would not satisfy the *Strickland* prejudice standard, the mistake certainly helped bolster the credibility of Lovly, who adamantly denied making the statement under aggressive cross-examination, and hurt the credibility of the defense as a whole. Thus, the Court has considered this error as part of its analysis as to the cumulative impact of the above-referenced errors on the outcome of the trial.

5

(including the telephone records and information regarding the black sedan), the government's credibility (and its reliance on largely uncorroborated cooperator testimony to sustain its burden) would have been so undermined that the jury would not have been able to reach a guilty verdict on any count beyond a reasonable doubt.[4] Finally, the government argues that there was some corroboration of the cooperators' identifications that has not been impacted by this additional evidence, such as the critical fact that Glass testified that he knew the defendant had a scar from a motorcycle accident, and defendant does have a scar from a motorcycle accident. However, this remaining piece of corroboration is tainted because it is uncontroverted that Glass interacted with other cooperating witnesses in the jail, and there is also evidence that Glass interacted with the defendant in the jail and could have easily learned about the motorcycle accident and scar in the jail, rather than from interactions at the time of the robbery conspiracy.

In sum, the Court emphasizes that it does not conclude that the defendant is factually innocent of the counts of conviction. Instead, the Court concludes that counsel was ineffective under *Strickland* by, *inter alia*, (1) failing to obtain telephone and other records (from school and work) that provided the defendant with the ability to argue to the jury that he was elsewhere at the approximate date and time of the charged robberies; (2) failing to communicate with his client regarding

Government Exhibit 7, which would have allowed defense counsel to completely undermine the government's contention that he used the black sedan referenced in Exhibit 7 to commit the 99th Street and St. Johns Place robberies; (3) entering a stipulation that contained positive identifications of the defendant by two individuals who did not testify at the trial at all; and (4) engaging in an erroneous line of cross-examination during the testimony of cooperating witness Martin Lovly that helped the credibility of that witness, and the government's case, in a substantial way. Moreover, having presided over the trial and having observed the substantial weaknesses in the government's case, the Court concludes that there is a reasonable probability that, but for these errors, the jury would not have convicted the defendant on any counts. The Court does not overturn a jury's verdict lightly; however, the Court is firmly convinced that the circumstances of this case require it. Accordingly, the motion for a new trial based upon ineffective assistance of counsel is granted.[5]

---

[4] Thus, the Court notes that, even if the 152nd Street robbery did not take place on January 13 and the defendant had no telephone records to address his whereabouts the day of the robbery, the Court still concludes without hesitation that the other errors had sufficient "spillover effect" on the jury's decision to credit cooperator testimony on the 152nd Street robbery so as to satisfy the *Strickland* prejudice standard as to all the counts of conviction.

[5] Defendant also has raised several other grounds in support of his ineffective assistance claim. First, defendant contends that trial counsel failed to meet, review evidence or discuss strategy with the defendant. Specifically, defendant claims: (1) in the 15 months from defendant's arrest until his trial, trial counsel only met the defendant three times in settings where they discussed the substance of the case; (2) defendant had no telephone contact with trial counsel; and (3) defendant was not given a copy of the Rule 16 discovery, the 3500 material, or the trial exhibits. Trial counsel testified regarding these and other allegations regarding his representation. Certain aspects of his testimony are disputed by the defendant. For example, trial counsel testified that he did not provide the defendant with Rule 16 discovery, 3500 material, or the trial exhibits because the defendant's brother did not want the documents being sent to the defendant in jail, and thus, with defendant's consent, these materials were provided to the defendant's brother to share with the defendant. The defendant and his brother dispute that they requested this arrangement. However, the Court need

## I.    BACKGROUND

### A.  Evidence Introduced at Trial

At trial, the government introduced evidence of defendant's participation in a conspiracy to rob drug dealers and business owners in New York City, Long Island, and New Jersey. Glass testified that he, defendant, and others committed the following crimes in 2008 and 2009: theft of clothing from a warehouse in New Jersey in late 2008 (*see* Trial Transcript ("Trial Tr.") at 423-42); armed robbery of marijuana dealer Christian Olic ("Olic") at 152nd Street in Queens, New York in January 2009 (*see id.* at 442-62); armed robbery of a medical office on 188th Street in Queens, New York at the end of January 2009 (the "Advanced Dermatology" robbery (*see id.* at 464-73); theft of power tools and a pickup truck in Queens in February 2009 (*see id.* at 473-76); armed burglary of an apartment in Hoboken, New Jersey sometime in 2009 (*see id.* at 476-80); and armed robbery of the Glen Oaks Bar in Queens, New York in March 2009 (*see id.* at 480-88). Lovly, also a participant in the 152nd Street robbery, also testified that defendant was involved in that robbery. (*See id.* at 231-43.) Athanasios Michaelides ("Michaelides"), another co-conspirator, testified that he observed defendant with Glass shortly after the 152nd Street robbery (*see id.* at 966-67), and that he saw defendant unloading the truck full of stolen clothing when Glass and his crew returned to Queens after breaking into the New Jersey warehouse in late 2008 (*see id.* at 971-72). Co-conspirator Kermit Odums ("Odums") also testified that he, defendant, and others committed an additional armed robbery of individuals at 99th Street in Queens in November 2009 (*see id.* at 853-86), and that he, defendant, and others participated in the burglary of an apartment in Brooklyn later that day (*see id.* at 886-92).

The jury also heard evidence concerning the division of the proceeds of these crimes. Glass testified that his crew, including defendant and Lovly, stole approximately two pounds of marijuana from Olic at the 152nd Street robbery. (*See id.* at 461-62.) Glass sold the marijuana to Michaelides for approximately \$4000, and then Glass paid each participant in the 152nd Street robbery, including defendant, a portion of that money. (*See id.* at 462.) Glass also testified that, following his theft of power tools and a pickup truck in Queens in February 2009, he sold the power tools for cash, and then divided the cash among his crew (including defendant). (*See id.* at 474-76.)

### B.  Procedural Background

Following the presentation of the government's case-in-chief, defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). (*See id.* at 1059.) The Court denied the motion as to Counts One through Seven, stating that "there is no question that there is sufficient proof with respect to each and every element of these, counts one through seven." (*Id.* at 1059-60.) Pursuant to Rule 29(b), the Court reserved judgment as to Count Eight, the money laundering conspiracy count. (*Id.*)

The Court submitted all eight counts of the superseding indictment to the jury. On May 1, 2014, the jury returned a verdict of guilty as to Count One (Hobbs Act robbery

---

not resolve the factual disputes regarding these issues or any other disputed aspects of the representation because the Court concludes that the above-referenced errors (discussed in further detail below) are sufficient to satisfy the *Strickland* standard. Similarly, the Court need not address defendant's motion for a new trial based upon newly discovered evidence (such as the telephone records and other evidence) because it has granted the motion on other grounds — namely, ineffective assistance of counsel.

7

conspiracy from April 2008 through April 2010), Count Three (robbery of Olic at 152nd Street in Queens), Count Four (brandishing a firearm during the 152nd Street robbery), Count Seven (conspiracy to distribute marijuana), and Count Eight (conspiracy to commit promotion money laundering). The jury acquitted defendant as to Count Two (the theft of clothing from the New Jersey warehouse), Count Five (the robbery of the medical office in Queens), and Count Six (the firearm charge premised upon Count Five).

Defendant renewed his motion for a judgment of acquittal as to Count Eight on June 9, 2014, which the Court denied in an October 27, 2014 Memorandum and Order.

On August 3, 2015, defendant filed a motion for a new trial under Rule 33 of the Federal Rules of Civil Procedure. On October 26, 2015, the government filed its opposition. After oral argument on November 6, 2015, the Court determined that an evidentiary hearing was necessary to hear testimony from trial counsel (and any other relevant witnesses) regarding the allegations of ineffective assistance of counsel. The Court held an evidentiary hearing over several days: March 31, 2016, and April 20-22, 2016. There was a substantial delay in the scheduling of the hearing because trial counsel, who was a critical witness at the hearing, was unavailable for a substantial period of time due to significant medical issues. After the hearing, defendant's new counsel asked for several weeks to prepare for post-hearing argument. Thus, the post-hearing argument was heard on June 8, 2016. On June 17, 2016, the government submitted an additional letter in response to issues raised by the Court at the post-hearing argument. On June 20, 2016, defendant submitted a letter in response to the government's submission.[6]

## C. Evidentiary Hearing

Set forth below is a summary of the testimony at the evidentiary hearing that the Court conducted in connection with defendant's motion for a new trial based upon ineffective assistance of trial counsel.

### 1. Detective Holmes

Detective Edwin Holmes testified on March 31, 2016, and April 20, 2016. Detective Holmes worked for 34 years with the Nassau County Police Department, and is currently an investigator with the Nassau County District Attorney's Office. (Tr. at 4.)[7] Detective Holmes was the case agent and one of the central investigators on the case, though he did not testify at trial. (Id. at 5.) Detective Holmes interviewed all of the cooperators who testified at the defendant's trial, including Glass, Lovly, Odoms, and Michalides, as well as cooperators who did not testify at trial, such as Terry Bedell and Gerry Machacek. (Id. at 5-6.) Detective Holmes testified that both Bedell and Machacek failed to positively identify the defendant as a perpetrator in the robberies. (Id. at 6.) Detective Holmes also testified that he helped prepare the cooperators for their testimony at trial. (Id.)

Detective Holmes testified that he believed that he was present for all of the identifications by the informant witnesses in this case. (Id. at 190.) Detective Holmes

---

[6] Although the defendant objects to the government's submission because it did not seek permission from the Court, the Court in its discretion has considered both the government's June 19 submission and the defendant's response.

[7] "Tr." refers to citations to the transcript of the evidentiary hearing, and "Ex." refers to exhibits admitted during the evidentiary hearing.

affirmed his prior testimony from the April 7, 2014 evidentiary hearing that his technique for identifications was "that if I show a photo pack to anyone and they identify no one, I still keep it as a piece of evidence. I'll write no ID or no identification. I'll still have the individual who viewed it, sign it, time it, and date it, and make an exhibit of it in case, even though it was not identified," and that this was his technique in the defendant's case. (*Id.* at 210; *see also* Apr. 7, 2014 Hrg. Tr. at 15-16.) Detective Holmes further testified that, when a witness indicates that he recognizes someone from the photo pack, "I normally have the individual circle the photographs and put his initials in the photograph as well as I will. And I will have him time and date the photograph, usually right within the circle or within that area. And I normally have him, on the bottom he will sign his name in full, as I would. And another law enforcement officer [who] was present and observed the identification process[, h]e will." (Tr. at 210; *see also* Apr. 7, 2014 Hrg. Tr. at 16.)

Detective Holmes testified that, when Glass first positively identified the defendant in a photo array on October 5, 2012, he noted the positive identification in his notes and circled the defendant's picture on the photo array. (Tr. at 211-12.) Detective Holmes indicated on the photo array that Glass referred to the individual in the array as "known to me as 'Rob,' he did robberies with me" and as a "friend of Jerry and Alex." (*Id.* at 212; Def. Ex. 275.) Detective Holmes further testified that, on December 18, 2012, the defendant was identified as "Rob." (*Id.* at 213-14; *see also* Def. Ex. 208.) Detective Holmes testified that, on April 30, 2013, Glass identified the defendant in a second photo array, which contained a different picture of the defendant, which was taken after he was arrested on January 29, 2013. (Tr. at 215;

*see also* Def. Ex. 280-81.) Detective Holmes stated that the April 30 photo array was done "[w]ith the assistance of the defense attorney" and that Mr. Jenks "wanted another photo pack done" because he believed that the defendant was not the individual identified in the first photo array. (Tr. at 218.) Detective Holmes testified that he circled the fifth image on the photo pack, wrote the date and time on the image, signed it, and had Glass initial it. (Tr. at 219; *see also* Def. Ex. 281.) Detective Holmes also testified that an arrow was drawn to the defendant's picture, which was also in the photo array, and that Glass identified both men at the same time. (Tr. at 220; *see also* Def. Ex. 281.) Detective Holmes confirmed that there was nothing in his notes regarding the photo pack shown to Glass on April 30, 2013, and indicated that the photo pack speaks for itself. (Tr. at 222.) Detective Holmes's April 30, 2013 notes included details about "Rob" and indicated that, according to Glass, "Rob" had a scar on his hand from a dog bite and a scar on his leg from a motorcycle accident, and both "Rob" and his cousin had pit bulls. (*Id.* at 223-24; *see also* Def. Ex. 212.) Detective Holmes confirmed that the description of "Rob" having dog bites and a motorcycle scar prompted the government to take pictures of the defendant. (Tr. at 230.) Detective Holmes testified that he believes that Glass learned that the defendant's name was Adam Velazquez when Glass saw him at MDC Brooklyn ("MDC") when the defendant refused to be produced for photographs. (*Id.* at 245-46.)

Detective Holmes then testified regarding Lovly's identification of the defendant. Detective Holmes confirmed that, at the government's October 2, 2013 interview with Lovly, Lovly indicated that he met the individuals he knew as "Rob" and "Alex" through Glass and that they were at the marijuana robbery in Whitestone. (*Id.*

9

at 238; Def. Ex. 258.) Lovly "described them as being dark skinned Dominicans with thin builds. He just referred to them as the 'black kids.'" (Tr. at 238; Def. Ex. 258.) Detective Holmes testified that, when Lovly was shown the photo pack, he identified the second image, which was a picture of the defendant, and the image was circled. (Tr. at 238-40; *see also* Def. Ex. 261.) Detective Holmes wrote on the photo pack that there was "no ID positively for the home invasion" but that Lovly "also saw this guy at Ralphie's barber shop while [he] was looking for Timothy Glass. [He] saw him at Ralphie's shop after the robbery looking to buy drugs from Glass." (Def. Ex. 261; *see also* Tr. 240-42.) Detective Holmes further testified that he met with Lovly again on October 10, 2013, at which point Lovly indicated that, after thinking about it for a week, he was "positive about the identification from the previous meeting" and said that he was "100 percent sure" that the individual identified in the October 2 photo pack was "the guy that did the robbery with [him.]" (Tr. at 243-44; *see also* Def. Ex. 262.) Lovly was not shown another photo pack on October 10, 2013. (Tr. at 243.)

With respect to cooperating witness Odoms, Detective Holmes testified that the New York City Police Department ("NYPD") conducted the photo array on May 27, 2010, in which Odoms identified the defendant by a photo of him as a teenager. (Tr. at 247.) Detective Holmes confirmed that he did not do a subsequent photo array with Odoms. (*Id.* at 248.) Detective Holmes testified that the NYPD had a separate and independent investigation into the defendant, which is how this initial photo pack with the defendant in it came to be made. (*Id.* at 252.) Detective Holmes testified that Anthony Stravello, a government source, provided information to the Nassau County Police Department in

2013, which he had previously provided to the NYPD "years earlier." (*Id.* at 254-55.)[8]

### 2. Edward Jenks

Trial counsel Edward Jenks testified on March 31, 2016. Mr. Jenks was appointed to represent defendant on January 29, 2013. (Tr. at 16.)

Mr. Jenks testified that, over the course of his representation, he never had any telephone communications with the defendant, though he spoke "many, many" times with defendant's brother, Scott Velazquez, approximately "three or more times a week throughout the duration of the case." (*Id.* at 30.) Mr. Jenks also testified that, as it "got closer to trial," in March and April 2014, defendant's mother, Marilyn, called the office several times. (*Id.* at 32.) Mr. Jenks testified that Scott Velazquez requested that he be provided with all the paperwork in the case and that paperwork not be sent to defendant, and that, accordingly, he did not send any documents to the jail except for defendant's plea agreement in February 2014. (*Id.* at 38-41.) Mr. Jenks testified that the defendant never objected to this arrangement. (*Id.* at 124.)

Mr. Jenks testified that he met the defendant in the pens in the Central Islip courthouse before or after his appearances, and that the U.S. Marshal's Service also produced the defendant for private meetings at the courthouse on at least four different occasions, but "maybe more." (*Id.* at 42-45, 109-110, 112-13.) Mr. Jenks testified that he reviewed the particular charges and salient portions of the indictment with the defendant. (*Id.* at 110-11.) Mr. Jenks testified that Scott Velazquez "may have asked [him] once" to visit the defendant, but that he didn't recall. (*Id.* at 35.)

---

[8] The hearing transcript incorrectly refers to the name as "Anthony Cervello."

10

Mr. Jenks testified that, when he discussed his case with the defendant, he "really had nothing to say except I don't know these people. I didn't do this, and I'm innocent." (*Id.* at 44; *see also id.* at 60.) Mr. Jenks further testified that, when he explained to plaintiff about the New Jersey warehouse burglary charge in the indictment, plaintiff told him that he had never been to New Jersey in his life. (*Id.* at 45; *see also* Jenks Decl. ¶ 9.)

Mr. Jenks acknowledged that plaintiff asked him to get cell phone records, but said that he told plaintiff that "they're basically worthless, the cell phone records, because the cooperators in this case are going to testify that all the defendants used burner phones." (Tr. at 47; *see also id.* at 53 ("Detective Holmes had discussions with Mr. Ryan, and the issue of burner phones came up and they told me that nobody used their cell phones.").) Mr. Jenks further testified that he initially told plaintiff that he was going to subpoena the phone records, but he then changed his mind and determined that "cell phone records are meaningless" because "[a]nybody can have your cell phone." (*Id.* at 48.) Mr. Jenks testified that he communicated his decision not to obtain the phone records to the defendant and told him that the plan was to try the case "on reasonable doubt." (*Id.* at 116-117; *see also* Jenks Decl. at ¶ 21.)

Mr. Jenks acknowledged that, by September 5, 2013, he knew the dates on which the crimes allegedly occurred for the substantive counts and for at least one of the counts in the conspiracy, though the dates given by the government were changing until one week before the trial started. (Tr. at 51-52, 64-65.) Mr. Jenks testified that he told the defendant of the dates verbally and also explained the dates to Scott Velazquez. (*Id.* at 62.) Mr. Jenks also testified that he told the defendant that, because many of the robberies were not reported to law enforcement, it was unlikely they would learn the exact dates of the robberies. (*Id.* at 67; *see also* Jenks Decl. ¶ 14.) Mr. Jenks further testified that the defendant told him that he wanted to take a polygraph, which Mr. Jenks told him would not show anything, as well as be put in a lineup, which Mr. Jenks asked to be done. (Tr. at 66.)[9]

Mr. Jenks testified that he did not provide the defendant with, or review with him, the 3500 material or the exhibits for the trial before the trial began. (Tr. at 85, 89-90.) Instead, Mr. Jenks testified that he "told [the defendant] basically what was in [the 3500 material]." (*Id.* at 89.) Mr. Jenks also testified that, prior to the trial, he had meeting with Scott Velazquez, which lasted approximately an hour or an hour and a half, regarding the exhibits and 3500 material prior to the trial, which Scott Velazquez indicated he would tell his brother about when he saw him. (*Id.* at 114.)

Mr. Jenks testified that, during the trial, the government repeatedly tried to connect a black, four-door sedan to the defendant. (*Id.* at 85.) Mr. Jenks further testified that, when they heard this testimony, both the defendant and Scott Velazquez told him that the defendant did not have a black sedan in 2009, and then tried to get Mr. Jenks information about this during the trial. (*Id.* at 86.) Mr. Jenks also testified that he "attempted to speak to Detective Holmes about the car being destroyed and plates surrendered, and Detective Holmes told [him] there's no New York State DMV abstract record of the car being destroyed, totaled, salvaged or plates surrendered." (*Id.*) Mr. Jenks acknowledged that a DMV

---

[9] Mr. Jenks indicated in his declaration that he "felt that putting Velazquez in a line-up was a poor idea because witnesses had already identified him from photo arrays." (Jenks Decl. ¶ 45.)

11

motor vehicle printout, admitted into evidence at trial, indicated that the defendant surrendered his car's plates on June 30, 2008. (*Id.* at 87; *see also* Gov. Ex. 7.) Mr. Jenks testified that the defendant "never mentioned a crashed black sedan to [him] in 2008, despite his being told that at the reverse proffer. He mentioned it for the first time at the trial." (Tr. at 81; *see also* Jenks Decl. ¶ 48.) However, Mr. Jenks acknowledged that, if the defendant had been shown the trial exhibits before trial, the defendant could have informed him that he did not have the car in 2009. (Tr. at 88-89.)

Mr. Jenks testified that he did not speak with the defendant about whether he spoke Spanish or try to get in evidence that he did not speak Spanish. (*Id.* at 80, 89.) Mr. Jenks also acknowledged that, in the 3500 material, Glass repeatedly indicated that the defendant had scars from a motorcycle accident as well as from a dog bite, (*id.* at 90), and that Glass testified at the trial that he knew that the defendant had scars on his face from a motorcycle accident. (*Id.* at 94.) Mr. Jenks testified that, when this testimony about defendant's scars came out at trial and the government introduced photographs of the defendant's scars, there was no discussion with either the defendant or his family about putting in evidence of childhood photographs to rebut Glass's testimony. (*Id.* at 102-03.)

Mr. Jenks testified that, prior to trial, Alex Ponze introduced himself as a friend of the defendant and offered his help with the trial, which Mr. Jenks accepted. (*Id.* at 72.) Mr. Jenks testified that he encouraged Mr. Ponze to talk to the defendant and also gave him an "assignment" during the trial to keep track of inconsistent statements made by the cooperators. (*Id.* at 72-73.)

Mr. Jenks testified that, when the Glen Oaks robbery was mentioned at trial, the defendant told him that the date of the robbery was his first day of work. (*Id.* at 118.) Mr. Jenks further testified that during the trial, for the first time, Mr. Ponze provided him with a letter from February 2013, which indicated that the defendant was initiated into Local Union 3 IBEW in July 2009 and was employed by participating employer contractors of the Joint Industry Board since March 2, 2009. (*Id.*; Gov. Ex. R.) Mr. Jenks testified that, once he obtained this letter, he asked the defendant who they could contact at IBEW to show that he was working and also directed his associate, John Kahn, to call the Joint Industry Board of Electrical Industry to get another letter as to defendant's time of employment in the union. (Tr. at 120.) Mr. Jenks further testified that they obtained an updated letter concerning defendant's employment and "entered into a stipulation with the government to show that on the date of the Glen Oaks robbery, which occurred allegedly at 2 a.m., Adam was starting work at 8 a.m. on that day in the city." (*Id.* at 121.) Mr. Jenks also testified that he entered into a stipulation with the government "showing the dates [defendant] was working and for what companies." (*Id.* at 122.)

Mr. Jenks testified that he discussed the 99th Street robbery, which occurred on November 23, 2009, with the defendant, and the defendant said that he "didn't do it" but that he did not know where he was on that date. (*Id.* at 121.) Mr. Jenks testified that he did not receive any information that the defendant had any type of an alibi for the robberies discussed at trial and that, if he had been given that information, he would have investigated it. (*Id.* at 122.)

3. Scott Velazquez

Defendant's brother, Scott Velazquez, also testified on March 31, 2016. Mr.

12

Velazquez is a Detective with the New York City Police Department. (*Id.* at 137.)

Detective Velazquez testified that the defendant obtained the scars on his face from a childhood injury with a swing set, rather than from a motorcycle accident. (*Id.* at 138-40.) Detective Velazquez testified that, when Glass testified about the source of defendant's scars during the trial, he told Mr. Jenks that such testimony was inaccurate and that Mr. Jenks knew that the scar was not from a motorcycle accident. (*Id* at 174-76.) However, Detective Velazquez testified that he never showed childhood photographs of the defendant with a scar on his face to Mr. Jenks during the trial. (*Id.* at 177-78.) Detective Velazquez also testified that he had never heard the defendant speak Spanish, even though his wife is from El Salvador, and that the defendant did not speak Spanish at home with his family. (*Id.* at 141.)

Detective Velazquez testified that he met Mr. Jenks the day of defendant's arraignment and asked Mr. Jenks for copies of all the paperwork so he could examine them "from an investigative viewpoint" because he and Mr. Jenks agreed that Detective Velazquez might see things "from a different point of view as an investigator." (*Id.* at 143.) Detective Velazquez testified that he never told Mr. Jenks not to send paperwork to the defendant or not to review it with the defendant. (*Id.*; *see also Id.* at 178-79.) Detective Velazquez stated that he did not understand that he was supposed to be the one to go over the paperwork with the defendant. (*Id.* at 147, 153.) Detective Velazquez testified that he never met with Mr. Jenks about the 3500 material or otherwise discussed the 3500 material with him, nor was he given a copies of the 3500 material. (*Id* at 153.)

Detective Velazquez testified that he told Mr. Jenks on more than one occasion that the defendant wanted to know the dates of the crimes and that Mr. Jenks responded that the dates were "always changing from the government" and "[h]e just didn't have the exact dates." (*Id.* at 148.) Detective Velazquez also stated that Mr. Jenks told his mother that it was not his practice to give his personal telephone number to his clients. (*Id.* at 146.)

Detective Velazquez testified that he told Mr. Jenks that the defendant wanted to see him "on numerous occasions where we talked in person, we talked on the phone, sometimes during texts." (*Id* at 144.) Detective Velazquez stated that he offered to drive Mr. Jenks to the MDC to visit the defendant on more than one occasion because Mr. Jenks was unable to drive there due to his Parkinson's disease, but that Mr. Jenks never set a date to go. (*Id.* at 150-51.) Detective Velazquez also testified that he spoke with Mr. Jenks about driving him to the bars defendant was alleged to have robbed so that Mr. Jenks could "say he was inside the place and be able to understand what they were talking about" but that Mr. Jenks never followed up and requested to be driven to the bars. (*Id.* at 163.)

Detective Velazquez testified that, on April 29, 2014, Mr. Jenks asked him to request the defendant's work records to use as alibi evidence because they learned of the date of a crime for the first time during trial. (*Id* at 154-55.) Detective Velazquez stated that he did not know what records were sent because they went to Mr. Jenks, but that they were not entered into evidence. (*Id.* at 155.) However, Detective Velazquez acknowledged that the stipulation about defendant's employment with the union was entered into evidence and he did not have anything else that he wished to be put into

evidence by Mr. Jenks that was left out. (*Id.* at 173-74.)

Detective Velazquez testified that his family learned about the government connecting a black Impala to defendant for the first time during the trial. (*Id.* at 160, 163.) However, Detective Velazquez indicated on cross-examination that he stated in his November 4, 2015 affidavit that he spoke with Mr. Jenks "about the fact that the black sedan had been wrecked and junked, first after the reverse proffer, which occurred in April 2013." (*Id.* at 164-65; *see also* Scott Velazquez Decl. ¶ 9.) Detective Velazquez indicated that, during the trial, his family was looking for insurance paperwork and the accident report to show when the car was destroyed and the insurance and plates were surrendered in order to prove that defendant's car had been destroyed before 2009. (Tr. at 160-61.) Detective Velazquez stated that his family was ultimately able to obtain the insurance proof, but not the accident report because the DMV does not keep accident reports for more than four years. (*Id.* at 161.) Detective Velazquez testified that, during the trial, the only thing they had to prove the 2008 accident was photographs, which they showed Mr. Jenks during the trial; however, according to Detective Velazquez, Mr. Jenks told him that "it was too late." (*Id.* at 162.)

Detective Velazquez stated that Mr. Jenks changed his position on phone records after the trial and, one month after the trial was over, tried to obtain the phone records. (*Id.* at 156-57.) Detective Velazquez testified that he texted a Verizon address and Adam's phone number to Mr. Jenks in June 2014 so that Mr. Jenks could obtain the phone records. (*Id.; see also* Def. Ex. 41 at line 113.)

### 4. Manuel Lopez

Manuel Lopez, an electrician with Local Union Number 3, also testified on March 31, 2016. Mr. Lopez testified that the defendant worked under his command for the Roosevelt Hospital project and that the defendant's first day on the job was the first day of the project. (*Id.* at 180-81.) Mr. Lopez stated that the defendant never called in sick or arrived late, and that he could not remember specifically if the defendant was late on his first day but "doubt[ed] it" because he fires people or brings them up on charges with the union for being repeatedly late and it would "stand out in [his] mind" if someone was late on the first day because "[i]t would hold [him] up from getting the other dozen or so guys started" due to the paperwork done on the first day. (*Id.* at 182-83.) Mr. Lopez also stated that the defendant told him that he had been hospitalized due to motorcycle accidents and showed him the scar on his chest caused by the accidents. (*Id.* at 184.)

### 5. Alex Ponze

Alex Ponze testified on April 20 and 21, 2016. He testified that he and the defendant were "acquaintances"[10] and that he became involved in the case after running into the defendant's wife, Marcella, at a restaurant in October 2013. (*Id.* at 257; *see also id.* at 295.) Mr. Ponze testified that Marcella told him that the defendant had been arrested and asked if she could pass his phone number along to defendant's mother because she remembered that Ponze was an attorney.

---

[10] Mr. Ponze testified that, although he was introduced to the Court at trial as a "family friend," that description was not accurate, but he "was standing in the back of the gallery" and "wasn't going to correct Mr. Jenks as he said that." (Tr. at 298-99.) Mr. Ponze testified that they met approximately ten years ago through a mutual friend and he had seen the defendant "maybe 20 times" prior to the fall of 2013. (*Id.* at 296-97.)

14

(*Id.* at 257-58.) Mr. Ponze testified that the defendant's mother, Marilyn Velazquez, started calling him the Monday after he gave Marcella his number and continued to contact him "three or four times a week for a couple of weeks." (*Id.* at 258-59.) Mr. Ponze stated that he did not respond to Mrs. Velazquez's phone calls immediately because he "was working in Brooklyn at the time, and [] didn't know anything about federal criminal law, and [] just didn't want to be a part of it." (*Id.* at 258.) Mr. Ponze stated that, ultimately, he "randomly picked up the phone" when Mrs. Velazquez called and, although he told her that he did not want to get involved, he asked her a few questions and thereafter, "stayed in contact with her about the case here and there." (*Id.* at 259.) Mr. Ponze testified that, in December 2013, about a month after he started speaking to Mrs. Velazquez about the case, she asked him if he would be willing to set up a Corrlinks account to communicate with the defendant at the jail. (*Id.* at 259-60.) Mr. Ponze testified that initially he just had "casual" communication with the defendant, "nothing related to legal representation" and that he "really had very little contact" with the defendant and Mrs. Velazquez until March 2013. (*Id.* at 260-61.)[11]

Mr. Ponze testified that, in the middle of March 2014, he was switching jobs and had a two-week period in which he was not working. (*Id.* at 261.) Mr. Ponze testified that he told Mrs. Velazquez this, and she asked if he would be willing to come to a status hearing for the defendant on March 25, 2014, and contact Mr. Jenks. (*Id.*) Mr. Ponze testified that he called and left a message for Mr. Jenks on March 21, to

introduce himself, and came to the status hearing on March 25. (*Id.*) Mr. Ponze testified that he observed the status conference from the gallery and introduced himself to Mr. Jenks at the end. (*Id.* at 265.) Mr. Ponze testified that Mr. Jenks asked him if he was admitted in the Eastern District and whether he had a secure pass; when he confirmed that he did, Mr. Jenks asked him to go down to the U.S. Marshal's pens and talk with the defendant. (*Id.*) Mr. Ponze testified that he went down to the pens without Mr. Jenks and spoke with the defendant for about 30 minutes. (*Id.*) Mr. Ponze testified that he took notes during the meeting, which he e-mailed to Mr. Jenks the next day. (*Id.* at 265-66; *see also* Def. Ex. 135.) Mr. Ponze testified that the defendant wanted to convey to Mr. Jenks that he was "scared and confused. He didn't really seem to know what he was being charged with, how he was identified. He insisted that he didn't know any of the co-conspirators on the case" and wanted to know if the Court was "aware of all of these inconsistencies in terms of the identification and just general lack of evidence against him." (Tr. at 269.) Mr. Ponze testified that the defendant wanted to investigate an alibi defense and specifically look into his cell phone records. (*Id.* at 269-70; *see also* Def. Ex. 135.)

Mr. Ponze testified that he visited the defendant for approximately three hours at the MDC on April 4, 2014, and thereafter, sent notes from the meeting to Mr. Jenks. (Tr. at 272; *see also* Def. Ex. 108-114.) Mr. Ponze testified that the defendant "want[ed] a copy of the 3500 material immediately", "want[ed] to familiarize himself with everything so he has an idea of where the case is going," and "want[ed] to know what is being done on his behalf and what steps are being taken to prove his innocence," including obtaining phone records and taking a lie detector test. (Tr. at 274-75; *see also* Def. Ex. 109.) Mr. Ponze also testified

---

[11] Mr. Ponze testified that he met with Scott Velazquez "[m]aybe two or three times" prior to the trial and once during the trial to pick up a copy of the transcript to bring to MDC. (*Id.* at 334.)

that the defendant provided his phone number and e-mail addresses so that they could be subpoenaed, which Ponze then provided to Mr. Jenks. (Tr. at 276; *see also* Def. Ex. 110.) Mr. Ponze testified that the defendant told him that he did not know the dates of the crimes he was alleged to have committed and wanted to know whether "the numerous discrepancies concerning his identification" would be presented to the Court, including the "erroneous assumption" that he has a dog bite on his hand and a tattoo by his foot and the "outdated and possibly doctored photograph used to identify" him. (*Id.* at 277-78; Def. Ex. 110-11.) Mr. Ponze also testified that the defendant wanted to know who would be called as defense witnesses at trial, what evidence would be presented on his behalf, how he could prepare, and what the strategy was. (Tr. at 279; Def. Ex. 111.)[12]

---

[12] Although Mr. Ponze testified that he sent e-mails to Mr. Jenks on March 26, 2014, and April 4, 2014, Mr. Jenks testified that he never received them. (Tr. at 69-71.) These two e-mails were sent from Mr. Ponze's hushmail.com account, whereas Ponze's other e-mails to Mr. Jenks were sent from Ponze's gmail.com account. (*Id.* at 316-17.) The format of the hushmail e-mails differs from that of the gmail messages Mr. Ponze sent Mr. Jenks and does not include a "from" line. (*Id.* at 319-20; Def. Ex. 135-36, 108-114.) Mr. Ponze testified that he forwarded the hushmail messages that he sent to Mr. Jenks to his gmail account and ultimately forwarded them to Ms. Laser to use in the case. (Tr. at 320.) Mr. Ponze testified that he called Mr. Jenks to tell him that he sent the March 26 e-mail with notes of his discussions with the defendant, but did not recall whether he discussed sending the April 4 e-mail. (*Id.* at 320-21.) Mr. Ponze also testified that, when he spoke with Mr. Jenks on March 26, he told Mr. Jenks that he would be memorializing his notes with the defendant in an e-mail. (*Id.* at 332.) Mr. Ponze could not remember whether Mr. Jenks acknowledged the e-mails. (*Id.* at 321.) Mr. Ponze testified that he began sending e-mails to Mr. Jenks from his gmail account, instead of his hushmail account, because it was inconvenient to use the hushmail account. (*Id.* at 332.) Mr. Ponze testified that he had used hushmail "a couple of times before" sending the e-mails to Mr.

Mr. Ponze testified that he never received 3500 material or any discovery either before or during the trial, nor did he review any 3500 material with the defendant. (Tr. at 294.) Mr. Ponze further testified that he was not involved in any aspect of trial preparation and was not present for the last three days of trial. (*Id.* at 294-95.)

Mr. Ponze testified that on, April 24, he told Mr. Jenks that he thought that "Adam must testify," to which Mr. Jenks responded "Adam can testify. His testimony will be short. His cross risky. They will bring Stravello on marijuana and Adam dealing. They still have two more informants: Odoms and Sacci." (Tr. at 305; *see also* Gov. Ex. L.)     Mr. Ponze further testified that, although he originally told Mr. Jenks that the defendant "must testify" on April 24, on April 26, he told Mr. Jenks that "Adam does not think it is necessary to testify," and Mr. Jenks agreed that it was "smart Adam not testify." (Tr. at 306; *see also* Gov. Ex. L.)

Mr. Ponze testified that on April 25, 2014, in the middle of the trial, he sent Mr. Jenks an e-mail regarding Machacek's plea, which he felt was contradictory to Glass's testimony at trial and could be exculpatory because (1) Machachek stated in his plea allocution that he stood watch outside and the eyewitness stated that only one gunman entered the doctor's office, whereas Glass testified at trial that both Machcek and the defendant went into the doctor's office, and (2) the eyewitness to the robbery described the gunman as 5'3" and 150 lbs., whereas

---

Jenks and had "never heard any complaints" about it. (*Id.* at 332-33.) Ms. Moses, Mr. Jenks's office manager, testified that she conducted a search of the office computer system to identify each e-mail sent between Mr. Ponze and Mr. Jenks, and that the first e-mail from Mr. Ponze was sent on April 18, 2014, and came from his gmail account. (*Id.* at 492-94.)

16

the defendant is 5'11'' and 170 lbs. (Tr. at 280-82; *see also* Def. Ex. 137.) Mr. Ponze testified that Mr. Jenks brought this information to the Court's attention, and on April 30, the parties stipulated to the Machacek plea. (Tr. at 283.)

Mr. Ponze testified that he never discussed the black car with the defendant, and that he was not at trial for the final two days when the government was trying to link the car to the defendant. (Tr. at 321-22.) Mr. Ponze testified that he was present when the issue of the defendant's facial scars came up at the trial and remembered the defendant's family saying that the facial scars were not from a motorcycle accident. (*Id.* at 323.) Mr. Ponze testified that he remembered "bringing it up to Mr. Jenks, because it seemed like he didn't know that that stuff was going to come into evidence" and that he did not think that Mr. Jenks knew that the defendant had been in two different motorcycle accidents. (*Id.*) However, Mr. Ponze testified that he was not a part of any discussions regarding childhood photographs of the defendant with his scar. (*Id.* at 323-24.)

Mr. Ponze also testified as to his cell phone records, which he obtained from Verizon, and summarized his calls with Mr. Jenks, including that Mr. Jenks first returned his call on March 24, 2014, that he had a seven minute phone call with Mr. Jenks on March 26, after visiting the defendant for the first time, and that on April 24 and 25, he spoke with Mr. Jenks regarding delivering the trial transcripts to the defendant at the MDC and his April 25 visit with the defendant. (Tr. at 284-89; *see also* Def. Exs. 446-71.)

Mr. Ponze confirmed that, during the trial, in his e-mails to Mr. Jenks, he told him that "I'm with you 100 percent." (Tr. at 303; *see also* Gov. Ex. L.)    Mr. Ponze

testified that, after the trial was over, on May 9, in an e-mail regarding filing a Rule 29 motion, he told Mr. Jenks "As I've said repeatedly, the outcome of this case was not indicative of your performance during trial. You did a fine job and going into summation I was confident that we would prevail." (Tr. at 310-11; *see also* Gov. Ex. L.) Mr. Ponze confirmed that he told Mr. Jenks that he was doing a "fine job" throughout the trial and that Mr. Jenks promptly responded to the various e-mails Ponze sent him throughout the trial. (Tr. at 316.) Mr. Ponze testified that, when he sent these e-mails, he was not aware whether Mr. Jenks had done any investigation into possible alibi evidence. (*Id.* at 330.)

Mr. Ponze testified that he sent an e-mail to Mr. Jenks on May 5, 2014, four days after the trial ended, to relay questions from the defendant, including "[w]hat exactly he was charged with," "what did the jury find him guilty of," "[w]hat did the jury not guilty of," and "when will he be able to review the transcript and the discovery materials so he can prepare his appeal." (*Id.* at 328-29; *see also* Gov. Ex. L.)

### 6. Adam Velazquez

The defendant testified on April 21 and 22, 2016.

The defendant stated that he started his electrical work in 2006/2007 for a private company and then joined his union on March 2, 2009. (Tr. at 339.) The defendant testified that the electrical union required him to attend work daily, take an electrical theory course after work once a week, and attend college throughout his apprenticeship. (*Id.* at 340.) The defendant stated that he attended work every day starting March 2, 2009, and began taking college courses at Empire State College in September 2009. (*Id.* at 340.)

The defendant was arrested at his home on January 29, 2013, as he was getting ready to leave for work. (*Id.* at 341.) Mr. Jenks was appointed to represent the defendant the same day, and the defendant testified that they met "very brief[ly]" in the courtroom where Mr. Jenks "read a little bit of the indictment" to the defendant and told him that he would need to enter a plea. (*Id.* at 342.) The defendant stated that Mr. Jenks never provided him a copy of the indictment either on January 29, or on a later date. (*Id.*) However, the defendant acknowledged that, when asked by the Court on January 29, whether he saw a copy of the superseding indictment and had sufficient time to review it with his attorney, he said yes. (*Id.* at 431-32.) The defendant testified that he saw Mr. Jenks again two days later, on January 31, 2013, for a status conference. (*Id.* at 343.) The defendant testified that he "was hoping to get a chance to speak with him more" but that, after the status conference, Mr. Jenks sent him downstairs with the prosecutor, Burton Ryan, to give his pedigree information, which made the defendant "a little uncomfortable that [Mr. Jenks] wasn't coming downstairs with [him]." (*Id.*)

The defendant described "that it seemed like forever, waiting for [Mr. Jenks] to come visit." (*Id.* at 344.) The defendant testified that, after the January status conference, they had a February visit, which he did not initially remember, and then an April visit. (*Id.* at 344-45.) The defendant stated that in the interim, he tried to contact Mr. Jenks through his family because a Global Tel Link account was necessary in order to make calls from the Nassau County Correctional Center ("NCCC"), where he was housed. (*Id.* at 345.) The defendant stated that his family put money in the Global Tel Link account so that he could call them, but that Mr. Jenks did not. (*Id.*) The defendant testified that he "never agreed" for his brother, Scott, to serve as a conduit for communications with Mr. Jenks and "absolutely" expected that he would personally be able to speak with Mr. Jenks. (*Id.* at 345.)

The defendant did not remember Mr. Jenks bringing the S4 indictment with him when he visited in February, but believes that he did bring it in April; however, the defendant testified that he did not get a copy of the indictment and stated "by the time [Mr. Jenks] left, I didn't leave with a full understanding of what it was that I was being held for or why I was being charged." (*Id.* at 346.) The defendant testified that he and Mr. Jenks also discussed the New Jersey warehouse robbery at the April 2013 visit, and that Mr. Jenks showed him the photo array that was used to indict him. (*Id.* at 347.) The defendant testified that because the photo array was a "really bad copy," he "couldn't make out what the picture was" and told Mr. Jenks that he "didn't believe it was me." (*Id.*) The defendant told Mr. Jenks that, although the photo array said "known to me as Rob," he never went by the name of Rob, and also expressed that he was innocent and could not have been in New Jersey because he had never been to New Jersey. (*Id.* at 347-48.) The defendant also testified that he asked Mr. Jenks to look into "phone records or work records or anything that could show that I was not there," and stated that Mr. Jenks told him that looking into phone records would be a good idea and that he would do it. (*Id.* at 348.)

The defendant attended a reverse proffer with Mr. Jenks, Mr. Ryan, and Detective Holmes on April 24, 2013. (Tr. at 348-49.) The defendant testified that Mr. Jenks told him before the meeting to "just listen, and if I had any questions, that I should ask for Mr. Ryan and Mr. Holmes to leave the room so that I could ask a question." (*Id.* at 349.) The defendant stated that he remembered Mr. Jenks asking if there was any hard

18

evidence, fingerprints, DNA, or anything concerning phone records, and that Detective Holmes told him that there was nothing in the records that connected the defendant to the witnesses. (*Id.*) The defendant also testified that, after the meeting was over, he asked Mr. Jenks to look into his phone records and Mr. Jenks agreed that he would do so. (*Id.* at 350.) The defendant testified that, after the reverse proffer, he had no further contact or visit with Mr. Jenks while he was incarcerated at the NCCC. (*Id.*)

The defendant stated that he never personally spoke to Mr. Jenks about a bail hearing, but he reached out to his family "constantly" to ask for a bail hearing throughout the time he was incarcerated at the NCCC. (*Id.*) The defendant testified that he never saw the government's March 15, 2013 letter, which argued that he should not be released on bail, and that he did not meet with Mr. Jenks prior to the July 31, 2013 bail hearing to discuss arguments for the hearing. (*Id.* at 350-51.) The defendant testified that he did not know prior to the bail hearing that the government was alleging that he had threatened another inmate at the NCCC. (*Id.* at 439.) The defendant also stated that he had never threatened anyone. (*Id.* at 437, 440.)

On August 15, 2013, the defendant was called to Central Islip to meet with Mr. Jenks in the U.S. Marshal's pens. (*Id.* at 351-52.) The defendant testified that, at that meeting, he "specifically ask[ed] Mr. Jenks for specific dates and times of the alleged crimes" as well as whether he had looked into the phone records and whether he could look into other phone, work, or school records. (*Id.* at 353.) The defendant testified that Mr. Jenks told him that he "was looking into it" and was going to subpoena those records. (*Id.*) The defendant also stated that, during his first meeting with Mr.

Jenks in NCCC, Mr. Jenks had brought up the idea of him taking a polygraph or being placed in a live lineup, and thus, at the August 15 meeting, the defendant followed up about those ideas and Mr. Jenks told him that the government was opposed to "either or both" of those ideas. (*Id.* at 354-55.) The defendant testified that Mr. Jenks told him that the government wanted to take pictures to determine whether he had a "scar or tattoo or something on [his] leg," but that Mr. Jenks instructed him not to cooperate unless there was a court order to do so. (*Id.* at 355.)

The defendant testified that, when he was called on September 30, 2013, he refused to be produced because he was told that he was going to the Brooklyn courthouse for a court date, but he did not know that he had a court date; thus, he "told the marshal that I didn't have a case in Brooklyn and that my lawyer wouldn't be there and that I didn't want to go." (*Id.* at 355-56; *see also* Def. Ex. 103.) The defendant testified that, after he refused to be produced, he called his mother, who got in contact with Mr. Jenks and relayed the message that the defendant refused to be produced and "didn't know anything about going to court." (Tr. at 356.) The defendant stated that Mr. Jenks told Mrs. Velasquez that he would be calling the defendant to Central Islip to have photographs taken in Mr. Jenks's presence. (*Id.* at 356-57.) The defendant testified that, when the pictures were ultimately taken, it was pursuant to a court order, and the government took pictures of his head, hand, and legs. (*Id.* at 367.)

The defendant testified that there was no requirement for the recipient of calls to set up a Global Tel Link account in order for an inmate to make phone calls at the MDC; rather, an inmate can call anyone so long as the recipient accepts the call. (*Id.* at 357.)

19

The defendant testified that he called Mr. Jenks's office "a few times" from the MDC, but "never received an answer. No one ever picked up." (*Id.* at 358-59.) The defendant testified that he asked Mr. Jenks for his cell phone number, but that Mr. Jenks told him that he "did not give his cell phone, his personal number, to clients" and also that "he didn't like to communicate by the phone, or by any means for that matter, other than in person, because he didn't want for things to be recorded [by] the government." (*Id.* at 359.) The defendant testified that Mr. Jenks did not want to communicate by e-mail for the same reason and that he did not get Mr. Jenks's e-mail address until after the trial, though he regularly communicates with his family and new counsel via e-mail. (*Id.*) The defendant testified that as a result, he was limited to communicating with Mr. Jenks through his family. (*Id.* at 360.)

The defendant testified that he had another court appearance on November 26, 2013, when the S7 indictment, which expanded the charges against him, came down. (*Id.* at 360-61.) The defendant stated that he was not given a copy of the indictment from Mr. Jenks that day, nor at a later date. (*Id.* at 361.) However, the defendant admitted that when asked by the Court on November 26, whether he had sufficient time to review the S7 indictment and discuss it with Mr. Jenks, he said yes. (*Id.* at 433.)

The defendant testified that Mr. Jenks called him to the Central Islip courthouse on December 19, 2013, where they had a meeting in the pens. (*Id.* at 363-64.) The defendant stated that Mr. Jenks did not give him or review any documents at this meeting, and remembered Mr. Jenks "getting angry" at him for asking about phone records, the dates of the crimes, conducting a polygraph or lineup, and for

grand jury minutes, as well as for doing his own research at jail and bringing suggestions to Mr. Jenks. (*Id.* at 364-66.) The defendant stated that Mr. Jenks told him "that it was the government's burden of proof to prove the case and that we didn't have to go after the phone records; that it was not our job to prove my innocence; that it was their burden of proof to prove that I was guilty." (*Id.* at 365.)

The defendant testified that, from the time he saw Mr. Jenks in December or January, he did not see or communicate with him again the trial, and they did not have any meetings about a defense, strategy, alibi evidence, or anything else. (*Id.* at 368.)[13] The defendant testified that he was "left with no choice but to speak through my family members" and would therefore call either his mother or brother and have them relay his messages to Mr. Jenks. (*Id.* at 368-69.) The defendant testified that, although Mr. Jenks saw him occasionally before or after court appearances, it was "two or three times at most" and "[t]here were many times I was waiting down there, hoping they would call me to come downstairs, whether before or after. . . . [a]nd a lot of times I didn't understand what happened in the courtroom and I need him to explain to know what exactly . . . happened and what they were talking about." (*Id.* at 369.) The defendant also testified that Mr. Jenks never discussed the purpose of, or strategy for, the identification hearing, which was held on April 7, 2014, with him. (*Id.* at 372).

---

[13] The prosecution played a recording made on January 8, 2014, to attempt to refresh the defendant's recollection as to whether a second reverse proffer was held on that date. (*Id.* at 468-70; Gov. Exs. 105A, 105B.) However, the defendant testified that he did not recall a meeting on that date, nor a discussion of the crimes he was charged with, including the dates of the crimes, or the review of a plea offer. (Tr. at 470.)

20

The defendant testified that he first met with Mr. Ponze on March 25, 2013, after his court appearance. (*Id.* at 374, 401-02.)[14] The defendant agreed with Mr. Ponze's description of their relationship as acquaintances and "pretty much everything he described." (*Id.* at 401.) The defendant agreed that Mr. Ponze's e-mails to Mr. Jenks were accurate as to what he wished conveyed to Mr. Jenks. (*Id.* at 402.)

The defendant testified that he was not given any discovery through the duration of the case, and that the only papers he was provided were the plea agreement and a copy of the S4 indictment, months after it came down. (*Id.* at 362.) The defendant testified that he never saw a copy of the government's March 24, 2014 letter discussing possible 404(b) evidence, other crimes evidence, and conspiracy evidence, or the government's April 17, 2014 letter that gave the dates of the robberies charged in the conspiracy count, nor did Mr. Jenks discuss these letters with him. (*Id.* at 370-71.) The defendant testified that he learned about 3500 material from other inmates and research in the law library, and asked Mr. Ponze to ask Mr. Jenks whether he would be provided with his 3500 material. (*Id.* at 373.) The defendant testified that he never saw or went over the 3500 material with Mr. Jenks, Mr. Ponze, or anyone else, nor did he receive any discovery or trial exhibits prior to trial. (*Id.* at 374-75.)

The defendant said that, once trial began, he saw many binders on the defense table,

which included police reports with dates and addresses, and he "started to write down some of the dates" that he saw and asked Mr. Kahn, Mr. Jenks's assistant, whether he could look through the books, which Mr. Kahn permitted. (*Id.* at 375-76.) The defendant testified that, as he looked through the binders, he saw that the government was looking to use a black Impala as evidence against him, prompting him to alert Mr. Kahn that he did not own the car at the time the government was accusing him of having it. (*Id.* at 376.) The defendant testified that Mr. Kahn told him that "it was too late at that point to bring it up" and "[n]othing was done about it" because they had already stipulated to putting it into the record (*Id* at 376-77.) The defendant testified that he was in an accident in 2008 in which his Impala was destroyed and had to be towed. (*Id.* at 379.) The defendant stated that his family had photos that he had previously taken of his totaled car, but did not know that the car was going to be an issue before the trial. (*Id.* at 379-80.) The defendant did not know whether his family tried to give these photos to Mr. Jenks or Mr. Kahn during the trial. (*Id.* at 380.) The defendant also stated that he "didn't have any communication with Mr. Jenks during the trial. . . because he was so busy he didn't want me to bother him." (*Id.* at 377.) As a result, the defendant said that he only could speak to Mr. Kahn, although there were times when he "tried to interrupt [Mr. Jenks] and convey messages in between breaks, but I had no real communication with him." (*Id.*)

The defendant stated that he was surprised by the testimony about his scars and brought it up to his parents, Mr. Jenks, and Mr. Kahn. (*Id.* at 378.) The defendant also testified that he did not speak Spanish and that Mr. Jenks never asked him whether he spoke Spanish before the trial. (*Id.* at 380.) The defendant testified that, once he

---

[14] The defendant acknowledged that he told the Court that he received a copy of the S8 indictment at this appearance and had sufficient time to review it with Mr. Jenks. (*Id.* at 434-35.) The defendant testified that he did not personally receive it, but answered that he had because he "took it as if Mr. Jenks is receiving it on my behalf." (*Id.* at 435.) The defendant testified that he "expected that Mr. Jenks at some point would go over" the indictments with him, but "he just never did." (*Id.* at 436.)

heard allegations that he spoke Spanish at the trial, he mentioned to Mr. Jenks that he did not speak Spanish, which prompted Mr. Jenks to ask the witness whether he knew if the defendant spoke Spanish. (*Id.*) The defendant also testified that he believes that Mr. Kahn contacted Scott Velazquez to attempt to obtain defendant's work records through his union, which was the wrong place to look for work records because they should have gone to the contractor; however, the defendant could not assist them in trying to obtain the work records because he was incarcerated. (*Id.* at 381-82.)

The defendant testified that, as the trial progressed, he believed that Mr. Jenks would be putting on a defense case. (*Id.* at 382.) The defendant testified that, at some later point during the trial, Mr. Jenks advised him that "things were going our way" and that they would not be putting on a defense. (*Id.* at 382-83.) The defendant stated that Mr. Jenks told him that he spoke with his family and they all thought it was best for him not to testify. (*Id.* at 383.) The defendant testified that he was surprised and "devastated" that they were not putting forth a defense because he felt like he "wasn't doing anything to prove [his] innocence." (*Id.* at 383-84.) The defendant admitted that he was certainly aware by April 30 that Mr. Jenks was not going to put on a defense case and that he was not going to take the stand, when the defense agreed to offer all exhibits at the end of the government's case as exhibits and the defendant indicated that he did not wish to testify. (*Id.* at 422-28.) However, the defendant testified that it did not occur to him to raise the fact that he wanted to put on witnesses with the Court and he did not know if he could "speak up." (*Id.* at 429.) The defendant testified that, if given the opportunity, he would have wanted to put in evidence of phone records, work records, school records, and records of

union meetings and specialty courses he attended as an apprentice to try to establish an alibi. (*Id.* at 474.)

The defendant testified that, after he obtained new counsel in December 2014, he was able to obtain alibi evidence, including his phone records and DMV records. (*Id.* at 384.) The defendant testified as to his subpoenaed phone records from the dates of the crimes. (*Id.* at 384-395.) The defendant testified that his phone records indicate that he was never in New Jersey with his phone from December 20-22, 2008, when the New Jersey burglary (of which he was acquitted) was alleged to have occurred. (*Id.* at 385-86.) The defendant testified that on January 13, 2009, a potential date of the Whitestone/152nd Street robbery which occurred at about 3:30 p.m., his phone records indicate that he was in Woodhaven, New York, where he was living at the time. (*Id.* at 387-88.) The defendant testified that his phone records for January 29, 2009, at 9:30-10:00 p.m., when he was charged with robbing a doctor's office in Fresh Meadows (a charge of which he was acquitted), show that he was in Jamaica, New York. (*Id.* at 388.) The defendant testified that he started work with his union on March 2, 2009, the morning of the Glen Oaks robbery, which occurred around 2:30 a.m. (*Id.* at 389-91.) The defendant testified that he was concerned with going to bed early on March 1, because he had to wake up at 4:30 a.m. to report to his job. (*Id.* at 390.) The defendant's phone records indicate that his last call on March 1, 2009, was an incoming call at 10:21 p.m., and the defendant testified that he went to sleep after that phone call until he woke up at 4:30 a.m. (*Id.* at 390-91.) The phone records show that defendant's first call on March 2, 2009, was at 11:52 a.m., which plaintiff testified was a call made on his lunch break to his civil attorney handling a case regarding his motorcycle accident. (*Id.* at 392.) The

22

defendant testified that his cell phone and work records put him in Manhattan during the November 23, 2009 99th Street and St. Johns Place robberies. (*Id.* at 395.) The defendant testified that he was working at the United Nations on November 23, 2009 because the contractors would shuffle around individuals when more people were needed for certain jobs. (*Id.* at 393-94.)

On July 16, 2013, the defendant was transferred to the MDC, but was not made aware of why he was transferred. (*Id.* at 351, 402-03.) The defendant testified that, once he arrived at the MDC, he was kept in the intake unit, G41, for three days until he was transferred to his main unit. (*Id.* at 403.) The defendant testified that there were two orderlies working in G41, who he did not know at the time but later found out were Billy Menegos,[15] another co-defendant, and Timothy Glass. (*Id.*) The defendant testified that Menegos approached him to give him a form to set up his e-mail and "in casual conversation he asked [the defendant] what the scar on [his] neck was from." (*Id.* at 404.) The defendant told him that the scar was from a tracheotomy from a motorcycle accident and testified that he gets asked "all the time" about his scar so he did not think anything of it. (*Id.*) The defendant also testified that he had contact with Glass because Glass handed out clothes to all the new inmates and had a list of everyone's names. (*Id.*) The defendant stated that he did not recognize Glass and had never seen him before, and that Glass did not say anything to him. (*Id.* at 404-05.)

The defendant also testified about his scars. He stated that the scar across his eye was from when he was hit in the eye by a swing in elementary school, requiring multiple stiches. (*Id.* at 410-11.) The

defendant testified that he never told Glass or anyone else that his eye scar was from a motorcycle accident. (*Id.* at 411.) The defendant further testified that he does not have any scars from dog bites, or any scars at all, on his hands, and that he does not have any scars on his legs. (*Id.*) The defendant also testified that he had never owned a pit bull. (*Id.* at 406.) The defendant stated that there was redness on his leg in the government's photograph that was introduced as an exhibit at trial because his sock left a red mark on his leg. (*Id.* at 411.) The defendant then showed his legs to the Court, and there was no visible scar or redness on either of his legs. (*Id.* at 411-13.) The defendant testified that his 1999 motorcycle accident required major surgery that caused a scar from the bottom of his chest to below his belly button, which the defendant showed the Court. (*Id.* at 414-16.) The defendant testified that, when he heard Glass misidentify his scars during the trial, he mentioned it to Mr. Jenks, and his mother also brought in photographs to show Mr. Jenks that the scars were not from the motorcycle accident. (*Id.* at 417.) The defendant testified that he was not privy to the conversations between his mother and Mr. Jenks, but that the photos were not used at trial. (*Id.* at 417-18.)

### 7. Sharon Moses

Sharon Moses, Mr. Jenks's office manager and administrative assistant, testified on April 22, 2016. Ms. Moses testified about the office procedures for handling communication with clients and filing client information generally, as well as how the defendant's case was handled specifically.

Ms. Moses testified that she met Scott Velazquez at the end of January 2013 in connection with opening a file for defendant's case, and that Detective

---

[15] The hearing transcript incorrectly refers to Menegos as "Maningos."

23

Velazquez instructed her not to send paperwork to the jail but rather to give it to him, which she noted in the defendant's file as well as in defendant's client profile on the computer. (Tr. at 483-87; *see also* Gov. Exs. A, B.) However, Ms. Moses testified that she did send a copy of a proposed plea agreement to the defendant in prison in February 2014. (Tr. at 491-92; *see also* Gov. Ex. F.)

Ms. Moses testified that Scott Velazquez called "very frequent[ly]" throughout defendant's case – "[h]e was in contact with the office weekly, on a daily basis, every other day" – and that Marilyn Velazquez started calling "towards the middle, more towards the end of the case." (Tr. at 488.) Ms. Moses testified that she never received a call from the defendant during the time when Mr. Jenks represented him. (*Id.* at 489; *see also* Gov. Exs. C, D.)

Ms. Moses testified she always accepted Corrlinks requests that the office received from clients and that the defendant requested that she set up a Corrlinks account for him to communicate with Mr. Jenks after the trial concluded. (Tr. at 494-95.)

Ms. Moses testified that there was nothing that she needed to do to make it possible for inmates to call the office from prison. (*Id.* at 498.) Ms. Moses also stated that it is office procedure to accept all collect phone calls from jails and prisons even if they do not know who is calling. (*Id.* at 480.) However, Ms. Moses testified that the answering service, which takes messages when she is unavailable to answer the phone, is not authorized to accept any collect calls. (*Id.* at 502-03.) Ms. Moses testified that she has never dealt with Global Tel Link and that it is not necessary to set up a Global Tel Link account in order to receive calls from clients at the NCCC. (*Id.* at 499.) Ms. Moses further testified that

when inmates call from the MDC, they call collect. (*Id.* at 500.) Ms. Moses confirmed that Mr. Jenks's business card does not have his e-mail address or cell phone number on it, and therefore, that a client would not know either unless Mr. Jenks told him. (Tr. at 512-13.) She stated that she did not know whether Mr. Jenks took inmate calls on his cell phone. (*Id.* at 513.)

Ms. Moses testified that Mrs. Velazquez started calling more frequently in the "middle to end of the case" because "she didn't believe that Scott was telling either Adam or her what was going on with the case, so she wanted to talk to Mr. Jenks directly." (Tr. at 508-12.)  Ms. Moses confirmed that Mrs. Velazquez left messages beginning at the end of November 2013, indicating that the defendant had questions regarding his case and that he wished to see Mr. Jenks. (*Id.* at 508.) For example, Mrs. Velazquez left the following messages: on December 10, 2013, "Adam wants to know what's going on. Hasn't seen you or talked to you."; on December 12, 2013, "Adam wants to see you. Hasn't talked to you. Not fair. No idea what's going on. Wants to go with motion for tomorrow. Not fair to him and his wife. Knows nothing."; on March 10, 2014, "She wants to know exactly what's going on. Adam keeps asking questions. Has no answers."; on March 12, 2014, "Saw Adam yesterday. Has lots of questions. Hasn't seen you or talked to you and wants answers. . . He's very upset that you don't visit him. Understand hard to get to Brooklyn but every week he sees guys sitting there with their attorney and you have never been to see him there and he wants to talk to you." (*Id.* at 508-10; Gov. Ex. C.)

## II.   STANDARD OF REVIEW

Defendant moves for a new trial pursuant to Federal Rule of Criminal

24

Procedure 33. Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion only in "'extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal citation and quotation omitted), and only if there exists "'a real concern that an innocent person may have been convicted.'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. In deciding a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted).

Pursuant to Rule 33(b)(1), a motion for a new trial based upon newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. Fed. R. Crim. P. 33(b)(1). It is well settled that a motion under Rule 33 can be asserted for ineffective assistance of trial counsel. *See United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010) ("[W]e hold that the proper procedural avenue for defendant who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33."). Pursuant to Rule 33(b)(2), such a motion must be filed within 14 days after verdict or finding of guilty. Fed. R. Crim. P. 33(b)(2).

However, pursuant to Rule 45 of the Federal Rules of Criminal Procedure, such time can be extended, even after the time to file has expired, if there was "excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). The Second Circuit has set forth four facts that the district court should consider in determining whether the "excusable neglect" stand has been met: "(1) the danger of prejudice to the party opposing the extension; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the party seeking the extension; and (4) whether the party seeking the extension acted in good faith." *Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*, 672 F.3d 113, 129 (2d Cir. 2011) (internal quotation marks and citations omitted).

In the instant case, although the defendant's Rule 33 motion was not filed within 14 days of the verdict, the Court finds that there was excusable neglect.[16] Specifically, trial counsel (whom defendant is now claiming was ineffective) still represented the defendant for months after the verdict on May 1, 2014, and new counsel only filed a Notice of Appearance on December 2, 2014. (Docket No. 420.) Upon being retained, new counsel had to become familiar with the case and obtain the information necessary to support the ineffective assistance of counsel claim, including the telephone records and other records. For example, in April 2015, new counsel filed a motion to compel a subpoena for certain records. (Docket No. 453.) Moreover, once obtaining the information necessary for the motion, new counsel had to prepare and file the comprehensive

---

[16] Trial counsel requested an extension of time to file a renewed Rule 29 motion on Count Eight, but never requested any extension to time to file a Rule 33 motion for a new trial. (Docket No. 325.)

motion papers on behalf of the defendant. Thus, there are compelling reasons for the delay; new counsel was clearly acting in good faith during this period of delay. In addition, the Court is aware of no prejudice to the government in granting the extension. In fact, the government does not even raise the timing issue in its opposition. Similarly, the delayed motion has not impacted the judicial proceeding in a negative manner. Accordingly, under the particular circumstances of this case, the Court finds that the failure to file the Rule 33 motion on the grounds of ineffective assistance of counsel until August 3, 2015 constitutes excusable neglect and the Court extends, *nunc pro tunc*, the time to file that motion to August 3, 2015. *See, e.g., Brown*, 623 F.3d at 113 n.5 ("We recognize that under Rule 33 a defendant must bring a motion for a new trial within 14 days of the verdict or finding of guilty, unless the court finds that the late filing was the product of 'excusable neglect.' Fed. R. Crim. P. 45(b)(2). Here, [the defendant] asserts that he first found out about the 20-year Plea Offer in a post-trial submission filed with the court in January 2007, approximately six months after the verdict. About a month later, at a hearing, [the defendant] filed his *pro se* petition alleging ineffective assistance of counsel . . . . At the time, Thompson – the allegedly ineffective attorney – continued to represent [the defendant]. On these facts, it is clear that [the defendant] has a reasonable contention to be adjudicated by the district court that his failure to move within the time specified in Rule 33 was attributable to excusable neglect."); *United States v. Frederick*, 868 F Supp. 2d 32, 43-44 (E.D.N.Y. 2012) (finding excusable neglect in belated filing of Rule 33 motion where the allegedly ineffective counsel continued to represent the defendant after the trial).

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Legal Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "'strategic choices made after thorough investigation of law and facts

26

relevant to plausible options are virtually unchallengeable,'" *id.* at 588 (quoting *Strickland*, 466 U.S. at 690). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland*, 466 U.S. at 690-91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they "'undermine[] confidence in the outcome.'" *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "'[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt*, 239 F.3d at 204 (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland*, the determination of prejudice may be made with the benefit of hindsight." *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (internal citation and quotation marks omitted).

Moreover, in examining errors by defense counsel, the Court should "consider these errors in the aggregate" because "'[s]ome errors [] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture.'" *Lindstadt v. Keane*, 239 F.3d 191, 1999 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 695-96). This Court proceeds to examine defendant's claims, keeping in mind he bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

### B. Application

Defendant asserts that his trial counsel provided ineffective assistance by (1) failing to investigate and present alibi evidence at trial; (2) failing to investigate so as to prevent counsel from erroneously stipulating to the admission of falsely inculpatory evidence; (3) failing to investigate, which resulted in counsel's attempt to elicit false exculpatory evidence from a key government witness; and (4) failing to allow the defendant to be fully informed or to assist in his defense. As set forth below, the Court concludes that the defendant has met the high burden established under *Strickland*. With respect to the first *Strickland* requirement, petitioner has demonstrated that counsel's performance fell below an objective standard of reasonableness. Petitioner has also satisfied the second *Strickland* requirement because based on the totality of the evidence presented to the jury, there is a reasonable probability that but for counsel's errors, the result of the trial would have been different.

### 1. Constitutionally Deficient Performance

In preparing for trial, "'[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Lindstadt*, 239 F.3d at 200 (quoting *Strickland*, 466 U.S. at 691); *see also Wiggins v. Smith*, 539 U.S. 510, 533 (2003) ("[S]trategic choices made after less than

27

complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." (internal quotation marks and citation omitted)); *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005) ("[C]ounsel has a duty to make reasonable investigations, and a decision not to investigate will be reasonable only to the extent that reasonable professional judgments support the limitations on investigation." (citation and quotation marks omitted)). "A reasonable decision to forego investigation may be based on a reasoned judgment that such investigation would be fruitless, wasteful, or even counterproductive." *Espinal v. Bennett*, 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008), *aff'd*, 342 F. App'x 711 (2d Cir. 2009) (citation omitted).

Specifically, reasonable decisions not to pursue an avenue of investigation encompass cases "where counsel . . . cease[d] further investigation as a result of having discovered . . . evidence . . . to suggest that challenging the prosecution's . . . evidence would have been counterproductive, or that further investigation would have been fruitless," or where counsel has "good reason to think further investigation would be a waste." *Gersten*, 426 F.3d at 610 (citations and quotation marks omitted); *see also Robles v. Superintendent of the Elmira Facility*, No. 07 Civ. 596 (LBS), 2007 WL 2600857, at *6-7 (S.D.N.Y. Aug. 30, 2007) (finding counsel had not erred in failing to pursue potential witness that was likely to be "poorly performing" and "uncooperative"); *Hernandez v. Greene*, No. 05-CV-5291 (JG), 2007 WL 433396, at *8 (E.D.N.Y. Feb. 8, 2007) (finding counsel had not erred in failing to pursue potential witness whose account of the relevant events would not be inconsistent with prosecution's case). However, "a failure to conduct reasonable investigation into possible alibi evidence, in the absence of such a reasonable explanation, falls below the standard of effective representation required by *Strickland*." *Espinal*, 588 F. Supp. 2d at 399-401 (citations omitted) (finding counsel's failure to investigate whether redacted police report and other disclosed materials could have supported his alibi claims could not "be presumed to be sound trial strategy"); *see also Thomas v. Kuhlman*, 255 F. Supp. 2d 99, 109-10 (E.D.N.Y. 2003) (finding counsel's failure to investigate murder scene constituted ineffective assistance, where through proper investigation, counsel could have discovered that witness could not have seen defendant on fire escape outside victim's window on night of the murder, as she claimed, where witness testimony was "of overwhelming importance for the prosecution's case"); *Garcia v. Portuondo*, 459 F. Supp. 2d 267, 287 (S.D.N.Y. 2006) (finding counsel's belief about the strength of documentary evidence submitted to the court supporting defendant's alibi did not excuse counsel's failure to further investigate additional alibi evidence). Here, for the reasons explained below, the Court finds that trial counsel breached his duty to investigate the defendant's case diligently.

First, the Court finds that trial counsel's failure to subpoena the defendant's cell phone records was unreasonable and fell below professional norms for counsel's representation. The defendant repeatedly requested that trial counsel subpoena his cell phone records. (*See, e.g.*, Tr. at 47, 275, 348, 353, 364-66.) Trial counsel's only rationale for not subpoenaing the phone records is that he believed them to be "basically worthless . . . because the cooperators in this case [were] going to testify that all the defendants used burner phones." (Tr. at 47; *see also id.* at 53 ("Detective Holmes had discussions with Mr. Ryan, and the issue of

28

burner phones came up and they told me that nobody used their cell phones."); Jenks Decl. ¶ 17 ("I reiterated that, because of the burner phones, the phone records were proof of nothing.").) Although the Court "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside,'" *Greiner*, 417 F.3d at 319, subpoenaing the phone records prior to trial entailed no "downside" at all, significant or otherwise.

Here, assuming the defendant was the person using the telephone (an issue the Court will address *infra*), the cell phone records reflect that on January 13, 2009, a potential date of the Whitestone/152nd Street robbery, the defendant was in Woodhaven, New York at the time of the robbery.[17] (Tr.

---

[17] The government points out that the actual date of the 152nd Street robbery is uncertain and that there is no evidence that the robbery could have occurred on January 13, 2009. (*See, e.g.*, Gov.'s June 17, 2016 Letter at 3.) Instead, the government suggests that the more likely date was January 19, 2009. However, as new defense counsel points out, the government's superseding indictment actually has the date of January 13, 2009 for that robbery, and there is a reasonable argument based upon the evidence at trial to support the view that the robbery occurred on January 13, 2009. (Def.'s June 19, 2016 Letter, at 2-3.) In short, the Court believes that it is reasonably likely based upon the indictment and evidence that the jury would have viewed the operative date of that robbery to be January 13, 2009, or, at the very least (given the uncertainty by the government as to the date), would have concluded that reasonable doubt would exist on that robbery if the defendant had an alibi for that date. The Court notes that the ability to obtain alibi evidence was complicated by the fact that the dates of certain robberies (and even which particular robberies the government intended to prove as part of the robbery conspiracy) changed in certain instances right up to the eve of trial. (*See, e.g.*, Gov.'s April 17, 2016 Letter to the Court, Docket No. 298) (amending the letter it had sent on March 24, 2014 and noting, *inter alia*, (1) that the date of the alleged robbery for the Glen Oaks Bar was March 2009 and not January 2009, (2) no evidence of the defendant's alleged participation in a robbery of a

at 387-88.) The cell phone records also indicate that for the Glen Oaks robbery, which occurred around 2:30 a.m. on March 2, 2009, defendant's last phone call on March 1 was at 10:21 p.m. in Jamaica, and his first call on March 2 was at 11:52 a.m. in New York, New York. (Tr. at 389-92.) Further, defendant's cell phone records from November 23, 2009, the date of the 99th Street and St. Johns Place robberies, show that he was in Manhattan, rather than Queens, where the robberies occurred. (*See* Exs. I-L to Def.'s Mem.)[18] Such evidence would have been extremely helpful to the defendant and supported his contention that he did not participate in the robberies, and thus, the Court agrees with defendant that counsel's failure to subpoena the cell phone records was deficient performance. *See, e.g., York v. Ducart*, No. 15-CV-01521-EMC, 2015 WL 9268124, at *5-6 (N.D. Cal. Dec. 21, 2015) (finding counsel's failure to introduce cell phone records at trial was unreasonable and noting that, even though the records were "not dispositive, counsel had no strategic reason not to introduce the cell phone records. The upside of the evidence outweighed any downside because it would at the very least call into question [witness's] credibility); *cf. Jackson v.*

---

home in Ozone Park in April 2009 would be offered at trial, and (3) the government would be offering proof of the defendant's alleged involvement in a robbery in the vicinity of St. Johns Place in Brooklyn).

[18] Additionally, the cell phone records would have been helpful to the defendant with respect to other charged crimes. For example, there is no indication from defendant's phone records that his phone was in New Jersey from December 20-22, 2008, when the New Jersey burglary occurred. (Tr. at 385-86.) Further, his phone records from January 29, 2009, at 9:30-10:00 p.m., the date of the robbery of the doctor's office, indicate that the defendant was in Jamaica, New York, rather than Fresh Meadows. (*Id.* at 388.) Defendant was acquitted of the counts that pertain to these crimes.

*Senkowski*, No. 03 CV 1965 (JG), 2007 WL 2275848, at *15 (E.D.N.Y. Aug. 7, 2007) (finding that failure to investigate and impeach witness with telephone records was not unreasonable where plaintiff failed to demonstrate "what the telephone records would prove" or "that the telephone records in question were material to [the defendant's] case").

Further, counsel's failure to obtain defendant's employment records, which would have constituted valuable alibi evidence, particularly for the 99th Street and St. Johns Place robberies, was also unreasonable. Defendant's employment records submitted in connection with this motion demonstrate that he worked a full day on November 23, 2009, from 7:00 a.m. to 2:30 p.m., at a construction site at the United Nations in Manhattan. (*See* Exs. F, G to Def.'s Mem.) Additionally, to the extent that the time for the St. Johns Place robbery was unclear, defendant's school records indicate that he was present for his computer course in the afternoon of November 23, 2009. (Ex. N to Def.'s Mem.) Such evidence would have provided important support for the defendant's contention that he was not present at either the 99th Street or St. Johns Place robberies, which occurred in Queens at 8:50 a.m. and in Brooklyn thereafter. (Trial Tr. at 497, 560, 945.)

The Court further finds that counsel's failure to investigate whether the defendant in fact owned the black four-door sedan was unreasonable. At trial, the government repeatedly elicited testimony from Odums that the defendant was connected to a black, four-door sedan, used in the 99th Street robbery. (*See* Trial Tr. at 881-84, 887-88.) The government then introduced evidence that the defendant owned such a car through a DMV record of registration that indicated that the defendant owned a black Chevrolet Impala. (Gov. Ex. 7.) However, documents

subpoenaed after the trial indicate that defendant's license plates for his black sedan were surrendered and destroyed on June 25, 2008, well before the 2009 99th Street robbery. (Ex. P to Def.'s Mem.) Further, defendant has photographs confirming that his car had been totaled in 2008 as well as proof that he gave up his car insurance effective June 26, 2008. (Exs. Q, R to Def.'s Mem.) Such evidence strongly refutes the government's argument that the defendant was connected to the robbery by this car. Given that the black car was the only piece of evidence other than cooperator testimony linking the defendant to the robberies, the Court finds that counsel's failure to investigate whether defendant in fact owned a black four-door sedan at the time of the robberies was deficient performance.[19] Further, based on the defendant's testimony that he alerted Mr. Kahn to the fact that he did not own his car in 2009 once he saw the exhibit binders during the trial (at which point, he was told it was "too late . . . to bring it up"), it appears that had Mr. Jenks discussed the 3500 material or exhibits with the defendant before trial, he would have been alerted to the fact that defendant did not own his car in 2009. (Tr. at 376-77.)

Thus, the Court finds that trial counsel's failure to investigate, specifically the failure to subpoena cell phone records, work and school records, and information regarding defendant's black Impala, was unreasonable under *Strickland*.[20] As the Second Circuit

[19] The Court further notes that the government's own exhibit (Gov. Ex. 7) indicated only that the defendant owned a black Impala in 2008. Counsel could have easily noticed before the trial began that the government's proof did not directly link the defendant to a black, four-door sedan in 2009 and confirmed with the defendant prior to trial whether he in fact owned the car in 2009.

[20] The Court is also concerned about the failure to place any evidence into the record, which apparently

held in *Gersten*, this was "not a case where counsel made a reasonable decision to cease further investigation as a result of having 'discovered . . . evidence . . . to suggest that' challenging the prosecution's [] evidence 'would have been counterproductive, or that further investigation would have been fruitless.'" *Gersten*, 426 F.3d at 610 (quoting *Wiggins*, 539 U.S. at 525). "Nor is this a case of 'diligent counsel . . . draw[ing] a line when they have good reason to think further investigation would be a waste.'" *Id.* (quoting *Rompilla*, 545 U.S. at 383). Instead, counsel "settled on a defense theory and cut off further investigation of other theories without having first conducted any investigation" into them. *Id.* Thus, "counsel did not have any reasoned basis to conclude that such an approach would be fruitless- and, in fact, subsequent counsel have found it quite fruitful." *Id.*

The Court also finds that trial counsel's decision to enter into a certain portion of a stipulation, Government Exhibit 10, was objectively unreasonable under *Strickland*. The Court recognizes that the decision to stipulate to certain evidence is a matter of trial strategy that is "virtually unchallengeable absent exceptional grounds." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (internal quotation marks omitted). However, this is one of those exceptional circumstances. A portion of that stipulation was helpful to the defense in that it stated that seven other co-conspirators in the robbery crew had failed

to identify the defendant in a photo array – including Gerard Machacek (who Glass testified was the one who introduced the defendant to the robbery crew) and Terri Ann Bedell (who allegedly committed the 152nd Street robbery with the defendant.) The stipulation also stated that the victim of the 152nd Street robbery failed to pick the defendant out of a photo array. A portion of the stipulation was helpful to the government. First, it stated that three cooperating witnesses who testified at the trial (Glass, Odums, and Lovly) had identified the defendant in a photo array. There was nothing unreasonable about trial counsel entering that stipulation because it only confirmed what had already been established during the testimony of those witnesses, and thus, was cumulative. However, another portion of that stipulation was highly problematic and extremely damaging to the defendant. Specifically, the stipulation also stated that two other individuals – Anthony Stravello and Pablo Burgos – had identified the defendant in a photo array. However, those two individuals never testified at the trial. Based upon the context of the stipulation, the clear inference was that these two individuals were also co-conspirators in the robbery crew and had implicated the defendant in the alleged criminal activity of the crew. That inference would have been factually incorrect because neither of those individuals implicated the defendant in any robberies of the Glass crew. In any event, the government would have never been able to make such an assertion without calling these witnesses to testify. *See, e.g., United States v. Billingslea*, 204 F. App'x 856, 858 (11th Cir. Nov. 7, 2006) ("[The witness] died in a car accident before [the defendant's] trial, but his photo identification of [the defendant] was admitted into evidence to obtain the conviction. . . . The circumstances

---

existed from defendant's relatives and friends (at a minimum) that the defendant does not speak Spanish. The government noted in its summation that the testimony by a victim of the 99th Street robbery that two robbers spoke Spanish was corroboration of Glass's testimony that the defendant and another co-conspirator spoke Spanish. (Tr. 1080.) In its summation, the government even pointed out that defense counsel suggested in questioning that the defendant does not speak Spanish, but there was no evidence to support that contention. (*Id.*)

objectively indicate that [the witness's] photo identification of [the defendant] was testimonial. . . . The *Confrontation Clause* barred admission of the testimonial identification of [the defendant] because, even though the witness was unavailable to testify at trial, [the defendant] did not have a prior opportunity for cross-examination. We therefore vacate our prior opinion and remand the case to the district court for a new trial." (internal quotation marks and citations omitted)).

When the stipulation was read out loud to the jury and the Court heard those identifications by two non-testifying witnesses, the Court was surprised and extremely concerned about the danger of unfair prejudice to the defendant. Thus, the Court *sua sponte* immediately summoned counsel to sidebar to ascertain why those individuals were in the stipulation. (Trial Tr. at 1037.) Defense counsel suggested to the Court that it was a mistake in that, at least with respect to Burgos, he had signed the stipulation a week earlier when he thought Burgos was going to be a witness. (*Id.* at 1037-38.) Initially, the Court was simply going to tell the jury to disregard those two identifications. (*Id.*) However, the Court was so concerned with the implication of that stipulation and its prejudicial effect on the defendant that it excused the jury for a break and discussed with counsel whether there was an instruction that could erase the negative inference that these individuals identified the defendant in connection with robberies or some other criminal activity. (*Id.* at 1039-41.) It was then agreed that the jury would be instructed that the identifications by Burgos and Stravello had nothing to with the case in that Burgos knew the defendant from jail and Stravello knew the defendant from their neighborhood, and those identifications should be disregarded. (*Id.* at 1039-42.) Notwithstanding that instruction, there is no question that trial

counsel's performance in connection with the stipulation – namely, the failure to realize that the stipulation being read to the jury contained identifications of the defendant in an array by two *non-testifying* witnesses – was a serious error that was unreasonable under *Stickland*.

With respect to the first prong of *Strickland*, the Court has carefully considered the government's arguments in opposition, as well as trial counsel's explanations with respect to these issues, and finds them unpersuasive. As noted above, there was no strategic reason to support any of these decisions. There was no downside to obtaining the records relating to the defendant's telephone and employment in an effort to establish an alibi for the charged robberies. Moreover, the Court rejects the contention that these types of records would have been useless in this case because anyone could have been using the defendant's phone at a given time. Although telephone records do not (on their face) prove the identity of the person using the telephone at a particular time, such records can still have high probative value for either the government or the defendant because often, in conjunction with other proof, a strong inference can be drawn that it was the defendant (rather than some third party) using the cellphone at the relevant time. Here, based upon the parties who were called, and given the overall context of the telephone records and the defendant's activities and relationships, defense counsel could have made a strong argument to the jury that the defendant was the person using the cellphone at the relevant times. Similarly, although the government suggests that "there is a split among federal courts as to the reliability of using historical cell-site analysis to determine a caller's location," (Gov.'s June 17, 2016 Letter, at 5), the government has successfully introduced exactly those types of records in other trials

before this Court, and defense counsel could not have reasonably concluded that such records would be inadmissible.

Further, the Court does not agree that the defendant's acquittal on several of the counts demonstrates that trial counsel provided effective representation in all respects. Trial counsel certainly conducted vigorous cross-examination of the government's witnesses during the trial, and gave effective opening and closing statements to the jury. However, his performance in those respects does not suggest that his performance was not deficient in the other respects outlined above. *See, e.g., Green v. Lee*, 964 F. Supp. 2d 237, 258 (E.D.N.Y. 2013) ("It is axiomatic that, even if defense counsel had performed superbly throughout the bulk of the proceedings, they would still be found ineffective under the Sixth Amendment if deficient in a material way, albeit only for a moment and not deliberately, and that deficiency prejudiced the defendant." (internal quotation marks and citation omitted)); *see also Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (a "failure to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," may be constitutionally deficient irrespective of trial performance); *Espinal*, 588 F. Supp. 2d at 401 (finding counsel's strategy of "pok[ing] holes in the prosecution's case," which was "largely successful" at petitioner's first trial, in which ten jurors voted for acquittal, "blinded him to the importance of the police reports he received prior to [the second] trial," which would have supported petitioner's alibi defense, and thus, "rendered [counsel's] vigorous defense of his client ineffective.").

Finally, trial counsel made a significant error during the cross-examination of Martin Lovly. In particular, trial counsel believed

that Lovly appeared in court with the defendant during a pretrial conference on January 29, 2013, and openly stated that he (Lovly) did not know the defendant. Such an interaction would have been significant for two reasons: (1) it would have allowed Lovly to see the defendant in a suggestive setting that would have helped with any identification; and (2) it would have bolstered the defense theory that Lovly did not really know who the defendant was. During the cross-examination, trial counsel repeatedly and vigorously questioned Lovly regarding this alleged encounter. (Trial Tr. 266-68, 281-83.) Moreover, defense counsel questioned the witness in a manner that also put counsel's credibility on the line. For example, the exchange between trial counsel and Lovly included the folllowing:

> "Q. Did you turn to my client and say, who the hell are you, on January 29th, 2013? A. No. . . . Q. You are under oath. You know that? A. Yes. Q. And were you sitting right there in that chair right now? A. I don't know which chair I was sitting in at the time... Q. And you saw Mr. Valazquez[21] sitting in court with me that same day; did you not? A. I didn't pay no attention. Q. Did you make any statement to either me or Mr. Valazquez? Just yes or no? Who the hell are you? And what the hell are you doing here? A. No, I did not."

(*Id.* at 267-68.) At the end of the case, just before summations, the government introduced documentary evidence from the docket sheet and United States Marshal's Service unequivocally establishing that Lovly and the defendant never appeared in the same courtroom on January 29, 2013, or

---

[21] The defendant's name was incorrectly spelled as Valazquez in the trial transcript as well as the indictment and other documents.

any other day prior to the identity hearing. (*Id.* at 976-77, 1043-44.) Thus, it was apparent from the stipulation read to the jury that trial counsel had made a mistake in vigorously questioning Lovly on this issue.

In sum, for the reasons discussed above, the Court finds that counsel's performance, in the aggregate, fell below an objective standard of reasonableness, and defendant has met his burden of establishing the first requirement of *Strickland*.

### 2. Prejudice

The Supreme Court has made clear that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. Consequently, if the conviction is supported by overwhelming evidence, even serious errors by trial counsel would not warrant granting relief under *Strickland*. *Lindstadt*, 239 F.3d at 204 *see also Wynters v. Poole*, 464 F. Supp. 2d 167, 176 (N.D.N.Y. 2006) ("[T]he determination of prejudice necessarily is affected by the quantity and quality of other evidence against defendant." (citing *Strickland*, 466 U.S. at 695)). Where the Second Circuit has found insufficient prejudice, the evidence against defendants was very strong, and counsel's error (or purported error) minor in comparison. *See, e.g., Murden*, 497 F.3d at 199 (finding insufficient prejudice from counsel's failure to investigate certain non-eyewitnesses who could have supported particular defense, where testimony of multiple eyewitnesses contradicted this defense); *Hemstreet*, 491 F.3d at 91-92 (finding prosecution's case "independently strong" even if counsel erred where, *inter alia*, defendant "arguably confessed" to murder to "two separate individuals"); *Bennett v. Fischer*, 246 F. App'x 761, 765 (2d Cir. 2007) (finding that

even if counsel had interviewed alibi witness, witness was not credible and would have contradicted defendant's version of events); *Lynn*, 443 F.3d at 253 (finding insufficient prejudice in part because jury was already aware of evidence counsel failed to admit); *Bridges v. United States*, No. 04 Civ. 2715 (HB), 2005 WL 1798084, at *4-5 (S.D.N.Y. Aug. 1, 2005) (failing to find prejudice due to failure to call defense witnesses and a voice exemplar where prosecution presented, *inter alia*, accomplice testimony and recordings of defendant's incriminating conversations with accomplices).

On the other hand, the Second Circuit has found sufficient prejudice to warrant relief where defense counsel failed to conduct investigation that "could have vastly increased the opportunity to cast doubt on . . . critical evidence." *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007); *see also Linstadt*, 239 F.3d at 204 (finding prejudice where counsel failed to investigate witness that could have undermined the credibility of the prosecution's eyewitness); *Batten v. Griener*, No. 03-MISC-0066 (JBW), 2003 WL 22284187, at *8 (E.D.N.Y. Aug. 26, 2003) (finding prejudice sufficient to warrant *habeas* relief where, *inter alia*, counsel failed to take sufficient steps to secure material witness for trial who would have called into question the testimony of the government's lone eyewitness); *Bohan v. Kuhlmann*, 234 F. Supp. 2d 231, 254 (S.D.N.Y. 2002) (finding prejudice sufficient to warrant *habeas* grant where counsel failed to file alibi notice).

The Court has carefully considered the totality of the prosecution's case against the defendant, and finds that "[t]his [was] a case of underwhelming evidence. . . . All of the evidence against [the defendant] was affected by his counsel's failures." *Linstadt*, 239 F.3d at 205. Given that the

34

verdict was based essentially on the testimony of cooperating witnesses and the defendant's alleged ownership of a black four-door sedan, the Court concludes that there is a strong likelihood that counsel's errors were pivotal to the outcome of the case. The introduction of alibi evidence through defendant's phone, work, and school records and evidence that the defendant's car was totaled in 2008 likely would have substantially undermined this weak case.

The only physical evidence connecting the defendant to the crime was the black four-door sedan. However, defendant's records indicating that his car was totaled in 2008 sharply call into question the government's argument that the defendant was connected to the robbery conspiracy based on his car. Had evidence that the defendant's car had been totaled and the plates surrendered in 2008 been introduced, trial counsel would have discredited the government's attempt to link the defendant to the robberies based on his ownership of a black four-door sedan, which was a crucial component of its case that was stressed in witness testimony, (*see* Trial Tr. at 881-84, 887-88), as well as the government's summation. (*See id.* at 1090 ("What were they in? A four-door black sedan. You heard about that car many times that the defendant was in and his partner was in. What did the government put into evidence? Government's Exh. 7. Who had a four-door sedan? Adam Todd Valazquez, the defendant.").)

Further, there were no witnesses, other than co-conspirators, who could directly connect the defendant to the crimes. Critically, even without this additional evidence undermining the government's case, the key cooperating witnesses in this case – Timothy Glass and Martin Lovly – had substantial credibility issues. Glass's

second identification of the defendant was in a photo array in which he identified two individuals, which Detective Holmes testified had never occurred in any other identification he had done over thirty years, and there was nothing in Detective Holmes's notes regarding this identification. (Tr. at 220-22; *see also* Def. Ex. 281.) Additionally, Glass had credibility issues. During the trial, he admitted that when he initially cooperated with the NYPD in 2009, he "was pretty much making things up" and "totally lying" about the robberies and who was involved in them. (Trial Tr. at 727-30.) Glass also cooperated two years before identifying the defendant, and once he ultimately identified the defendant, he did not know his name, but rather, referred to him interchangeably as either "Rob" or "Alex." (*Id.* at 610-11, 635-36, 695, 726.) Glass also had stated that the defendant had the following personal characteristics: (1) he had a scar on his hand from a dog bite (Def. Ex. 285);[22] (2) he was "in his early 20s" at the time of the robberies (Trial Tr. at 731); and (3) he spoke Spanish (*Id.* at 573). However, all of these descriptive characteristics appear to be inconsistent with those of the defendant. It is undisputed that the defendant has no scar on his hand from a dog bite, or anything else. Second, given the defendant's date of birth of August 22, 1978, (Gov. Ex. 7), he was over 30 years old at the time of the alleged robberies. Third, there is no evidence in the record that the defendant speaks Spanish (and both the defendant and his family testified at the hearing that he does not). (*See* Tr. at 141, 380.)

---

[22] The government repeated this allegation in a pretrial letter, dated July 31, 2013, to the Court: "Valasquez, also was involved in the planning for the armed robbery of a doctor's office on 188th Street and Horace Harding Boulevard, Queens, New York but was unable to carry a gum [sic] because of an injury to his hand caused by a dog bite." (Docket No. 198, at 3.)

The substantial weaknesses in Glass's testimony is further reflected in the fact that his testimony was not corroborated by other government cooperating witnesses who did not testify. In particular, Glass told investigators that Machacek had extensive contacts with the co-conspirator whom Glass had picked out as the defendant, including that (1) Machacek introduced Glass to the defendant "at the end of '08" (Trial Tr. 416-17, 588, 677, 693); (2) Machacek was in the presence of the defendant "many times" and "vouched for [defendant] and trusted him" (*Id.* at 685, 725); (3) Machacek participated in the charged New Jersey warehouse burglary with the defendant (*Id.* at 423-42); (4) Machacek and the defendant drove together to commit the charged doctor's office robbery (*Id.* at 465, 469-71); (5) Glass, Machacek, and the defendant robbed the Glen Oaks Bar together (which was part of the charged robbery conspiracy) (*Id.* at 481-86); and (6) Glass, Machacek, and the defendant burglarized a construction company and all left there in the same vehicle (*Id.* at 473-75). However, Machacek, who is a cooperating witness with the government, was present with three photo arrays containing the defendant's photo, and failed to identify the defendant at all. (Apr. 7, 2014 Hrg. Tr. at 11, 21; Trial Tr. at 1035; Trial Ex. 10; Tr. at 6.) Similarly, Teri Bedell, who was a co-conspirator and Glass's girlfriend, also was a cooperating witness for the government. Bedell participated in several of the charged robberies against Velazquez, including the 152nd Street robbery, the doctor's office robbery, and the New Jersey warehouse robbery. (Trial Tr. at 451-54, 586-88.) However, Bedell also did not identify the defendant as a participant in those robberies. (Tr. at 6; Trial Ex. 10.)

Cooperating witness Martin Lovly also had substantial credibility issues. Initially, Lovly did not positively identify the defendant when shown a photo array, but rather, just indicated that he had seen him at Ralphie's barber shop. (*See* Def. Ex. 261; Tr. 240-42.) Ultimately, Lovly positively identified the defendant as an accomplice for the robbery one week later, without being shown another photo array; rather, Lovly indicated that he was now "100 percent sure" after thinking about the photo array for one week. (Tr. at 243-44; *see also* Def. Ex. 262.) That delayed identification was further undermined by the fact that (1) the robbery had occurred five years earlier, and Lovely had been involved in dozens of robberies (Trial Tr. at 252); and (2) Lovely said he met the defendant only an hour before the crime, and the defendant was wearing a hoody (*Id.* at 225-26, 302); and (3) Lovely was on heroin at the time of the robbery. (*Id.* at 375.) Lovely also incorrectly told investigators that the defendant was a "dark skinned Dominican[]." (*Id.* at 314-15.)[23]

Based upon the jury's verdict, there is no question that the jury had issues with the credibility of the cooperating witnesses, including two of whom identified the defendant as having been involved in the 152nd robbery – that is, Glass and Michaelides. For example, the jury acquitted the defendant of the interstate transportation of stolen property charge relating to the New Jersey Warehouse burglary, even though both Glass and

---

[23] The government has a third cooperating witness, Athanasios Michaelides, who testified, among other things, about the defendant's involvement in the 152nd Street robbery. However, Michaelides never identified the defendant prior to trial, but rather identified the defendant for the first time during the trial. Moreover, prior to trial, Michaelides and defendant had interacted as co-defendants on the prison bus and in the courtroom, and Michaelides acknowledged that he told Velazquez that he had no idea who he was or what he was doing there. (Trial Tr. 999-1001, 1007.)

Michaeledes testified that the defendant was involved in that crime. Similarly, the jury acquitted the defendant of the Advanced Dermatology robbery, even though Glass testified as to the defendant's involvement in that robbery.

In short, given the substantial weaknesses in the government's case, the Court is firmly convinced that, but the above-referenced errors by trial counsel, the jury would not have returned a guilty verdict on any count.

The Court has considered the government's arguments on the "prejudice" issue and finds the arguments unpersuasive. One of the government's primary arguments is that, even assuming there were issues with defense counsel's performance, those issues did not relate to key evidence offered by the government. For example, in its supplemental letter, the government suggests that there were no issues regarding the effectiveness of the cross-examination of Martin Lovly. (*See, e.g.*, Gov.'s June 17, 2016 Letter, at 2 ("Trial counsel's cross-examination of Martin Lovly was thorough and not the subject of any meritorious criticism. In particular, there is simply no identified omissions nor inadequacy in the performance of trial counsel regarding the questioning of Martin Lovly.").) Thus, the government contends that the convictions should stand because the jury, under the law, could have convicted the defendant based solely on the uncorroborated testimony of an accomplice, such as Lovly. *See id.* at 1 ("Under the controlling standard, that testimony [by Martin Lovly] is sufficient, in and of itself, to uphold defendant's conviction on the 152nd Street Hobbs Act robbery. It also is sufficient to uphold the convictions for the narcotics trafficking conspiracy conviction and the money laundering conviction." (citations omitted)).

The government frames the question incorrectly. Obviously, under federal law, a jury could convict a defendant based solely on the uncorroborated testimony of a single accomplice if the jury believes that witness's testimony establishes guilt beyond a reasonable doubt. *See United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990). However, on an ineffective assistance of counsel claim, the issue is not whether *could* the jury have convicted the defendant in the absence of defense counsel's errors; rather, the question is whether the jury *would* have convicted the defendant but for those errors. In the instant case, having presided over the trial and witnessed the errors in the context of the government's entire case, the Court firmly believes the answer to that question is that, in the absence of the errors by defense counsel, there is a high probability that the jury would not have convicted the defendant on any counts based upon Lovly's testimony alone, or in conjunction with all of the government's evidence.

First, the government is incorrect in its assertion that none of the alleged errors related to Lovly's testimony. As discussed *infra*, trial counsel aggressively questioned Lovly and accused him of admitting at a pre-trial conference with the defendant on January 29, 2013 that he (Lovly) did not know who the defendant was. However, that extensive line of questioning turned out to be an error by counsel – Lovly was not present at that conference, and counsel apparently confused Lovly with another co-defendant. Although this may seem like a minor error in the abstract, the error was magnified, as discussed above, because of the nature and tone of questioning by trial counsel. Moreover, the government attempted to capitalize on this error by emphasizing it in the summation, and linking the error to the defendant himself by suggesting that this showed that the defendant and his counsel were engaged in

37

wild speculation, while Lovly was testifying carefully and truthfully. Specifically, the prosecutor read the back and forth on this issue to the jury from the transcript, and said this:

> That is Mr. Lovly being careful. *That is defendant and defense counsel asking you to speculate.* Because what has happened today, ladies and gentlemen, is there is a stipulation. There is a stipulation, ladies and gentlemen, in which the parties agree that despite all those questions, all those questions you heard about, 'didn't you say who the hell are you?' Didn't you say that to Mr. Valazquez?' And all that. You heard that question and you heard that answer. You heard that. What does the stipulation now say that has been entered into? What does that say that Mr. Ryan read you this morning? It says the defendant Valazquez and Martin Lovly were never together in court in a marshal's bus or elsewhere until Lovly testified at a pretrial hearing in this case on April 7th, 2014. All those questions you heard about what was said in court, defense counsel asking question after question of Martin Lovly, he wasn't there. And they can now read he wasn't there. So where is the basis for those questions? *What is being done there is a way – those questions are about credibility. . . . It is an attack on his credibility. And Mr. Lovly, ladies and gentlemen, was, as the photo pack show, as his observations of the defendant during that robbery show, was a careful witness, telling you only what he recalled, what he observed, what he saw.*

(Trial Tr. at 1085-86 (emphasis added).) Thus, it is the Court's view – in light of (1) the nature and timing of the error, (2) the government's utilization of the error in its summation to bolster Lovly's credibility, and (3) the government's suggestion that trial counsel's error was a desperate attempt at speculation by counsel and his client – that it is highly likely that this error not only helped Lovly's credibility, but hurt the defendant's credibility with the jury. *See generally Henry v. Poole*, 409 F.3d 48, 65 (2d Cir. 2005) ("It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force." (quotation marks and citation omitted)).

Second, the damage to the defendant's case from the error regarding the stipulation containing identifications of two non-testifying witnesses was not linked to a particular witness or even a particular robbery; rather, by suggesting that the government had two additional co-conspirators who identified the defendant, it had the potential impact to bolster the government's entire case, including the credibility of Mr. Lovly and the other cooperating witnesses. Although the Court gave a limiting instruction, the Court is extremely concerned that the specter of identifications by two other co-conspirators had an impact on the jury's decision to convict.

Third, even with respect to the errors that related to robberies other than the 152nd Street robbery (such as the 99th Street robbery), the Court believes that there was a "prejudicial spillover" with respect to the counts of conviction. In its summation, the government repeatedly referred to the robberies together in an effort to bolster the credibility of the cooperators on each individual robbery. For example, although

38

there were not four cooperating witnesses for any individual robbery in the case (and, in fact, several of the robberies had only one cooperating witness), the government repeatedly referred to the "four" cooperating witnesses together and also referred to cross-corroboration. (*See, e.g.*, Trial Tr. at 1076-77 ("As Mr. Ryan told you last week, this is not a case of a lone gunman. It is a lone gunman part of a crew. Adam Valazquez was part of Timothy Glass' robbery crew for a number of different robberies. You have four different members of that crew who identified Mr. Valazquez in court as part of that robbery crew. And they corroborated each other as to place and as to different places."); *id.* at 1082 ("What you have here, ladies and gentlemen, is extensive cross corroboration. Look at 152nd Street. Look at that."); *id.* at 1094 ("And what you are left with here, ladies and gentlemen, I believe, is four members of the crew coming in here and saying, yep, I know him. And they know him from different places and they remember him from frequent and memorable encounters."); *id.* at 1128 ("Do you know what that means? That means that he is more unlucky than anybody who ever won a lottery. Because what are the chances, the mathematical chances, that four individuals separately questioned in separate years at separate times would all pick out as the person and provide the details as to the same crime or series of crimes. That is unbelievably remarkable."); *id.* at 1135 ("Now, you know these crimes happened. The only decision, the only decision you have to make is whether this defendant (indicating) is the unluckiest person in the world because four robbery crew members, separately, at separate times, under separate debriefings and sometimes in separate years, identified him as being a member of his crew, or whether in truth, justice and the facts showed that he did do these things.").) The Court is not suggesting at all that there

was anything inaccurate or improper about these arguments – such statements certainly constitute fair argument based upon the evidence. However, because this case was tried in this particular manner, there is a much greater risk that errors by defense counsel in connection with a particular charged crime spilled over into all aspects of the case. Similarly, the Court believes that the alibi evidence that was not presented to the jury (including phone records, employment records, and school records) was so significant with respect to certain robberies (such as the 99th Street and St. Johns Place robberies) that it was reasonably likely that it would have undermined the jury's confidence in the government's entire theory of the case and would have made them unwilling to rely solely on cooperator testimony for any of the other robberies, including the 152nd Street robbery.

Finally, to the extent that the jury would have still convicted regardless of these errors because of the ability of Glass and Lovly to identify the defendant because of certain scars, the Court disagrees. The probative value of this corroboration is significantly diminished by the fact that (1) there is clear evidence that the cooperating witnesses interacted with each other in the jail, in the courthouse, or in the Marshal's bus, prior to testifying at the trial (Trial Tr. 264-66, 574, 577, 795-96, 812-13, 833, 836-39, 954-55); and (2) Glass had interacted with the defendant in the jail (Def. Ex. 269-270; Tr. at 402-05) and would have had an opportunity to learn about such scars from such interactions.

In sum, the Court finds that, had the additional evidence been placed before the jury and had the other above-referenced errors by defense counsel not occurred, it is reasonably likely that, in light of the evidence at trial, the outcome of defendant's trial would have been different in that the

39

jury would not have convicted him on any counts. Because the cumulative effect of counsel's errors undermined confidence in the outcome of the trial, the Court finds that the defendant suffered clear prejudice due to counsel's constitutional deficiencies at trial and the second prong of the *Strickland* test is satisfied.

### IV. CONCLUSION

For the reasons set forth herein, the Court finds that the defendant has shown that his counsel's performance fell "outside the wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 690. Thus, defendant's motion for a new trial is granted.[24]

### SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated: June 24, 2016
Central Islip, NY

\*    \*    \*

The United States is represented by Robert L. Capers, United States Attorney, Eastern District of New York, by Burton T. Ryan, Jr. and Charles P. Kelly, Assistant United States Attorneys, 610 Federal Plaza, Central Islip, NY 11722. Defendant is represented by Gail E. Laser, 314 Main Street, Suite 200, P.O. Box 566, Park City, UT 84060.

---

[24] Because the Court grants the motion on the grounds of ineffective assistance of counsel, the Court need not, and does not, address other bases for the motion, namely whether the motion also should be granted under the "newly discovered evidence" standard.

40

# EXHIBIT V

## Death Certificate of Gerald F. Machacek III

Certificate No. 156-21-016612

NYSCEF Doc. No. 74, Aug. 4, 2021

Romano v. United States, No. 26-15 (2d Cir.)

FILED: QUEENS COUNTY CLERK 08/04/2021 11:33 AM

NYSCEF DOC. NO. 74

INDEX NO. 703130/2018

RECEIVED NYSCEF: 08/04/2021

## THE CITY OF NEW YORK
## VITAL RECORDS CERTIFICATE

# DEATH TRANSCRIPT

THE CITY OF NEW YORK – DEPARTMENT OF HEALTH AND MENTAL HYGIENE

**DATE FILED** MAR-21-2021 01:22 PM

### CERTIFICATE OF DEATH

Certificate No. 156-21-016612

**1. DECEDENT'S LEGAL NAME** GERALD  F  MACHACEK III
(First, Middle, Last, Suffix)

| Place Of Death | 2a. New York City / 2b. Borough **Queens** | 2c. Type of Place 1☐ Hospital Inpatient 2☐ Emergency Dept/Outpatient 3☐ Dead on Arrival 4☐ Nursing Home/Long Term Care Facility 5☐ Hospice Facility 6☒ Decedent's Residence 7☐ Other Specify | 2d. Any Hospice care in last 30 days 1☐ Yes 2☒ No 3☐ Unknown | 2e. Name of hospital or other facility (if not facility, street address) 3230 157th St, Flushing, NY 11354-3332 |
|---|---|---|---|---|

| Date and Time of Death or Found Dead | 3a. (Month) **March** | (Day) **20** | (Year-yyyy) **2021** | 3b. Time **11:58** | ☐AM ☐PM | 4. Sex **Male** | 5. OCME Case No. **Q21011365** |
|---|---|---|---|---|---|---|---|

**6. CAUSE OF DEATH**

**PART I**
a. Immediate cause **Pending Further Study**
b. Due to or as a consequence of
c. Due to or as a consequence of

**PART II** Other significant conditions contributing to death but not resulting in the underlying cause given in Part I. Include operation information.

7a. Injury Date (mm dd yyyy) 7b. Time ☐AM ☐PM  7c. At Work 1☐Yes 2☐No  7d. Place of Injury – At home, factory, street, etc.  7e. Location

7f. How Injury Occurred

7g. If Transportation Injury Specify ☐ Driver/Operator ☐ Pedestrian ☐ Passenger ☐ Other Specify

8. Manner of Death ☒ Pending further study ☐ Natural ☐ Homicide ☐ Accident ☐ Suicide ☐ Undetermined

9. Autopsy ☒ Yes ☐ No Autopsy Pursuant to Law ☐ No Autopsy

10. On the basis of examination and/or investigation, in my opinion, death occurred due to the causes and manner stated:
Certifier Signature *Julian Samuel* M.D. Date MAR-21-2021
Certifier Name (Print) JULIAN SAMUEL Medical Examiner

| 11a. Usual Residence State **New York** | 11b. County **Queens** | 11c. City or Town **Flushing** | 11d. Street and Number **3230 157th St** | Apt. No. | ZIP Code | 11e. Inside City Limits? 1☒Yes 2☐No |
|---|---|---|---|---|---|---|

| 12. Date of Birth (Month) **July** | (Day) **18** | (Year-yyyy) **1969** | 13. Age at last birthday (Years) **51** | Under 1 Year / Under 1 Day | 14. Social Security No. |
|---|---|---|---|---|---|

15a. Usual Occupation (Type of work done during most of working life) **General Contractor**
15b. Kind of business or industry **AMMA Services Group**
16. Aliases or AKAs **Gerald Frank Machacek III**

17. Birthplace (City & State or Foreign Country) **Flushing, New York**

18. Education (Check the box that best describes the highest degree or level of school completed at the time of death) 1☐ 8th grade or less: none 2☐ 9th-12th grade; no diploma 3☐ High school graduate or GED 4☒ Some college credit, but no degree 5☐ Associate degree (e.g. AA, AS) 6☐ Bachelor's degree (e.g., BA, AB, BS) 7☐ Master's degree (e.g., MA, MS, MEng, MEd, MSW, MBA) 8☐ Doctorate (e.g., PhD, EdD) or Professional degree (e.g., MD, DDS, DVM, LLB, JD)

19. Ever in U.S. Armed Forces? 1☐ Yes 2☒ No

20. Marital/Partnership Status at time of death 1☒ Married 2☐ Domestic Partnership 3☐ Divorced 4☐ Married, but separated 5☐ Never Married 6☐ Widowed 7☐ Other, Specify 8☐ Unknown

21. Surviving Spouse's/Partner's Name (prior to first marriage)(First, Middle, Last) **Colleen Byrne**

22. Father/Parent Name (Prior to first marriage) (First, Middle, Last) **Gerald Frank Machacek Jr.**

23. Mother/Parent Name (Prior to first marriage) (First, Middle, Last) **Libera Mazzella**

24a. Informant's Name **Tara Lynne Taggart**
24b. Relationship to Decedent **Friend**
24c. Address (Street and Number) **3230 157th St, Flushing, NY** Apt. No. City & State ZIP Code

25a. Method of Disposition 1☐ Burial 2☒ Cremation 3☐ Entombment 4☐ City Cemetery 5☐ Other Specify

25b. Place of Disposition (Name of cemetery, crematory, other place) **Garden State Crematory**

25c. Location of Disposition (City & State or Foreign Country) **North Bergen, New Jersey**

25d. Date of Disposition mm **03** dd **25** yyyy **2021**

26a. Funeral Establishment **Quinn-Fogarty Funeral Home (Flushing)**
26b. Address (Street and Number) City & State ZIP Code **19215 Northern Blvd Flushing, NY 11358-2954**

Changes approved for filing by the Commissioner of Health Formerly: Disposition Method. Interim; approved by Deputy City Registrar J. Hicks on Mar-24-2021; No further entry beyond this point.***

EVT20210316-1759

March 25, 2021

*Gretchen Van Wye*
Gretchen Van Wye, PhD, City Registrar

This is to certify that the foregoing is a true copy of a record on file in the Department of Health and Mental Hygiene. The Department of Health and Mental Hygiene does not certify to the truth of the statements made thereon, as no inquiry as to the facts has been provided by law.

Do not accept this transcript unless it bears the security features listed on the back. Reproduction or alteration of this transcript is prohibited by §3.19(b) of the New York City Health Code if the purpose is the evasion or violation of any provision of the Health Code or any other law.

VR 18 (Rev. 01/20)

140000616412

FILED: QUEENS COUNTY CLERK 08/04/2021 11:33 AM

NYSCEF DOC. NO. 74

INDEX NO. 703130/2018

RECEIVED NYSCEF: 08/04/2021

**EXHIBIT D**

# EXHIBIT C

## Doc. 94 — Summary Order and Judgment

United States v. Romano, No. 14-1588-cr (2d Cir.)
Filed 11/17/2015

Romano v. United States, No. 26-15 (2d Cir.)

14-1588-cr
United States v. Romano

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

**SUMMARY ORDER**

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of November, two thousand and fifteen.

Present:
> PETER W. HALL,
> GERARD E. LYNCH,
> > *Circuit Judges,*
> JED S. RAKOFF,
> > *District Judge.*<sup>*</sup>

UNITED STATES OF AMERICA,

> *Appellee,*

> v.                                                                            No. 14-1588-cr

JOSEPH ROMANO,

> *Defendant-Appellant.*

---

For Defendant-Appellant:     DANIEL S. NOOTER, Esq., Washington, DC.

---

<sup>*</sup> The Honorable Jed Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

1

For Appellee:          UNA A. DEAN (David C. James, *on the brief*), Assistant United States Attorneys, *for* William J. Hochul, United States Attorney for the Western District of New York, Buffalo, NY.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Keenan, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED.**

Defendant Joseph Romano was convicted by a jury of conspiring to murder a federal judge and Assistant United States Attorney ("AUSA"), all in violation of 18 U.S.C. § 1117, in retribution for their roles in convicting and sentencing him for offenses related to a previous coin fraud scheme. According to the evidence presented at trial, the conspiracy took root when Romano, who was serving a 180 month sentence for mail and wire fraud, informed a fellow inmate of his desire to murder the judge and AUSA and mutilate their bodies. Based on this information, law enforcement set up a sting operation involving an undercover officer who posed as a contract killer. After paying the officer to assault a mechanic with whom he had a financial dispute, Romano offered to pay $40,000 for the murder of the judge and AUSA. The murders, of course, were never consummated. Romano was arrested, convicted, and sentenced, *inter alia*, to life in prison for his crimes. We assume the parties' familiarity with the underlying facts, the procedural history of the case, and the issues on appeal.

Romano contends that the district court erred in denying his motion to suppress incriminating statements he made after being arrested, claiming that the arresting officers violated his *Miranda* rights by tricking him into believing he was entering a cooperation agreement with the government. *See United States v. Romano*, No. 12 CR. 691 JFK, 2013 WL 5278420, at **1, 6 (E.D.N.Y. Sept. 18, 2013). We review a district court's determination

2

regarding the constitutionality of a *Miranda* waiver *de novo* and its factual findings for clear error. *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015). In determining whether a defendant's confession was the product of coercion, the court considers "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). Further, "[r]egardless of whether [an] agent's statements were false, misleading, or intended to trick and cajole the defendant into confessing, specific findings must be made that under the totality of the circumstances . . . the defendant's will was overborne by the agent's conduct." *Id.*

It was not error, much less clear error, for the trial court to find that there was "simply no evidence whatsoever of deceit by the agents." *Romano*, 2013 WL 5278420, at \*6. The court noted that the agents did not actively question Romano until after he was transported from his prison cell to the FBI field office. *Id.* Further, Romano was informed of his *Miranda* rights both orally and in writing, and signed a written waiver that required him to initial next to each of the rights he was waiving. *Id.* at \*\*5–6. The court credited the agent's testimony at the suppression hearing that Romano appeared to be calm and understood what was happening and found Romano's assertions to the contrary to be incredible. *Id.* at \*6. Such "[c]redibility determinations are the province of the trial judges, and should not be overruled on appeal unless clearly erroneous." *United States v. Yousef*, 327 F.3d 56, 124 (2d Cir. 2003).

The court further noted that, although the agents had suggested that cooperation would be in Romano's interest because "it would be made known to the prosecutors and the judge," *Romano*, 2013 WL 5278420, at \*6, it is well established that promises of leniency, without more, do not render a confession involuntary. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); *United States v.*

3

*Bye*, 919 F.2d 6, 8–9 (2d Cir. 1990) (emphasizing that voluntariness of waiver is a "comprehensive inquiry" and that mentioning the benefits of cooperation is not *per se* coercive); *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir.1987) ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.").

Romano argues that his case is distinguishable from the foregoing cases because the agents did not merely hold out a hope of leniency but led him to believe that he was entering a formal cooperation agreement. Romano contends the officers' actions violated the spirit of *Missouri v. Seibert*, which prohibits "two-step" interrogation techniques designed to deliberately circumvent the requirements of *Miranda*. *See Missouri v. Seibert*, 542 U.S. 600, 618–22 (2004) (Kennedy, J., concurring). Even if we were to extend *Seibert*'s holding to situations in which a defendant is "tricked" by law enforcement into believing he is entering a cooperation agreement, Romano has not presented any evidence that the agents deceived him. The purported agreement signed by Romano makes no mention of a promise of leniency. It merely stated Romano's intention "to cooperate with the FBI and provide statements about crimes I know of and crimes in which I was personally involved." *Romano*, 2013 WL 5278420, at *3. Aside from this signed statement, there is no other evidence to support Romano's claims.

Romano further contends that the trial court's jury instructions on his entrapment defense were legally erroneous and confusing to the jury. We review challenges to jury instructions *de novo*. *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014). "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *Id.* (internal quotation omitted).

4

Entrapment is an affirmative defense with two elements: "(1) government inducement of the crime, and (2) lack of predisposition on the defendant's part." *United States v. Bala*, 236 F.3d 87, 94 (2d Cir. 2000). To establish inducement, a defendant must show "that it was the government, not he, that originated 'the criminal design.'" *United States v. Brand*, 467 F.3d 179, 189 (2d Cir. 2006) (quoting *Jacobson v. United States*, 503 U.S. 540, 548 (1992)). "If a defendant presents credible evidence of government inducement, then the prosecutor must show predisposition beyond a reasonable doubt." *Bala*, 236 F.3d at 94. The court instructed the jury that in order to prove his entrapment defense, Romano initially had the burden to show by "a preponderance of the evidence that a government agent originated the criminal design" of the crimes charged. If the jury so found, then the government would have the "burden to prove beyond a reasonable doubt that prior to first being approached by government agents, the defendant was ready and willing to commit the crime." JA 157–58.

Romano argues it was error to require the defense to show inducement by a preponderance of the evidence. He also asserts that the court conflated the inducement and predisposition prongs of the entrapment defense. These arguments are without merit. It is well established in this circuit that "a defendant hoping to assert the entrapment defense bears the burden of establishing inducement by a preponderance of the evidence." *Brand*, 467 F.3d at 190. To the extent that Romano asks us to overrule our prior precedents, we lack the power to do so; only the Court sitting *en banc* may overrule our prior decisions.[1] *Lotes v. Hai Precision Indus.*

---

[1] It is misleading to compare our precedents to that of sister circuits that have required a lower burden of production with respect to proving inducement, as those circuits have generally adopted a more stringent definition of what constitutes government inducement. *See United States v. Mayfield*, 771 F.3d 417, 431 (7th Cir. 2014) (comparing this circuit's "expansive understanding of inducement," which "encompasses almost *any* government solicitation of the crime," with other circuits that "define[] inducement as requiring more than mere government initiation or solicitation of the crime").

5

*Co.*, 753 F.3d 395, 405 (2d Cir. 2014). Moreover, Romano's assertion that the court blurred the inducement and predisposition prongs of the entrapment defense is simply not supported by the record. Testimony from a government informant regarding Romano's intentions and his detailed planning of the crime prior to the government's involvement is relevant to prove *both* Romano's predisposition to commit the crime and a lack of government inducement.

In any event, the evidence that Romano was not induced by the government and that he was predisposed to commit the crime was overwhelming. *See United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011) ("An error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." (internal alterations and quotation marks omitted)). For the inducement prong, the jury heard testimony that Romano had discussed his plans for revenge prior to any government involvement and that Romano himself had admitted to law enforcement that the murder plot "was his idea." GA066. A rational jury would have concluded that Romano, and no one else, initiated the conspiracy. Further, there was overwhelming evidence that Romano was predisposed to committing the crime, including his enthusiasm and prompt positive response when offered assistance in committing the murders and his behavior in threatening to kill a witness in his prior coin fraud case. *See Bala*, 236 F.3d at 93–94 (stating that government may prove disposition by showing defendant's "previously formed design to commit the crime" or his "ready response" to government's inducement). Thus, any error was harmless.

For these reasons, the judgment of the district court is AFFIRMED.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

6

# EXHIBIT D

## Doc. 100 — Order Denying Rehearing

United States v. Romano, No. 14-1588-cr (2d Cir.)
Filed 01/11/2016

Romano v. United States, No. 26-15 (2d Cir.)

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 11th day of January, two thousand sixteen.

United States of America,

        Appellee,

v.

Dejvid Mirkovic, AKA Dave Mirkovic, AKA David Mirkovic, AKA Dejuid Mirkovic,

        Defendant,

Joseph Romano,

        Defendant - Appellant.

**ORDER**

Docket No: 14-1588

Appellant, Joseph Romano, filed a petition for panel rehearing, or, in the alternative, for rehearing *en banc*. The panel that determined the appeal has considered the request for panel rehearing, and the active members of the Court have considered the request for rehearing *en banc*.

IT IS HEREBY ORDERED that the petition is denied.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk



MANDATE

14-1588-cr
United States v. Romano

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 17th day of November, two thousand and fifteen.

Present:
> PETER W. HALL,
> GERARD E. LYNCH,
> > *Circuit Judges,*
> JED S. RAKOFF,
> > *District Judge.**

---

UNITED STATES OF AMERICA,

> *Appellee,*

> v.                                                                    No. 14-1588-cr

JOSEPH ROMANO,

> *Defendant-Appellant.*

---

For Defendant-Appellant:     DANIEL S. NOOTER, Esq., Washington, DC.

---

* The Honorable Jed Rakoff, of the United States District Court for the Southern District of New York, sitting by designation.

I

MANDATE ISSUED ON 01/21/2016

For Appellee:     UNA A. DEAN (David C. James, *on the brief*), Assistant United
States Attorneys, *for* William J. Hochul, United States Attorney for
the Western District of New York, Buffalo, NY.

---

Appeal from a judgment of the United States District Court for the Eastern District of

New York (Keenan, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND
DECREED** that the judgment of the district court is **AFFIRMED**.

Defendant Joseph Romano was convicted by a jury of conspiring to murder a federal

judge and Assistant United States Attorney ("AUSA"), all in violation of 18 U.S.C. § 1117, in

retribution for their roles in convicting and sentencing him for offenses related to a previous coin

fraud scheme.  According to the evidence presented at trial, the conspiracy took root when

Romano, who was serving a 180 month sentence for mail and wire fraud, informed a fellow

inmate of his desire to murder the judge and AUSA and mutilate their bodies.  Based on this

information, law enforcement set up a sting operation involving an undercover officer who posed

as a contract killer.  After paying the officer to assault a mechanic with whom he had a financial

dispute, Romano offered to pay $40,000 for the murder of the judge and AUSA.  The murders,

of course, were never consummated.  Romano was arrested, convicted, and sentenced, *inter alia*,

to life in prison for his crimes.  We assume the parties' familiarity with the underlying facts, the

procedural history of the case, and the issues on appeal.

Romano contends that the district court erred in denying his motion to suppress

incriminating statements he made after being arrested, claiming that the arresting officers

violated his *Miranda* rights by tricking him into believing he was entering a cooperation

agreement with the government. *See United States v. Romano*, No. 12 CR. 691 JFK, 2013 WL

5278420, at **1, 6 (E.D.N.Y. Sept. 18, 2013).  We review a district court's determination

2

regarding the constitutionality of a *Miranda* waiver *de novo* and its factual findings for clear error. *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015). In determining whether a defendant's confession was the product of coercion, the court considers "the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). Further, "[r]egardless of whether [an] agent's statements were false, misleading, or intended to trick and cajole the defendant into confessing, specific findings must be made that under the totality of the circumstances . . . the defendant's will was overborne by the agent's conduct." *Id.*

It was not error, much less clear error, for the trial court to find that there was "simply no evidence whatsoever of deceit by the agents." *Romano*, 2013 WL 5278420, at *6. The court noted that the agents did not actively question Romano until after he was transported from his prison cell to the FBI field office. *Id.* Further, Romano was informed of his *Miranda* rights both orally and in writing, and signed a written waiver that required him to initial next to each of the rights he was waiving. *Id.* at **5–6. The court credited the agent's testimony at the suppression hearing that Romano appeared to be calm and understood what was happening and found Romano's assertions to the contrary to be incredible. *Id.* at *6. Such "[c]redibility determinations are the province of the trial judges, and should not be overruled on appeal unless clearly erroneous." *United States v. Yousef*, 327 F.3d 56, 124 (2d Cir. 2003).

The court further noted that, although the agents had suggested that cooperation would be in Romano's interest because "it would be made known to the prosecutors and the judge," *Romano*, 2013 WL 5278420, at *6, it is well established that promises of leniency, without more, do not render a confession involuntary. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) ("Generally, promises of leniency will not render a confession involuntary."); *United States v.*

3

*Bye*, 919 F.2d 6, 8–9 (2d Cir. 1990) (emphasizing that voluntariness of waiver is a "comprehensive inquiry" and that mentioning the benefits of cooperation is not *per se* coercive); *United States v. Guarno*, 819 F.2d 28, 31 (2d Cir.1987) ("[A] confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.").

Romano argues that his case is distinguishable from the foregoing cases because the agents did not merely hold out a hope of leniency but led him to believe that he was entering a formal cooperation agreement. Romano contends the officers' actions violated the spirit of *Missouri v. Seibert*, which prohibits "two-step" interrogation techniques designed to deliberately circumvent the requirements of *Miranda. See Missouri v. Seibert*, 542 U.S. 600, 618–22 (2004) (Kennedy, J., concurring). Even if we were to extend *Seibert*'s holding to situations in which a defendant is "tricked" by law enforcement into believing he is entering a cooperation agreement, Romano has not presented any evidence that the agents deceived him. The purported agreement signed by Romano makes no mention of a promise of leniency. It merely stated Romano's intention "to cooperate with the FBI and provide statements about crimes I know of and crimes in which I was personally involved." *Romano*, 2013 WL 5278420, at *3. Aside from this signed statement, there is no other evidence to support Romano's claims.

Romano further contends that the trial court's jury instructions on his entrapment defense were legally erroneous and confusing to the jury. We review challenges to jury instructions *de novo. United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014). "Instructions are erroneous if they mislead the jury as to the correct legal standard or do not adequately inform the jury of the law." *Id.* (internal quotation omitted).

4

Entrapment is an affirmative defense with two elements: "(1) government inducement of the crime, and (2) lack of predisposition on the defendant's part." *United States v. Bala*, 236 F.3d 87, 94 (2d Cir. 2000). To establish inducement, a defendant must show "that it was the government, not he, that originated 'the criminal design.'" *United States v. Brand*, 467 F.3d 179, 189 (2d Cir. 2006) (quoting *Jacobson v. United States*, 503 U.S. 540, 548 (1992)). "If a defendant presents credible evidence of government inducement, then the prosecutor must show predisposition beyond a reasonable doubt." *Bala*, 236 F.3d at 94. The court instructed the jury that in order to prove his entrapment defense, Romano initially had the burden to show by "a preponderance of the evidence that a government agent originated the criminal design" of the crimes charged. If the jury so found, then the government would have the "burden to prove beyond a reasonable doubt that prior to first being approached by government agents, the defendant was ready and willing to commit the crime." JA 157–58.

Romano argues it was error to require the defense to show inducement by a preponderance of the evidence. He also asserts that the court conflated the inducement and predisposition prongs of the entrapment defense. These arguments are without merit. It is well established in this circuit that "a defendant hoping to assert the entrapment defense bears the burden of establishing inducement by a preponderance of the evidence." *Brand*, 467 F.3d at 190. To the extent that Romano asks us to overrule our prior precedents, we lack the power to do so; only the Court sitting *en banc* may overrule our prior decisions.[1] *Lotes v. Hai Precision Indus.*

---

[1] It is misleading to compare our precedents to that of sister circuits that have required a lower burden of production with respect to proving inducement, as those circuits have generally adopted a more stringent definition of what constitutes government inducement. *See United States v. Mayfield*, 771 F.3d 417, 431 (7th Cir. 2014) (comparing this circuit's "expansive understanding of inducement," which "encompasses almost *any* government solicitation of the crime," with other circuits that "define[] inducement as requiring more than mere government initiation or solicitation of the crime").

*Co.*, 753 F.3d 395, 405 (2d Cir. 2014). Moreover, Romano's assertion that the court blurred the inducement and predisposition prongs of the entrapment defense is simply not supported by the record. Testimony from a government informant regarding Romano's intentions and his detailed planning of the crime prior to the government's involvement is relevant to prove *both* Romano's predisposition to commit the crime and a lack of government inducement.

In any event, the evidence that Romano was not induced by the government and that he was predisposed to commit the crime was overwhelming. *See United States v. Kozeny*, 667 F.3d 122, 130 (2d Cir. 2011) ("An error is harmless if it is clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." (internal alterations and quotation marks omitted)). For the inducement prong, the jury heard testimony that Romano had discussed his plans for revenge prior to any government involvement and that Romano himself had admitted to law enforcement that the murder plot "was his idea." GA066. A rational jury would have concluded that Romano, and no one else, initiated the conspiracy. Further, there was overwhelming evidence that Romano was predisposed to committing the crime, including his enthusiasm and prompt positive response when offered assistance in committing the murders and his behavior in threatening to kill a witness in his prior coin fraud case. *See Bala*, 236 F.3d at 93–94 (stating that government may prove disposition by showing defendant's "previously formed design to commit the crime" or his "ready response" to government's inducement). Thus, any error was harmless.

For these reasons, the judgment of the district court is AFFIRMED.

FOR THE COURT:
CATHERINE O'HAGAN WOLFE, CLERK

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

# EXHIBIT F

## Doc. 103 — Supreme Court Certiorari Denial

United States v. Romano, No. 14-1588-cr (2d Cir.)
Filed 05/18/2016

Romano v. United States, No. 26-15 (2d Cir.)

# Supreme Court of the United States
# Office of the Clerk
# Washington, DC  20543-0001

**Scott S. Harris**
Clerk of the Court
(202) 479-3011

May 16, 2016

Clerk
United States Court of Appeals for the Second
Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, NY  10007

   Re: Joseph Romano
     v. United States
     No. 15-8925
     (Your No. 14-1588)

Dear Clerk:

  The Court today entered the following order in the above-entitled case:

  The petition for a writ of certiorari is denied.

        Sincerely,

        **Scott S. Harris**, Clerk

# EXHIBIT G

## Doc. 31, Pages 4–5 — Defense Withdrawal Motion

United States v. Romano, No. 14-1588-cr (2d Cir.)
Filed 08/25/2014

Romano v. United States, No. 26-15 (2d Cir.)

3.     With respect to the murder conspiracy case, Romano was convicted of conspiring to murder the Honorable Joseph F. Bianco, United States District Court Judge for the Eastern District of New York, and Assistant United States Attorney Laura Treinis Gatz of the United States Attorney's Office for the Eastern District of New York. Judge Bianco had presided over Romano's guilty plea and sentence in the prior coin fraud case, and AUSA Gatz was the prosecutor assigned to prosecute Romano for such fraud. The Government maintained in the murder conspiracy case that Romano had conspired to murder Judge Bianco and AUSA Gatz in an effort to force the recusal of Judge Bianco and the withdrawal of AUSA Gatz from the coin fraud case in the hope that a new judge and new prosecutor might agree to impose a lesser sentence against him therein.

4.     As a result of the charges levied in the murder conspiracy case (initially by criminal complaint and later by indictment), AUSA Gatz withdrew from the coin fraud case via an email to chambers, dated, October 11, 2012. Thereafter, in an order, dated, October 19, 2012 (09 Cr. 170, *ecf* #526), Judge Bianco recused himself from continuing to preside over the coin fraud case. The coin fraud case was then reassigned from the Central Islip courthouse of the Eastern District of New York to the Brooklyn courthouse and the Honorable Sterling Johnson, Jr., was ultimately appointed to preside over the remaining District Court proceedings related solely to the coin fraud case (i.e., to determine the amount of restitution owed to the victims of the offense, which had yet to be determined).

5.     Also as a result of the charges levied in the murder conspiracy case, the Hon. Carol B. Amon, Chief Judge of the United States District Court for the Eastern District of New York, issued an Administrative Order, dated, November 8, 2012 (12 Cr. 691, *ecf* #12), disqualifying the entire Eastern District bench from presiding over Romano's murder conspiracy

trial, pursuant to 28 U.S.C. § 455(a), because "the impartiality of the United States District Judges of the United States District Court for the Eastern District of New York might reasonably be questioned." Loretta Lynch, the United States Attorney for the Eastern District of New York, similarly withdrew her supervision of the case and limited the involvement of her office to only those attorneys essential to its prosecution.

6. The Honorable John F. Keenan, United States District Court Judge for the Southern District of New York, was designated by this Court to preside over Romano's murder conspiracy trial as a visiting judge to the Eastern District. With the exception of one brief ex parte conference relating to the health of prior counsel, all other proceedings relating to Romano's murder conspiracy case took place in the Brooklyn courthouse of the Eastern District of New York.

7. Prior to being indicted for conspiracy to murder Judge Bianco and AUSA Gatz, but subsequent to the imposition of his 15-year sentence in the coin fraud case, Romano fired his retained counsel and elected to proceed pro se in the coin fraud case. Romano has remained pro se in the coin fraud case ever since.

8. On October 5, 2012, a sealed complaint was issued against Romano alleging the two murder conspiracies.

9. On October 9, 2012, Romano was placed under arrest in relation to the murder conspiracy case to which he pleaded not guilty.

10. Also on October 9, 2012, Romano requested the appointment of counsel to represent him in relation to the murder conspiracy charges and, after a judicial determination that Romano could not afford retained counsel, Joseph F. Kilada, Esq., was appointed pursuant to the

# EXHIBIT H-1

## Doc. 133 — Government Motion to Preclude Impeachment

No. 1:12-cr-00691-DC (E.D.N.Y.), filed 01/03/2014
PageID #: 833–836

Romano v. United States, No. 26-15 (2d Cir.)

Case 1:12-cr-00691-DC    Document 133    Filed 01/03/14    Page 1 of 4 PageID #: 833



**U.S. Department of Justice**

*United States Attorney*
*Western District of New York*

MLM:UAD

January 3, 2014

VIA HAND DELIVERY AND ECF

The Honorable John F. Keenan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

             Re:   United States v. Joseph Romano
                  Criminal Docket No. 12-691 (JFK)

Dear Judge Keenan:

      The government respectfully submits this letter requesting that the Court deliver an instruction to the jury regarding the admission of recordings containing out-of-court statements not being offered for their truth. In addition, the government respectfully requests that the defense be precluded from introducing evidence aimed at impeaching the declarant of those statements.

I.    Background

      In August 2012, Nassau County Correctional Center ("NCCC") inmate Gerald Machacek approached the government to report that another NCCC inmate, the defendant Joseph Romano, was discussing the murder of the judge and prosecutor assigned to his case, United States District Judge Joseph F. Bianco and AUSA Lara Treinis Gatz. On August 10, 2012, under the supervision of law enforcement agents, Machacek recorded a conversation with Romano in the holding cell at the federal courthouse in Central Islip, New York. The government intends to authenticate and introduce the recording through the testimony of law enforcement agents who supervised the creation of the recording.[1]  At this time, the government does not intend to call

---

[1] Courts have repeatedly admitted recordings involving

1

Machacek in its case-in-chief.  Out of an abundance of caution, the government has provided the defendant with disclosures that would be required if Machacek were to be called as a government witness, including disclosures under Giglio v. United States and Title 18, United States Code, Section 3500.

## II.   Argument

While the recording in question contains statements made by Gerald Machacek, the government seeks to admit those statements not for their truth, but for the limited purpose of placing in context the defendant's statements on the recording.  It is well settled that statements of witnesses not appearing at trial are properly admitted for this limited purpose.  See, e.g., United States v. Dominguez, 280 Fed. Appx. 81, 84 (2d Cir. 2008) (holding, post-Crawford, that there is no Sixth Amendment violation where "the government fails to produce as a witness at trial an informant who is heard in a tape-recorded conversation with the defendant" so long as the informant's recorded statements are not admitted for their truth, but rather to establish context for the statements of the accused); United States v. Paulino, 445 F.3d 211, 216-17 (2d Cir. 2006); United States v. Barone, 913 F.2d at 49 (statements on tape made by cooperating witness not available for trial were admissible).

Accordingly, the government respectfully requests that the Court instruct the jury that Machacek's recorded statements are not being offered for their truth, but merely as context for the recorded statements of the defendant.  See, e.g., Dominguez, 280 Fed. Appx. at 84 (district court gave limiting instruction, "reminding the jury prior to their hearing the recordings that the statements of the confidential informant were not evidence, and were to be used by the jury only as context for the statements of [the defendant]").  This instruction should also note that Machacek's credibility is not at issue.  The government requests the following instruction, adapted from the instruction of then-United States District Judge Reena Raggi in United States v. Wagner, 00 CR 078 (RR), aff'd, 103 Fed. Appx. 422, 429 (2d Cir. 2004):

---

cooperating witnesses where the foundation for admissibility is laid by testimony of a supervising agent.  See, e.g., United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990); United States v. Fuentes, 563 F.2d 527, 532 (2d Cir. 1977); United States v. Dinero Express, Inc., 2000 WL 1134484, at *3 (S.D.N.Y. Aug. 9, 2000); United States v. Viola, 1992 WL 302903, at *3-*4 (E.D.N.Y. Oct. 7, 1992).

2

> The government is about to play a recording in which an individual known as Gerald or Jerry Machacek was a participant. Nothing said by Mr. Machacek on the recording is to be considered by you to be true. Only statements made by the defendant are to be considered for their truth. The statements of Mr. Machacek, or any other unidentified voice, are simply admitted to provide you with a context in which to evaluate any statements by the defendant. Because Mr. Machacek has not been called as a witness, and because his statements are not admitted for their truth, you do not have to evaluate his credibility or believability the way you have to evaluate the testimony of witnesses who have been on the stand before you. I emphasize again, none of Mr. Machacek's statements are offered for their truth.

A transcript of Judge Raggi's instruction is attached as Exhibit A.

In addition, the government respectfully requests that the Court preclude the defense from cross-examining government witnesses or otherwise introducing evidence to attack Machacek's credibility. Rule 806 of the Federal Rules of Evidence governs the admissibility of evidence offered to attack the credibility of an out-of-court declarant. The Rule provides in relevant part:

> When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness.

Fed. R. Evid. 806 (emphasis added).

Federal Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c) (emphasis added). As noted, the government does not seek to admit Machacek's recorded statements for their truth, but rather merely to place the defendant's recorded statements in context. Nor will the government seek to introduce

3

any statement of Machacek as a purported admission of the defendant pursuant to Rule 801(d)(2)(C), (D), or (E). In short, because the government will not offer any of Machacek's statements for its truth, it will not be placing Machacek's credibility in issue. Evidence impeaching Machacek's credibility is therefore not admissible. See, e.g., Paulino, 445 F.3d 211, 217 ("[C]learly established is the principle that a statement not offered to prove the truth of the matter asserted may not be impeached under Rule 806"); United States v. Zagari, 111 F.3d 307, 318 (2d Cir. 1997) ("Rule 806 is not applicable to non-hearsay statements"); McGowan, 58 F.3d at 15-16 (affirming district court's refusal to permit impeachment of credibility of non-testifying informant who had made surreptitious recordings of defendant that were offered at trial).

Accordingly, the Court should preclude the defense from introducing, through cross-examination of the government's witnesses or otherwise, evidence of the Machacek's criminal history, bad character or conduct, or the nature of any benefit Machacek may have received from the government.

## III. Conclusion

For the reasons set forth above, the government respectfully requests an instruction to the jury indicating that recorded statements by Gerald Machacek are not being offered for their truth, but rather as context for statements by the defendant. In addition, the government respectfully requests that the Court preclude the defense from introducing evidence to impeach the credibility of Gerald Machacek.

Respectfully submitted,

ERIC H. HOLDER, JR.
Attorney General of the United States
WILLIAM J. HOCHUL, JR.
United States Attorney

By:  /s/ Marshall L. Miller
Marshall L. Miller
Una A. Dean
Assistant U.S. Attorneys
(718) 254-6421/6473

Encl.

cc:       Defense counsel (via email and ECF)

4

# EXHIBIT H

## Doc. 142 — In Limine Ruling

No. 1:12-cr-00691-DC (E.D.N.Y.), filed 01/08/2014
PageID #: 861–866

Romano v. United States, No. 26-15 (2d Cir.)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------X
UNITED STATES OF AMERICA          :
                                  :
      -against-                   :      No. 12 Cr. 691 (JFK)
                                  :      **MEMORANDUM OPINION & ORDER**
JOSEPH ROMANO,                    :
                                  :
            Defendant.            :
-------------------------------X

**JOHN F. KEENAN, United States District Judge:**

Before the Court is the Government's motion in limine seeking to preclude the defense from impeaching the Government's informant, Gerald Machacek, whom the Government is not calling in its case-in-chief.  For the reasons that follow, the motion is granted.

The conversation at issue occurred on August 10, 2012 between Defendant and Machacek, who recorded it.  It is important to note that Defendant is not seeking the exclusion of the conversation under Rules 403 or 404(b), or any other provision of the Federal Rules of Evidence.  Indeed, the Court has admitted the entire recording upon Defendant's motion. See Fed. R. Evid. 106.  In opposing the Government's motion, Defendant instead argues that he must be allowed to introduce evidence that undermines Machacek's credibility.

Defendant is mistaken.  "The Federal Rules of Evidence provide that a declarant's credibility may be attacked only "[w]hen a hearsay statement, or a statement defined in Rule

801(d)(2)(C), (D), or (E) has been admitted into evidence." United States v. Perez, No. 05 Cr. 441, 2005 WL 2709160, at *2 (S.D.N.Y. Oct. 20, 2005) (Leisure, J.) (citing Fed. R. Evid. 806). Here, the Government is offering Machacek's statements to provide context for Defendant's responses and remarks during the recording. See, e.g., United States v. Sorrentino, 72 F.3d 294, 298 (2d Cir. 1995) (overruled on other grounds) (confidential informant's statements were not hearsay where offered not "to prove the truth of the matters asserted but only to render what [the defendant] said in these conversations intelligible"); United States v. Walker, No. 99 Cr. 379, 1999 WL 777885, at *4 (S.D.N.Y. Sept. 29, 1999). Because Machacek's statements are not being offered for their truth, they are not hearsay as defined in Rule 801(c). Accordingly, Machacek's credibility is not relevant and, unless he testifies at trial, there is no valid basis for the defense to call his credibility into question. See Perez, 2005 WL 2709160, at *4 ("Because the informant's statements are not hearsay, and because the government will not call the informant as a witness at trial, it follows that defendant may not impeach the credibility of the informant.").

Defendant's remaining arguments in opposition to the Government's motion in limine are similarly meritless. First, he purports to distinguish the caselaw cited by the Government

2

because those cases do not concern a confidential informant. However, it is well settled in this Circuit that a district court may preclude the defense from impeaching an informant or cooperator who does not testify and whose recorded statements are not offered for their truth. See, e.g., United States v. Wagner, 103 F. App'x 422, 429 (2d Cir. 2004) (summary order) (vacated on other grounds); Sorrentino, 72 F.3d at 298; United States v. McGowan, 58 F.3d 8, 15-16 (2d Cir. 1995).

Second, contrary to Defendant's claims, the Government's use of the recorded conversation at trial does not violate his rights under the Confrontation Clause, as the Second Circuit has consistently held both before and after Crawford v. Washington, 541 U.S. 36 (2003), was decided by the Supreme Court. See, e.g., United States v. Paulino, 445 F.3d 211, 216-17 (2d Cir. 2006); United States v. Barone, 913 F.2d 46, 49 (2d Cir. 1990) (no Confrontation Clause problem when "the government fails to produce as a witness at trial an informant who is heard in a tape-recorded conversation with the defendant," so long as the informant's statements are offered for context and not for truth); see also Crawford, 541 U.S. at 59 n.9 (noting that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted").

3

Third, the fact that the defense now plans to argue entrapment does not alter the established principles set forth by the precedent.  While the defense is free to call Machacek at trial in support of its entrapment theory, it cannot impeach Machacek on the mere basis of the August 10, 2012 recording because the jury need not evaluate his credibility or motives to consider that evidence. See Wagner, 103 F. App'x at 429; Perez, 2005 WL 2709160, at *2-3.  Similarly, that Machacek is the Government's "principal informant" does not change the analysis. See United States v. Regan, 103 F.3d 1072, 1083 (2d Cir. 1997) ("We have previously made clear that a district court need not allow impeachment of even a 'central figure' whose out-of-court statements were not admitted for their truth." (quoting McGowan, 58 F.3d at 15-16)).

Finally, Defendant repeatedly cites United States v. Check, 582 F.2d 668, 684 n.44 (2d Cir. 1978), for the broad proposition that "when the Government introduces the out-of-court testimony of a Government informant, the defense may impeach the credibility" of that informant.  Check does not so hold.  In that case, the panel concluded that the Government had improperly called to testify a detective whose main purpose was to serve "as a transparent conduit for the introduction of inadmissible hearsay information obviously supplied by and emanating from" a confidential informant. Id. at 678.  The panel

4

further determined that there was "no doubt that the out-of-court statements uttered by Cali [the informant], audaciously introduced through the artifice of having Spinelli [the detective] supposedly restrict his testimony to his half of his conversations with Cali, were being offered to prove the truth of the matters asserted in them." Id. at 679.  The Second Circuit reversed the conviction and remanded for a new trial, but noted in the footnote cited here by Defendant that it had been proper for the defense to impeach the informant, whose statements had been indirectly offered for their truth through the detective, under Rule 806. See id. at 684 n.44.  In the instant case, however, Machacek's statements are not hearsay and are not being offered for their truth.  Accordingly, as the Second Circuit has repeatedly recognized, there is no proper basis for impeachment under Rule 806. See Wagner, 103 F. App'x at 429; McGowan, 58 F.3d at 15-16.

## Conclusion

For the reasons stated above, the Government's motion to preclude the defense from impeaching Machacek on the basis of his recorded statements is granted.  The Court will deliver a limiting instruction to the jury advising them that Machacek's statements on the recording are offered only for context and not for their truth.  The defense remains free to call Machacek as its own witness. See Fed. R. Evid. 607; Perez, 2005 WL 2709160,

5

Case 1:12-cr-00691-DC    Document 142    Filed 01/08/14    Page 6 of 6 PageID #: 866

at *3.    The defense also remains free to argue in its summation that the jury should draw an adverse inference from the Government's decision not to call Machacek. See, e.g., United States v. Torres, 845 F.2d 1165, 1170-71 (2d Cir. 1988).

**SO ORDERED.**

Dated:    Brooklyn, New York
          January  8  , 2014                    s/John F. Keenan
                                                John F. Keenan
                                                United States District Judge

# EXHIBIT I

## Machacek Letter (Gov't Ex. 3500-GM-14)

August 7, 2012
Fax footer: USAO EDNY

Romano v. United States, No. 26-15 (2d Cir.)

AUG-07-2012 09:35AM From: ID:USAG EDNY Page:002 R=97%

GOVERNMENT
EXHIBIT
3500-GM-14
12 CR 691 (JFK)

Dear Mo Le Pons,

Hi I hope you are feeling and doing well. I am upset about something, I don't know what to do. I was in the law library the other day with another Federal inmate who was sentenced to 16yrs. He has known me in here for a while, he's nuts but what makes him so dangerous is the amount of money, hence power he has, he has corrupted most of the staff, inmates alike. Well he is so Angry at his "(unfair)" sentence he's a snob thinks he's above the law because of his millions, previous lifestyle. He told me he wants the Judge who sentenced him, the Ass US attorney, and the probation officer who did his psi dead, killed, what do I do, This man is 100%

Aug. 7. 2012 9:33AM

capable and has the means to do this all ⊗ he ranted about for 2 hours was he doesn't care about any thing else in life except getting his revenge against the Judge, US Att & probation off. Should we talk to MR Ryan & MR Holms about this I have no idea if he has plans in the works or what I'm scared for all these people, I would like you to come up and see me, I can't sleep Mr. LaPinta I will try & see him again _____ and see where his head is at of course if he brings it up I will persuade him that its a bad idea, but the last time, this guy is hell bent on revenge this eyes are crazy, he told me he doesn't care what it costs him money or any thing else. He was

(wife, kids ect)

Case: 26-15, 05/26/2026, DktEntry: 41.1, Page 135 of 321

AUG-07-2012 09:36AM From: ID:USAO EDNY Page:004 R=97%

talking about his expertise in
(his connections weapons & bombs, how he knows
to other experts) from the Navy, he went
on for a good hour,
maybe he's nuts, but he
convinced me, I can paint
a better picture if I
speak about it better than
writing. Please call Eve; when
you get this I wish you
could accept my calls if
you have a # that accepts my
calls give it to Eve, you can
pay my your phone also. The
Judge is our Judge Bianco
thats how this guy got stopped
he saw my paper work w/ his
(Bianco's) name on it, I'm not sure
of the US Att name I'll
try & get it tomorrow.
I have told no one about
this, I don't trust anyone
in here, he pays off many
employees; here, I only trust
you, & Mr Ryan & Mr Johns I
know its crazy but I
always get a good vibe from

them. Well in the mean time I'll just sit here and stress. I'm not even thinking about my situation right now, that's how rattled this has me. Please be discreat I don't want any one to know that I'm talking about this it will get me killed in here but I can't just not say any thing these people could loose their lives. Waiting to ~~here~~ hear from you

thanks for listening

sincerly Jerry

Oh yeah the guy's name is Joe I'll get his last name if I can

Please tell Eve if I have to go to the courthouse

# EXHIBIT I-1

## Envelope

Postmarked September 12, 2014

Romano v. United States, No. 26-15 (2d Cir.)





# EXHIBIT J

## Jury Charge Excerpt — Entrapment Instruction

No. 1:12-cr-00691-DC (E.D.N.Y.)
Trial Tr. 1630:22–1632:8 (Jan. 23, 2014)

Romano v. United States, No. 26-15 (2d Cir.)

substitute for proof that the defendant committed the crimes charged in this case. Nor may you consider this evidence as proof that the defendant has a criminal propensity or bad character. The evidence of other bad acts was admitted for a limited purpose, and you may consider it only for that limited purpose.

Evidence has been introduced that the defendant made statements to law enforcement officials about the crimes charged. You should weigh that evidence with caution and carefully consider all the circumstances surrounding the making of the statement. Do this in deciding what weight to give it, along with all the other evidence, when deciding the guilt or innocence of the defendant. In examining the circumstances surrounding the statement, you may consider whether the defendant made it freely and voluntarily with an understanding of what he was saying. You may consider whether he made it without fear, threats, coercion, or force, either physical or psychological, and without promise of reward. You may consider the conversation between law enforcement and the defendant. Considering all the circumstances, you should give his statement such weight as you think it deserves.

Now, I will discuss with you the defense of entrapment. The defendant asserts, as a defense, that he was the victim of entrapment by an agent of the Government. While the law permits government agents to trap an unwary criminally

*Charge of the Court*                                      1631

minded person, the law does not permit the government agents to entrap an unwary innocent. Thus, a defendant may not be convicted of a crime if it was the Government who gave the defendant the idea to commit the crime, if it was the Government who also persuaded him to commit the crime, and if he was not ready and willing to commit the crime before the government officials or agents first spoke with him.

On the other hand, if the defendant was ready and willing to violate the law, and the Government merely presented him with an opportunity to do so, that would not constitute entrapment.

Your inquiry on this issue should first be to determine whether the defendant has shown by a preponderance of the evidence that a government agent originated the criminal design of the particular criminal acts charged in the indictment. To prove something by a preponderance of the evidence means to prove only that it is more likely true than not true. If you find that the defendant has failed to meet this burden, then there cannot be any entrapment and your inquiry on this defense should end there.

If, on the other hand, you find that a government agent initiated the criminal acts charged in the indictment, then you must decide if the Government has satisfied its burden to prove beyond a reasonable doubt that prior to first being approached by government agents, the defendant was ready

and willing to commit the crime.

To determine whether the defendant was ready and willing to commit the offenses charged, you may rely upon any relevant evidence of what the defendant said or did before first being approached by a government agent. You may also rely upon any of the relevant statements of the defendant after he was first approached by the government agent. But you may rely upon the defendant's conduct after he was first approached by the government agent only if that conduct is independently motivated and not the product of attention that the Government might have directed at the defendant.

If you find beyond a reasonable doubt the defendant was predisposed - that is, ready and willing - to commit the offenses charged, and merely was awaiting a favorable opportunity to commit them, then you should find the defendant was not the victim of entrapment. On the other hand, if you have a reasonable doubt that the defendant would have committed the offenses charged without the Government's inducements, you must acquit the defendant.

You have heard testimony from both Agents of the Federal Government and the Nassau County and Suffolk County Police Departments. The fact that a witness acts in a law enforcement capacity does not mean that his or her testimony is deserving of more or less consideration or greater or lesser weight than that of an ordinary witness. It is for you

*Charge of the Court* 1633

to decide, after weighing all of the evidence, in light of the instructions I have given you about factors relevant to determining the credibility of any witness, whether you accept the testimony of a government employee or law enforcement witness and what weight, if any, it deserves.

There has been evidence introduced at trial that the Government used an informer in this case. I instruct you that there is nothing improper in the Government's use of informers and, indeed, certain criminal conduct never would be detected without the use of informers. You, therefore, should not concern yourselves with how you personally feel about informers because that's really beside the point. Put another way, your concern is to decide whether the Government has proved the guilt of the defendant beyond a reasonable doubt, regardless of whether the evidence was obtained by the use of an informer.

On the other hand, when an informer testifies, as he did here, his testimony must be examined with greater scrutiny than the testimony of an ordinary witness. You should consider whether he received any benefits or promises from the Government which would motivate him to falsely testify against the defendant. For example, he may believe that he will only continue to receive these benefits if he produces evidence of criminal conduct.

If you decide to accept his testimony, after

# EXHIBIT K

**Trial Transcript Excerpt — Jury-Note Chronology**

No. 1:12-cr-00691-DC (E.D.N.Y.)
Trial Tr. 1646:4–10; 1648:4–1649:13 (Jan. 23, 2014)

Romano v. United States, No. 26-15 (2d Cir.)

*Proceedings*                                                                1646

(Jury enters courtroom.)

THE COURT:  All right.

You all may be seated.

I received the following note from the jury at 11:48:

We need to review the video between Jerry -- it reads Machek, which means Machacek, and Joseph Romano.

Juror #1.

The note has been shown to counsel, the video is here and we can play it.  The transcripts are there, 201.

If you want to look at the transcript, you can; if you don't want to, you don't have to.  Remember it is what you hear and what you see that is the evidence, not the transcript of what you see.  The transcript is only an aid for you.  All right.

You may play 201.

(Whereupon, the tape is playing.)

(Tape is paused.)

MR. MILLER:  Your Honor, I'd just reminds folks that there are those smaller screens.  It is a little hard to see because of the lights.

THE COURT:  Okay, you can use the smaller screens.

(Tape continues.)

(Tape concluded.)

THE COURT:  All right.

*Proceedings*                                                    1648

A F T E R N O O N   S E S S I O N

(Time noted:  2:20 p.m.)

(Defendant present.)

THE COURT:  Good afternoon, everyone.

MR. MILLER:  Good afternoon.

THE COURT:  The reason I asked you all to come back earlier and asked the Marshals to produce -- you may be seated -- to produce Mr. Romano is about two minutes after the jury went in after having heard 201 they sent another note, Mr. Ryan was down getting their lunch so the court officer gave me the note and I marked it, it is Court's Exhibit Two, 1:39 p.m., 1/23/14:

Can we have 201T as in aid, it reads, in our discussion?

Juror No. 1.

Now, of course, the answer is no.  So, we'll have to bring them in and tell them that and explain why.

MR. MILLER:  Yes, Your Honor.

THE COURT:  Okay.

MR. GOLTZER:  Yes.

MR. BACHRACH:  Thank you, Your Honor.

THE COURT:  Thank you for coming back early, I appreciate it.  Thank you, Marshals.

(Pause.)

(Jury enters courtroom.)

*Proceedings* 1649

THE COURT: All right. You may be seated.

First of all, I should explain to you why there was some delay. The lawyers and Mr. Romano are entitled to lunch too and so we couldn't answer your note under the rules until I showed it to them and let them know what this was all about.

So, the note, as they know, is:

Can we have 201T as in aid, it reads -- I think you mean an aid -- in our discussion?

Juror No. 1.

And I discussed it with the lawyers and the answer is no and the reason the answer is no is because it's only an aid in listening. So, you can't have it, sorry. You may resume your deliberations.

A JUROR: Thank you, Your Honor.

THE COURT: Okay.

(Jury leaves courtroom.)

(Deliberations continue.)

THE COURT: All right. Thank you, gentlemen and Ms. Dean.

MS. DEAN: Thank you, Your Honor.

(Deliberations continue.)

(Continued on next page.)

HOLLY DRISCOLL, CSR
OFFICIAL COURT REPORTER

# EXHIBIT L

## Doc. 99 — Machacek Plea Transcript

No. 2:11-cr-00639-JFB (E.D.N.Y.), filed 11/27/2012
PageID #: 257–296

Romano v. United States, No. 26-15 (2d Cir.)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X
                              :
UNITED STATES OF AMERICA,     :
                              :      11-CR-639 (JFB)
        v.                    :
                              :      October 16, 2012
GERALD MACHACEK,              :
                              :      Central Islip, NY
            Defendant.        :
                              :
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR PLEADING
BEFORE THE HONORABLE JOSEPH F. BIANCO
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          LORETTA LYNCH, ESQ.
                             UNITED STATES ATTORNEY
                             BY: BURTON RYAN, ESQ.
                             ASSISTANT U.S. ATTORNEY
                             271 Cadman Plaza East
                             Brooklyn, New York  11201


For the Defendant:           ANTHONY LaPINTA, ESQ.




Audio Operator:


Court Transcriber:           ARIA SERVICES, INC.
                             c/o Elizabeth Barron
                             102 Sparrow Ridge Road
                             Carmel, NY 10512
                             (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

THE CLERK:  Calling case 11-CR-639, U.S.A. v. Gerald Machacek.  Counsel, please state your appearance for the record.

MR. RYAN:  For the government, your Honor, Burton Ryan.

THE COURT:  Good afternoon, Mr. Ryan.

MR. LaPINTA:  Good afternoon, your Honor. For Mr. Machacek, Anthony LaPinta.

THE COURT:  Good afternoon, Mr. LaPinta. And the defendant is present as well.  I apologize for the delay but we are ready to proceed.  As you can see, we don't have the court reporter here, so if everyone could just remain seated and make sure that you're using the mics, so that we have a good record of the proceeding, that would be great.

Okay.  My understand is your client has an application today, Mr. LaPinta.

MR. LaPINTA:  Yes, your Honor.

THE COURT:  What is that?

MR. LaPINTA:  The application is that he will be entering a plea of guilty --

THE COURT:  Just pull the mic a little closer to you.

MR. LaPINTA:  I'm sorry, sir.  The application is that my client will be pleading guilty

3

to Counts 1, 6 and 11 of the superseding indictment.

THE COURT:  Okay.  And that's pursuant to an agreement with the government?

MR. LaPINTA:  Yes, sir.

THE COURT:  Okay.

Is that correct, Mr. Machacek?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  Before I can accept your guilty plea to those counts, Mr. Machacek, I have to ask you a number of question, so that I can establish to my satisfaction that you wish to plead guilty because you are guilty and not for some other reason. I also need to establish that you know what rights you're giving up by pleading guilty.

So I'm going to ask you a series of questions.  If you don't understand one of my questions, let me know and I'll rephrase it, or if you want to speak to Mr. LaPinta at any time for any reason, let me know and I'll give you as much time as you need to do that, okay?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  Are you speak, read and understand English?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  If you could please raise

4

your right hand.

(Defendant is sworn.)

THE COURT:  Okay, you can put your hand down.  Having been sworn, your answers to my questions will be subject to the penalties of perjury or making a false statement, if you do not answer truthfully.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Could you state your full name for the record?

THE DEFENDANT:  Gerald Machacek.

THE COURT:  How old are you, Mr. Machacek?

THE DEFENDANT:  43.

THE COURT:  You said you're 43?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  And how far did you go in school?

THE DEFENDANT:  High school to college, some college.

THE COURT:  Some college?

THE DEFENDANT:  Yes.

THE COURT:  Is that yes?  I didn't hear you.

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Are you now or have you recently been under the care of a doctor or a

5

psychiatrist?

THE DEFENDANT: No.

THE COURT: Have you ever been hospitalized or treated for any mental illness, including any type of addiction, such as drug or alcohol addiction?

THE DEFENDANT: No, your Honor.

THE COURT: Have you taken any drugs, medicine or pills or any alcoholic beverages in the past 48 hours?

THE DEFENDANT: No.

THE COURT: Is your mind clear today?

THE DEFENDANT: Yes, your Honor.

THE COURT: Do you understand what you're doing today?

THE DEFENDANT: Yes.

THE COURT: Do either counsel have any doubt as to the defendant's competence to plead at this time?

MR. LaPINTA: I have no doubt.

THE COURT: Mr. Ryan?

MR. RYAN: None, Judge.

THE COURT: Okay. On the basis of Mr. Machacek's responses to my questions, my observations of his demeanor and the representations of counsel, I find that he is fully competent to enter an informed plea at this time.

Mr. Machacek, have you had sufficient time to discuss this case with Mr. LaPinta, including any possible defenses that you might have to the charges to which you're pleading guilty?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Are you satisfied with your attorney's representation?

THE DEFENDANT:  Yes, very.

THE COURT:  Okay.  I'm now going to describe to you certain rights that you have under the Constitution and laws of the United States.  You're giving up these rights by pleading guilty, so please listen carefully.

Under the Constitution and laws of the United States, you're entitled to a speedy and public trial by a jury, on the charges contained in superseding indictment 11-639 (S-3).

Do you understand that?

THE DEFENDANT:  Yes, Judge.

THE COURT:  At the trial, you would be presumed to be innocent and the government would be required to prove your guilt.  They would have the burden of proof by competent evidence beyond a reasonable doubt, before you could be found guilty

Do you understand that?

7

THE DEFENDANT:  Yes, your Honor.

THE COURT:  A jury of twelve people would have to agree unanimously that you were guilty and you would not have to prove that you were innocent, if you were to go to trial.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  During the trial -- at the trial and at every stage of your case, you would be entitled to be represented by a lawyer, and if you could not afford a lawyer, one would be appointed at public expense, free of cost, to represent you at each and every stage of the criminal proceeding.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  During the trial, the government would have to call the witnesses to court to testify in your presence.  Your lawyer could cross-examine the witnesses for the government, your lawyer could object to evidence offered by the government, and your lawyer could offer evidence on your own behalf, if you so desired.  You'd also have the right to have subpoenas issued or other process used to compel witnesses to testify in your defense.

Do you understand that?

8

THE DEFENDANT: Yes, your Honor.

THE COURT: At the trial, although you would have the constitutional right to testify if you chose to do so, you also have the constitutional right not to testify. And if you decided not to testify, no one, including the jury, could draw any adverse inference or suggestion of guilt from the fact that you did not testify.

Do you understand that?

THE DEFENDANT: Yes, Judge.

THE COURT: If you're convicted at trial, you would have the right to appeal the verdict.

Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Even now, as you're offering to enter this guilty plea, you have the right to change your mind, continue in a plea of not guilty, and go to trial on the charges contained in superseding indictment (S-3).

Do you understand that?

THE DEFENDANT: Yes.

THE COURT: If you plead guilty and if I accept your plea, you will give up your right to a trial and all the other rights that I've just discussed with you, other than your right to an attorney, because

9

you have the right to an attorney regardless of whether or not you plead guilty.

However, if you plead guilty, there will be no trial and I will enter a judgment of guilty and sentence you on the basis of your guilty plea, after I've considered the presentence report and the submissions and arguments by both sides, in connection with your sentencing. There will be no appeal on the question of whether you did or did not commit the crimes to which you are pleading guilty.

Do you understand that?

THE DEFENDANT: Yes, Judge.

THE COURT: If you plead guilty, you also have to give up your right not to incriminate yourself because in a moment, I'm going to ask you questions about what you did, in order to satisfy myself that you are guilty as charged, and you will have to admit and acknowledge your guilt under oath.

Do you understand that?

THE DEFENDANT: Yes, Judge.

THE COURT: Mr. Machacek, are you willing to give up your right to a trial and the other rights that I've just discussed with you?

THE DEFENDANT: Yes, Judge.

THE COURT: Let me just summarize the

10

charges to which you're pleading guilty, to make sure that you understand them.  I know you've obviously discussed this with your attorney, but let me just summarize them.

You're pleading guilty to Count 1, which is, in summary, a robbery conspiracy, and it charges that between approximately April 1st of 2000 and April 10th -- excuse me, April 1st of 2010, that you, in the district, along with others, knowingly and intentionally conspired to commit robbery of illegal narcotics traffickers and business owners in Brooklyn, Queens, the Bronx, Nassau and Suffolk, in violation of Section 1951 of Title 18.

Count 6 charges you with conspiracy to launder money.  In summary, again, it charges that between April 1st of 2008 and October 26th of 2011, in this district and elsewhere, you along with others knowingly and intentionally conspired to conduct financial transactions in and affecting interstate commerce, specifically money obtained from the sale of controlled substances and robbery proceeds.  And knowing that that property involved the proceeds form this unlawful activity, you engaged in these transactions with the intent to promote the carrying on of the specified unlawful activity, in violation of the

money laundering statutes under federal law that are stated in the indictment.

And finally, Count 11 charges you with the use of a firearm during a crime of violence, specifically that on or about January 29th of 2009, in this district, that you with others knowingly and intentionally used and carried a black handgun during and in connection with the robberies in Count 1 to Count 10, and that you knowingly and intentionally possessed the gun in furtherance of those crimes of violence, in violation of Section 924(c) of Title 18.

Do you understand, in summary, that that's what the indictment charges you with?

THE DEFENDANT:  Yes, Judge.

THE COURT:  Let me just briefly go through the elements of that crime that the government would have to prove to the jury beyond a reasonable doubt, if you were to go to trial on those charges.  Obviously, you're giving up your right to have the jury make the findings with respect to these elements, but I want to make sure that you understand what those elements are.

First, with respect to the Hobbs Act robbery conspiracy, the government would have to prove that there was an agreement between two or more persons, not including law enforcement people, people acting at the

direction of law enforcement, that there was an agreement to commit robbery.  They would have to prove the elements of the objective of robbery to the jury specifically under federal law:

First, that the defendant knowingly obtained or took the personal property of another or from the presence of another;

second, that you took this property against the victim's will, by actual or threatened force, violence or fear of injury, whether immediately or in the future;

and third, that the obtaining of the property by force as described affected interstate commerce in some way.

So it would have to prove each of the elements of the objective of that conspiracy, and then they would have to prove that you knowingly and intentionally joined or participated in that conspiracy to commit robbery or to bring about that objective, and that it occurred on or about the dates of the indictment in this district.  Those would be the elements for Count 1.

With respect to Count 6, the conspiracy to launder money, again, because it's a conspiracy, they would have to prove two or more people, not at the

direction of law enforcement, agreed to commit the crime of money laundering. They would have to prove each of the elements of that crime of money laundering to the jury. This is under Section 1956(a)(1)(A)(i).

Specifically, they would have to prove first that there were financial transactions that were conducted in and affecting interstate commerce. Specifically here, we're talking about money that they allege was from the sale of controlled substances and robbery proceeds.

And they would have to prove that the transactions involved the proceeds of these specified unlawful activities, so they would have to prove that the proceeds were from narcotics trafficking, in violation of the federal narcotics laws that are stated in the indictment, as well as robbery, in violation of Section 1951 that I've already described to you.

And the next element of that crime is that you must know that the property involved in the transactions in fact represented the proceeds of that unlawful activity.

And then the last element is that the transaction as described was engaged in with the attempt to promote the carrying on of the specified unlawful activity.

So they would have to prove all of the elements of money laundering with respect to the conspiracy, and then again, they would have to prove that you knowingly and intentionally joined and participated in that conspiracy to launder the proceeds of the robbery and narcotics offenses, and that it occurred -- your participation in that conspiracy occurred on or about the dates of the indictment in this district.

Finally, with respect to Count 11, the use of a firearm during a crime of violence:

First, they would have to prove the underlying crime of violence, all of the elements of the underlying crime of violence, that is Count 1 or Count 10, which is a particular robbery, the January 29th, 2009 robbery. They would have to prove the elements of robbery as I've described them to you, that that occurred -- that on or about January 29th, 2009, that a robbery occurred, with all of the elements that I've previously described.

And then they would have to prove that you knowingly and intentionally used and carried a firearm in connection with the robbery, and that you knowingly and intentionally possessed that firearm in furtherance of the robbery.

So they would have to prove all of those elements to the jury beyond a reasonable doubt. Again, they would have to prove that it occurred on or about January 29th of 2009, in this district.

Do you understand that if you were to go to trial, the government would have to prove all those elements to the jury beyond a reasonable doubt, and by pleading guilty, you're giving up your right to have them do so?

THE DEFENDANT: Yes, Judge.

THE COURT: Let me review with you now the maximum penalties as well as any mandatory minimum penalties for the crimes to which you're pleading guilty.

Count 1, the conspiracy to commit robbery, carries a maximum term of imprisonment of twenty years. There is no minimum term of imprisonment. There is a maximum supervised release term of three years that would follow any term of imprisonment.

There are conditions that are attached to supervised release. If you violate any of those conditions, you can be sentenced to up to two years additional in jail, without credit for pre-release imprisonment or time previously served on post-release supervision.

There is a maximum fine of the greatest of $250,000 or two times the gross pecuniary gain derived from the offense or two times the gross pecuniary loss to persons other than yourself, resulting from the offense.  You are also subject to restitution to the victims of the crime, in an amount to be determined by the Court at sentencing, which is not greater than the dollar amount of the total losses suffered by the victims of the robberies that are part of Count 1.

I'll get to this in a moment.  In your agreement, you're consenting to have the Court include the losses resulting from any related conduct in the order of restitution, and I'll explain that more in a moment, when I get to your agreement.  And, also, restitution with respect to the offense of conviction for this crime is mandatory.

There's also a $100 mandatory special assessment, and you're also subject to criminal forfeiture, which again I'll describe more in connection with your agreement.

With respect to Count 6, conspiracy to launder money, the maximum term of imprisonment is twenty years.  There is no minimum term of imprisonment.

There's a maximum supervised release term of

17

three years, to follow any term of imprisonment.  If a condition of release is violated on this count, you may be sentenced to up to two years, without credit for pre-release imprisonment or time previously served on post-release supervision.

You're subject to the greater of $500,000 or twice the value of the funds involved in the money laundering.  You're also subject to restitution, in an amount to be determined by the Court.  Again, restitution is mandatory.  There's a $100 mandatory special assessment.  Again, for this count, you're also subject to criminal forfeiture as well.

Finally, with respect to Count 11, the use of a firearm during a crime of violence, there's a mandatory minimum term of imprisonment of five years that must run consecutively to any other sentences imposed, including the sentences imposed on Counts 1 and 6.

You're also subject on Count 11 to a maximum supervised release term of three years, to follow any term of imprisonment.  If a condition of release is violated, you could be sentenced to up to two years additional in jail, without credit for pre-release imprisonment or time previously served on post-release supervision.

18

You're subject on this count to a maximum fine of the greatest of $250,000 or two times the gross pecuniary gain derived from the offense or two times the gross pecuniary loss to persons other than yourself resulting from the offense.

For Count 11, you're also subject to restitution in an amount to be determined by the Court, which is not greater than the dollar amount of the total losses suffered by the victims of the offense in Count 11.  Again, you're consenting to have the Court include losses resulting from any related conduct in any order of restitution.  You're also subject to a $100 mandatory special assessment.

I want to emphasize to you that the sentences for Counts 1 and 6 may be imposed consecutively.  That's within the discretion of the Court.  So they could be imposed to run one after the other, and as I told you a moment ago, the sentence imposed for Count 11 must run consecutively.  So in total, you're exposing yourself to a maximum, with all the counts combined, of 45 years in jail with a mandatory minimum of five years.

Do you understand that those are the applicable mandatory sentence -- those are the applicable maximum sentences as well as the mandatory

19

minimum sentences for the crimes to which you're pleading guilty?

THE DEFENDANT:  I understand, your Honor.

THE COURT:  Under the law -- let me just ask you first, are you a United States citizen?

THE DEFENDANT:  Yes, sir.

THE COURT:  As a result of your guilty plea, you may lose certain valuable civil rights, such as the right to vote, the right to hold public office, the right to serve on a jury and the right to bear a firearm.

Do you understand that?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  As part of the plea proceeding, I need to describe to you a summary of how the sentencing process works, just to make sure you understand sentencing.  I'm sure Mr. LaPinta has discussed this at length with you, but I'm going to give you a brief summary, just to make sure that you understand.

The first thing you need to understand is that there is no such thing as parole in the federal system.  It does not exist, so you will not be released from prison any earlier on parole.

Second, the determination of what sentence

20

you will receive is to be made by the Court and only the Court.  Nothing that your lawyer told you regarding sentencing is binding on the Court.  Nothing that the prosecutor may have told you is binding on the Court.  Sentencing is up to the Court, and as I said, I will sentence you on the basis of your guilty plea, after I've considered the presentence report and whatever submissions and arguments are made by both sides in connection with your sentencing.

The next thing I want to advise you about is that under the current state of the law, before imposing sentence, I am required by law to consider a number of factors, statutory factors about this case, including among others -- I'm not going to describe all of them to you.  There's a list of them.

Some of the factors are the nature and circumstances of the offense, your history and characteristics, the need for the sentence imposed to reflect the seriousness of the offense, to provide a just sentence that accounts for the need to deter you and others from committing the type of crime for which you're convicted, and as I said, there are a number of other factors as well.

One of the other factors I do want to mention to you is something called the sentencing

guidelines. These sentencing guidelines are, as the name suggests, a set of guidelines that take into account any criminal history that you have, as well as the relevant criminal conduct that you have committed, and it sets forth a range of imprisonment within which you could be sentenced.

I want to emphasize to you that these guidelines are not mandatory, they are only advisory, which means I am not required to impose a sentence within whatever the applicable range may turn out to be. I can sentence you above or below that range, depending upon how I weigh all the factors that I am to consider under the law.

Finally, whatever sentence I do ultimately impose in this case, and no matter how happy or unhappy you may be with that sentence, you may not withdraw or get back your guilty plea. In other words, while you may appeal the sentence itself, you may not undue your being found guilty by virtue of your plea here today.

Do you understand all those things about sentencing?

THE DEFENDANT: Yes, Judge.

THE COURT: Have you entered into an agreement with the government?

THE DEFENDANT: Yes.

22

THE COURT:  I have the original, which I've marked as Court Exhibit 1.  Did you sign this today in the presence of Mr. LaPinta?

THE DEFENDANT:  Yes.

THE COURT:  Did you read it before you signed it?

THE DEFENDANT:  Yes.

THE COURT:  Did you discuss it with him before you signed it?

THE DEFENDANT:  Yes.

THE COURT:  Did you fully understand it before you signed it?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Okay.  I just want to highlight I guess three things, again, just to make sure that you understand.  The first thing is the thing I mentioned a moment ago regarding restitution.  Normally, restitution can be ordered in connection with the conduct that is the subject of the crime of conviction. It says here in the agreement that you're agreeing to restitution for all relevant conduct that relates to these counts of conviction.

So in other words, with respect to robberies, you're agreeing to restitution to all the victims of any robberies that you have been involved

23

in, whether or not you specifically mention it here today when you allocute to the robberies.  So you're agreeing that restitution will be ordered to all the victims of the robberies.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  That's part of your agreement.

Do you understand that?

THE DEFENDANT:  Yes.

THE COURT:  The second thing is, with respect to forfeiture, obviously, you're subject to forfeiture as a result of these counts.  And as part of your agreement, you're representing that there are no monies or properties that you own or have an interest in that are subject to forfeiture, that you've disclosed all your assets to the government with respect to that.

I just want to make sure you understand two things:  That failure to disclose the assets or to inform the government of any material changes up until the time of sentencing would constitute, according to your agreement, a breach of the agreement.  And should any such assets ultimately be discovered, you're agreeing as part of your -- this agreement to summary forfeiture of whatever property or interest that may

24

be.   So there would not be a proceeding with respect to that.

The government could breach -- could argue that you've breached your agreement.  You would not get an opportunity to withdraw your plea and you would be subjecting yourself to summary forfeiture of that interest as well.  This is laid out obviously in more detail in the agreement, but that's I think an accurate summary.

Is that correct, Mr. Ryan?

MR. RYAN:  That's correct, Judge.

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  And then the last thing I want to point out to you -- it's in paragraph 8.  That paragraph says, among other things, that if the U.S. attorney's office determines that you've cooperated fully, that you've provided substantial assistance to law enforcement, and that you otherwise complied with the terms of the agreement, that they will file what's called a 5k1.1 motion with the sentencing court that sets forth the nature and extent of your cooperation.

Let me just ask Mr. Ryan -- I just want to clarify this.  There's no provision --

MR. RYAN:  I noticed that myself.  We will include --

25

THE COURT:  A 3553?

MR. RYAN:  -- 3553(e) section in there to permit the Court to not only sentence him below the advisory guidelines but also under any mandatory minimum sentence that would otherwise be required by statute.

THE COURT:  Okay, I'm writing that in and I'm asking everybody just to initial that.

And then I'll explain that to you, Mr. Machacek, because I'm sure Mr. LaPinta has discussed with you but I think there's a typographical error.

(Pause in Proceedings)

THE COURT:  The record should reflect that everybody has initialed that change to the agreement, and I'm going to explain it to Mr. Machacek, just to make sure he understands.

So if you cooperate fully with the government, provide substantial assistance to law enforcement and comply with the terms of the agreement, they will file a motion under 5k1.1 of the sentencing guidelines as well as 3553(e) that sets forth the nature and extent of the cooperation.

That allows the government -- that allows the Court to do two things:  One is to go below, if it wishes to, the mandatory minimum sentence that would

otherwise apply to this offense, that five-year mandatory minimum. It would also allow the Court to consider in applying the advisory guidelines that cooperation in determining what your sentence is under the advisory guideline range.

I want to emphasize a couple of things about that. First of all, as it says here, the decision of whether or not you have met the requirements of this paragraph, whether you cooperated fully, whether you provided substantial assistance and whether you complied with the agreement, is up to the U.S. attorney's office. They decide whether those conditions are met, and if they decide not to file that motion, you do not get an opportunity to get your plea back.

The second thing is that even if they do file that motion, that motion doesn't bind me in any way. I can sentence you above or below the mandatory minimum. Whatever I ultimately decide based upon all the factors where to sentence you, that determination is still up to the Court, regardless of any motion that the government may make on your behalf.

Do you understand those things?

THE DEFENDANT:  Yes, Judge.

THE COURT:  Does this agreement constitute

your complete and entire agreement with the government?

THE DEFENDANT:  Yes.

THE COURT:  Has anyone offered you any inducements or threatened you or forced you to enter this agreement or to plead guilty?

THE DEFENDANT:  No, your Honor.

THE COURT:  Has anyone made any promise to you as to what your sentence will be?

THE DEFENDANT:  No, not at all.

THE COURT:  Mr. LaPinta, do you know of any valid defense that would prevail at trial or do you know any reason why your client should not be permitted to plead guilty?

MR. LaPINTA:  I do not know of any valid defenses, your Honor.

THE COURT:  Okay.  Or any other reason why your client should not be permitted to plead guilty?

MR. LaPINTA:  No.

THE COURT:  Okay.

At this point, I need you to tell me in your own words, Mr. Machacek, what you did that makes you guilty of those counts, if you could just go through them count by count with me, and then I may have some followup questions for you.  Go ahead.

THE DEFENDANT:  Okay, Count 1:  Between

April 1st, '08 and April 1st, 2010, I conspired with others to obstruct the movement of articles and commodities in commerce by robbing owners of businesses in Queens.

THE COURT:  Okay, let me just ask a couple of followup questions to that.  What type of businesses were you --

THE DEFENDANT:  It was a medical office and a perfume distributor.

THE COURT:  A medical office and a perfume distributor?

THE DEFENDANT:  Yes.

THE COURT:  And these were in Queens?

THE DEFENDANT:  Yes.

THE COURT:  So you planned with others to rob both of those places?

THE DEFENDANT:  Yes, I was there, yes.

THE COURT:  And did those robberies take place?

THE DEFENDANT:  Yes.

THE COURT:  Were weapons used in those robberies?

THE DEFENDANT:  Yes.

THE COURT:  What kind of weapons?

THE DEFENDANT:  It was a black handgun?

29

THE COURT:  In both of them?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And there were people present during both of those robberies?

THE DEFENDANT:  Yeah, there was people present, yes.

THE COURT:  People who worked with those businesses?

THE DEFENDANT:  Yes.

THE COURT:  And you took money during those robberies?

THE DEFENDANT:  My coconspirators did, yeah.

THE COURT:  Okay.  You went in there with other people.

THE DEFENDANT:  I wasn't in there but they were there with --

THE COURT:  What was your role?

THE DEFENDANT:  I was outside.

THE COURT:  Okay, you were outside.  Were you a lookout?  What were you doing outside?

THE DEFENDANT:  Yeah, I was watching the car.

THE COURT:  Okay.  And you understood, obviously, when you went with them that while you were watching the car, they were going to go in and commit

the armed robbery of these places?

THE DEFENDANT:  Yes.

THE COURT:  And they came out with the proceeds of that?

THE DEFENDANT:  Yes.

THE COURT:  And when you joined this conspiracy to commit these robberies with other individuals, you did so knowingly and intentionally?

THE DEFENDANT:  Yes.

THE COURT:  You knew it was against the law?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  You can move now to Count 6, the money laundering conspiracy.

THE DEFENDANT:  Okay.  On or between April 1st, '08 and October 26th, '11, I together with others knowingly conspired to affect interstate commerce by using money obtained from the sale of burglary and robbery proceeds, knowing that the property involved in the transaction represented the proceeds form illegal activities that I committed with others.

THE COURT:  Before I ask you some followup questions regarding that, what's the government's theory in terms of the promotion?  What's the government's theory?

MR. RYAN:  The government's evidence would

be that the proceeds were collected by Mr. Timothy Glass, who sold them and then would use the monies from the proceeds to distribute to the crew members, in order to have them come back for further robberies.

THE COURT:  So like material articles were sold?

MR. RYAN:  Material articles were stolen, like the perfume was taken from the perfumery.  He would exchange those for cash or sell them and then use the monies to distribute to the robbery crew.

THE COURT:  Okay.

Let me just ask you then a couple of followup questions.  So you agreed with others that the property that was taken during robberies would be sold and then the proceeds would be distributed -- distributed among the members of the robbery, in order to promote the committing of additional robberies.

Is that all accurate?

THE DEFENDANT:  Yes, Judge.

THE COURT:  Again, what was your role in connection to that?  Were you involved in --

THE DEFENDANT:  Transporting the stuff, you know, driving them over there and driving some trucks with stolen stuff.

THE COURT:  Okay.  So you drove the truck

32

that had the proceeds from the robbery?

THE DEFENDANT:  Yes.

THE COURT:  To a location where they were going to be subsequently sold?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And then those proceeds were distributed among those involved in the robbery?

THE DEFENDANT:  Yes.

THE COURT:  And you understood when you agreed to do this that the purpose was to promote the robberies and additional robberies in the future?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  And you understood that those things that you were driving in that truck were the proceeds from the robberies themselves?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  And this again took place in Queens, among other places?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Moving to Count 11, use of a firearm, can you tell me what you did in connection with that?

THE DEFENDANT:  I together with others knowingly -- on 1/29/09, I together with others knowingly and intentionally used a firearm to commit a

33

robbery in a physician's office in Queens.

THE COURT:  Okay.  I know we talked about this I guess a little bit previously, in connection with Count 1.  But, again, explain -- your role in connection with this was what?  Were you outside on this one?

THE DEFENDANT:  Yes.

THE COURT:  So you drove -- you drove them or --

THE DEFENDANT:  No, I was just a passenger in the car.

THE COURT:  Okay.  And your role was to wait outside as a lookout and watch the car?

THE DEFENDANT:  Yes.

THE COURT:  And you knew one of the individuals who went into the physician's office had a gun?

THE DEFENDANT:  Yes.

THE COURT:  And was going to commit a robbery?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Again, the robbery took place and they received proceeds from individuals in that doctor's office?

THE DEFENDANT:  Yes.

THE COURT:  Did you knowingly and intentionally aid and assist in the use of this firearm during the robbery?

THE DEFENDANT:  Yes.

THE COURT:  And you knew it was against the law?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

Are there any other questions you want me to put to the defendant?

MR. RYAN:  No, Judge, I believe all the elements have been established.

THE COURT:  Okay, can you -- I know you did this a little bit before but can you just summarize what the government's proof would be if the defendant were to go to trial?

MR. RYAN:  The proof would be that the defendants would meet before these robberies at an apartment in Queens, where guns would be distributed and a plan of action for the particular robbery would be described.  This particular defendant did go to at least two robberies in Queens, one the office of -- the house of the perfume distributor, who had the contents and was believed to have a large amount of money in the house.  A number of people entered there armed, robbed

35

that individual woman, stole a large amount of her product, proceeds, money and jewelry, and then took it, sold it and distributed it among the crew to pay for that robbery and to promote future robberies.

Later on, they went to the doctor's office of one of the -- of Ms. Bedell, who was a coconspirator, and they again distributed guns amongst themselves, drove to the doctor's office and robbed the employees of the doctor's office, taking money, purses and jewelry, and distributed that as well amongst themselves, and sold the non-monetary items and distributed the proceeds.

THE COURT:  Okay.  And the second is the one that is the subject of Count 11?

MR. RYAN:  Count 11 is the doctor's office, Judge.

THE COURT:  Okay.  And you'd be able to prove that the firearm was used during that robbery?

MR. RYAN:  There were multiple firearms, including a black handgun, that were distributed and used during that robbery.

THE COURT:  Okay.  And you'd be able to prove that these occurred on or about the dates in the indictment for each of them.

MR. RYAN:  Correct, Judge.

36

THE COURT:  And this is through the victims as well as other witnesses as well?

MR. RYAN:  It's through victims and coconspirators' evidence.

THE COURT:  Okay.  And with respect to the interstate commerce requirement, what would the government's proof be on that?

MR. RYAN:  The government's proof would be that many of the items stolen were not manufactured in the State of New York and that the businesses, each of which were involved and affected interstate commerce.

THE COURT:  Okay.  And that would include the proceeds with respect to the money laundering.

MR. RYAN:  Correct, Judge.

THE COURT:  Okay.

And your client is not contesting the government's ability to prove the interstate commerce requirement; is that correct, Mr. LaPinta?

MR. LaPINTA:  Yes, your Honor.

THE COURT:  Is that correct?

THE DEFENDANT:  Yes.

THE COURT:  Okay.

How do you now plead to Count 1 of superseding indictment (S-3) 11-639, guilty or not guilty?  How do you now plead?

THE DEFENDANT:  Guilty, sir.

THE COURT:  How do you now plead to Count 6 of superseding indictment (S-3), guilty or not guilty?

THE DEFENDANT:  Guilty, your Honor.

THE COURT:  And how do you now plead to Count 11 of superseding indictment (S-3), guilty or not guilty?

THE DEFENDANT:  Guilty, your Honor.

THE COURT:  Did you do what you're charged with doing in those counts?

THE DEFENDANT:  Yes, your Honor.

THE COURT:  Are you pleading guilty because you are guilty?

THE DEFENDANT:  Yes.

THE COURT:  Are you pleading guilty voluntarily and of your own free will?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Because you acknowledge that you're guilty as charged in those counts, because you know your rights and are waiving them, because your plea is entering knowingly and voluntarily and supported by an independent basis in fact for each of the elements of the offense, I accept your guilty plea and I adjudge you guilty of Count 1, Count 6 and Count 11 of superseding indictment (S-3) 11-639.

Do you want me to hold off preparation of the presentence report?

MR. RYAN:  Yes, Judge.  I believe Probation has requested that they all be --

THE COURT:  Held in abeyance?

MR. RYAN:  -- held in abeyance.  There is a person already assigned working on them, but I believe they're going to try and do them all at once.

THE COURT:  Okay.

Do you agree with that?  In other words --

MR. LaPINTA:  I was hoping we could have it completed sooner than later.

THE COURT:  Okay.  So I'm going to direct that they -- I only do that if there's consent on both sides.  If you would prefer to have them start that process --

MR. LaPINTA:  Yes.

MR. RYAN:  That's fine, Judge.

THE COURT:  Okay.

MR. RYAN:  Because I think Probation will work out its own schedule.

THE COURT:  Okay.  So I'm going to direct that they prepare the presentence report.

Do you wish to be present for the interview?

MR. LaPINTA:  Yes, please.

39

THE COURT:  Okay, that will be noted and we'll set sentencing for --

THE CLERK:  February 15th at 2:00.

THE COURT:  February 15th, 2013 at 2:00?  At 2:00 p.m.

MR. RYAN:  Thank you, Judge.

THE COURT:  Okay.  Anything else?

MR. RYAN:  That concludes the business, Judge.

MR. LaPINTA:  No, sir, thank you.

THE COURT:  Okay, thank you.

* * * * * * * *

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

ELIZABETH BARRON                    November 27, 2012

# EXHIBIT M

**Machacek Sentencing Transcript (Certified)**

No. 2:11-cr-00639-JFB (E.D.N.Y.)
June 30, 2014; pp. 1–22

Romano v. United States, No. 26-15 (2d Cir.)

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,    : 11-CR-639(JFK)

-against-    : United States Courthouse
: Brooklyn, New York

GERALD MACHACEK,    : Monday, June 30, 2014
: 11:00 a.m.

Defendant.    :

- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE JOHN F. KEENAN
VISITING JUDGE SITTING BY DESIGNATION
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government:    LORETTA E. LYNCH, ESQ.
United States Attorney
Eastern District of New York
610 Federal Plaza
Central Islip, New York 11722
BY: BURTON T. RYAN, ESQ.
Assistant United States Attorney

For the Defendant:    ANTHONY M. LAPINTA, ESQ.
Attorney for the Defendant -
Gerald Machacek
200 Vanderbilt Motor Parkway
Suite C-17
Hauppauge, New York 11788

Court Reporter:    Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter
Telephone: (718) 613-2487
Facsimile: (718) 613-2694
E-mail: Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.
Transcript produced by Computer-aided Transcription.

*Sentencing* 2

(In open court.)

COURTROOM DEPUTY: All rise.

THE COURT: Good morning.

MR. RYAN: Good morning.

MR. LAPINTA: Good morning.

COURTROOM DEPUTY: Please be seated.

THE COURT: You may produced the defendant, Mr. Marshal.

(Defendant enters the courtroom at 10:46 a.m.)

THE COURT: Good morning, Mr. Machacek.

THE DEFENDANT: Good morning, Judge.

THE COURT: Good morning to you, Mr. LaPinta.

MR. LAPINTA: Good morning.

THE COURT: Mr. Ryan.

MR. RYAN: Good morning.

THE COURT: This is matter of the United States of America against Gerald Machacek. Before we begin, there are a couple of things I'd like to address.

First of all, in the transcript of testimony at the trial where Mr. Machacek testified, at Pages 1418 and 1419 and then again at 1441 through 1444, and then also at 1383, 1387, 1390, 1428, 1434, 1438, and 1448 of the record there are missed attributions or mistypes. When I say "misattributions," primarily, what I'm saying is that whenever I ask questions of Mr. Machacek the record reflects

*Sentencing* 3

that you, Mr. LaPinta answered the questions and that's not what happened. It was Mr. Machacek who answered my questions and I'm only correcting this at this point because of the importance of the conviction in the *Romano* case at which Mr. Machacek testified because there's certainly going to be appeal and in view of the errors in the record I wanted to be clear that those mistakes have been noted and hopefully will be corrected.

Also, I want to compliment you, Mr. LaPinta, on your excellent submission here for sentence purposes and for correcting the probation department and the presentence report. It was in error, no question it was. So I suppose first thing I should ask you is: Are you ready for sentence?

MR. LAPINTA: Yes, sir.

THE COURT: All right.

Now, Mr. Ryan, my deputy informs me that there's still something of a dispute. Maybe I'm wrong. There's not a dispute?

Is there an agreement as to what the offense level is?

MR. RYAN: Yes, there is, your Honor. We've reviewed both probation's addendum as well as counsel's submission and I believe we agree with counsel's submission relative to the correct analysis of the sentencing

*Sentencing* 4

guidelines.

THE COURT: In other words, you think the Total Offense Level is 24.

MR. RYAN: That's correct, Judge.

THE COURT: 24?

MR. LAPINTA: Yes.

THE COURT: Again, I compliment you. The probation department was in error a second time, apparently.

The Total Offense Level is 24 with a Criminal History Category of VI. And, as I understand it, under the guidelines for a range of 100 to 125 months.

MR. LAPINTA: Yes, sir.

THE COURT: Okay. And you're ready for sentence?

So I have to ask you: Have you read the probation report? Obviously, you have, otherwise, you wouldn't have made a careful analyses that you depend but I have to ask you: Did you read the presentence report?

MR. LAPINTA: Yes, your Honor, I did. And I also spent numerous hours reviewing the probation report with Mr. Machacek as well.

THE COURT: Fine. I'll hear you on sentence.

MR. LAPINTA: Great. May I stand?

THE COURT: If you want. You can remain seated and speak into the microphone.

MR. LAPINTA: Your Honor, first and foremost, let

*Sentencing* 5

me acknowledge that in the courtroom here today on behalf of Mr. Machacek is his wife, Colleen Machacek.

THE COURT: She raises her hand. I see her there in the back.

MR. LAPINTA: There were other family members that were scheduled to be here but, if you recall, this matter was first scheduled for June 24th.

THE COURT: I do remember.

MR. LAPINTA: They took off work on that date to be here and it was subsequently rescheduled and they could not have taken off work again. So that involved his older son Vincent and his sister who you have read her letter as Exhibit A of my submission.

THE COURT: Yes. And I received a letter today which you brought, I believe, and supplied and that letter was from the son.

MR. LAPINTA: Yes, Vincent Machacek, yes.

Also, your Honor, as you're aware, you may be aware, AUSA Una Dean is on vacation now. I did speak to her before she left about Mr. Machacek's sentencing and I understand that she worked together with Mr. Ryan in compiling the 5K1 letter that you have read. And also, you may know, Marshall Miller is working in Washington, D.C. and is not able to be here as well.

Also who is here and is of major importance to the

*Sentencing* 6

Court is FBI Ray Tarici who spearheaded this investigation. He was the lead of the FBI team that worked together with Mr. Machacek in the *Romano* case. And I thank him for being here and I think his appearance and presence is very symbolic of the Government's commitment to all involved in this investigation including Mr. Machacek.

With that said, your Honor, I was prepared to argue my submission but, in fact, there is no need for that because we have agreed on the sentencing guideline range of Level 24, Criminal History Category VI, yielding a sentencing range of 100 to 125 months.

THE COURT: Also, by the the way, I also want to compliment you. As I understand it, you are waiving the time requirements of Rule 32.

MR. LAPINTA: Yes.

THE COURT: So he can be sentenced today because you certainly didn't get the probation report in the time requirements of Rule 32.

MR. LAPINTA: Yes.

THE COURT: And so I thank you for that, too.

MR. LAPINTA: I actually had four days.

THE COURT: You don't have any objection to being sentenced today, do you, Mr. Machacek?

THE DEFENDANT: No, your Honor.

THE COURT: All right. Fine. Go ahead, sir. I

*Sentencing* 7

didn't mean to cut you off and I thank you again for that.

MR. LAPINTA: So I'll jump to the second of my submission, your Honor, that deals with I would call the variance for family circumstances.

Exhibit A of your submission has predominantly a letter from Elissa Delaney, my client's sister. And I must say I think you've been doing this a few year longer than I have, but in the years I've been doing it I have to say that that letter is probably the best written letter I've come across in terms of a character letter that I've seen and I've done this work pretty often the last 23 years. It's extremely well written, and over and above that it has extremely relevant content that is real and compelling for the Court's consideration.

Mr. Machacek's mother is not well, she is an elderly woman who is suffering an array of problems including her physical health. She is unable to ambulate. She has a colostomy bag that she uses. She has deformed feet and is suffering from severe psychiatric issues including terrible anxiety. She is financially destitute, her home is in the midst of a foreclosure proceeding that I've appended as Exhibit B to my submission. And I think that her condition here is relevant insofar as Ms. Delaney, her only her child, is unable to care for her alone. There's really nobody else in the family unit that can step

*Sentencing*                                                8

up and provide Mrs. Machacek, the mother, with the care and need that she needs.

Taking a step back, you're aware from Ms. Delaney's letter and also from the probation report -- by the way, the probation report, in its addendum, incorporates Ms. Delaney's letter as findings of fact relevant to family circumstances. So obviously, they found it to be credible and useful submission.

Mr. Machacek's upbringing has been riddled with issues. He did not come from the most fostering and supportive of family units. Both of his parents were fighting their own demons. His father was fighting alcohol addiction and his mother was fighting numerous psychiatric issues involving major depressive disorder and anxiety disorder that she is still suffering from.

Basically, there really was no home discipline in that unit. There were no boundaries for young Mr. Machacek and no role models for him to follow which is a recipe for disaster for a young boy growing up on the streets. Unfortunately, as a young boy, he was allowed to walk the streets and became part of a street culture of alcohol and stealing that has steadily progressed into his adulthood. His history has been a progression of crime that has, unfortunately, now escalated into federal court and he's now facing the consequences of his numerous interactions with

the criminal justice system.

Relevant to note, perhaps not all that important for the Court's consideration is most of his crimes involved him being a lookout. He never hurt anybody himself in a crime, although people that he was with did brandish weapons. And in one or two instances, some people were physically injured. But they were all crimes motivated by theft. And by saying this, I am not in any way, your Honor, excusing his conduct. I'm not mitigating it in any way. Let there be no doubt that Mr. Machacek and his record clearly indicate a man who was a career offender.

Let me move to Phase 2 two of my submission, his exceptional cooperation.

Let me start with his own case, Hobbs Act, §924(c) conspiracy case.

Shortly after his arrest, he immediately began his cooperation with the Government and was instrumental in the prosecution of what the Government has termed the "Timothy Glass Robbery Crew." That crew involved, particularly, five other, I'll call them "significant defendants" insofar as they are the planners, the organizers, the actors. It involved a number of other people as well, but most notably, Mr. Machacek provided substantial assistance with regard regarding all of the main targets of that conspiracy. He had proffered on numerous, numerous occasions. I was there

*Sentencing* 10

on most of them, so I'm well aware of it. And the information that he provided proved to be valuable not only for that Timothy Glass conspiracy but for other unrelated crimes that the Government has investigated and are continuing to investigate. Mr. Machacek spent considerable time preparing for the Timothy Glass trial. In fact, that trial ended up in a plea, I believe, during jury selection. So he was ready and able to go as a witness for that trial, but obviously, there was no need to by virtue of that plea.

This now brings us to the Romano trial. And let me say that I have never come across a situation like this before and I hope I never do. And you probably know it from the trial but I'll reiterate it real shortly and simply.

I came to work one day and opened my mail and found a letter from Mr. Machacek that basically said that I need to see you right away, there may be something here that could be a big problem. So I did that, I met with him. He explained to me the circumstances. When I got to my car in the parking lot of the Nassau County Jail, I called Mr. Ryan and the next day we were in his office with Mr. Machacek explaining the details of this Romano conspiracy.

Two long years later, we're here and you know what's happened in that meantime. Mr. Machacek spent long hours and days preparing for that Romano trial with Ms. Dean and Mr. Miller, I was present during many of those

occasions. They ultimately decided not to call him as a witness for strategic reasons but we anticipated that the defense would call him in light of their entrapment defense. And when I was aware of that and was given notice that he would be a witness, I then stepped up and spent a long time at the Queens G.E.O. facility preparing Mr. Machacek for his anticipated cross-examination.

We spent a lot of time on this, your Honor, and I say that proudly. Very rarely does a defendant have an opportunity to be involved in a case like this that not only calls for duty but, in my opinion, mandates duties from us as citizens of the United States. And for me as a defense lawyer it was the first time that I was involved in a such a case. I had numerous cooperators over my career but this clearly has been a unique and special, for lack a better word, situation.

But Mr. Machacek's cooperation here is going to come with a price. And the price is that he will forever have the stigma of being a cooperator. The Romano case was prominently displayed in the media, it was a headline. And basically everybody knows that Mr. Machacek was a cooperator and that's of great concern to us over and above the concern of Mr. Romano. Mr. Romano, during the pendency of his case, inquired of other inmates at the MCC of information regarding Mr. Machacek and his family. Ms. Dean called me

immediately upon learning of that and I spoke with Mr. Machacek and there was a decision for him to make at that point whether he wanted to go forward or not given the inquiries that Mr. Romano was making. He decided to go forward given what the importance of that case is about.

So, to us, there is a real threat that exists, not a perceived threat. And this is a threat from a man who went to the lengths of paying $40,000 to kill a federal judge and a prosecutor for giving him a 15-year sentence. God knows what Mr. Romano has in mind for Mr. Machacek now that he has been sentenced to two life sentences. So that is a concern to us in the future. I don't know if Mr. Romano will have the ability from his small, cold, dark jail cell to do anything, I hope and pray not. But that'll forever be over the heads of the Machacek family and they'll have to be thinking of that in the future. Not only for Mr. Romano but from other people that may not look at cooperators as favorably as we do in this courtroom.

So I mentioned that as a real concern to us and as an expected consequence of doing what he did, we knew that that was going to happen but we did it anyway.

I think you would agree that this is a unique case because of what's happened here, the people involved, and thankfully, we were able to divert tragedies of just unspeakable dimension.

*Sentencing*                                                    13

I'm a baseball fan, I've always been a baseball fan and I hope you are, too, because I think the best way to explain Mr. Machacek in terms of being a cooperator I would go as far as to say, your Honor, maybe you can consider him the Babe Ruth of cooperators because I don't see any other circumstance here that could be better or more serving to the Government and to the people of our society than what Mr. Machacek has done.

So I leave it to you. You have the ability here to set a great example for others that may be similarly situated in what Mr. Machacek was in. You have the eyes and ears of society hearing and looking at you here and that message could be a very profound one for people similarly situated in the future to be proactive if they should ever come across a situation like this again to help save a public official, prosecutor, a witness, or any other citizen; to be proactive, to not turn a blind eye or a deaf ear to people that are doing such heinous offenses.

So I present to you Mr. Machacek, a man well deserved of your consideration. I think a sentence of time served, 30 months, is appropriate here. You have the ability by virtue of his 5K letter to downwardly give him a three-year supervised release sentence. I think that would be appropriate. I think he needs supervision. He has a lot to prove to us at this point because he could look at this

Anthony D. Frisolone, FAPR, RDR, CRR, CRI, CSR
Official Court Reporter

two ways: One, he's gotten a great deal, something fell in his lap and he took great advantage of it; or his cooperation could mark a turnaround in his life, a demarcation from a life of crime to maybe now a life of doing good. And he has a family out there that needs him and loves him and a mother out there who truly is in need of his services. So I ask that you sentence him to 30 months and three years' supervised release, your Honor, thank you.

THE COURT: Thank you.

Excellent presentation.

Mr. Ryan.

MR. RYAN: Judge, we've submitted the 5K letter that is really only a pale comparison of the benefits that he would receive by defendant's cooperation.

As the record reflects, he has spent his time in a lifetime of crime since he was 13 years old choosing always the wrong thing. When he heard from Mr. Romano, however, he had the wisdom to bring it to counsel's attention and to ultimately bring it to the Government's attention and cooperated fully with the FBI in difficult circumstances while incarcerated in order to provide the evidence to show that this was not just the rantings of an individual but actually something that he actually intended to do. That's of significant value to the Government and to the United States and we leave the sentence to your discretion

based on everything that you know and that has been presented to you here.

Thank you.

THE COURT:  Thank you.

Mr. Machacek, please rise.

If there's anything you want to say, sir, you go right ahead.  You certainly have the right to speak and I'm happy to hear you.  If you want to sit while you're addressing me you may.  But when I sentence you, I'm going to ask you to stand.  So sit down now and tell me whatever you want to tell me.

THE DEFENDANT:  Forgive me, your Honor, I'm very nervous.

THE COURT:  Take your time, try and calm down. Don't be nervous.

Go ahead.

THE DEFENDANT:  Let me begin by thanking my lawyer, Mr. LaPinta, for his devotion to my case, for working so hard for me.

THE COURT:  He has done a very good job, there's no question about it.

THE DEFENDANT:  And believing that I am a man that could be a contributing member to society.  I have been in and out of trouble since I was a young boy.  For whatever reason, it has taken me until now to understand I got to

*Sentencing* 16

stop this. I have no one to blame, not my parents, not my friends, not law enforcement. I can only blame me. I've taken full responsibility for all my crimes. Everything I've ever done. I've told the Government everything I've ever done. And I took responsibility for everything I've done. I've been a drain and a burden to society and to my family. For once in my life, I was able to do something good. And he didn't kill that judge and the U.S. Attorney. Judge Bianco and U.S. Attorney Gatz. This has been a defining moment for me to turn my life around. And now to do good, no more bad. It was really good to do good.

My family needs me, my mother in particular. I ask that you please consider allowing me the opportunity to help her and care for her. Judge, you'll never see me back here again.

THE COURT: Please rise. All right. Before the Court is a 44-year-old defendant who has been in custody approximately two and a half years. I read the Government's submission of June 25, 2014, and the Government's submission consists of primarily of a 5K1.1 letter which details the defendant's cooperation.

Indeed, I'm well aware of the defendant's cooperation because he testified before me at the Romano trial and I believe he testified truthfully. I've heard his testimony. I've also read, obviously, because we've

*Sentencing* 17

discussed it but I want the record to reflect that I've read the excellent submission by Mr. LaPinta as well as the letters which are attached to the submission and the letter that I received this morning.

As Mr. LaPinta said, the defendant seeks time served and three years of supervised release. The Total Offense Level here comes out to be 24 which both sides have agreed upon in spite of the probation department's report, which is in error, and the sentencing range under the guidelines at a Criminal History Category VI which both sides agree the defendant is. The sentencing range is 100 to 125 months, that's eight years and three months, up to ten years and five months.

I recognize that the guidelines are advisory, they're not mandatory, and I don't have to follow them in any case. And particularly here, where I received the 5K1 letter and where I personally know the cooperation and the testimony of the defendant.

I considered Title 18 Section 3553(a) and its various subdivisions.

On counts, One action Six and Eleven, the defendant is committed to the custody of the Attorney General for the United States for a total of 42 months which is three and a half years on each count. All the sentences are to run concurrently and not consecutively.

On counts One and Six, the period would be three years.

On Count Eleven, the period of supervised release is to be five years. The periods of supervised release are to be concurrent and not consecutive.

During the five years of supervised release, the defendant is released under the mandatory and standard conditions of supervised release, plus he is to submit his person, his property, his house, his residence, his vehicle, his papers and his computers, and any other electronic communications or data storage devices or media or office to search conducted by the United States Probation Department. Failure to submit to search may be grounds for revocation of release. The defendant is to warn any other occupants that the premises may be subject to search pursuant to this condition.

The probation office may search pursuant to this condition only when reasonable suspicion exists and the defendant has violated a condition of his supervision and that the area is to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable fashion.

I'm not fixing any fine, the defendant doesn't have the wherewithal to pay a fine. Three $100 special assessments are ordered as required by the law.

*Sentencing* 19

Both sides are advised of their right to appeal, particularly, the Government since I have varied tremendously.

Now, I know you wanted to be walking out of here today, Mr. Machacek. But in view of your record, I didn't think that was the thing I could do. Frankly, I always write down the sentence ahead of time and because of the excellent submission and presentation by your lawyer, I had written down five as he was talking, I cut it to four, and as he went on, I cut it to three and a half. So you really can thank him but I do think that some prison time is necessary in view of your record.

MR. LAPINTA: Can I keep talking then?

THE COURT: You've done very well.

MR. LAPINTA: Thank you.

THE COURT: Mr. Ryan.

MR. RYAN: Thank you, Judge.

THE COURT: I want to make sure that appropriate steps are taken for his safety while in custody and that's very important.

MR. RYAN: That's an issue we have and continue to address, Judge.

THE COURT: Thank you very much.

MR. LAPINTA: To that end, your Honor, perhaps you could make a judicial recommendation.

*Sentencing* 20

THE COURT: Go ahead.

MR. LAPINTA: That may go a long way in achieving that. He is presently housed in the Queens G.E.O. facility until he's designated. They may not move him out of there because it's a year sentence to go. So perhaps --

THE COURT: I recommend that be he be institutionalized in the institution that he is presently housed in.

MR. LAPINTA: Great. And perhaps, in the alternative, if the Marshals Service feels a need to move him to a designated facility, perhaps we could have him moved to the Danbury, Connecticut, facility.

THE COURT: So ordered. And that will be in the judgment.

(A brief pause in the proceedings was held.)

MR. LAPINTA: I'm told that the G.E.O. facility is not considered a designated facility. So once his sentencing paperwork goes through the marshals, he will be moved out of there.

THE COURT: All right. So once the judgment is filed, he will be moved.

So does the Government have any objection to my recommending the Danbury facility?

MR. RYAN: Absolutely not, Judge.

THE COURT: All right. I withdraw the statement

*Sentencing*                                                    21

that he's to remain in the Queens facility.  As soon as the judgment is filed, he's to be transferred at my recommendation, and strong recommendation, that it can be to the Danbury facility.

Thank you very much.  Good luck to you, Mr. Machacek.

MR. LAPINTA:  I'm sorry, two more things.  May you seal these proceedings upon my request?

THE COURT:  Oh, there was a letter about that.

The trouble with that is he testified in public, everybody knows it.  It's an open courtroom, the press is here, I don't see any point to sealing it.  I mean, I just don't think it makes any sense to seal it.

MR. LAPINTA:  Okay.

THE COURT:  So that application is denied.

MR. LAPINTA:  Okay.  One last application.  Will you dismiss the remaining counts of the indictment?

MR. RYAN:  Yes, Judge, we move to dismiss any open counts.

THE COURT:  All the open counts are ordered dismissed.

MR. LAPINTA:  Thank you, sir.

THE COURT:  Good luck to you, Mr. Machacek.

THE DEFENDANT:  Thank you, your Honor.

(Defendant exits from courtroom at 11:19 a.m.)

*Sentencing* 22

(WHEREUPON, this matter was adjourned.)

\*   \*   \*

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.

Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter

# EXHIBIT N

## Doc. 120 — Stipulation & Protective Order

No. 1:12-cr-00691-DC (E.D.N.Y.), filed 12/18/2013
PageID #: 716

Romano v. United States, No. 26-15 (2d Cir.)

★ DEC 18 2013 ★

BROOKLYN OFFICE

MLM:UAD
F.#2012R01631

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   -against-

JOSEPH ROMANO,

        Defendant.

- - - - - - - - - - - - - - - - X

STIPULATION AND
PROTECTIVE ORDER

12 CR 691 (JFK)

IT IS HEREBY STIPULATED AND AGREED by and between the undersigned attorneys and the defendant JOSEPH ROMANO (the "defendant") through his attorneys and ORDERED by the Court that:

1.   The material produced by the government to defense counsel pursuant to 18 U.S.C. § 3500 and United States v. Giglio ("Trial Discovery"), and any copies, notes, transcripts, documents or other information derived or prepared from this Trial Discovery shall not be further disseminated by the defendant or defense counsel to any individuals, organizations or other entities, other than members of the legal staff of defense counsel who has signed this Stipulation and Order, without further order of the Court;

2.   Each of the individuals to whom disclosure is authorized in paragraph 1, that is, members of the legal staff of defense counsel who has signed this Stipulation and Order, shall be provided a copy of this Stipulation and Order and will be advised

2

that he or she shall not further disseminate any portion of the Trial Discovery or any copies, notes, transcripts, documents or other information derived or prepared from the Trial Discovery except in conformity with this Stipulation and Order;

3.    Where the defendant and/or defense counsel wishes to disclose any portion of the Trial Discovery or any copies, notes, transcripts, documents or other information derived or prepared from the Trial Discovery to any individual to whom disclosure is not authorized by paragraph 1, defense counsel must provide advance notice to the government and make application to the Court for authorization to make such disclosure, and such notice must be given sufficiently in advance of the contemplated application so as to permit briefing and argument on the propriety of such disclosure;

4.    None of the Trial Discovery, nor any copies, notes, transcripts, documents or other information derived or prepared from the Trial Discovery shall be disseminated to, or discussed with, the media in any form.    Nothing in this Stipulation and Order prohibits the media from obtaining copies of any items that become public exhibits at any conference, hearing, trial or other proceeding;

5.    Nothing in this Stipulation and Order in any way releases counsel for the government or defense counsel from the obligations of the "Free Press Fair Trial Directives" of Local Rule 23.1 of the Local Criminal Rules of the Eastern District of New York;

3

6.    Nothing in this Stipulation and Order shall preclude the government from seeking a further protective order as to particular items of Trial Discovery;

7.    If the defendant obtains substitute counsel, the undersigned defense counsel will not transfer any portion of the Trial Discovery or any copies, notes, transcripts, documents or other information derived or prepared from the Trial Discovery unless and until substitute counsel enters into this Stipulation and Order;

8.    The defendant and defense counsel will return to the government the Trial Discovery and all copies thereof, whether in the possession of the defendant, defense counsel or members of the legal staff of defense counsel who has signed this Stipulation and Order, when the defendant enters a guilty plea, at the conclusion of any post-trial/appellate proceedings or immediately following an acquittal, whichever occurs last; and

9.    Any violation of this Stipulation and Order (a) will require the immediate return to the United States of the Trial

4

Discovery and all copies thereof, and (b) may result in contempt of

Court.

Dated:    Brooklyn, New York
          December 17, 2013

George Goltzer, Esq.
Michael Bachrach, Esq.
Counsel for Joseph Romano

ERIC H. HOLDER, JR.
Attorney General of the United States
WILLIAM J. HOCHUL, JR.
United States Attorney

By:

Marshall L. Miller
Una A. Dean
Assistant U.S. Attorneys

SO ORDERED:
12/18/13

HON. JOHN F. KEENAN
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

5

# EXHIBIT O

**Doc. 180 — Government Confiscation Request**

No. 1:12-cr-00691-DC (E.D.N.Y.), filed 09/15/2014
PageID #: 1848

Romano v. United States, No. 26-15 (2d Cir.)



**U.S. Department of Justice**

*United States Attorney*
*Western District of New York*

PT:UAD
F.#2012R1316

September 15, 2014

<u>VIA ECF and Regular Mail</u>

The Honorable John F. Keenan
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

        Re:    United States v. Joseph Romano
                  <u>Criminal Docket No. 12-691 (JFK)</u>

Dear Judge Keenan:

        The government writes to respectfully alert the Court to a violation of the December 18, 2013 protective order issued in this case and to request an order that the Metropolitan Detention Center (the "MDC") confiscate from the defendant all documents covered by the terms of the protective order, which is further described below.

        On December 18, 2013, the Court issued a Stipulation and Protective Order (the "Protective Order"), which was also signed by the parties, governing the use of materials produced to the defendant pursuant to 18 U.S.C. § 3500 and <u>United States v. Giglio</u>, 405 U.S. 150 (1972) (collectively, the "Trial Discovery").[1] The Protective Order prohibited the dissemination of the Trial Discovery to anyone other than (1) the defendant, (2) defense counsel and (3) staff for defense counsel who had signed the Protective Order. A copy of the Protective Order is attached hereto as Exhibit A.

        On September 11, 2014, pursuant to a mail cover that the government instituted for the defendant's incoming and outgoing mail at the MDC following standard Bureau of Prison procedures, the undersigned received a copy of a letter sent from the defendant at the MDC to his wife on Long Island. Included in the letter was sensitive Trial Discovery produced to the defendant prior to trial. The Trial Discovery contained in the letter has never been made public. A copy of the contents of the letter is attached hereto as Exhibit B.

---

[1]        Counsel for the defendant signed the Protective Order on the defendant's behalf. However, the government confirmed with defense counsel prior to disclosure of the Trial Discovery that they apprised the defendant of the terms of the Protective Order.

By sending the Trial Discovery to his wife, the defendant breached the terms of the Protective Order.   Accordingly, and pursuant to the terms of the Protective Order, the government seeks the return of all copies of Trial Discovery in the defendant's possession, whether in electronic, paper or any other form.[2]   A proposed order is enclosed.[3]

Respectfully submitted,

ERIC H. HOLDER, JR.
Attorney General of the United States
WILLIAM J. HOCHUL, JR.
United States Attorney

By:     /s/_____
        Una A. Dean
        Assistant U.S. Attorney
        (718) 254-6473

cc:     Clerk of Court (JFK) (via ECF)
        Daniel Nooter, Esq. (via email)

---

[2]     The undersigned has spoken to the defendant's prior counsel Michael Bachrach, Esq., who advised that the defendant received from his counsel copies of the Trial Discovery both on CDs and in hard copy.   The defendant is currently represented by Daniel Nooter, Esq.

[3]     The defendant has been designated to serve his sentence in the above-listed case and his underlying coin fraud case at another Bureau of Prisons facility, but has remained at the MDC pending a restitution hearing in the coin fraud case.   Post-hearing briefing in the coin fraud case concluded on September 14, 2014.   However, the government requested that the BOP await the resolution of the instant issue before initiating the transfer.

PT:UAD
F.#2012R1316

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    PROPOSED ORDER

   - against -                              Cr. No. 12-691 (JFK)

JOSEPH ROMANO,

              Defendant.

- - - - - - - - - - - - - - - - - - -X

       WHEREAS a Stipulation and Protective Order ("Protective Order") was issued in this case on December 18, 2013, governing "Trial Discovery," as defined in the Protective Order;

       WHEREAS the Protective Order prohibited the dissemination of Trial Discovery by the defendant to anyone other than his counsel or members of his counsel's legal staff who have signed the Protective Order; and

       WHEREAS it appears that, on or about September 11, 2014, the defendant sent certain Trial Discovery to his wife Karen Romano, an individual not authorized to receive such material, thereby violating the terms of the Protective Order;

       IT IS HEREBY ORDERED THAT:

1. The United States Attorney's Office for the Eastern District of New York ("USAO-EDNY") shall provide to the Brooklyn Metropolitan Detention Center (the "MDC") a list of all Trial Discovery covered by the Protective Order; and

2. The MDC, with the assistance of counsel for the defendant, shall identify and confiscate any and all Trial Discovery in the defendant's possession, custody

or control, whether in hard or electronic copy, and return said materials to the USAO-EDNY.

Dated: Brooklyn, New York
September ____, 2014


_____
HONORABLE JOHN F. KEENAN
UNITED STATES DISTRICT JUDGE

# EXHIBIT P

## Doc. 185 — Confiscation Order

No. 1:12-cr-00691-DC (E.D.N.Y.), filed 09/25/2014
PageID #: 1875–1879

Romano v. United States, No. 26-15 (2d Cir.)

Case 1:12-cr-00691-DC   Document 185   Filed 09/25/14   Page 1 of 5 PageID #: 1875

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

---------------------------------X
UNITED STATES OF AMERICA        :
                                :
        -against-               :          No. 12 Cr. 691 (JFK)
                                :          **ORDER**
JOSEPH ROMANO,                  :
                                :
            Defendant.          :
--------------------------------X

**JOHN F. KEENAN, United States District Judge:**

By letter dated September 15, 2014, the Government seeks an order demanding the return of all copies of materials produced to Defendant Joseph Romano pursuant to 18 U.S.C. § 3500 and United States v. Giglio, 405 U.S. 150 (1972). See ECF No. 180. The Court gave Defendant any opportunity to respond and allowed the Government to reply. Defendant also submitted a response to the Government's reply. The Court has reviewed each of the four letters submitted.

Defendant does not dispute the essential facts as set forth by the Government. The parties agree that a Stipulation and Protective Order ("Protective Order") was issued in this case on December 18, 2013, governing "Trial Discovery," as defined in the Protective Order. The Protective Order prohibited the dissemination of Trial Discovery by Mr. Romano to anyone other than his counsel or members of his counsel's legal staff who have signed the Protective Order. Paragraph 9 of the Protective Order requires the "immediate return" of Trial Discovery to the

Government upon "any violation" of its terms.  On or about September 11, 2014, Mr. Romano apparently sent certain Trial Discovery to his wife, an individual not authorized to receive such material, thereby violating the plain terms of the Protective Order.

Defendant argues, however, that the violation of the Protective Order was merely technical as the document sent to Mr. Romano's wife was discussed in some detail at trial. (Trial Tr. 1427-35.)  The Government contends that given Mr. Romano's "history of violence, flouting court orders, tampering with witnesses and obstructing justice," he should be held to the plain terms of the Protective Order, which requires return of Trial Discovery upon any violation of its terms. (ECF No. 183 at 2.)  The Government also points to a recent telephone conversation between Mr. Romano and his wife where he allegedly says that "we need to have a serious talk about something things [sic] that I need to get done here, ok?." (ECF No. 183 at 3.) The Government also provides a letter Mr. Romano received that references a man who "hasn't done what promised [sic] because he needs $20,000 and is [sic] so hard to do anything yet (he is still in the S.H.U.) and many ugly things are happening with his lawyer." (ECF No. 183 Ex. A, at 2.)  The Government believes these communications demonstrate an improper motive and may even reflect Mr. Romano's continued scheming from prison.  These

2

instances are obviously not the proverbial smoking gun, but given Mr. Romano's history of plotting violent crimes while incarcerated, these cryptic communications certainly provide enough smoke to raise concerns that even a so-called technical violation of the Protective Order could suggest something more menacing.  Thus, the Court finds that the circumstances surrounding Mr. Romano's violation of the Protective Order weigh heavily in favor of enforcing the Protective Order's plain language.

Defendant also suggests that having to return all Trial Discovery would prejudice him during his appeal.  The Government correctly notes, however, that there will be no undue prejudice to Defendant because he is represented by counsel, who will have access to the Trial Discovery during the appeal process. Moreover, whatever prejudice Defendant will face is not unwarranted because the relief sought by the Government is the precise remedy set forth in the Protective Order itself.  To the extent that defense counsel has not received "all the documents relevant to Mr. Romano's appeal — including the documents covered under the Protective Order," the Government shall remedy that immediately.

Finally, the Court notes defense counsel's argument that taking the Trial Discovery away from Mr. Romano will continue a "vicious, escalating circle of Mr. Romano violating his legal

3

obligations and then receiving an extremely harsh punishment, which only further . . . enrages and humiliates Mr. Romano and predicates his continuing to act out." (ECF No. 184 at 3.) The "cycle" alluded to by defense counsel is one entirely of Mr. Romano's own making. It only continues because Mr. Romano continues to "violat[e] his legal obligations." Court orders must have meaning and, therefore, violations of those orders must have consequences. There is nothing "extremely harsh" or "draconian" about holding Mr. Romano to the plain language of the Protective Order, which requires the return of Trial Discovery for "[a]ny violation" of its terms. Furthermore, there is a rather obvious way for this "cycle" to end: Mr. Romano must stop violating his legal obligations.

In view of the serious nature of the crimes that Mr. Romano was convicted of and his clear violation of the plain terms of the Court's Protective Order, the Court grants the relief requested by the Government. Therefore, it is hereby ORDERED that:

1. The U.S. Attorney's Office for the Western District of New York[1] ("USAO-WDNY") shall provide to the Brooklyn

---

[1] Although the Assistant U.S. Attorney handling this case is an Assistant primarily to the U.S. Attorney for the Eastern District of New York, she was also sworn in as an Assistant to the U.S. Attorney for the Western District of New York because the Western District Office handled the prosecution of this case after the Eastern District Office was recused.

4

Metropolitan Detention Center (the "MDC") a list of all Trial Discovery covered by the Protective Order; and

2. The MDC, with assistance of Defendant's counsel, shall identify and confiscate any and all Trial Discovery in Defendant's possession, custody or control, whether in hard or electronic copy, and return said materials to the USAO-WDNY.

3. The USAO-WDNY shall provide defense counsel with any documents relevant to Mr. Romano's appeal, including those covered by the Protective Order, as soon as practicable.

**SO ORDERED.**

Dated:    New York, New York
          September 24, 2014

                                         John F. Keenan
                                         United States District Judge

5

# EXHIBIT Q

## Doc. 333 — Sealed Minute Entry

No. 2:09-cr-00170-EK (E.D.N.Y.), filed 06/23/2011
PageID #: 4635–4636

Romano v. United States, No. 26-15 (2d Cir.)

Case 2:09-cr-00170-EK    Document 333    Filed 06/23/11    Page 1 of 2 PageID #: 4635

**FILED**
IN CLERK'S OFFICE
DISTRICT COURT E D N Y

★  JUN 23 2011  ★

LONG ISLAND OFFICE

**DOCKET NUMBER:** CR-09-170-1-JFB-AKT

~~SEALED~~                    ~~SEALED~~            ~~SEALED~~

### CRIMINAL CAUSE FOR MOTION

Date Received By Docket Clerk:_____    Docket Clerk Initials:_____

BEFORE JUDGE: A. Kathleen Tomlinson, M.J.  DATE: 6/23/2011 TIME IN COURT 1 HR 10 MINS

DEFENDANT'S NAME: Joseph Romano DEFENDANT # 1

X    Present      ☐    Not Present      X    Custody      ☐    Not Custody

DEFENSE COUNSEL: Vincent Ansanelli and Mark Goidell

☐    Federal Defender    ☐    CJA      X    Retained

A.U.S.A.: Not present

PRETRIAL/PROBATION OFFICER_____    COURTROOM DEPUTY: Mary Ryan

COURT REPORTER: OR ESR OPERATOR: Ellen Combs    TAPE LOG_____

INTERPRETER:_____LANGUAGE:_____

| | | | |
|---|---|---|---|
| ☐ | Arraignment | ☐ | Revocation of Probation non contested |
| ☐ | Change of Plea Hearing (~Util-Plea Entered) | ☐ | Revocation of Probation contested |
| ☐ | In Chambers Conference | ☐ | Sentencing non-evidentiary |
| ☐ | Pre Trial Conference | ☐ | Sentencing Contested |
| ☐ | Initial Appearance | ☐ | Revocation of Supervised Release evidentiary |
| ☐ | Status Conference | ☐ | Revocation of Supervised Release non- |
| ☐ | Telephone Conference | | evidentiary |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ | Voir Dire Begun | ☐ | Voir Dire Held | ☐ | Jury selection | ☐ | Jury trial |
| ☐ | Jury Trial Death Penalty | ☐ | Sentence enhancement Phase | | ☐ | Bench Trial Begun | |
| ☐ | Bench Trial Held | ☐ | Bench Trial Completed | X | Motion Hearing Non Evidentiary | | |

☐    Other Evidentiary Hearing Contested   TYPE OF HEARING_____

**UTILITIES**

| | | | |
|---|---|---|---|
| ☐ ~Util-Plea Entered | ☐ ~Util-Add terminate Attorneys | ☐ ~Util-Bond Set/Reset |
| ☐ ~Util-Exparte Matter | ☐ ~Util-Indictment Un Sealed | ☐ ~Util-Information Unsealed |
| ☐ ~Util-Set/Reset Deadlines | ☐ ~Util-Set/Reset Deadlines/Hearings | | |

☐ ~Util-Set/Rest Motion and R&R Deadlines/Hearings    ☐ ~Util-Terminate Motions

☐ ~Util-Terminate Parties

☐ ~Util-Set/Reset Hearings

333

**Speedy Trial Start:_____Speedy Trial Stop:_____ CODE TYPE:_____**

**Do these minutes contain ruling(s) on motion(s)? X      YES      ☐      NO**
**TEXT**

SEALED PROCEEDING. Courtroom sealed. Mr. Romano's wife present in courtroom. Mr. Romano heard by

Court. Mrs. Romano heard by Court. Motion to Withdraw as attorney by Mr. Ansanelli and Mr. Goidell heard.

Decision: reserved. Written decision to follow. MINUTE ENTRY and TRANSCRIPT SEALED by oral order as

stated on record. Not for viewing by AUSA office or by Judge Bianco's chambers._____

# EXHIBIT Q-1

## Doc. 776 — Sealed Transcript (Unsealed 07/13/2022)

No. 2:09-cr-00170-EK (E.D.N.Y.), filed 07/20/2022
PageID #: 4725–4777

Romano v. United States, No. 26-15 (2d Cir.)

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,          :

    -against-                          :

JOSEPH ROMANO,                     :

        Defendant.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

    CR-09-00170

    United States Courthouse
    Central Islip, New York

    June 23, 2011
    3:00 p.m.

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE A. KATHLEEN TOMLINSON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:      LORETTA E. LYNCH, ESQ.
                        UNITED STATES ATTORNEY
                        610 Federal Plaza
                        Central Islip, New York 11722
                        BY:  LARA TREINIS GATZ, ESQ.

For the Defendant:      VINCENT W. ANSANELLI, ESQ.
                             and
                        MARK GOIDELL, ESQ.

Official Court Reporter:   Ellen S. Combs, CSR
                            100 Federal Plaza - Suite 1180
                            Central Islip, New York 11722
                            Phone (631) 712-6107
                            Fax (631) 712-6123

Proceedings recorded by mechanical stenography
Transcript produced by Computer

2

(The following took place at 3:09 p.m.)

THE CLERK: Calling criminal case 09-170 United States of America vs Joseph Romano.

Please state your appearances for the record.

MR. GOIDELL: For the defendant, Mark Goidell.

Good afternoon, your Honor.

MR. ANSANELLI: For the defendant, Vincent Ansanelli.

Good afternoon, judge.

THE COURT: Good afternoon.

THE DEFENDANT: Joseph Romano.

THE COURT: Okay.

A VOICE: Intern.

THE COURT: Okay, and we have sitting in the gallery -- who is this, please?

MR. GOIDELL: Joseph Romano's wife.

THE COURT: Mr. Romano, you're consenting to your wife being here. Is that correct?

THE DEFENDANT: Yes, ma'am.

THE COURT: And who is sitting behind you?

The marshals. Excuse me. How do I not know that?

All right, good afternoon. I'm Magistrate Judge Tomlinson. I understand there is an application to withdraw as counsel in this case, which Judge Bianco has

asked me to handle this afternoon.

I have gone through Mr. Ansanelli's memo that you submitted in support of your motion to withdraw. And I am prepared to hear you further in this regard. And then I also want to hear from Mr. Romano. All right?

MR. ANSANELLI: Thank you, judge.

MR. GOIDELL: Your Honor, I'm going to be addressing the application, if that is agreeable with the court?

THE COURT: Go ahead.

MR. GOIDELL: Does the court want me to do that from here or from the podium?

THE COURT: It might be easier for the court reporter from the podium, so that she can hear through the microphone.

MR. GOIDELL: Thank you, judge.

Judge, there are some changes in circumstances of those that were presented to the court in the proposed declaration and the proposed memorandum of law. And in fact the situation has been exacerbated in recent days. And I think that requires some explanation.

The extent of the mistrust between the defendant and his counsel now is such that the defendant has accused Mr. Ansanelli, I'm told by Mr. Ansanelli, of in essence being in cahoots with the government. And that there is a

system that's in place here which is designed to deprive him of rights. And that everybody including his own counsel is a participant in that conspiracy.

And specifically, what Mr. Mr. Ansanelli was accused of, was to use the colloquial, *tank* a bail application that was brought not to long ago in the, within the past month and-a-half.

THE COURT: This was brought before Judge Bianco?

MR. GOIDELL: Yes.

THE COURT: Okay.

MR. GOIDELL: At a conference that immediately preceded that bail hearing.

And as a result of those kinds of allegations, as well as what has been presented in the declaration and memorandum of law, there is a remarkable divergence at this point. We're being asked to advocate matters on behalf of Mr. Romano which we simply in good faith can not.

THE COURT: All right, let me stop you for one second, Mr. Goidell. Because this is a sealed proceeding, I'm going to ask you to go into specifics here.

It's my understanding that I'm the only one that is going to hear this. All right? And so I would like you to be as specific as you possibly can.

5

MR. GOIDELL: I will, your Honor.

Your Honor, the defendant's current position is that he would like his counsel, or demands, rather, that his counsel argue that the prosecutor is engaged in prosecutorial misconduct; that the system is corrupt: that the court and his defense team are part and parcel of the corruption that he perceives.

At this point in time in conjunction with that, the defendant has changed his previous position and now he would like us to advocate sentence mitigation. We had been prepared for a substantial period of time to file objections to the facts presented in, many facts presented in the presentence report, and to contest various enhancements including the calculation of loss, the number of victims, the vulnerability of victims, his role in the offense, as well as to advocate for certain departures as well as variances from the applicable guidelines.

Mr. Romano told us, *don't do that*; refused to permit us to advocate on his behalf. Instead he requested or demanded that we instead move to vacate his plea. We advised him against vacating the plea in the strongest of terms. Only now --

THE COURT: But now he changed his mind?

MR. GOIDELL: Now Mr. Romano has changed his mind. As I understand, Mr. Romano has expressed to

6

Mr. Ansanelli as recently as this past week when Mr. Ansanelli visited Mr. Romano at the jail, that, yes, he wants us now to pursue sentence mitigation.

However, now in conjunction with that he wants us to pursue all contentions available; that the process and the participants in the process lack integrity and are part and parcel of this conspiracy, that again he perceives.

In addition to all of that, your Honor, Mr. Romano has expressed to Mr. Ansanelli in the past, and as recently as few days ago during a jail visit, that he refuses to pay the outstanding fee. There is a balance that is owed of somewhere in the neighborhood of $70,000. There are assets that are not subject to forfeiture, that are available to pay the outstanding balance. There are assets that are available and not subject to forfeiture that are available to pay the continued fee that is required by the agreement with the defendant moving forward. And the defendant's position is simply that he has paid up, and he is he not paying any more.

THE COURT: Let me stop you for a minute.

What was the amount of the initial retainer?

MR. GOIDELL: I'm going to have to defer to Mr. Ansanelli.

MR. ANSANELLI: $25,000, your Honor.

Ellen S. Combs, CSR
OFFICIAL COURT REPORTER

7

THE COURT: And the $25,000 was paid?

MR. ANSANELLI: The initial $25,000 has been paid. Subsequent bills had been rendered over and above the original $25,000. Those bills haven't been paid. However --

THE COURT: How much has been paid up until now?

MR. ANSANELLI: We have been paid $230,000.

THE COURT: All right, so to date you have been paid $230,000?

MR. ANSANELLI: Sorry, judge?

THE COURT: To date you have been paid $230,000.

MR. ANSANELLI: That's correct.

THE COURT: He still owes you according to your calculations about $70,000.

MR. ANSANELLI: Exactly closer to $79,000 judge. And we have asked Mr. Romano for an additional retainer going forward as well. We combined the initial retainer with the work remaining, as well as the outstanding balance. We have asked Mr. Romano for $125,000 to address the past due balance, as well as the money that would need to be paid for going forward.

THE COURT: All right. Thank you.

MR. GOIDELL: And if I may, your Honor, the work that has been performed for Mr. Romano is detailed in Mr. Ansanelli's declaration.

Ellen S. Combs, CSR
OFFICIAL COURT REPORTER

THE COURT: Yes. I saw that.

MR. GOIDELL: And the work that is still required to be done on his behalf is voluminous if we are in fact permitted to do the attorney's job, rather than to be restrained in the way that Mr. Romano is. So, there are literally tens of thousands of pages of documents that need to be culled, reviewed, collated, reorganized to submit an order, to make a factual demonstration necessary for a Fatico Hearing, and then to attempt to prove our contentions at those hearings. And then of course the time we need for the preparation of all documents in connection with the presentence, or the appropriate sentence advocacy.

THE COURT: All right, let me just -- I want to make sure I have this clear.

I'm going to let you address this a moment yourself, Mr. Romano.

You say that he is demanding that counsel argue prosecutorial misconduct. Is that still the case?

MR. GOIDELL: Yes, as of two days, three days ago, yes.

THE COURT: Okay. And with reference to his team being part of the corruption, he still wants that argued as well, according to what you believe is the case right now?

9

MR. GOIDELL:  Yes.

THE COURT:  Okay.  But that he has not any longer asked for his plea to be rescinded, but that he does want you to argue for mitigation with regard to the various aspects of mitigation, along with the defense of the number of victims, et cetera, as well as variances from the applicable federal sentencing guidelines. Correct?

MR. GOIDELL:  That's correct.

THE COURT:  Okay.  And he also wants it to be argued that the participants here are, all lack integrity?

MR. GOIDELL:  That's correct.

THE COURT:  Okay.  And the rest has to do with the amount of money that is owed according to counsel for the services rendered and to be rendered.  Right?

MR. GOIDELL:  That is also correct.

THE COURT:  All right thank you?

Mr. Romano this is your opportunity to be heard on this application.

THE DEFENDANT:  Yes, ma'am.

Would you like me to stand at podium.

THE COURT:  I just need to make sure, if you can move the mike over directly in front of him.

THE DEFENDANT:  Can I talk without the mike so that you can hear me?  This is really bad, and I really

**10**

can't hear myself from the reverberation.

THE COURT: Well, we'll see how it works for the court reporter. If she tells me she needs the mike I'm probably going to put it on the mike. Go ahead.

THE DEFENDANT: You want me to do it from --

THE COURT: You can sit. That's fine.

THE DEFENDANT: Your Honor, I really don't know how to answer these things in really a simple way, you know. And I have to tell you I'm very happy with the work that Mr. Ansanelli has done in the past. And referring to trust issues, or trying to make me sound like I'm psychotic, like I think the whole world is against me. I'm paranoid. I think that's ridiculous. Okay?

First of all, I have to explain the story to you but I have to go back a little ways. When I first came into the courtroom I was -- I hired Charles Carnesi. I have never been in any trouble to speak of before in my life, and I didn't know how this went.

I really, I was here I am with a federal indictment I'm sitting at home and I'm thinking, well okay, here I am under a federal indictment. I'll simply get a lawyer and we'll straighten this out.

Well, there is a couple of bad things that happened along the way. I was referred to this Charlie Carnesi, who you know he is a known Mafia attorney. And I

have to tell you, I didn't know that. He was referred by a personal friend of both mine and my wife.

And my wife, and she said to me she -- I told her, I said, Listen, this is a Greg Gallo who said this is a good attorney. And he's a great attorney. He works in the federal system, so on and so forth. And I hired this man. He said to me that he gets $100,000 for everything proceeding up until trial. Okay.

I'm a man who has paid my bills. I don't owe anybody anything. Actually when I had to hand over a sheet, you want to know what credit card bills I have. I don't owe anybody anything. I paid all my bills. I live within my means, and I don't ask anybody for anything.

I paid this man his hundred thousand dollars. And I told him I said -- he came to visit me in one of my apartments in Manhattan. I told him, I said, You know, if there's, if there's one bit of illegitimate money that came, that filtered through me while I'm retiring in Florida, I said, then you give back. You call up the prosecutor. You give back every single dime of everything I have because I don't need anything. I don't need even a house. I can build my own house, just like I have built all my houses.

Well, I think they were part of -- because I was given this referral by this Greg Gallo, he somehow let him

12

know that I had a lot of money.

Well, I don't think this man has got my best interests at heart. And he says -- I tried to call him, and I told him, Did you get in touch with the prosecutor? It's a phone call.

A couple of months went by. And in the meantime he calls me back up and he says to me some three months after I'm indicted, he says, Yeah, the prosecutor wants you to take a plea of ten years.

I told him, Ten years? I don't know what you're talking about here. And I start to understand the seriousness of it and I realize, you know, this is my man, he's a top notch attorney known by everybody.

Well, what happened is he strung me along. He has -- as you know, my bail was, was revoked. I needed money. I've sat there. I told you where am I going to get money like this to give you? I have some money but I have bills. I have mortgages to pay. I have people I owe money to. I don't walk around not paying people. And like they're saying to me here -- I pay people.

Well, he said to me -- I told him, I said, You know I need to -- I need to make money to pay you. What am I going to do?

Well, I'm not going to blame him. I'm 48 years old. I accept responsibility for what I do. Okay.

Ellen S. Combs, CSR
OFFICIAL COURT REPORTER

13

Sometimes, sometimes I'm in a position of authority which is usually always, I always accept responsibility for my underlings.

Well, Mr. Carnesi said, Well, if you go and you get involved in the, in the telemarketing, which is what I did as you know. I was consulting for that firm. And quite frankly, yeah, they could have never been established without me consulting them on how to go ahead and build a coin company.

Of course what's happened in the past has been, that I've been told what happened there, and committed other crimes. And you know, these types of things I didn't go ahead and commit the crimes that I knew about in the first place. Okay. Was I aware of what went on and what you call fraud? Yeah, I've heard that. Yes, I've heard them say it. I've heard some of the salesmen say, I've admitted that. I understand that.

Why didn't I do anything? Certainly because of money. However, when I went to this other place and I consulted, to think, to think that I would go there and teach them how to do something that I didn't teach people how to do in the first place, is absolutely absurd.

MR. GOIDELL: May I interrupt very briefly? I'm very sorry, Mr. Romano. Your Honor, may I, please?

THE COURT: Go ahead.

14

MR. GOIDELL: I just want to advise the defendant, while these proceedings are sealed, and I presume that they will not be subject to an inspection by the prosecutor and hopefully by District Judge Bianco --

THE COURT: That is one of the things here, yes. But I understand your concern for what information is being proffered by Mr. Romano. And if you want, I'll give that instruction. All right?

MR. GOIDELL: Yes, thank you. We do have a legitimate concern that what he is saying jeopardizes the acceptance of responsibility.

THE COURT: Mr. Romano, just so you understand. This record is going to be sealed, and no one else is going to see it; neither Judge Bianco, nor any of the prosecutors in the case.

But what your lawyers are concerned about, rightfully so, is that any statements that you make here that could be of an incriminating nature in any way; I need to caution you that that may not be the direction you want to go in here. And the whole point of this proceeding is to determine whether or not you want to proceed with your current counsel. And I have to make a determination whether there is a conflict at this point with your current counsel.

So it would be, I think very helpful to you, to

15

try to narrow the universe of information that you want to give to me at this point. All right?

THE DEFENDANT: Yes, your Honor. I understand completely. And I will give you the condensed version, reduced version.

I think the issue that the gentlemen have is about acceptance of responsibility. And I think you know what I wanted to say in that matter is, I have accepted responsibility. And I'm not, I'm not pushing myself away from the acceptance of responsibility and saying this. As I said, what I perceived to be non-criminal was something that I went back into. Okay. I'm not saying that I didn't do anything that was criminal. But I will condense this whole thing for you.

My bail was revoked. I had to go to trial. I was not offered any type of plea agreement.

I showed up at the trial, and Carnesi used the fact that I was in jail. His advice to me was, well you know, if you get caught, he says, I'll simply go there and I'll get you out. I'll get you back out on bail. It was a very, very poor judgment on my part. I understand that.

Well, that was some 15 months ago that I have been in the Nassau County Jail. He used, he used the fact that I'm locked up in jail, and he was the in between, between myself and my wife. It was very hard to

**16**

communicate in person.

And he ended up collecting another $200,000 from me. He said he needs to be paid $200,000 before it goes to trial.

Well, I walk into the courtroom and him and all of the attorneys which he told me he needed to get my brothers all new attorneys, all his so-called friends -- I walk into a courtroom and they say to me, No, we can't take this to trial. They're going to give you 17 years. And they did a whole scare tactic.

And I say to my brothers, I said, Listen, I don't understand you guys. We're taking this to trial. I said, Are you kidding me?

They said, No, we want you to take a plea. You need to take a plea. I was bombarded by all three attorneys, Charles Carnesi included. He was paid $200,000, and I took the plea.

He said to me -- I told him at the desk, I said, Well, what about the $200,000 because you told me $100,000 between now and trial. Well we're not going to trial.

He says, No, I never said that.

I said, Well what do you mean you never said that? You've said that. With that we moved onto -- we fired him. We fired him, and I moved on with Mr. Ansanelli. The way I found Mr. Ansanelli was through

17

Brian Aryai (ph) who is a retired FBI agent who does forensic work.

Well, after the plea I hired these gentlemen post-plea. I told them that I would like to -- I would like to stay with the plea. I don't want to go ahead with this trial. Lets stick with the plea and we'll work on mitigating circumstances, so on and so forth. A retainer, as I said was $25,000. And I have incurred $230,000 worth of bills. In the meantime it's not just $230,000. There is this Brian Aryai. He was going to be the forensic accountant.

Well, the forensic accountant, what I understood the forensic accountant for, is he is going to take the $7 million that I pleaded guilty to, okay, and he is going to condense that into a smaller figure so I don't get hit with some 10 or 20 points. I believe it was 20 points added on to the -- I don't know --

THE COURT: It's called the amount of loss with regard to the fraud. Correct?

THE DEFENDANT: The what?

THE COURT: The amount of loss with regard to the fraud.

THE DEFENDANT: Yes. But on the sentencing table, the sentences guideline, the base number for that is the 6 points. You add 20, you're talking about 26.

18

And now we have enhancements that the government is trying to bring forth and forward. And this is what my problem is.

I paid Brian Aryai $50,000. Now that's $280,000. I have a contract here. If you would like to see the contract I can present it to you. And it's signed by Mr. Ansanelli. And it says that, there is one sentence in there that says that he directs everything that this Brian Aryai is going to do.

Well that's fine, except for we sent Brian Aryai, we sent him down to Florida. And I told Brian Aryai through other sources, I said, You know, I can understand taking a plea agreement. But this judge has to, this judge has no clue who I am as a human being. He thinks I'm the worst guy in creation. All he has to do is read anything that the government says, the PSI report which was rubber stamped, or read the newspapers.

According to the Newsday I'm a Mafia Don. Well, we sent him down to Florida and gave him the direction. I said, Go and interview these people, okay? They didn't say those things. They're lies. Just go interview them. There's no way these people are going to be able to say that about me. They know who I am. They know what I've done with them, and they know who I am as a friend. And not that I'm looking for any kind of lawyer

19

who will do favors for them. But they're -- some of these people were decent people, and they were pressured.

While I sent Brian Aryai down to interview these people, he's interviewing Dave Murkovitz (ph) that was the owner of Collectible Coins, CCI in Florida.

THE COURT: Yes.

THE DEFENDANT: He interviews David Murkovitz. And the reason why he interviewed him is because David Murkovitz changed his story. He changed his story about it a couple of times. He's a wishy washy guy. And he sat there and he told -- he gave one version, and then all of a sudden he changes it around. He's a cooperating witness with a no prosecution agreement. And he's in cahoots with the government.

You know, I'm not mad at these people. I'm not mad at these people at all. I just, I just feel that it's wrong. They were somehow pressured. We sent Brian Aryai down to Florida. And as he is interviewing David Murkovitz he gets a phone call on his cell phone from an attorney who was given to him by Charles Carnesi. Well, with that he is talking to Brian Aryai, he opens up the cell phone and he says, Hello. And he puts him on speaker phone in front of Brian Aryai, who's, who's word is impeccable. He has a top secret clearance. And he informed me that he would testify to these facts, because

what I have learned I need to be able to prove everything that I said. Well I can.

And he said, this Jason Wanderer (ph), I believe that's his name, he said that Lara Gatz's office called him and told him, said for to him tell David Murkovitz don't talk to Romano's people if they go down there, because we have Charles Carnesi, he's under investigation. They're trying to investigate him. And don't talk to those people. They just want to investigate Charles Carnesi.

Now, I don't know anything. I really don't know too much about the law, only what I've read in the past year which, which now is a lot.

I asked Brian Aryai, I asked Vincent Ansanelli, I asked Tom Cleary (ph) who was, who was part of Mr. Ansanelli's team. And my answer was, the answer they gave me was, that that is absolutely absurd, nobody does that. That is wrong to do such a thing.

Well, this is how the process took place. And my wife had also taped this Charles Carnesi who pretended he didn't collect all these monies that went to him. As well as, we have, we paid his -- we paid his private investigators who mysteriously folded tent when we tried to find them, when we tried to call them and asked them, Well, where is all the information about all of these

21

people you interviewed?

My point is, your Honor, that I took a guilty plea. But I wanted to tell the judge, you know, I don't know what you've heard, or what you've read, or what you've seen, or what the government had handed over, or what the PSI report was rubber stamped about. I don't, I don't know what you've heard. But I wanted you to know that I took a plea. And the have a whole assortment of people who sit there and boldfaced lie to people. Okay. And they have -- there are people who have recanted their statements.

THE COURT: Who is the they, just so I understand?

THE DEFENDANT: The cooperating witnesses. They interviewed, they interviewed -- and this is what I've heard because I speak to these people -- they interviewed two of my secretaries. They accused me of fathering a baby of one of the secretaries. This is Lara Gatz who I'm talking about. They accused me of fathering a baby to my secretary. They accused me of having sex with the other secretary.

Judge Tomlinson, you know I, if that were true, it has nothing to do with this case.

THE COURT: Well, let me ask you a question. Pardon me for interrupting you.

**22**

Is that information contained in the presentence report?

THE DEFENDANT: Absolutely not.

THE COURT: Okay.

THE DEFENDANT: And Mr. Ansanelli can tell you that we sat there in the PSI, and gave a PSI report. And the only thing that comes out of my mouth is the truth. And you know, I have a PSI report here that I can not believe. I can not believe that this is what this man wrote.

THE COURT: Well all right, let me stop you there for a moment.

Because part of what the defendant's counsel particularly does in those circumstances is, once the PSI is produced your counsel has an opportunity to file a written response in the form of objections back to the person who prepared the presentence report to see if some of this can be rectified.

And if it's rectified, great. It will be published in an addendum to the presentence investigation report that then goes back to Judge Bianco. If they can't reconcile it, your counsel still has the right to raise those objections with Judge Bianco at the time of sentencing. And many of the attorneys do this in the form of preparing a sentencing memorandum, which is what I

23

assume your counsel was referring to earlier. And in that sentencing memorandum they're going to deal with the issues that are in the presentence report that you have concerns about. And they're also going to bring in any other factors about you that they think the court should take into account with regard to you as a person who is about to be sentenced here, based upon the plea that you took.

They also have the right to raise issues of law with regard to the sentence. For example, you were talking earlier about mitigating factors. They should be taken into account. For example, one of the things that you mentioned and raised was the -- one second, I'll go back to this -- your role in the offense, and the number of victims for example.

I understand that you now do want counsel to argue mitigation, to argue those factors, which is what typically is done here by defense counsel when somebody is getting ready for sentencing. So I'm still trying to get back to understanding what differences you have with your current counsel, number 1.

Number 2, whether you want them to continue representing you.

And number 3, whether there's grounds here for me to establish that there's some kind of a conflict.

24

That is what I'm trying to get at.  Counsel has indicated to me that he believes there is a conflict here.  That's why I'm trying to get more information from you.

THE DEFENDANT:  I believe the conflict that he is speaking about is a trust issue.  And I can tell you I think that they have an associate that works with them, Ellen Kugler (ph), who is an incredible human being.  She does, she does her work.  She's sincere.  She's a humanitarian.  And you know what, I think their office does do a great job, and does not -- I don't not trust them.  You know.  I don't not trust them.  You know I, I can work very well with these people.  I live in a very volatile environment with bad people and gang members, and I manage to, I manage to keep people in order in that environment.

I certainly have no difficulty with running with Mr. Ansanelli.  I know -- I am not going to -- I will not hold him accountable if I happen to disagree with a way that a procedure is going.  The problem is, is that I would like to be approached straightforward.  Don't -- you can not show up to me after a hearing and tell me about, well you need to hand me $150,000 just because I was turned down on bail.  I feel that that is a tactic.  And I, and that's the only issue that I would have in terms of; don't use the fact that I'm turned down at a bail

25

hearing.

THE COURT: Well, let me stop you there for a moment again.

I want you to try for a moment, because I have to look at two issues here. One is, there are several grounds that have been raised by counsel here. One is the non-payment of fees. The other is the conflict between you. And the conflict, meaning from the standpoint of the attorney-client relationship, and whether or not that is so severely impaired that they feel they can't represent you as you should be represented for purposes of sentencing. And I'm trying find out from you if you feel that's the case. If you do, then I want you to tell me, yes, that's the case and explain to me why.

If you don't think that's the circumstance, and you don't feel you have a conflict, and you want them to continue representing you, then you have to tell me that.

Part of the conflict that they're raising is that there are various things that they would normally proceed to argue on your behalf at sentencing as mitigation factors. Obviously there was some point in time that there was a disagreement with regard to this, because you were indicating at some point, I believe, that you wanted to revoke your plea. You've now said that is not the case. And you want them to go ahead and deal with

26

and argue mitigation of these factors for purposes of your sentencing.

So, I need to get from you some direct answers to those questions.

THE DEFENDANT:  Okay.

THE COURT:  And try separating your mind and your discussion for the moment, the money issue versus the conflict issue.  Okay?

THE DEFENDANT:  I have to tell you, I don't believe that there's a conflict issue.  I believe what went on is, and if it wasn't done the way it just pours out to you when you say it -- when we thought, when I thought about taking the plea back, we decided that we wanted to take a back seat and see how my brothers' trial turned out.  That's why I told -- I said, listen you need, we need to start thinking about removing the plea.  I said, I'm very unhappy with the fact of sitting here with this plea agreement and the way things are transpiring.

The PSI report that came out and was devastating, was devastating.  When I spoke to Tom Cleary, the counsel who worked for Mr. Ansanelli. he told me that he answered that.  He could not believe that that PSI was the one that was, that was for me.  He answered it word for word.

Why we're sitting on waiting all these weeks,

27

six weeks to have the PSI answered. I don't understand that.

My only argument is, all the time the same thing. Every time I meet with Ansanelli, I said, So Judge Bianco at this -- currently thinks that I'm the unabomber, because he has never been told anything else. We're talking about I was originally arrested in November of 2008. We're talking about two and-a-half, three possibly three years ago almost. And Judge Bianco only knows me as a person whose purposely not showing up to court, or a person who, who just does what he wants. And to paraphrase Judge Bianco, flagrantly going back into the coin business.

This may be an impression that I believe that the prosecutor wants to show everybody. I believe that. But that is not the case. And the issues that both myself and Mr. Ansanelli have are, they all boil down to money.

Why isn't the PSI answered? Because he wants me to hand him over $50,000. I'm in the Nassau County Jail. Money does not fall out of a tree. There has been money taken away from me. I'm working off rentals. When they say that I have properties and I have all this, I guess everybody knows what I have. I'm supposed to take a $500,000 home and sell it for $100,000 to hand it over to Mr. Ansanelli.

28

And the problem I had is, as I said, this was in my letter to the judge from my wife; is, if that's the case, let me go and hand the property over to one of the victims, because money don't mean anything to me. But to sit there and waste and to destroy things, it just doesn't work according to the way that everybody would like.

If I was sitting here on all kinds of money that I could just, that I could burn through, if I could sign a blank check and have Mr. Ansanelli work off it without having to worry if my wife or my children are going to be able to pay the bills, which I still maintain some eleven houses and everything else for that matter, okay. Where are they supposed to go? What am I supposed to do with this? And this is something I believe after paying $280,000, some of the stuff should have been done already.

THE COURT: All right. But you understand that right now you're not prejudiced because --

I'm going to let you talk, ma'am, just bear with me a minute.

You're not prejudiced from the standpoint that your ability to respond, or counsel's ability to respond with regard to the objections to what is in the presentence report, you still have the opportunity to do that. That is not bypassed in any way. All right? And so those arguments will be made on sentencing by whoever

29

is representing; you whether it's these folks or somebody else.

So that I want you to understand is not an issue here. You still have the right and you still have the opportunity to bring that information to the attention of Judge Bianco.

The real issue here is; aside from the money which is I understand a significant issue to everybody, but it's one issue out of two that we have to deal with here. The other one is whether or not you believe you can continue to work to assist counsel here in your defense to prepare for your sentencing. And that you can continue to work with them to get to a point where they can make the best possible case for you by way of arguing mitigation for example at your sentencing. And you have tell me if you think you can do that.

THE DEFENDANT: Yes, I absolutely can. I have no problem with anyone in this world, and especially a man who has helped me. The issue here basically is two simple things. Money, and how fast it gets over to Mr. Ansanelli. And the other issue is when I -- to answer what they said, I'm not paranoid about the system. And what I believe the system to be, whether I believe it's corrupt or what have you, that's not something that -- I don't think that should be brought out loud. These are my

30

personal opinions about things.

THE COURT: Well, that is important, because if you're asking them to argue something like that for you in that sentencing, I can understand why they're having difficulty.

THE DEFENDANT: No, I'm not. I did not ask them to argue whether or not I think something is corrupt. Okay?

The problem is, is I believe, I really believe that this prosecutor, okay, goes out of her way -- and I have read, I've read this, this whole entire stack here about -- and it doesn't make me an expert on prosecution misconduct. And you know what? I'm -- she falls under this, under so many things here. It's almost unfair that someone has to sit here and be subjected to the things that she said and nobody will address this.

And so I asked Mr. Ansanelli, can I address it? I want to address it. Why? I'm told I'm not -- I'm looking at 12 to 15 years. You know a condemned man has very little fear. I am not -- I will -- if I believe it's a full blown liar, I believe she's out of line. And she is.

THE COURT: All right, so let me stop you there.

The real issue here, and we have to put this in some kind of context. You have taken a plea. Correct?

31

THE DEFENDANT:  Correct.

THE COURT:  So you've admitted your guilt.

THE DEFENDANT:  Correct.

THE COURT:  Whatever prosecutorial misconduct you're referring to, I don't know what that has to do with your sentencing or anything that is in the presentence interview.  I suspect it's not in there.

Whatever arguments the government is going to make at sentencing, with regard to what they believe should be done with regard to sentencing, it is why you have counsel to represent you to refute those arguments.

I don't -- arguing that there is some form of prosecutorial misconduct here that you think is going to impact your sentencing is a little divergent here.  You may feel that way, but I'm saying to you that you, you know, you have a right to feel that way.  That is entirely up to you.  You're the one who is living through these circumstances.

But it puts them at a disadvantage in terms of how you argue, that somehow there has been prosecutorial misconduct here, particularly because of the fact that you have taken a plea.  What you need to focus on is what you pled to and what arguments they can make on your behalf with regard to mitigating the number that you're concerned about, the enhancements to your sentence.  Right?

32

THE DEFENDANT:  Correct.

THE COURT:  And the question is, can you do that with them, without putting them in a position of having to argue things that are not going to really support your claim for those.  Whether or not there has been -- and look, I'm not taking a position on this one way or the other, I'm just trying to make you understand -- whether or not there is prosecutorial misconduct has very little to do with whatever sentence you're going to get based on the plea that you took.  Do you understand?

Now you know what's significant to you, what is really outside the box of what the court is going to look at here with regard to the plea that you took, and what sentence is properly imposed here.  There are other things here that your counsel can argue that are much more relevant to what Judge Bianco is going to be looking at.  And I just need to make sure that you understand that.

THE DEFENDANT:  I understand what you're saying, your Honor.  Except that you know what we're failing to look at is the fact that I paid $50,000 to a man to go down and interview people.  And all of a sudden there's this whole scenario going on.  And it's -- I've been billed for it.  It's been talked about.  It's been -- I've been charged an exuberant amount of money for it as well as paying the $50,000.  So if that has nothing to do with

33

anything. I don't think it's some big giant surprise that -- I don't know, look at me, I'm off the hook because I found someone else doing the wrong thing. I don't think that by any stretch of the imagination.

But I certainly don't think for one second that a person who's in a position where people sit around and they, they bequeath to someone who's part of the government, honesty and they stand for something. They stand for the United States of America against me. And that's the type of things that go on?

I mean there was an instance today where we sat here and we had a hearing. And you have the prosecutor, who is very aggressive, and takes a position that there are, there are 187 statements. And we gave them to people. And we know full well that they weren't given, and we weren't given anything. We're not given the opportunity to view things.

And again, I just -- the problem I have is, I tell Mr. Ansanelli is, I need a forum to say these things. Because your Honor, I can own what's mine, okay? I can do that. I'm a very big boy. I served this country honorably. I'm a pilot. I flew airplanes and helicopters and aerobatics. I know what's mine. I know what I can own up to. I'm a stand-up person. I'm a handshake guy. And I have to, I have to sit around and, and take this?

34

I don't know why?  I don't know why, if you, your Honor would look at me saying something like this, and then sentencing me.  I mean you, you have to be able to separate the two.  Alls I'm saying is, why can't we point these things out?  It's not right that this is being done.  It's an abuse of power.

THE COURT:  Well look, that's one of the things I suggest that you will likely talk to whoever is representing you for purposes of sentencing and to what is appropriate.  And if you want to express your belief and have your counsel express that that's your belief, then that is something you can talk to your counsel about.  All right?

Your wife was anxiously waiting to tell me something.  Go ahead.

MRS. ROMANO:  Thank you, your Honor.

THE COURT:  I'm going to have to make you come to the podium.

MRS. ROMANO:  The only problem that we've had for any of this, and the only conflict we have right now is as I see it is the money.  I had retained Mr. Ansanelli's office in October for $25,000.  I was -- it never happened to me before.  I mean this situation was explained to Mr. Ansanelli what happened and what transpired that we feel obviously is not right.  And

35

Mr. Ansanelli promised me that he would be forthcoming, and help my family, and represent my husband, and come forward to the judge, and help me, and said a lot of things. And I trusted him, and I trusted Brian. And it was a matter of trust for me to them and especially the situation. I'm alone. I have three children, my husband is in jail.

He was very -- I see all the work he did. I like Tom Cleary. They sent me bills, I would pay them. I sold one of the condos in Manhattan, and that's what provided me an opportunity to find him a new counsel. As soon as the money runs out, and basically which was coincidentally the same time my brother in-law's trial started, we decided, Joe and I, let's wait and see what happens with Michael. We don't know how this is transpiring. We don't know what this all means. And it's a scary thought to know that your husband is facing 15 years. I have three children.

In the end it was a money thing. And as soon as I could not pay those bills any more, which I have my children to feed, Mr. Ansanelli turned on me. He told me that if I didn't pay him the money that he no longer would represent me. And that was the only conflict we had. Because other than that, he was doing a great job.

I spoke to Tom Cleary who is no longer at the

36

firm, that Mr. Ansanelli never told us to this day that Mr. Cleary had gone. And I spoke to Tom Cleary about all of these anxieties and money issues and financial situations to Mr. Cleary.

And he told me, Karen what you paid is enough. Okay? And you need to stand ground because they'll, they will take everything. And I at that point I was draining my account. I was down to like whatever I had to do just to survive with my kids. As soon as the money ran out that was when Mr. Ansanelli turned. And all of a sudden it was a problem.

My feeling is that we gave him a lot of money. And the billing that I saw on the invoices were ridiculous. He is charging me $325 an hour. Okay? And every time I pay a bill I would get one in the mail the next day.

I understand that what he is doing is, is helping my family, is for the benefit of my family. But I was overbilled -- tremendously. And we can go down that list of invoices. He was charging me, for an example, for Aryai. They were charging me just to talk to one another. The billing is -- it's as far as I'm concerned, I'm being overcharged. And that bill needs to be looked over. And I think at some point there should be a resolution between what a fixed rate is, what we're actually paying for, and

**37**

in order to get his sentencing done and over with.  That is all we want.

And if Mr. Ansanelli wants another $150,000 for, for I don't know what, because we're going to end up with the same circumstances, the same sentencing.  I don't understand why he would want, and why he wants all this money.  Especially knowing what I gave him already, and what he overbilled me on.  So if Mr. Ansanelli wants to sit down and go through the bills line by line, I can go to his office and do that.  Because there is a lot of discrepancies that I see.  And maybe we can somehow fix, fix the balance and the rate, and maybe we can come to a fixed possible rate much less than $150,000 to finish the sentencing, so that we can proceed and we can move on with our lives.

Because obviously my life will never be the same again.  But I'm not going to sit here and make my children suffer any more, not financially either for, for the problems that we do have.  I have three children.  And I have bills to pay.  And I'm not going to give it to another attorney.  I would rather give it to the victims.  That's it.

THE COURT:  All right.

Mr. Goidell, do you want to have a brief rebuttal?

38

MR. GOIDELL: Yes. Thank you, judge.

Judge, some of the specifics that related to conversations with Mr. Ansanelli I'm going to refer to Mr. Ansanelli. He'll address those individually.

I will say a few things. There was a direct, direct mandate from Mr. Romano to do nothing with respect to sentence, to refrain from filing objections, to refrain from any sentence work while he contemplated whether or not to direct us to move to vacate the plea. And there was a direction to look into the propriety of moving to vacate the plea.

There was a specific direction from Mr. Romano just a few days ago that he wanted his counsel to advocate the things that he just articulated to the court on his behalf: the prosecutorial misconduct, the absence of integrity of the court. And in addition to that, expressly accused us of being involved in this conspiracy against him. I didn't hear Mr. Romano address that in any way, shape, or form.

MRS. ROMANO: I can address that.

THE COURT: One moment.

MR. GOIDELL: My understanding is that that conversation occurred between two people, Mr. Ansanelli and Mr. Romano.

What I am hearing with respect to the payment of

39

the fees; first of all, I think the court should understand that this monthly billing in the firm, I believe Mr. Ansanelli has addressed this more specifically, that every month an invoice goes out. There has never once, as I understand it, been any objection whatsoever to any of the invoices that have been presented to Mr. Romano or to his wife. There has never been any suggestion of excessive billing, double billing, or anything of that nature until now.

With equal emphasis I submit to the court that what we're hearing now is simply a refusal to pay, for whatever reason; whether it's because Mrs. Romano or Mr. Romano disagreed with the billing; they don't like the way that it has been billed. Whatever the case is, it's clearly a refusal to pay. And a refusal to pay is sufficient to create a conflict as defined by the Second Circuit.

This is not something that it is simply an inability to pay, and that we have taken a lot of money and therefore we should, we took a chance. This might happen because of the nature of those assets. That is not the case here. The case, what is being articulated to the court is their refusal to pay, for whatever reason; whether it's disagreements of the billing, or something else.

40

So, I'll rest with those comments and respectfully request that the application -- that the recommendation be issued granting the application to withdraw.

THE COURT: All right, Mr. Ansanelli? Yes.

Mr. Ansanelli: Judge, I believe that Mark Goidell from the firm has adequately addressed many of the issues concerning billing. What I want to focus in on is the ethical issue before the court.

This problem with regard to pointing the finger at others rather than taking personal responsibility has been evident throughout our post-plea representation of Mr. Romano. However, it is most of the problem. What Mr. Romano wants this firm to do is abdicate a position that we ethically can not do. And that is, to point the finger at the prosecution, point a finger at prior counsel, point a finger at the court, point a finger everywhere but back at himself in terms of where responsibility ultimately lies. And to make those points, which are nothing more than a major distraction and undermines the points that the court is aware that we need to make concerning the sentencing enhancements, sentence disparity, and all of the issues that go to proper representation.

I've had this discussion. I visited with

41

Mr. Romano numerous times in the jail. I've asked, I've implored, I've written, I've done everything one man can do to ask him to take those issues that aren't important to him, this whole conspiratorial system corrupt philosophy, and perhaps write a book one day. But to take them off the table and allow us to do our job. Because it would -- those distractions, that lack of taking personal responsibility for the actions that he was involved in, will undermine any efforts that we can make on his behalf.

Although the payments of the firms bill is important, it is not the central issue here. The central issue here is; even if the bills were paid up to date and there was no issue with money, we still could not properly advocate for this client. I don't know how to go forward in good faith on his behalf at this juncture with this position being what it is. I feel that at the end of the day his directives which have been inconsistent throughout, and now are quite clear; and that is advocate a position that I ethically can not. It's ultimately a place I can not stand in. And that's why we're asking to be relieved.

THE COURT: All right, I understand your position.

Mr. Ansanelli: I want to make one last point on the fee issue.

Ellen S. Combs, CSR
OFFICIAL COURT REPORTER

42

This whole discussion with regard to Brian Aryai. Just so this court understands; it's also unfortunately a distraction. Mr. Aryai is a retired federal treasury agent. He is an accountant, not an attorney. We did not hire Mr. Aryai. He was hired by the Romano family prior to our involvement. We did not pay Mr. Aryai. He is not under our wing. The family, the Romano family paid him whatever he billed, whatever he asked for a retainer. We did indicate, however, because of prior working with Mr. Aryai on other cases, that we would welcome his involvement with regard to forensic accounting services that he could bring to the table.

To that extent we had an agreement, a typical agreement bringing an accountant under the firm's wing for purposes of attorney-client privilege, indicating that we had that working relationship with regard to the Romano case. However, we did not direct his activities as has been discussed today, his ongoing investigation, or whatever he did down in Florida, where he had various potential issues of prosecutorial misconduct that they thought were appropriate.

We in fact informed the client on many occasions that that was a distraction, and ultimately would make our job much more difficult. So I just want to give the court that perspective. And thank the court for its time today.

Ellen S. Combs, CSR
OFFICIAL COURT REPORTER

43

Thank you.

THE COURT: All right, getting back to Mr. Romano.

Part of what I'm hearing from counsel does concern me for your benefit. Even if you have other attorneys representing you at sentencing, you're going to continue to have this same problem with any attorney who you're asking to advocate a position of prosecutorial misconduct. Do you understand that?

THE DEFENDANT: I understand that, your Honor.

THE COURT: Okay. So the question is -- I mean I realize having heard from you I understand how passionate you feel about this. The difficulty is, you put an attorney who is representing you into an ethical dilemma. And the ethical dilemma becomes trying to point out your experience in this process, which I see from your discussion is not only very frustrating to you, but is something that you believe and feel compelled to get out on a public record here somehow.

There is a concept that we know of at this point, and it's part of your sentencing proceeding itself, that talks about acceptance of responsibility. And when you take a plea and certain things fall into place, you get a reduction in the sentencing guidelines for acceptance of responsibility.

**44**

You're putting that, that acceptance of responsibility which you say you do admit, and again for purposes of taking the plea you would be eligible to receive the reduction on that basis. But you also want some accuracy here that even though you're taking responsibility you're really saying you're very disturbed with the performance and actions and conduct of the prosecutor.

You've made some statements today before me that lead me to conclude that you believe there is some sort of conspiracy that went along here with regard to your prosecution. And you're essentially putting the defense attorney between a rock and a hard place. They can't argue both of those positions. Do you understand that and do you understand why?

THE DEFENDANT: I do, your Honor. I don't think -- I don't think I put Mr. Ansanelli in an arduous position. The conversation was for Mr. Ansanelli to give me some sort of form. some sort of forum to put that on the record. Because I just -- I feel, honestly feel in my heart what about the next guy. Okay? And you know what? I don't care about the prosecutor. I know whether you know, she has a job to do. I know, I read all kinds of, all kinds of paperwork about prosecutors. I just want to put that on the record. And Mr. Ansanelli knows that,

45

that's what I wanted to do.  The issue here is not about any sort of ethics.

And as far as accepting responsibility and getting some three points.  Your Honor, nobody knows what's in my heart, and if I'm accepting responsibility.  Words aren't going to show that.  Okay?  I have accepted responsibility for this.  And I have explained it in the most simplest and honest terms to a PSI inspector -- I don't know what you would call them.

THE COURT:  The officer who interviewed you?

THE WITNESS:  The officer who did the interview.  He put the three points back on.  He put the three points back on, which of course I know that Mr. Ansanelli will review.  But he said that I am distancing myself from responsibility.

And you know, I don't know if saying what a prosecutor is doing, or saying that something that's going on within a courtroom and that I believe to be unfair to me -- I think that should be addressed.  I think it should be addressed.  I don't think there's some big giant coup going on.  I know that the government has their job to do.

Our job has always been sentence mitigation.  There is a couple of glitches involved there where we thought maybe we should pull the plea back.  There was the Brian Aryai.

46

How Mr. Ansanelli can say that this man works for me and me alone, when I'm sitting on a contract that is signed by Mr. Ansanelli that says that Brian Aryai is directed by Mr. Ansanelli's firm. And you know, I'm not sitting here making this stuff up. I'm only speaking about the facts. The facts are, I have a contract saying that.

Why do we go down that route? Why would you even entertain me with getting the -- catching a prosecutor giving information that she shouldn't have to an attorney that don't even work for, for one of the cooperating witnesses any more. You know? I don't think there's a -- I just wanted a forum. I've put it out there.

I don't have a problem with Mr. Ansanelli. I don't think that they want to represent me any more, not because of ethical issues. It's money.

THE COURT: Let me stop you there.

The problem here is, they can't give you a forum for what you want. And I'm not sure that that is resonating with you.

Because what you're asking them to do, effectively, is to take contrary positions when they're representing you for sentencing purposes. It doesn't seem contrary to you, but ethically it is contrary. Because

47

what it's saying essentially is to the judge; yes, I accept responsibility for what I did, but I think it's important for you to understand that I believe this prosecutor committed some ethical violations herself. Which is really what I think you're saying here. Correct?

THE DEFENDANT: Yes. But I don't believe that I want to say it at that sentencing, while we're mitigating. I believe we've created a forum now.

THE COURT: I'm glad to hear that, because I would have some real doubts about your common sense if that were the case.

THE DEFENDANT: I absolutely know that. I absolutely know that. But by the same token I feel -- I am not have a child that's going to sit in a courtroom mute to people saying things that are untrue. Or for instance again today. I mean there is a point. And I told Mr. Ansanelli while he was here, I said she never produced this stuff. I want someone to voice that.

And that's where, that's where we have a little bit of a problem. And maybe, maybe that I feel that you need to meet force with force and Mr. Ansanelli takes a different approach. But I'm not a person that can't meet half way with anybody.

THE COURT: Well the meeting half way here, the predicament is that what Judge Bianco is going to be

48

looking at, because he took your plea, so he certainly heard what you allocuted as your plea. Correct?

THE DEFENDANT: Correct.

THE COURT: He's also faced with this presentence investigation report. And typically he then has the objections that are filed by your counsel along with any presentation that your counsel intends to make about other factors that counsel believes the court should consider in formulating a sentence for you.

It's not a scenario where this issue of whatever your beef is -- and again I understand exactly what it is at this point -- where your beef with the prosecutor is going to come up. Judge Bianco is not going to be looking at that. He is going to be looking at the information that is in front of him, and his own experience with you based on what he heard in the plea; what he has read in the report; what objections he has; and the preparation and presentation that is made by your counsel with regard to mitigation.

This other thing for the most part is really on the back burner somewhere. I don't know what you can do with it eventually, or what you intend to do with it eventually. But asking counsel to deal with this, or to let you say something about it during a sentencing proceeding, it wouldn't matter if it is this counsel or 20

others sitting there, I can guarantee you that they're all going to take the same position. It puts them in an ethical bind. And their first duty is to you. And to allow you to do something like that where you could be literally shooting yourself in the foot as far as sentencing is concerned, is just not a place you want to be.

And I think you know that. And I understand your frustration with this. But if that's what you're expecting them to do, or wanting them to do, it wouldn't matter if I put seven other attorneys in that box, you're going to have the same problem. If I were practicing at this point I would have a problem with it. My job is to represent you the best way I can, even when that means telling you that the course of action you want to pursue is not in your best interests. Okay?

THE DEFENDANT: Yes.

THE COURT: One last word.

MRS. ROMANO: I feel at this time that my husband -- this has nothing to do with -- this to me is a distraction of what the real issue is. Mr. Ansanelli does not want to be on this case any more because he knows that his billing practices are off major-ly. And I can sit here with him any time he wants to go over the bills, line by line. The whole prosecutional misconduct to me is

50

something that my husband expressed to Mr. Ansanelli, especially during a time that Mr. Ansanelli continually goes to visit my husband in jail. And for me and from my impression is antagonizing a person who is already incarcerated and asking him, putting him in a position of asking him for money. And then all of a sudden you have somebody who is in a defense mode, okay, and he is expressing himself. I don't think we're ever going to be addressing this. I think this is the thing that is all about money, your Honor. And I just want to make sure.

THE COURT: Well, I understand your position. But it really isn't all about money. I have heard myself from your husband several times today that he has an agenda he wants to address for sentencing purposes.

MRS. ANSANELLI: Well, it's --

THE COURT: Let me finish.

That he wants to address it for sentencing purposes. The only person who knows what he's thinking, how he wants to proceed at this point is him. I'm listening to him.

MRS. ROMANO: Right.

THE COURT: If he's tells me he's prepared to pass that for purposes of these proceedings, that's a different story. But I haven't gotten an affirmative yes from him yet.

51

MRS. ROMANO: And I can tell you from a discussion that I had with him yesterday or Monday, and I can't even think right now. We discussed that. We just want to move forward with sentencing. We want to get this over with, and let's not be distracted by anything else. And we want to keep Mr. Ansanelli as counsel, because we think he is doing, he did a great job, and he has been submitting stuff to the court. But what I see happening is that things stopped because of other moving pieces only to see where we would go with it, not knowing what the outcome would be. But it boils down to money.

THE COURT: Okay. All right, I heard your argument. Thank you.

And I'm not saying that there isn't an issue of money here, because it's perfectly clear that there is an issue, because both sides have raised it. So that both sides is counsel and Mr. Romano raised it.

But the equally significant key to me here is, whether or not you're in a position to take counsel's advice in terms of doing what they believe is in your best interests to give you the best foot forward in sentencing. And which I believe, based on what I hear, that advice is good advice. And the question is whether or not you are willing to abandon for the moment, at least for purposes of the sentencing proceeding, the very strong feelings you

have with regard to this issue of what you've now put on the record as prosecutorial misconduct. So you have to tell me that.

THE DEFENDANT: Your Honor, I have been given my forum. I am satisfied. I'm not going to press that issue. I know its a moot subject. And I want Mr. Ansanelli to represent me with mitigating circumstances.

I have read most of the things that he has had. I have actually written a lot of it, and they have edited it. I'm very happy with it, and I want to move forward. And I also want to state, okay, and I know this doesn't mean much. And I know that people make promises in this world that they can't keep. I am a man of my word. My handshake -- my handshake would put lawyers out of business. Okay?

I have every intention of giving this man every dime that's warranted. I would pay him double just to have things set straight for my story, and who I am as a person be told to Judge Bianco.

I'm very happy with this man. I want him on, and I will try whatever tricks I have up my sleeve -- whether it's, I'll sell everything I have, none of these materials things mean anything. Money does not mean anything to me. I've given away millions. I'll try my

53

best to get him paid.

But we do need to move forward. And I think Mr. Ansanelli knows that a lot of this was stopped not because of -- because I don't want to proceed forward. A lot of it was stopped because he said he needs $150,000. And to quote, he said he needed $50,000 certified check. I have to tell you, your Honor, things do not work in the same time frame in the real world as they do in the Nassau County Jail.

THE COURT: All right, I understand your position.

And I think I've heard sufficient now as to everybody's position. I am going to take this under advisement. And I will issue a written decision without revealing anything that I believe is inappropriate to Judge Bianco with regard to his considerations going forward with this trial, or in any way jeopardizing your status here. All right?

We have concluded then. Thank you.

The minutes are sealed.

MR. GOIDELL: Thank you.

Mr. Ansanelli: Thank you, judge.

(The proceedings were concluded at 4:24 p.m.)

Ellen S. Combs, CSR
OFFICIAL COURT REPORTER

# EXHIBIT R

## SAMs Documentation

USP Florence ADMAX, June 1, 2015
pp. 1–16

Romano v. United States, No. 26-15 (2d Cir.)



## U.S. Department of Justice
Federal Bureau of Prisons

*Federal Correctional Complex*
☑ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

*Office of the Warden*                    *Florence, CO 81226*

June 1, 2015

NOTICE TO     JOSEPH ROMANO, REG. NO. 72247-053

FROM:         J. Oliver, Complex Warden

SUBJECT:      **Notification of Special Administrative Measures**

You were convicted in the Eastern District of New York after a jury trial of two counts of conspiring to murder an employee of the United States. The convictions stemmed from a plot you orchestrated to murder United States District Judge Joseph F. Bianco and Assistant United States Attorney (AUSA) Lara Treinis Gatz in retaliation for their roles in your prosecution for coin telemarketing fraud, for which you received a 15-year sentence. On April 14, 2014, you were sentenced to two concurrent terms of life imprisonment for the murder conspiracy.

According to the United States Attorney for the Western District of New York (USA/WDNY), in 2008, a grand jury in the Eastern District of New York returned an indictment charging you and others with conspiracy to commit mail and wire fraud, in connection with the operation of a coin boiler room involving the theft of more than $40 million of investor money.[1] You were arraigned and released on bail. The prosecution was handled by AUSA Gatz and presided over by Judge Bianco. While the case was pending trial, investigators discovered you had continued your coin fraud business while on pretrial supervision. You did so by opening a coin company in Florida and installing your friend Dejvid Mirkovic (who would later become your conspirator in the murder plot) as the nominal owner of the company. This subsequent fraud netted $1.3 million dollars in profits in its first year of operation. Mirkovic funneled those profits to you and your family. As a result of those activities, your bail was revoked and you were housed in the

---

[1] In December 2012, the United States Attorney's Office for the Eastern District of New York was recused from further investigation or prosecution of the Romano murder conspiracy case, with the exception of two Assistant United States Attorneys who are operating under the supervision of the USA/WDNY.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 2

custody of the United States Marshals Service at the Nassau County Correctional Center (NCCC). In September 2010, the case proceeded to trial, and you pled guilty during jury selection. In February 2012, Judge Bianco sentenced you to fifteen years of imprisonment and ordered the forfeiture of approximately $7 million.

After the sentence was imposed, you remained in confinement at the NCCC pending the resolution of the restitution portion of your coin fraud case. During that period, you orchestrated a plot to murder Judge Bianco and AUSA Gatz in retaliation for your prosecution and the sentence. To that end, you solicited the assistance of hitmen who, unbeknownst to you, were undercover officers (UC1 and UC2). At the initial meeting with UC1, you offered to pay UC1 $3,000 to assault an auto mechanic who had seized two of your vehicles after you defaulted on the bill. Based on his communications with you, UC1 understood this assignment to be a test of his ability to carry out the murders. You informed the UC that you had "a whole bunch more" after that attack was completed. At your direction, co-conspirator Mirkovic delivered to UC2 $1,500 as a down payment for the assault on the mechanic. In September 2012, UC1 met with Mirkovic and gave him a staged photograph purporting to evidence the assault on the mechanic, along with an identification card belonging to the mechanic, as proof of the assault. Mirkovic paid the $1,500 balance.[2]

Later that same day, Mirkovic again met with UC1 and, at your direction, instructed UC1 to murder Judge Bianco and AUSA Gatz, offering $40,000 for the commission of the two murders. From custody, you further directed Mirkovic to offer UC1 a bonus if he beheaded both Judge Bianco and AUSA Gatz, and severed AUSA Gatz's breasts. Mirkovic also advised UC1 that you were also interested in having three of your former attorneys beaten. Over the following weeks, you paid UC1 $22,000 in cash down payments for the murders and promised payment of the final $18,000 when the murders were completed. You provided instructions and remained in constant communication with Mirkovic via telephone, jail visits, and correspondence. To conceal your placement of calls from within the jail, you used the Personal Identification Numbers (PINs) of 34 different inmates to surreptitiously place the calls to Mirkovic.

In September 2012, you were transferred from the NCCC to the GEO Queens Private Detention Facility in Jamaica, New York (GEO). Your transfer resulted, in part, because NCCC officials discovered you were planning an escape from custody. Additionally, you demonstrated your commitment and ability to circumvent prison restrictions and to continue to direct illegal activity while incarcerated. A review of the NCCC telephone records revealed that you had placed 794 calls to co-conspirator Mirkovic using other

---

[2] Based on Romano's post-arrest statements and further investigation, law enforcement officers learned that, in March 2012, Romano solicited another inmate at NCCC to attack the auto mechanic. Law enforcement officers recovered from the inmate (after his release) a hand-written note provided by Romano with the auto mechanic's name, address, and description.

"Sensitive But Unclassified"

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 3

inmate's PINs and, in a two-month period, made 170 calls to a coin company employee, who subsequently sent money to inmates on your behalf. Almost immediately upon your arrival at GEO, you began your attempts to influence other inmates, sending money to them in exchange for using their telephone accounts. While housed in the SHU, you also arranged for your wife to deposit funds into your co-conspirator's commissary account.

At the time of your and Mirkovic's arrests on October 9, 2012, law enforcement officers recovered $18,000 in cash (which corresponds to the balance due UC1 for the contract murders) and a loaded 9mm semi-automatic handgun at Mirkovic's residence in Florida. Following your arrest, and after being advised of your *Miranda* rights, you confessed to your involvement in the crime, stating that you hated AUSA Gatz and Judge Bianco and wanted them dead. When told by a law enforcement officer that you needed to "let it go," you responded, "I'll never let this go." You further admitted that you previously had engaged in discussions with your wife and another inmate about escaping from jail. To that end, a recording of an August 2012 meeting between you and the inmate revealed that you were researching the countries that did not have extradition treaties with the United States. Additionally, a search of a computer seized from your home revealed that someone had run an Internet search for a "plastic handcuff key." According to an inmate who had been housed with you, you had asked your wife to obtain a plastic handcuff key, and she had found one, but was too afraid to give it to you. The investigation further revealed you enlisted the help of Mirkovic in your escape plans, asking Mirkovic to obtain for you a fake identification document, a passport, an offshore bank account, and literature on how to disappear. At the time of his arrest, Mirkovic had begun work on these tasks and sent numerous documents to you in jail regarding how to "disappear."

Between December 2012 and August 2013, FBI investigation revealed you continued in your quest to kill or harm Judge Bianco and AUSA Gatz, stating that you "was not going to stop" your attempts. The investigation further revealed you said you wanted to torture Judge Bianco and AUSA Gatz and noted that although the government had seized all of your "obvious" money, you had instructed your wife to hide additional money and assets, and that you intended to use those funds to accomplish your goal. You also stated that you intended to murder William Hessle, the former United States Postal Inspector who had investigated the coin fraud case; that you intended to assault your court-appointed defense counsel in order to cause a mistrial; that you had "a big surprise" planned; and that "this isn't over for the government." You also asked an inmate to arrange for someone to do the killings for you, telling the inmate that, in exchange, you would show the inmate how to "get rich" by doing favors for you. The inmate refused. Another inmate reported you then offered to pay the inmate if he would assist you in better identifying and locating the family of a person you believed to be cooperating with the government, offering to connect the inmate with a person outside the prison who could assist you.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 4

Your anger toward the government has increased since your April 14, 2014, sentencing hearing. During the sentencing hearing, you spoke on your own behalf for approximately 45 minutes, expressing anger toward the government for both your coin fraud and murder conspiracy convictions. You directed what was described as aggressive outbursts toward the prosecuting attorneys and the United States Postal Service Investigator who handled the coin fraud case, accusing them of "evil designs against you." Persons who witnessed these and other outbursts during the sentencing hearing verified your aggressive tone, eye contact, and body language.

Additionally, during a May 22, 2014, conference regarding restitution in the coin fraud case, you spoke at length to the magistrate judge presiding over the matter about how the government should be held in contempt for committing prosecutorial misconduct. One of the prosecutors was in the gallery to observe the proceedings. You pointed out the prosecutor's presence in the gallery to the court, calling it a "cameo appearance" and accused the prosecutor of participating in a cover-up of prosecutorial misconduct. While not directly threatening, your conduct evinces your continued rage against the prosecution team and the government.

You have also written harassing letters to the district court judge who presides over the restitution segment of your case and to Judge Bianco. In June and July 2014, you sent letters to Judge Bianco. In these letters, you accused Judge Bianco of being responsible for your placement in the SHU and of "playing along with the murder-for-hire scheme," stating that you did not and cannot believe that [Judge] was the "author of such a plot," but would expose him when and/or if you found out otherwise. You also blamed Judge Bianco for contributing to your father's pain because you and your brothers are incarcerated as a result of the coin fraud scheme, and your father died without being able to see them. The letters, coupled with your outbursts during court, reveal that you continue to harbor ill will toward the court, the prosecutors, and the government.

A review of recorded conversations during the murder conspiracy and reports of your conduct from prison reveal that you purposefully communicate non-verbally, using hand gestures, speak in whispered tones or with your hands obstructing your mouth, and abruptly change topic when guards are present. During the murder conspiracy, you spoke to your co-conspirators using coded language, referring to the murder plot as a "Dodge truck." In an August 18, 2014, letter to a friend, you asked the third party to obtain some addresses for you. The letters appear to be intentionally cryptic, as you know your mail is monitored.

Finally, on September 11, 2014, you sent a letter to your wife. Enclosed in the letter was sensitive *Jencks* Act material of a witness, which material had been provided to you during the murder conspiracy trial. This disclosure of the *Jencks* Act material was unauthorized as the material is covered by a protective order that prohibits the defense from further dissemination of the material. Law enforcement authorities do not know

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 5

your purpose in sending the *Jencks* Act material to your wife, but believe that there is a likelihood you sent the material to your wife as part of a plan to retaliate against the witness.

The USA/WDNY requests Special Administrative Measures (SAM) be imposed on you because there is a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons. The Federal Bureau of Investigation (FBI) concurs. In support of this conclusion, the USA/WDNY cites (1) your previous communications in code; (2) your lengthy history of communicating through other inmates; (3) your demonstrated ability to thwart existing prison regulations regarding communications; (4) your ability to circumvent standard prison procedures used to control your ability to communicate with others outside of prison; (5) your ability to direct persons outside of prison to commit acts of violence on your behalf and carry out your directives; and (6) your efforts to retaliate against various government personnel, witnesses, your defense attorney, and their families.

Based upon information provided of your proclivity for violence, it was found there is substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons. Therefore, pursuant to 28 C.F.R. § 501.3, it was requested we continue to implement the SAM to restrict your access to the mail, the media, the telephone, and visitors. This SAM will be in effect for one year from the date of approval, subject to further direction.

1. **General Provisions:**

    a. **Adherence to Usual United States Marshals Service (USMS), Bureau of Prisons (BOP), and Detention Facility (DF) Policy Requirements** – In addition to the below listed SAM, you must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between the USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM is more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then the USMS/BOP/DF policies shall control.

    b. **Interim SAM Modification Authority** – During the term of this directive, the Director, Office of Enforcement Operations (OEO), Criminal Division, may modify your SAM as long as any SAM modification authorized by OEO:

        i. Does not create a more restrictive SAM;

        ii. Is not in conflict with the request of the USA/WDNY, FBI, or USMS/BOP/DF, or applicable regulations; and

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 6

  iii.  Is not objected to by the USA/WDNY, FBI, or USMS/BOP/DF.

 c. **Inmate Communications Prohibitions** – You are limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else except as outlined and allowed by this document that could reasonably foreseeably result in you communicating information (sending or receiving) that could circumvent the SAM's intent of significantly limiting your ability to communicate (send or receive) threatening or other crime-related information.

2. **Attorney/Client Provisions:**

 a. **Attorney[3] Affirmation of Receipt of the SAM Restrictions Document** – Your attorney (or counsel) – individually by each if more than one – must sign an affirmation acknowledging receipt of the SAM restrictions document. By signing the affirmation, the attorney acknowledges his/her awareness and understanding of the SAM provisions and his/her agreement to abide by these provisions, particularly those that relate to contact between you and your attorney and the attorney's staff. The signing of the affirmation does not serve as an endorsement of the SAM or the conditions of confinement, and does not serve to attest to any of the factors set forth in the conclusions supporting the SAM. However, in signing the affirmation, your attorney and precleared staff[4] acknowledge the restriction that they will not forward third party messages to or from you.

---

[3] The term "attorney" refers to the inmate's attorney of record, who has been verified and documented by the USA/SDNY, and who has received and acknowledged receipt of the SAM restrictions document. As used in this document, "attorney" also refers to more than one attorney where the inmate is represented by two or more attorneys, and the provisions of this document shall be fully applicable to each such attorney in his/her individual capacity.

[4] "Precleared" when used with regard to an attorney's staff, or "precleared staff member," refers to a co-counsel, paralegal, or an investigator who is actively assisting the inmate's attorney with the inmate's defense, who has submitted to a background check by the FBI and USA/SDNY, who has successfully been cleared by the FBI and USA/SDDNY, and who has received a copy of the inmate's SAM and has agreed – as evidenced by his/her signature – to adhere to the SAM restrictions and requirements. As used in this document, "staff member" also refers to more than one staff member, and the provisions of this document shall be fully applicable to each such staff member in his/her individual capacity. A "paralegal" will also be governed by any additional DF rules and regulations concerning paralegals.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 7

       i.      The USA/WDNY shall present, or forward, the attorney affirmation of receipt of the SAM restrictions document to your attorney.

      ii.     After initiation of the SAM and prior to your attorney being permitted to have attorney/client privileged contact with you, your attorney shall execute a document affirming receipt of the SAM restrictions document and return the original to the USA/WDNY.

     iii.    The USA/WDNY shall maintain the original of the SAM acknowledgment document and forward a copy of the signed document to OEO in Washington, D. C. and the USMS/BOP/DF.

b.    **Attorney/Client Privileged Visits** – Attorney/client privileged visits may be contact or noncontact, at the discretion of the USMS/BOP/DF.

c.    **Attorney May Disseminate Inmate Conversations** – Your attorney may disseminate the contents of your communication to third parties for the sole purpose of providing necessary legal services related to your post-sentencing proceedings – and not for any other reason – on the understanding that any such dissemination shall be made solely by your attorney, and not by the attorney's staff.

d.    **Unaccompanied Attorney's Precleared Paralegal(s) May Meet with Client** – Your attorney's precleared paralegal(s) may meet with you without the necessity of your attorney being present. These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF.

e.    **Simultaneous Multiple Legal Visitors** – You may have multiple legal visitors provided that at least one of the multiple legal visitors consists of your attorney or precleared paralegal. These meetings may be contact or noncontact, at the discretion of the USMS/BOP/DF. An investigator or interpreter/translator may not meet alone with you.

f.    **Legally Privileged Telephone Calls** – The following rules refer to all legally privileged telephone calls or communications:

       i.      Inmate's Attorney's Precleared Staff May Participate in Inmate Telephone Calls – Your attorney's precleared staff are permitted to communicate directly with you by telephone, provided that your attorney is physically present and participating in the legal call as well.

      ii.     Inmate's Initiation of Legally Privileged Telephone Calls – Your initiated telephone communications with your attorney or precleared staff are to be placed by a USMS/BOP/DF staff member and the telephone handed

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 8

over to you only after the USMS/BOP/DF staff member confirms that the person on the other end of the line is your attorney. This privilege is contingent upon the following additional restrictions:

1) Your attorney will not allow any non-precleared person to communicate with you, or to take part in and/or listen to or overhear any communications with you.

2) Your attorney must instruct his/her staff that:

    a) Your attorney and precleared staff are the only persons allowed to engage in communications with you.

    b) The attorney's staff (including the attorney) are not to patch through, forward, transmit, or send your calls, or any other communications, to third parties.

3) No telephone call/communication, or portion thereof, except as specifically authorized by this document:

    a) Is to be overheard by a third party.[5]

    b) Will be patched through, or in any manner forwarded or transmitted to a third party.

    c) Shall be divulged in any manner to a third party, except as otherwise provided in Section 2d, above.

    d) Shall be in any manner recorded and preserved.[6] Your attorney may make written notes of attorney client privileged communications.

4) If the USMS/BOP/DF, FBI, or USA/WDNY determines that you have used or are using the opportunity to make a legal call to speak with another inmate or for any other nonlegal reason that would circumvent the intent of the SAM, your ability to contact your attorney by telephone may be suspended or eliminated.

---

[5] For purposes of the SAM, "third party" does not include officials of the USMS/BOP/DF/FBI/DOJ, or other duly authorized federal authorities when acting in connection with their official duties. This section does not allow monitoring of attorney/client privileged communications.

[6] Except by the USMS/BOP/DF/FBI/DOJ or other duly authorized federal authorities. This section does not allow monitoring of attorney/client privileged communications.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 8

    g.    **Documents Provided by Attorney to Inmate** – During a visit, your attorney may provide you with or review with you, documents related to your post-sentencing proceedings, and/or material prepared by your attorney related to such proceedings, so long as any of the foregoing documents are translated, if translation is necessary, by a precleared interpreter/translator. Any document not related to your post-sentencing proceedings must be sent to you via general correspondence and will be subject to the mail provisions of subparagraphs 2i and 3g. Documents previously reviewed and cleared for receipt by you, and already in your possession at the outset of the visit, may be discussed or reviewed by you and your attorney during the visit.

        i.    None of the materials provided may include inflammatory materials, materials inciting to violence, military training materials, or materials that may be used to pass messages from inmate to inmate, unless such materials have been precleared by the USA/WDNY and FBI.

        ii.    The USA/WDNY may authorize additional documents to be presented to you. If any documents not listed or described above need to be transmitted to you, consent for the transmission of the document can be obtained from the USA/WDNY without the need to formally seek approval for an amendment to the SAM.

    h.    **Legal Mail**[7] – Your attorney may not send, communicate, distribute, or divulge your mail (legal or otherwise), or any portion of its contents, to third parties, except when disclosure of the contents is necessary for the sole purpose of providing necessary legal services related to your post-sentencing proceedings – and not for any other reason. In signing the SAM acknowledgement document, your attorney and precleared staff will acknowledge the restriction that only inmate case-related documents will be presented to you, and that the attorney and his/her staff are strictly prohibited from forwarding third party mail to or from you.

3.    **Inmate's Nonlegal Contacts:**

    a.    **Nonlegally Privileged Telephone Contacts** –

        i.    You are only authorized to have nonlegally privileged telephone calls with your immediate family members.[8]

---

[7] Legal mail is defined as properly marked correspondence (marked "Legal Mail") addressed to or from the inmate's attorney. All other mail, including that otherwise defined by the USMS/BOP/DF as Special Mail, shall be processed as "nonlegal mail."
[8] The inmate's "immediate family members" are defined as the inmate's (USMS/BOP/

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-063
June 1, 2015
Page 10

     ii.     The quantity and duration of your nonlegal telephone calls with your immediate family members shall be set by the USMS/BOP/DF, with a minimum of one call per month.

   b.   **Rules for Telephone Calls** -- For all nonlegally privileged telephone calls or communications, no telephone call/communication, or portion thereof:

     i.     Is to be overheard by a third party.

     ii.     Is to be patched through, or in any manner forwarded or transmitted, to a third party.

     iii.     Shall be divulged in any manner to a third party.

     iv.     Shall be in any manner recorded or preserved.[9]

     All telephone calls shall be in English unless a fluent FBI or USMS/BOP/DF approved interpreter/translator is available to contemporaneously monitor the telephone call. Arranging for an interpreter/translator may require at least fourteen days' advance notice.

   c.   **Telephone SAM Restriction Notifications** -- For all nonlegally privileged telephone calls to your immediate family member(s):

     i.     The USMS/BOP/DF shall inform you of the telephone SAM restrictions prior to each telephone call.

     ii.     The USMS/BOP/DF shall verbally inform your immediate family member(s) on the opposite end of your telephone communication of the SAM restrictions. The USMS/BOP/DF is only required to notify your communication recipient in English.

     iii.     The USMS/BOP/DF shall document each such telephone notification.

   d.   **Family Call Monitoring** -- All calls with your immediate family member(s) shall be:

     i.     Contemporaneously monitored by the FBI.

---

DF/FBI verifiable) spouse, natural children, parents, and siblings. Requests for additional nonlegal contacts (whether telephone, visits, or mail) may be submitted and will be considered on a case-by-case basis.

[9] Except for the USMS/BOP/DF/FBI/DOJ or other duly authorized federal authorities.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 11

  ii. Contemporaneously recorded (as directed by the FBI) in a manner that allows such telephone calls to be analyzed for indications the call is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

  iii. A copy of each telephone call recording involving an inmate/immediate family member shall be provided by the USMS/BOP/DF on a single, individual cassette tape or compact disk for forwarding to the FBI. These recordings shall be forwarded on a call-by-call as soon as practicable.

 e. **Improper Communication** – If telephone call monitoring or analysis reveals that any call or portion of a call involving you contains any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence or terrorism, or actual or attempted circumvention of the SAM, you shall not be permitted any further calls to your immediate family members for a period of time to be determined by the USMS/BOP/DF. If contemporaneous monitoring reveals such inappropriate activity, the telephone call may be immediately terminated.

 f. **Nonlegal Visits** –

  i. **Limited Visitors** – You shall be permitted to visit only with your immediate family members. The visitor's identity and family member relationship to you will be confirmed by the USMS/BOP/DF and FBI in advance.

  ii. **English Requirement** – All communications during nonlegal visits will be in English unless a fluent FBI or USMS/BOP/DF approved interpreter/translator is readily available to contemporaneously monitor the communication/visit. Arranging for an interpreter/translator may require at least 14 days' advance notice.

  iii. **Visit Criteria** – All nonlegal visits shall be:

   1) Contemporaneously monitored by the USMS/BOP/DF and/or FBI, in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent the SAM.

   2) Permitted only with a minimum of 14 calendar days' advance written notice to the USMS/BOP/DF facility where you are housed.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 12

       3)   Without any physical contact. All such meetings shall be noncontact to protect against harm to visitors or staff.

       4)   Limited to one adult visitor at a time. However, your FBI verified children may visit with a preapproved adult visitor.

g.   **Nonlegal Mail** – Nonlegal mail is any mail not clearly and properly addressed to/from your attorney and marked "Legal Mail" (incoming and outgoing). Nonlegal mail is limited to only your immediate family, U.S. courts, federal judges, U.S. Attorney's Offices, member of U.S. Congress, the BOP, and other federal law enforcement entities.

   i.   **General correspondence with limitations:** Correspondence is authorized only to immediate family members. The volume and frequency of outgoing general correspondence with immediate family members may be limited to three pieces of paper (not larger than 8 ½ x 11), double-sided, once per calendar week to a single recipient, at the discretion of the USMS/BOP/DF. The identity and your family member relationship will be confirmed by the USMS/BOP/DF and FBI.

   ii.   **General correspondence without limitations:** There is no volume or frequency limitation on correspondence to/from U.S. courts, federal judges, U.S. Attorney's Offices, members of U.S. Congress, the BOP, and other federal law enforcement entities, unless there is evidence of abuse of these privileges, threatening correspondence is detected, circumvention of the SAM is detected, or the quantity to be processed becomes unreasonable to the extent that efficient processing to protect the security, good order or discipline of the institution, the public or national security may be jeopardized.

   iii.   **All nonlegal mail will be:**

       1)   **Copied** – Shall be copied (including the surface of the envelope) by the warden, or his/her designee, of the facility in which you are housed.

       2)   **Forwarded** – Shall be forwarded, in copy form, to the location designated by the FBI.

       3)   **Analyzed** – After government analysis and approval, if appropriate, your incoming/outgoing nonlegal mail will be forwarded to the USMS/BOP/DF for delivery to you (incoming); or directly to the addressee (outgoing).

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 13

    iv.    The federal government will forward your nonlegal mail to the USMS/BOP/DF for delivery to you or directly to the addressee after a review and analysis period of:

        1)    A reasonable time not to exceed 14 business days for mail which is written entirely in the English language.

        2)    A reasonable time not to exceed 60 business days for any mail which includes writing in any language other than English, to allow for translation.

        3)    A reasonable time not to exceed 60 business days for any mail where the federal government has reasonable suspicion to believe that a code was used, to allow for decoding.

    v.    **Mail Seizure** – If outgoing/incoming mail is determined by the USMS/BOP/DF or FBI to contain overt or covert discussion of or requests for illegal activities, the soliciting or encouraging of acts of violence, or actual or attempted circumvention of the SAM, the mail shall not be delivered/forwarded to the intended recipient but referred to the FBI for appropriate action. You shall be notified in writing of the seizure of any mail.

4.    **Communication with News Media:** You shall not be permitted to talk, meet, correspond, or otherwise communicate with any member or representative of the news media in person; by telephone; by furnishing a recorded message; through the mail, your attorney, or a third party; or otherwise.

5.    **Religious Visitation:**

    a.    You shall not be allowed to engage in group prayer with other inmates.

    b.    If an FBI and/or USMS/BOP/DF approved religious representative is to be present for prayer with you, the prayer shall be conducted as part of a contact or noncontact visit, at the discretion of the USMS/BOP/DF.

6.    **No Communal Cells and No Communication Between Cells:**

    a.    You shall not be allowed to share a cell with another inmate.

    b.    You shall be limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 14

7. **Cellblock Procedures:**

    a.    You shall be kept separated from other inmates as much as possible while in the cellblock area.

    b.    You shall be limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from communicating with any other inmate while in the cellblock area.

8. **Access to Mass Communications:** To prevent you from receiving and acting upon critically timed information or information coded in a potentially undetectable manner, your access to materials of mass communication is restricted as follows:

    a.    **Publications/Newspapers** –

        i.    You may have access to publications determined not to facilitate criminal activity or be detrimental to: national security; the security, good order or discipline of the institution; or the protection of the public. This determination is to be made by the USMS/BOP/DF, in consultation with the USA/WDNY.

        ii.    Sections of the publication/newspaper which offer a forum for information to be passed by unknown and/or unverified individuals, including but not limited to classified advertisements and letters to the editor, should be removed from the publications/newspapers prior to distribution to you.

        iii.    If restricted by the USMS/BOP/DF rules, access to a publication will be denied. If acceptable, upon delivery, the USMS/BOP/DF will review the publication and make the initial determination. If the FBI's expertise is required, the publication will be forwarded to the FBI for review. The USMS/BOP/DF will also forward the publication to the FBI if translations are needed to make the determination. (In these cases, the FBI shall respond to the USMS/BOP/DF within 14 business days.) You shall then have access to the remaining portions of the publications/newspapers deemed acceptable, in accordance with the USMS/BOP/DF policy.

        iv.    In order to avoid passing messages/information from inmate to inmate, you shall not be allowed to share the publication(s) with any other inmates.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 15

      b.    **Television and Radio** – You are authorized to have television and radio viewing and listening privileges, in accordance with standard and applicable USMS/BOP/DF policies and procedures.

      c.    **Termination or Limitation** – If the USMS/BOP/DF determines that mass communications are being used as a vehicle to send messages to you relating to the furtherance of criminal activities, your access may be limited or terminated for a period of time to be determined by the USMS/BOP/DF.

9.    **Access to Books:** You may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution. This initial determination is to be made by the USMS/BOP/DF and, if the USMS/BOP/DF determines that the FBI's expertise is required, the book(s) will be forwarded to the FBI for review. In conducting its analysis, the FBI will determine whether the book advocates or promotes acts of violence and/or whether access to the book by you would pose a substantial threat to national security. In order to avoid passing messages/information from inmate to inmate, you shall not be allowed to share the books with any other inmates.

10.    **Transfer of Custody:** In the event that you are transferred to or from the custody of the USMS, BOP, or any other DF, the SAM provisions authorized for you will continue in effect, without need for any additional DOJ authorization.

**CONCLUSION**

The SAM set forth herein, especially as they relate to attorney/client privileged communications and family contact, are reasonably necessary to prevent you from committing, soliciting, or conspiring to commit additional criminal activity. Moreover, these measures are the least restrictive that can be tolerated in light of the ability for you to aid, knowingly or inadvertently, in plans that create a substantial risk that your communications or contacts with persons could result in death or serious bodily injury to persons.

With respect to telephone privileges, the SAM is reasonably necessary because of the high probability of calls to co-conspirators to arrange terrorist or criminal activities.

With respect to mail privileges, the SAM is reasonably necessary to prevent you from receiving or passing along critically timed messages. Accordingly, your interest in the timely receipt and/or submission of mail, with the possible danger the contents of the mail may post to others, was weighed. It was determined that delaying mail delivery to allow authorized personnel to examine a copy of the mail is the least restrictive means available to ensure that the mail is not used to deliver requests for, or to assist in, violent threats, and/or criminal acts against government witnesses or others.

**"Sensitive But Unclassified"**

Notification of Special Administrative Measures
Joseph Romano, Reg. No. 72247-053
June 1, 2015
Page 16


To the extent that the use of an interpreter/translator is necessary, the government has the right to ensure that the interpreter/translator given access to you is worthy of trust.

The SAM's prohibition of contact with the media is reasonably necessary. Communication with the media could pose a substantial risk to public safety if you advocate criminal and/or violent offenses, or if you make statements designed to incite such acts. Based upon your past behavior, it is believed that it would be unwise to wait until after you solicit or attempt to arrange a violent or criminal act to justify such media restrictions.

The SAM's limitations on access to mass communications are reasonably necessary to prevent you from receiving and acting upon critically timed messages. Such messages may be placed in advertisements or communicated through other means, such as the television and/or radio. It is believed that limiting and/or delaying media access may interrupt communication patterns you may develop with the outside world, and ensure that the media is not used to communicate information that furthers violent and/or criminal activities.

These conditions are imposed by the USMS/BOP/DF at the request of the Attorney General, through his designated agent, the Attorney General.


Received: June _____, 2015
    (16 pages)

_____
Joseph Romano
Reg. No. 72247-053

"Sensitive But Unclassified"

# EXHIBIT S

## Docket Text Order — Judge Komitee

No. 2:09-cr-00170-EK (E.D.N.Y.)
07/13/2022

| 07/13/2022 | ORDER as to Joseph Romano (1) -- Joseph Romano's motion (ECF No. 761 ) is denied. Defendant submitted that motion *pro se*, but pursuant to Rule 49 of the Federal Rules of Criminal Procedure, when a defendant is represented by counsel, "every written motion and other paper must be signed by at least one attorney of record in the attorney's name." Fed. R. Crim. P. 49 (b)(4). Joseph Romano also filed a motion through counsel (ECF No. 764 ) which is granted in part and denied in part. First, the Court will mail all orders directly to Romano given defense counsel's explanation that the special administrative measures Romano is under makes it difficult to send information "in an expedient manner." ECF No. 764 at 1. Second, the Clerk of Court is respectfully directed to unseal ECF Nos. 330 , 333 , 334 , and shall order and post on the docket the transcript of the June 23, 2011 hearing before Magistrate Judge Tomlinson relating to his then-attorney's motion to withdraw as counsel. Third, his request for a new restitution hearing is denied. I have already determined that a new hearing is NOT REQUIRED and have ordered restitution in the amounts specified in ECF No. 766 . Ordered by Judge Eric R. Komitee on 7/13/2022. (copy mailed to J. Romano). (Guy, Alicia) *Modified on 7/13/2022 to correct a clerical error of the ecf document numbers.* (Guy, Alicia). (Entered: 07/13/2022) |

# EXHIBIT T

**Declaration of Joseph Romano**

28 U.S.C. § 1746
No. 26-15 (2d Cir.)

Romano v. United States, No. 26-15 (2d Cir.)

# UNITED STATES COURT OF APPEALS

# FOR THE SECOND CIRCUIT

Joseph Romano,

Applicant,

v.

United States of America,

Respondent.

Docket No. 26-15

## DECLARATION OF JOSEPH ROMANO

## PURSUANT TO 28 U.S.C. § 1746

1.  I, Joseph Romano, am the Applicant in the above-captioned proceeding. I am currently incarcerated at the United States Penitentiary, Administrative Maximum Facility (ADX Florence), Florence, Colorado, under Bureau of Prisons Register Number 72247-053. I have been subject to Special Administrative Measures (SAMs) since June 1, 2015, as documented in Exhibit R to the amended motion. I make this declaration based on my personal knowledge.

2.  I submit this declaration to establish: (a) my receipt and continuous preservation of the family copy of Government Exhibit 3500-GM-14 on which Applicant relies as Exhibit I; (b) the years of efforts my wife and I made to obtain legal assistance; (c) the systematic review of court records Karen Romano conducted beginning in 2025 that identified the evidentiary connection now before this Court; (d) the communications transmitted to me at ADX Florence, subject to SAMs monitoring, through which I received those findings; and (e) the steps taken to enable me to personally file the amended motion in compliance with this Court's order of April 30, 2026 (DktEntry 33.1).

3.  For trial in United States v. Romano, et al., No. 1:12-cr-00691-DC (E.D.N.Y.), I received Jencks Act materials produced by the Government pursuant to 18 U.S.C. § 3500, including the document designated Government Exhibit 3500-GM-14—a handwritten letter from cooperating witness Gerald Machacek to his attorney, bearing a fax footer on each page reading "AUG-07-2012 09:36AM From: ID:USAO EDNY" and the Government's own evidence sticker "12 CR 691 (JFK) / 3500-GM-14 / EXHIBIT / GOVERNMENT." At my sentencing on April 14, 2014, I raised the contents of material marked "3500 Gerry Machacek 15 JFK," and the court responded that "[u]sually 3500 material is not admissible as evidence." Doc. 178 at 49, PageID #: 1825 (Sentencing Tr., Apr. 14, 2014, filed July 9, 2014). This material was governed by the protective order entered December 18, 2013, which defined "Trial Discovery" as material produced pursuant to 18 U.S.C. § 3500 and Giglio. Doc. 120, PageID #: 716.

4.  Prior to the entry of the confiscation order, while I was in custody, I found the handwritten August 2012 Machacek letter in the materials that had been provided to me for trial.

I recognized that letter as important, made a copy of it, and mailed that copy to my wife Karen Romano at Karma Boutique, 2880 Merrick Road, Bellmore, New York 11710. The copy I mailed already bore the Government exhibit sticker "3500-GM-14 / 12 CR 691 (JFK)." The preserved envelope bears a United States Mail postmark of September 12, 2014, reflected in Exhibit I-1. The Government's own proposed confiscation order, filed September 15, 2014, confirms that on or about September 11, 2014, Romano "appears to have sent trial discovery to his wife Karen Romano, an unauthorized recipient." Doc. 180-1, PageID #: 1850. The Government's accompanying letter to the court states that "[i]ncluded in the letter was sensitive Trial Discovery produced to the defendant prior to trial." Doc. 180, PageID #: 1848.

5. On September 25, 2014, the court entered an order directing the Metropolitan Detention Center to confiscate from me all documents covered by the terms of the protective order, including all Jencks Act and Giglio materials. Doc. 185 at 5, PageID #: 1879. From that date forward, I no longer had access to the original Jencks set, including the original of Government Exhibit 3500-GM-14. The family-preserved copy held by Karen Romano, reflected in Exhibit I, is the only copy to which I have had access since the confiscation.

6. After my conviction, I continued to pursue relief on my own. I filed motions and applications and continued advocating for myself. At the same time, I did not possess a complete set of the outside court records, transcripts, audits, and related materials now before this Court. I also was unable to secure counsel who could obtain approval and assist in assembling the full record in a usable form.

7. On June 1, 2015, Special Administrative Measures were imposed on me at USP Florence ADX. Under those measures, my outgoing nonlegal correspondence is limited to three pages per calendar week to a single recipient, subject to FBI monitoring and processing delays of up to sixty business days. The Special Administrative Measures have been, and remain to this day, a substantial barrier to my ability to communicate, obtain assistance, and assemble court materials in usable form.

8. Beginning no later than January 2025, Karen Romano began sending me findings from her review of court records and related dockets that she was able to obtain from PACER and other record sources outside the prison. Before that time, she was not yet in a position to provide me that level of organized assistance. Through her continuing correspondence, I came to understand more fully how the handwritten August 2012 Machacek letter, the later findings concerning Machacek in the Velazquez case, and the trial record fit together. I had always understood that the letter itself was important. What I had not had before was the fuller court-record framework showing how those pieces were connected.

9. Karen Romano has preserved the letters I sent her in response to the findings and materials she mailed to me. Those letters reflect, in real time, my receipt of her research and my effort to incorporate those findings into my filings. My understanding of many of the outside record materials came through Karen Romano's review and correspondence, not through direct possession of the complete docket and transcript record by me.

10. Although I never stopped pursuing relief, I had never before had a real opportunity to present these matters in assembled, usable form. I continued filing and advocating for myself, but what changed in 2025 was not my effort. What changed was our ability to assemble the necessary materials in usable form. Karen Romano was finally able to help gather and transmit the outside record materials, and I then incorporated those findings into the motion I filed on

September 23, 2025. I later learned from the court record that, before trial, the district court granted the Government's motion barring impeachment of Gerald Machacek based on the August 10, 2012 recording unless he testified. Doc. 142 at 2, 4–5, PageID ##862, 864–865. Until now, I did not have all of the documents, audits, analysis, and cross-docket record materials being presented together.

11. On April 30, 2026, Circuit Judge Alison J. Nathan issued an order (DktEntry 33.1) granting my motion for a thirty-day extension of time and setting a new deadline of May 30, 2026 for the amended motion. The order denied the motions for spouse authorization and power of attorney. Under that order, I am required to personally deposit the signed filing through ADX Florence's institutional legal mail system on or before May 30, 2026. Under Fed. R. App. P. 25(a)(2)(A)(iii), the deposit date is the filing date.

12. As a direct consequence of the SAMs restrictions, I cannot independently assemble, review, and transmit a 400-page evidentiary package within a thirty-day deadline. The limitation is not only volume but the combined effect of restricted communication, lack of electronic access to court records, delayed mail processing, and inability to coordinate document assembly in real time. To enable my compliance with DktEntry 33.1, Karen Romano assembled, printed, and mailed to me at USP Florence ADMAX two complete pre-printed sets of the amended motion and all exhibits. Each set contains the complete amended motion, the exhibit list, Exhibits A through X, the DOJ-361 Certification of Identity, this declaration, a Form 7 Declaration of Inmate Filing, a Certificate of Service, and a pre-addressed envelope. Upon receipt, I reviewed the amended motion, confirmed that it is my filing prepared at my direction and with my prior authorization, signed both sets, and am depositing them into the institutional legal mail system on the date written above. The amended motion is my filing. All positions and representations in it are mine.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: May 22, 2026

At: USP Florence ADX, Florence, Colorado

Joseph Romano

Reg. No. 72247-053

USP Florence ADX

P.O. Box 8500

Florence, Colorado 81226

# EXHIBIT U

**Declaration of Karen Romano**

28 U.S.C. § 1746
No. 26-15 (2d Cir.)

Romano v. United States, No. 26-15 (2d Cir.)

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

Joseph Romano,

*Applicant,*

v.

United States of America,

*Respondent.*

Docket No. 26-15

### DECLARATION OF KAREN ROMANO
### PURSUANT TO 28 U.S.C. § 1746

1. I am Karen Romano. I am the wife of Joseph Romano, Applicant in the above-captioned proceeding. I reside at 22 Lilac Lane, Levittown, New York 11756. I make this declaration based on my personal knowledge.

2. I submit this declaration to establish: (a) my receipt and continuous preservation of the family copy of Government Exhibit 3500-GM-14 on which Applicant relies as Exhibit I; (b) the years of efforts my husband and I made to obtain legal assistance; (c) the systematic review of court records I conducted beginning in 2025 that identified the evidentiary connection now before this Court; (d) the communications I transmitted to my husband at ADX Florence, subject to SAMs monitoring, through which he received those findings; and (e) the steps I undertook to enable Joseph Romano to personally file the amended motion in compliance with this Court's order of April 30, 2026 (DktEntry 33.1).

3. In September 2014, I received an envelope sent by my husband from the Metropolitan Detention Center, Brooklyn, New York. The envelope was addressed to me c/o Karma Boutique, 2880 Merrick Road, Bellmore, New York 11710, which was my place of business at that time. The envelope bears a United States Mail postmark of September 12, 2014, reflected in Exhibit I-1 to the amended motion. That envelope contained a copy of the handwritten August 2012 Machacek letter, already bearing the Government exhibit sticker "3500-GM-14 / 12 CR 691 (JFK)." I preserved that envelope and its contents continuously from the date of receipt to the present. I have never discarded them.

4. Approximately two to three days after I received that envelope, two individuals who identified themselves as FBI agents came to my home and asked whether I had received anything from Joseph Romano.

5. From the time of my husband's conviction in January 2014 to the present, I made continuous efforts to obtain legal assistance for him. Over the course of those years, my husband and I wrote to attorneys, public officials, and members of Congress seeking help with his case. I have preserved copies of those letters. On November 17, 2022, I submitted a written request to the Bureau of Prisons at www.bop.gov regarding my husband's conditions at ADX Florence,

which generated a timestamped automated response from auto-reply@bop.gov confirming receipt. Despite those continuous efforts, we were unable to secure counsel willing or able to assist, in significant part because of the nature of the charges and because of the Special Administrative Measures imposed on my husband beginning June 1, 2015, which severely restricted his ability to communicate and made legal coordination extraordinarily difficult.

6. I obtained my own PACER account and taught myself to navigate the federal court dockets in an effort to understand my husband's case and the related proceedings. Beginning in approximately 2022, I attempted to review the PACER records across the related dockets. I returned to that effort in 2025 and conducted a fuller cross-docket review that allowed me to identify connections that had not previously been visible to me.

7. Beginning no later than January 2025, I conducted a systematic review of PACER records across the related dockets. Through that review, I identified the connection between the judicial findings in United States v. Velazquez, et al., No. 2:11-cr-00639-JFB (E.D.N.Y.), Doc. 579, and the trial court's discussion of predisposition in United States v. Romano, No. 1:12-cr-00691-DC (E.D.N.Y.), Doc. 168. I also came to understand how the Government had classified, used, and later handled the handwritten Machacek letter that my husband had mailed to me in 2014.

8. Beginning no later than January 2025, I transmitted my research findings to my husband at ADX Florence through written correspondence sent by United States Mail to USP Florence ADMAX, P.O. Box 8500, Florence, Colorado 81226. My husband's SAMs restrictions limited and delayed our nonlegal correspondence. I therefore transmitted my findings across many letters over an extended period. Pursuant to the SAMs imposed on my husband, our nonlegal correspondence was subject to government monitoring, review, and delay.

9. My husband received my findings through that correspondence. Over the summer of 2025, he incorporated those findings into the motion filed September 23, 2025, in United States v. Romano, No. 1:12-cr-00691-DC (E.D.N.Y.), Doc. 296. I have preserved letters he sent me in response to the findings I mailed to him. Those letters document the exchange of findings and the assembly of the evidentiary package now before this Court.

10. On February 14, 2026, I requested a certified transcript of the June 30, 2014 sentencing proceeding of Gerald Machacek in No. 2:11-cr-00639-JFB (E.D.N.Y.) from court reporter Anthony D. Frisolone. I received that certified transcript on March 2, 2026. That transcript is attached to the amended motion as Exhibit M.

11. I have preserved all correspondence I have received from my husband at ADX Florence. I have never discarded any of it. I have preserved copies of letters sent over the years to attorneys, public officials, and members of Congress seeking assistance for my husband. I have preserved the envelope and contents of Government Exhibit 3500-GM-14 continuously since September 2014. Those materials remain in my possession and are available for inspection.

12. This application did not come together earlier because, despite years of effort to obtain help, I did not complete the cross-docket record review that revealed these connections until 2025, and I was not in a position to provide my husband this level of organized outside assistance until early 2025. After I identified the relevant materials, I mailed my findings to my

husband, continued gathering supporting records, and preserved the letters he sent me in response.

13. On April 30, 2026, Circuit Judge Alison J. Nathan issued an order (DktEntry 33.1) granting Joseph Romano's motion for extension of time and setting a new deadline of May 30, 2026 for the amended motion. The court denied the motions for spouse authorization and power of attorney. Under that order, Joseph Romano must personally deposit the signed filing through ADX Florence's institutional legal mail system on or before May 30, 2026. Under Fed. R. App. P. 25(a)(2)(A)(iii), the deposit date is the filing date.

14. As a direct consequence of the SAMs restrictions, Joseph Romano cannot independently assemble, review, and transmit a 400-page evidentiary package within a thirty-day deadline. The limitation is not only volume but the combined effect of restricted communication, lack of electronic access to court records, delayed mail processing, and inability to coordinate document assembly in real time. To enable his compliance with DktEntry 33.1, I assembled, printed, and mailed to him at USP Florence ADMAX two complete pre-printed sets of the amended motion and all exhibits. Each set contains the complete amended motion, the exhibit list, Exhibits A through X, the DOJ-361 Certification of Identity, a blank Form 7 Declaration of Inmate Filing, a pre-filled Certificate of Service, and a pre-addressed envelope. Upon receipt, Joseph Romano will sign both sets and deposit them into the institutional legal mail system on or before May 30, 2026.

15. I have preserved all records documenting the March 25–26, 2026 physical delivery to the Clerk's Office and the electronic transmission to priscases@ca2.uscourts.gov on March 26, 2026, including the timestamped transmittal record attached to this filing. I have preserved the May 1, 2026 mailing record for the two-set packet sent to Joseph Romano at ADX Florence. Those materials remain in my possession and are available for inspection.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on: May 1, 2026
At: Levittown, New York

*Karen Romano*

Karen Romano
22 Lilac Lane
Levittown, New York 11756
Romano2379@gmail.com

# EXHIBIT W

## DD-214 (Certificate of Release or Discharge from Active Duty)

United States Navy
See Doc. 178, p. 16, PageID #: 1792

Romano v. United States, No. 26-15 (2d Cir.)

**CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY**

| DD FORM 214 1 JUL 79 | | | |
|---|---|---|---|

| 1. NAME (Last, First, middle) | 2. DEPARTMENT, COMPONENT AND BRANCH | 3. SOCIAL SECURITY NO. |
|---|---|---|
| ROMANO, JOSEPH MIN | NAVY-USN | 084-56-14877 |

| 4a. GRADE, RATE OR RANK | 4b. PAY GRADE | 5. DATE OF BIRTH | 6. PLACE OF ENTRY INTO ACTIVE DUTY |
|---|---|---|---|
| AMS3 | E4 | 17JAN63 | NEW YORK |

| 7. LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 8. STATION WHERE SEPARATED |
|---|---|
| PATROL SQUADRON ELEVEN | NAS BRUNSWICK, ME |

| 9. COMMAND TO WHICH TRANSFERRED | 10. SGLI COVERAGE |
|---|---|
| NAVAL RESERVE PERSONNEL CENTER, NEW ORLEANS, LA. 70149 | AMOUNT $ 50,000  ☐ NONE |

| 11. PRIMARY SPECIALTY NUMBER, TITLE AND YEARS AND MONTHS IN SPECIALTY (Additional specialty numbers and titles involving periods of one or more years) | 12. RECORD OF SERVICE | YEAR(S) | MON(S) | DAY(S) |
|---|---|---|---|---|
| AMS – 8319 P3 SYSTEM ORGANIZATIONAL MAINTENANCE TECHNICIAN 1YR 2MOS | a. Date Entered AD This Period | 82 | JUL | 28 |
| | b. Separation Date This Period | 84 | JUL | 27 |
| | c. Net Active Service This Period | 04 | 00 | 00 |
| | d. Total Prior Active Service | 00 | 00 | 00 |
| | e. Total Prior Inactive Service | 00 | 01 | 28 |
| | f. Foreign Service | 00 | 00 | 00 |
| | g. Sea Service | 00 | 00 | 00 |
| | h. Effective Date of Pay Grade | 84 | JUN | 16 |
| | i. Reserve Oblig Term Date | 88 | MAY | 29 |

| 13. DECORATIONS, MEDALS, BADGES, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED (All periods of service) |
|---|
| SEA SERVICE DEPLOYMENT RIBBON (1 STAR). |

| 14. MILITARY EDUCATION (Course Title, number weeks, and month and year completed) |
|---|
| AMS "A" SCHOOL, 8.6 WKS, SEP83. BASIC CORROSION CONTROL, 3DYS, OCT83. P3C CORROSION CONTROL, 2DYS, OCT83. P3 AIRFRAMES AND HYDRAULICS SYSTEMS MAINTENANCE, 9WKS, DEC83. |

| 15. MEMBER CONTRIBUTED TO POST-VIETNAM ERA VETERANS' EDUCATIONAL ASSISTANCE PROGRAM | 16. HIGH SCHOOL GRADUATE OR EQUIVALENT | 17. DAYS ACCRUED LEAVE PAID |
|---|---|---|
| ☐ YES  ☒ NO | ☒ YES  ☐ NO | 12.0 |

| 18. REMARKS |
|---|
| MEMBER COMPLETED DENTAL EXAMINATION AND TREATMENT WITHIN 90 DAYS PRIOR TO RELEASE FROM ACTIVE DUTY. |

| 19. MAILING ADDRESS AFTER SEPARATION | 20. MEMBER REQUESTS COPY 6 BE |
|---|---|
| 9 LILAC, LN LEVITTOWN, NASSAU, NY. 11756 | SENT TO NY DIR. OF VET AFFAIRS  ☒ YES  ☐ NO |

| 21. SIGNATURE OF MEMBER BEING SEPARATED | 22. TYPED NAME, GRADE, TITLE AND SIGNATURE OF OFFICIAL AUTHORIZED TO SIGN |
|---|---|
| *Joseph Romano* | J. R. SAUVE, LTJG, USNR, PERSOFF BY DIR |

**SPECIAL ADDITIONAL INFORMATION** (For use by authorized agencies only)

| 23. TYPE OF SEPARATION | 24. CHARACTER OF SERVICE (Includes upgrades) |
|---|---|
| RELEASED FROM ACTIVE AND TRANSFERRED TO NAVAL RESERVE. | HONORABLE |

| 25. SEPARATION AUTHORITY | 26. SEPARATION CODE | 27. REENLISTMENT CODE |
|---|---|---|
| MILPERSMAN 3620150 | LBK | RE-1 |

| 28. NARRATIVE REASON FOR SEPARATION |
|---|
| USN RELEASE FROM ACTIVE DUTY AND TRANSFER TO NAVAL RESERVE |

| 29. DATES OF TIME LOST DURING THIS PERIOD | 30. MEMBER REQUESTS COPY |
|---|---|
| TL: 02  07SEP84 TO 09SEP84 | JR |

S/N 0102-LF-000-2140

# EXHIBIT X

---

## SAMs Renewal — Notification of Modification of

Special Administrative Measures

U.S. Department of Justice, September 10, 2025

Romano v. United States, No. 26-15 (2d Cir.)



**U.S. Department of Justice**
Federal Bureau of Prisons

*Federal Correctional Complex*
☑ *Administrative Maximum Security Institution*
☐ *High Security Institution*
☐ *Medium Security Institution*
☐ *Minimum Security Institution*

September 10, 2025

NOTICE TO: JOSEPH ROMANO, REG. NO. 72247-053

FROM: D. Baysore, Complex Warden

SUBJECT: **Notification of Modification of Special Administrative Measures (SAM)**

On January 23, 2014, a jury in the Eastern District of New York convicted you of two counts of conspiring to murder an employee of the United States. The convictions stemmed from your role in a plot to murder United States District Judge and Assistant United States Attorney in retaliation for their roles in your prosecution for coin telemarketing fraud, for which he received a 15-year sentence. On April 14, 2014, the court sentenced you to two concurrent terms of life imprisonment for the murder conspiracy. Because of the substantial risk that your communications or contacts with persons could result in death or serious bodily injury, the Attorney General placed you under Special Administrative Measures (SAM), originally effective November 13, 2014. The SAM have been extended annually thereafter and the current SAM will expire on November 13, 2025. You are currently being housed by the Federal Bureau of Prisons (BOP) at the U.S. Penitentiary, Administrative Maximum facility (ADX) in Florence, Colorado.

This modification is to permit you to write to Alice Johnson care of the Office of the Pardon Attorney. As Ms. Johnson is not a permitted non-legally privileged contact under Section 3 of your SAM, specific authorization must be granted for you to have such contact with Ms. Johnson. Neither the United States Attorney for the Eastern District of New York, nor the Federal Bureau of Investigation (FBI), objects to the request so long as the content of any letters sent by you to Ms. Johnson is limited to the subject of you receiving a pardon and/or commutation. Therefore, you are authorized to send up to three letters during the current SAM period (to expire on November 13, 2025) to Ms. Johnson, and such letters shall be limited to the subject matter of you obtaining a pardon and/or commutation. Furthermore, all outgoing and incoming correspondence conducted pursuant to this modification shall conform to the non-legally privileged mail guidelines set forth in Section 3 of your SAM. Additionally, you shall be notified in writing by BOP of the limits established by this modification on your letters to Ms. Johnson, and the FBI shall review your outgoing letters to ensure the content is limited to the matter of obtaining a pardon and/or commutation. If an outgoing letter is denied due to a violation

Notification of Modification of Special Administrative Measures (SAM)
Joseph Romano, Reg. No. 72247-053
September 10, 2025
Page 2

of the terms of this modification, you shall be advised in writing of that decision and offered the opportunity to revise the denied letter. Furthermore, this modification shall be voided if Ms. Johnson leaves the government.

    All other SAM provisions for you will continue in full force and effect for the remainder of the current authorization period, subject to further direction.

Received: _____, 2025
       (2 pages)

_____
Joseph Romano
Reg. No. 72247-053

**"Sensitive But Unclassified"**

**U.S Department of Justice**

## Certification of Identity



FORM APPROVED OMB NO. 1103-0016
EXPIRES 04/30/27

**Privacy Act Statement.** In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The primary purpose for the collection of the information on this form is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. The authority by which information is collected on this form is 5 U.S.C. § 552 and 5 U.S.C. § 552a(a), as well as 28 CFR Section 16.41(d). Any information you provide may also be disclosed pursuant to a "routine use" under the Privacy Act of 1974, 5 U.S.C. § 552a, listed in a DOJ System of Records Notice, which may include: JUSTICE/DOJ-004 Freedom of Information Act, Privacy Act, and Mandatory Declassification Review Records (CMS) for the Department of Justice, available at https://www.justice.gov/opcl/doj-systems-records#DOJ. Your disclosure of information to the Department of Justice on this form is voluntary. If you do not complete all or some information fields in this form, however, the Department of Justice may not be able to effectively respond to your request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. § 1001 and/or 5 U.S.C. § 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1] __Joseph Romano__

Citizenship Status [2] __U.S Citizen__       Social Security Number [3] __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__

Current Address __P.O BOX ADX Florence CO 81226-8500__

Date of Birth __01/17/1963__       Place of Birth __Brooklyn, NY__

## OPTIONAL: Authorization to Release Information to Another Person

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

__Karen Romano__
### Print or Type Name

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4] _____       Date __05/01/2025__

[1] Name of individual who is the subject of the record(s) sought.

[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.

[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.

[4] Signature of individual who is the subject of the record sought.

FORM DOJ-361



Case: 26-15, 05/26/2026, DktEntry: 41.1, Page 320 of 321

ROMANO, Joseph
72247653

MAX

81226-8500

U.S. OFFICIAL MAIL
US POSTAGE PENALTY FOR PRIVATE USE $300
IMI PITNEY BOWES
Correction
$ 000.001
MAY 18 2026
ZIP 81226
02.2H
0005951581

FOREVER USA

USA *1

Clerk of the Court
United States Court of Appeals
United States Court house
40 Foley Square
New York, New York
10007



U.S. OFFICIAL MAIL  PENALTY FOR PRIVATE USE $300
US POSTAGE IMI PITNEY BOWES
Correction
ZIP 81226
'02 ZH  $ 000.00¹
0005951581  MAY 18 2026

Clerk of the Court
United States Court of Appeals
United States Courthouse
40 Foley Square
New York, New York
10007